# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **In re:** | § | **CHAPTER 11 CASE** |
| | § | |
| **TXCO RESOURCES INC.,** *et al.,* | § | **CASE NO. 09-51807** |
| | § | |
| **Debtors.** | § | **Jointly Administered** |
| | § | |

## DISCLOSURE STATEMENT REGARDING PLANS OF REORGANIZATION FOR TXCO RESOURCES INC., ET AL., DEBTORS AND DEBTORS-IN-POSSESSION BASED ON (A) SALE OF DEBTORS' ASSETS OR, IN THE EVENT THE DEBTORS DO NOT CLOSE ON THE SALE OF THE DEBTORS' ASSETS, (B) REORGANIZATION OF DEBTORS' OPERATIONS

By:    _/s/ Deborah D. Williamson_
      Deborah D. Williamson
      State Bar No. 21617500
      Patrick L. Huffstickler
      State Bar No. 10199250
      Thomas Rice
      State Bar No. 24025613
      Meghan Bishop
      State Bar No. 24055176

**COX SMITH MATTHEWS INCORPORATED**
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205
(210) 554-5500
(210) 226-8395 (Fax)

**ATTORNEYS FOR THE DEBTORS AND THE DEBTORS-IN-POSSESSION**

**THIS DISCLOSURE STATEMENT AND ACCOMPANYING PLANS OF REORGANIZATION FOR TXCO RESOURCES INC., ET AL., DEBTORS AND DEBTORS-IN-POSSESSION HAVE NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS HAVE SEPARATELY NOTICED A HEARING TO CONSIDER THE ADEQUACY OF THIS DISCLOSURE STATEMENT UNDER SECTION 1125 OF THE BANKRUPTCY CODE. THE DEBTORS RESERVE THE RIGHT TO FURTHER MODIFY OR SUPPLEMENT THE DISCLOSURE STATEMENT AND THE ACCOMPANYING PLANS OF REORGANIZATION FOR TXCO RESOURCES INC., ET AL., DEBTORS AND DEBTORS-IN-POSSESSION PRIOR TO AND UP TO THE DATE OF SUCH HEARING.**

## PLEASE READ THIS IMPORTANT INFORMATION[1]

THIS DOCUMENT IS THE DISCLOSURE STATEMENT FOR THE PLANS DESCRIBED HEREIN. THE DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED INTO AND MADE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN. THE STATEMENTS AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WERE MADE AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DATE SET FORTH ON THE COVER PAGE HEREOF. HOLDERS OF CLAIMS AND INTERESTS MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLANS IN DECIDING WHETHER TO ACCEPT OR REJECT THE PLANS.

[THE BANKRUPTCY COURT HAS REVIEWED THIS DISCLOSURE STATEMENT, AND HAS DETERMINED THAT IT CONTAINS ADEQUATE INFORMATION AND MAY BE SENT TO YOU TO SOLICIT YOUR VOTE TO ACCEPT THE PLANS.]

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLANS ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS CITED HEREIN AND THE PLANS ATTACHED HERETO, BEFORE VOTING TO ACCEPT OR REJECT THE PLANS.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF SOLICITING HOLDERS OF CLAIMS AND INTERESTS TO ACCEPT OR REJECT THE PLANS. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLANS. MOREOVER, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE SUMMARY OF THE PLANS AND OTHER DOCUMENTS DESCRIBED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED BY REFERENCE TO DOCUMENTS THEMSELVES AND THE EXHIBITS THERETO.

---

[1] This proposed Disclosure Statement has not been approved under section 1125(b) of the Bankruptcy Code by the Bankruptcy Court as containing adequate information for use in connection with the solicitation of acceptances or rejections of the Plans described herein. Accordingly, the filing and dissemination of this proposed Disclosure Statement is not intended and should not in any way be construed as a solicitation of votes on the Plans, nor should the information contained herein be relied upon for any purpose before a determination by the Bankruptcy Court that the proposed Disclosure Statement contains adequate information.

THE DEBTORS BELIEVE THAT THE INFORMATION HEREIN IS ACCURATE BUT ARE UNABLE TO WARRANT THAT IT IS WITHOUT ANY INACCURACY OR OMISSION.

THE DEBTORS HAVE NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLANS OR THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT RELY UPON ANY OTHER INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OR REJECTION OF THE PLANS.

THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLANS.

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLANS HAVE BEEN FILED WITH OR REVIEWED BY, AND THE NEW EQUITY TO BE ISSUED PURSUANT TO THE PLANS WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") UNDER THE SECURITIES ACT OF 1933 (THE "SECURITIES ACT"), OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES LAW ("BLUE SKY LAW"). THE PLANS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE NEW EQUITY BEING ISSUED PURSUANT TO THE PLANS CONSULT THEIR OWN ADVISORS CONCERNING ANY RESTRICTIONS ON HOLDING OR THE TRANSFERABILITY OF SUCH EQUITY.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLANS, CERTAIN OTHER DOCUMENTS, AND CERTAIN FINANCIAL INFORMATION. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLANS OR THE OTHER DOCUMENTS OR FINANCIAL INFORMATION INCORPORATED HEREIN BY REFERENCE, THE PLANS, OR SUCH OTHER DOCUMENTS, AS APPLICABLE, SHALL GOVERN FOR ALL PURPOSES.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER OF A CLAIM OR INTEREST IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED TO BE RELIED UPON, AND CANNOT BE RELIED

UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# TABLE OF CONTENTS

# TABLE OF EXHIBITS

A.       Plans of Reorganization for TXCO Resources Inc., et al., Debtors and Debtors-in-Possession Based on (A) Sale of the Debtors' Assets or, in the Event the Debtors do not Close on the Sale of the Debtors' Assets, (B) Reorganization of Debtors' Operations

B.       Order Approving Disclosure Statement (To be Provided)

C.       Glossary of Oil and Gas Terms

D.       Corporate Structure

E.       Purchase and Sale Agreement between TXCO Resources Inc., et al., and Newfield Exploration Company (without Exhibits and Sellers' Disclosure Schedules)

F.       Liquidation Analysis (To be Provided)

G.       Undeveloped Valuation Report dated _____ (To be Provided)

H.       Reserve Report dated May 17, 2009 and updated on November 30, 2009 (To be Provided)

I.       Initial capitalization of Reorganized Debtors (To be Provided)

J.       Pro Forma Financials "Projections" (To be Provided)

K.       Form 10-K for the Year ending December 31, 2008

L.       Form 10-Q for the Period Ending September 30, 2009

M.       Chart of Prepetition Litigation

N.       Chart of Claims and Causes of Action

O.       Chart of Insurance Policies

P.       Chart of Prepaid Expenses

Q.       Chart of Avoidance Actions (To be Provided)

R.       Chart of executory contracts and unexpired leases, and their proposed treatment (To be Provided)

S.       Chart of Oil and Gas Leases, which were not subject to Pre-petition Bank Liens (To be Provided)

T.      Chart of Oil and Gas Leases, which are subject to Pre-petition Bank Liens (To be Provided)

U.      Chart of Accounts Receivable owed by Third Parties for JIB Obligations (To be Provided)

V.      Chart of Equity Holders Holding more than 5% of outstanding shares of common stock

## EXECUTIVE SUMMARY

TXCO Resources Inc. ("TXCO"), Eagle Pass Well Service, L.L.C. ("Eagle Pass"), TXCO Drilling Corp. ("Drilling"), Charro Energy, Inc. ("Charro"), Texas Tar Sands Inc. ("Tar Sands"), TXCO Energy Corp. ("Energy"), Output Acquisition Corp. ("Output"), OPEX Energy, LLC ("OPEX"), PPL Operating, Inc. ("PPL"), Maverick Gas Marketing, Ltd. ("Maverick Gas"), and Maverick-Dimmit Pipeline, Ltd. ("Maverick-Dimmit") (collectively, the "Debtors" or "Companies"), Debtors and Debtors-in-Possession in the above-captioned Cases pending before the United States Bankruptcy Court for the Western District of Texas, San Antonio Division (the "Bankruptcy Court"), submit this *Disclosure Statement Regarding Plans of Reorganization for TXCO Resources Inc., et al., Debtors and Debtors-in-Possession Based on (A) Sale of the Debtors' Assets or, in the Event the Debtors Do Not Close on the Sale of the Debtors' Assets, (B) Reorganization of Debtors' Operations* (the "Disclosure Statement"). This Disclosure Statement is to be used in connection with the solicitation of votes on the *Plans of Reorganization for TXCO Resources Inc., et al., Debtors and Debtors-in-Possession Based on (A) Sale of the Debtors' Assets or, in the Event the Debtors do not Close on the Sale of the Debtors' Assets, (B) Reorganization of Debtors' Operations,* as amended and modified, dated November 12, 2009 (the "Plans"). Copies of the Plans are attached hereto as Exhibit "A." Unless otherwise defined herein, capitalized terms used herein have the meanings ascribed thereto in the Plans (see Article I of the Plans entitled "Definitions").

As described in this Disclosure Statement, the Debtors are putting forth two separate plans for consideration by the Holders of Allowed Claims in connection with the payment of Allowed Claims by the Debtors. The first plan (the "Sale Plan") contemplates a sale of substantially all of the assets of the Debtors to Newfield Exploration Company ("Newfield") for $223 million as set forth in the Purchase and Asset Agreement by and between the Debtors and Newfield (the "Newfield PSA"). Under the Newfield PSA there are also certain Excluded Assets, which will remain with Reorganized TXCO and managed in order to pay the claims of Holders of Allowed General Unsecured Claims. The Debtors also have the opportunity to consider any unsolicited Acquisition Proposals to determine if they would constitute a Superior Proposal, as defined in the Newfield PSA. The Debtors submit that the Sale Plan represents the best alternative for holders of all Claims.

Upon Confirmation of the Sale Plan, the Debtors anticipate that the proceeds from the sale to Newfield will allow the Debtors to pay in full all Allowed Administrative Expense Claims. The Debtors also contemplate paying in full, including applicable interest, charges and reasonable attorneys' fees and expenses as allowed by the Court at the Confirmation Hearing, the DIP Loan Secured Claim, the Revolver Loan Secured Claim and the Term Loan Secured Claim. Additionally, the Debtors believe that there will enough funds to pay most Senior Mineral Lien Claimants in full. Furthermore, the Debtors expect that the Excluded Assets under the Newfield PSA will provide over time a significant recovery to all General Unsecured Creditors. While the Sale Plan does not currently provide for a recovery to the holders of Preferred Stock, the Sale Plan has a mechanism for making distributions to the holders of Preferred Stock in the event Reorganized TXCO's operations are able to pay all General Unsecured Creditors in full.

In the event the Court does not confirm the Sale Plan, the Debtors would propose that the Court consider confirming the alternative plan described in this Disclosure Statement. Under the

alternative plan (the "Operational Plan"), the Debtors propose converting some of the debt held by the DIP Lenders and the Term Lenders into new equity of Reorganized TXCO. Additionally, the Debtors would issue new Notes to substantially all the Holders of Allowed Claims, except for Holders of General Unsecured Claims, who will receive a cash distribution equal to 5% of their Allowed Claim or 2.5% of the new equity of Reorganized TXCO. The Debtors submit that they will ONLY seek confirmation of the Operational Plan in the event the Court does not confirm the Sale Plan or Closing does not occur as set forth in the Sale Plan. The Operational Plan preserves the Debtors' ability to confirm a plan of reorganization prior to the Maturity Date of the DIP Loan.

The Operational Plan is premised on the Debtors continuing their operations and satisfying the Claims of creditors by consensually converting certain Claims into the equity of Reorganized TXCO, while providing limited payments to other creditors over time to conserve the Debtors' cash flow. The ultimate payment of Claims will be tied to the Debtors continuing to operate profitably into the future.

Given the limited amount of time in connection with the Maturity Date under the DIP Loan, the Debtors will seek to have Creditors cast simultaneous separate ballots on both the Sale Plan and the Operational Plan. If the Debtors obtain the votes necessary to proceed with the Confirmation Hearing on the Sale Plan, only the Sale Plan will be considered at the Confirmation Hearing. In the event the Debtors do not receive the votes required to confirm the Sale Plan or the Court denies Confirmation of the Sale Plan, the Debtors will seek to continue the Confirmation Hearing for a short period of time and proceed with obtaining Confirmation of the Operational Plan.

## **INTRODUCTION**

The Debtors hereby transmit this Disclosure Statement for use in the solicitation of votes to accept the Plans. This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rules 3016(c) and 3018. Copies of the Plans are attached to this Disclosure Statement as Exhibit A. This Disclosure Statement, among other things, (i) contains certain information regarding the Debtors' prepetition history, (ii) describes the Plan, the effects of confirmation of the Plan, the treatment of claims and interests and distributions under the Plan, and (iii) discusses the confirmation process and voting procedures that Claim Holders [and Interest Holders] must follow for their votes to be counted. Furthermore, the Debtors are providing this Disclosure Statement for use in connection with the Confirmation Hearing scheduled for _____, at _____ [a.m./p.m.] Central Time.

The Debtors and DIP Lenders are co-proponents of the Plans within the meaning of section 1129 of the Bankruptcy Code. No materials other than the Disclosure Statement and any exhibits and schedules attached thereto or referenced therein have been authorized by the Debtors for use in soliciting acceptances or rejections of the Plans.

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLANS. PLEASE READ THIS DOCUMENT WITH CARE.

2752695.1

On _____, 2009, the Bankruptcy Court entered an order pursuant to section 1125 of the Bankruptcy Code (the "Disclosure Statement Order") approving this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor, typical of the solicited holders of Claims against and Interests in the Debtors, to make an informed judgment with respect to the acceptance or rejection of the Plans. A copy of the Disclosure Statement Order is included in the materials accompanying this Disclosure Statement as Exhibit "B."

Each holder of a Claim or Interest entitled to vote to accept or reject the Plans should read this Disclosure Statement and the Plans in their entirety before voting. No solicitation of votes to accept or reject the Plans may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Debtors and its professionals, no person has been authorized to use or promulgate any information concerning the Debtors, its businesses or the Plans, other than the information contained herein, in connection with the solicitation of votes to accept or reject the Plans. No holder of a Claim or Interest entitled to vote on the Plans should rely upon any information relating to the Debtors, their businesses or the Plans other than that contained in the Disclosure Statement and the exhibits hereto. In making a decision in connection with the Plans, holders of Claims and Interests must rely on their own examination of the Debtors and the terms of the Plans, including the merits and risks involved. They should not construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice, and members of these Classes should consult their own advisors with respect to those matters and related aspects of their acceptance or rejection of the Plans. Unless otherwise indicated, the sources of all information set forth herein are the Debtors and its professionals.

This Disclosure Statement contains summaries, believed to be accurate, of some of the terms of specific documents incorporated herein by reference. All summaries are qualified in their entirety by such reference and holders of Claims and Interests should read the actual documents, copies of which are attached as exhibits to this Disclosure Statement or which will be made available by the Debtors and their Counsel on request, for the complete information contained in such documents.

## FORWARD-LOOKING STATEMENTS

The information presented in this Disclosure Statement includes forward-looking statements in addition to historical information. These statements involve known and unknown risks and relate to future events, the Debtors' and Reorganized TXCO's future financial performance or the Debtors' and Reorganized TXCO's projected business results. In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "targets," "potential" or "continue" or the negative of these terms or other comparable terminology. Forward-looking statements are only predictions. Actual events or results may differ materially from any forward-looking statement as a result of various factors, including those contained in the section entitled "Risk Factors" and other sections of this Disclosure Statement, including the documents incorporated by reference herein. Although the Debtors believe that the expectations reflected in the forward-looking statements are reasonable, the Debtors cannot guarantee future results, events, levels of activity, performance or achievements. The Debtors expressly disclaim a duty to update any of the forward-looking statements.

3

## THE CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.  The Bankruptcy Court has scheduled a Confirmation Hearing, on _____, at _____, [Prevailing] Central Standard Time, in the Bankruptcy Court.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan, be filed so as to be received  on or before _____ p.m. [Prevailing] Central Time on _____, in the manner described under the caption, "Confirmation of the Plan — Confirmation Hearing" in Section 7.1 below.

THE DEBTORS AND THE DIP LENDERS SUPPORT CONFIRMATION OF THE PLANS AND URGE ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLANS.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plans by voting in favor of or against the Plans on the enclosed color coded ballots and return the same to the address set forth on the ballot, in the enclosed return envelope, so that it will be **received** by the Debtors' balloting agent, Administar Services Group, LLC at the addresses listed below no later than _____ p.m., [Prevailing] Central Time, on _____.  FACSIMILE BALLOTS OR BALLOTS SENT VIA ELECTRONIC MAIL WILL/WILL NOT BE ACCEPTED.  The Blue Ballot is for the Sale Plan.  The Gold Ballot is for the Operational Plan.

(Via US Mail)
TXCO Resources, et al.
c/o Administar Services Group LLC
PO Box 56636
Jacksonville, FL 32241
(904) 807-3023

(Via Expedited Courier)
TXCO Resources Inc., et al.
c/o Administar Services Group LLC
8475 Western Way, Ste 110
Jacksonville, FL 32256

If you do not vote to accept the Plans, or if you are the holder of an Unimpaired Claim, you may be bound by the Plan if the requisite holders of Claims accept it.  See "Confirmation of the Plan" in Section 7.1 below.

TO BE SURE YOUR BALLOT IS COUNTED; YOUR BALLOT MUST BE RECEIVED NO LATER THAN ____ P.M., CENTRAL STANDARD TIME ON _____. For detailed voting instructions and the name, address and phone number of the person you may contact if you have questions regarding the voting procedures, see "Confirmation of the Plan — Solicitation of Votes; Voting Procedures" in Section 7.1 below.

2752695.1

# ARTICLE I
# BACKGROUND

Section 1.1.    Introduction

TXCO is a small, full-cycle, publicly traded, oil and gas exploration and production company with a diversified exploitation, development and exploration project inventory.[2]

Section 1.2. The Debtors' Corporate Structure

The Debtors are comprised of multiple affiliated entities, each organized under U.S. law. A chart reflecting the Debtors' and their non-debtor affiliates' organizational structure as of the Petition Date is attached hereto Exhibit "D." Eagle Pass, Drilling, Charro, Tar Sands, Energy, Output and PPL are wholly owned subsidiaries of TXCO. OPEX is a wholly owned subsidiary of Output. PPL is the 1% general partner of both Maverick Gas and Maverick-Dimmit. TXCO is the 99% limited partner of both Maverick Gas and Maverick-Dimmit. Prepetition, Maverick Gas and Maverick-Dimmit ceased operating a pipeline and have no substantial ongoing business operations. The remaining subsidiaries are engaged in one or more aspects of the acquisition, development, exploration and exploitation of oil and gas properties within the United States.

Section 1.3.    The Debtors' History

TXCO was originally formed as The Exploration Company, incorporated in the State of Colorado in 1979 and reincorporated in the State of Delaware in 1999, becoming The Exploration Company of Delaware, Inc. At the 2007 Annual Stockholders' Meeting, TXCO's stockholders approved the changed of the name to TXCO Resources Inc. TXCO is headquartered in San Antonio, Texas and maintains an office in Houston, Texas. Its subsidiaries are focused on one or more aspects of the acquisition, development, exploration and exploitation of oil and gas properties.

As of the date of this Disclosure Statement, the Debtors produce approximately 14.3 MMcfe per day, approximately 64% of which is crude oil. Annual production for 2008 was 9.2 Bcfe.

Section 1.4.    Overview of the Debtors' Business Operations

The Debtors' business is conducted primarily through TXCO and its directly and indirectly owned subsidiaries and affiliates. The Debtors are primarily engaged in the acquisition, development, exploration and exploitation of oil and gas properties within the United States ("Business Activities"). Debtors' currently focus their operations in the core area of the Maverick Basin in South Texas. Debtors are also involved in additional strategic areas of the Fort Trinidad Field in the East Texas Basin, the Marfa Basin in West Texas, the Midcontinent area of western Oklahoma, and onshore and shallow waters of the Gulf of Mexico.

---

[2] A glossary of common terms used within the oil and gas industry is attached hereto as Exhibit "C."

In conducting some of its Business Activities, the Debtors' implementation of advanced technologies, such as 3-D seismic and horizontal drilling, is integral to the Companies' strategy. Debtors act both as operators and participants in non-operated wells. The Debtors were growth focused with goals to discover, develop and/or acquire more reserves on an annual basis than are produced.

Estimated net proved reserves at year-end 2008 were 81.7 billion cubic feet equivalent, a 10.1 Bcfe, or 11.0%, decrease from 91.8 Bcfe at year-end 2007. Annual production for 2008 was 9.2 Bcfe. Reserves sold during 2008 were 3.8 Bcfe. Net reserve additions for the year were 2.9 Bcfe in the face of downward revision in reserve estimates due to the decline in oil and natural gas prices in late 2008. The decline in price was partially offset by commodity hedges in place on a portion of our oil and natural gas production. In 2008, the Debtors reserve replacement rate from the drill bit was 32%, while the Debtors all-source reserve replacement rate was negative 9% due to the sale of certain non-core properties. The Debtors three-year average all source reserve replacement rate was 286% for the 2006 through 2008 period.

As of October 1, 2009, the Debtors owned interests in approximately 592 gross (349.3 net) producing wells. Collectively, the various interests owned by the Debtors are referred to as the "Mineral Properties."

The Debtors produced an additional 0.4 million barrels of oil and 1.0 million cubic feet of natural gas in the first six months of 2009, and received an average price of $42.92 per barrel and $4.20 per thousand cubic feet, respectively, resulting in total oil and gas sales revenue for the six month period of $23 million, before the effects of hedging. Further information concerning estimates of the Debtors' proved reserves as of May 17, 2009, and November 30, 2009 is set forth in Section 1.9 "Debtors' Assets" below, and in the Reserve Report [summary] attached as Exhibit "H" hereto.

Section 1.5. Ownership

(i) Common Stock

TXCO is a publicly-traded company whose common stock is presently quoted in the OTC Pink Sheets under the symbol "TXCOQ.pk"

On December 31, 2008, TXCO had 100 million shares of common stock, par value $0.01 per share ("Common Stock") authorized under its charter documents, of which 38,553,311 shares of Common Stock are issued and outstanding and an additional 639,000 shares of Common Stock are issuable, pending vesting schedules in some instances, upon the exercise or conversion, as applicable, of outstanding warrants, options and other derivative securities.

(ii) Holders of Record

There were approximately 1,116 holders of record of the TXCO's Common Stock as of February 13, 2009, based on public filings. Exhibit "V" sets forth the name, number and percentage of shares held by each person who, to TXCO's knowledge, beneficially owns more than 5% of outstanding shares of Common Stock.

2752695.1

(iii)   Preferred Stock

TXCO has 10 million shares of preferred stock authorized.  These consist of Series A, B, C, D and E Preferred Stock (collectively the "Preferred Stock").

Series A and Series B Preferred Stock

At December 31, 2008, there were no Series A or Series B Preferred Stock issued and outstanding.

Series C Preferred Stock

In November 2007, TXCO issued 55,000 shares of convertible perpetual preferred stock, Series C (the "Series C Preferred Stock"). The Series C Preferred Stock had a stated value of $1,000 per share and a par value of $0.01 per share. It was issued in a private placement, raising a total of approximately $52.8 million after offering costs. The Series C Preferred Stock was convertible into TXCO's common stock at a price of $14.48 per share, aggregating approximately 3.8 million shares. Holders of the Series C Preferred Stock were entitled to receive dividends, payable quarterly in cash or, at TXCO's option, TXCO common stock, at the rate of 6.5% per annum, which increases to 12% under certain circumstances, and had preference over the common stock in the event of liquidation. The Series C Preferred Stock required the Debtors to not exceed a maximum consolidated leverage ratio of 3.65 to 1.00 (as defined in the amended Senior Lien Debt Credit Agreement). The Series C Preferred Stock provided that the holders thereof had the right to request redemption of such shares at a redemption price of, in general, an amount equal to the product of (a) 115% and (b) the sum of such shares' stated value, accrued and unpaid dividends, and any make-whole amounts related to preferred stock dividends.  However, TXCO's obligation to pay the redemption price of any preferred stock requested to be redeemed is suspended until the earlier of (a) October 31, 2012 or (b) the date that all of the Debtors obligations under the Senior Lien Debt Credit Agreement have been satisfied.  All Series C Preferred Stock was exchanged for Series D Preferred Stock.  There is no Series C Preferred Stock issued and outstanding.

Series D and Series E Preferred Stock

On February 28, 2008, TXCO entered into an agreement related to the private placement of an aggregate of $20 million of shares of the TXCO's Series E Convertible Preferred Stock (the "Series E Preferred Stock") and the exchange of the issued and outstanding shares of its Series C Preferred Stock for shares of its Series D Convertible Preferred Stock (the "Series D Preferred Stock") pursuant to the Securities Purchase Agreement among the Debtors and the buyers listed therein.  Closing and funding occurred in March 2008. The Series D Preferred Stock has the same terms that were contained in the Series C Preferred Stock.

The Series E Preferred Stock has a stated value of $1,000 per share and a par value of $0.01 per share, and is currently convertible into shares of TXCO common stock at a conversion price of $17.36 per share, aggregating approximately 1.2 million shares. Holders of the Series E Preferred Stock are entitled to receive dividends, payable quarterly at the rate of 6% per annum, which increases to 12% under certain circumstances, and have preference over the common stock in the event of liquidation. The Series E Preferred Stock requires the Debtors to not exceed

a maximum consolidated leverage ratio of 3.65 to 1.00 (as defined in the amended Senior Lien Debt Credit Agreement). The Series E Preferred Stock provides that the holders thereof have the right, upon the occurrence of certain events, to request that TXCO redeem such shares at a redemption price of, in general, an amount equal to the product of (a) 115% and (b) the sum of such shares' stated value, accrued and unpaid dividends, and any make-whole amounts related to preferred stock dividends. However, TXCO's obligation to pay the redemption price of any preferred stock requested to be redeemed is suspended until the earlier of (a) October 31, 2012, or (b) the date that all of the Debtors' obligations under the senior indebtedness agreements have been satisfied.

Additionally, one of the purchasers of the Series D Preferred Stock exercised its right to purchase additional shares of Series D Preferred Stock. The purchaser acquired an additional 13,909 shares of Series D Preferred Stock in April 2008. All other rights to acquire additional shares of Series D Preferred Stock expired unexercised in late March 2008.

With each issuance of Preferred Stock, TXCO concurrently entered into call spread options related to the newly issued preferred shares that may offset the dilution to common shares caused by a conversion of the Preferred Stock. Each call spread is a combination of a bought and a sold call option. See the "Call Options" section that follows for more information.

In October 2008, holders of 12,000 shares of TXCO Series D Preferred Stock, with an aggregate stated value of $12.0 million and a conversion price of $14.48, converted those shares into a total of approximately 829,000 shares of TXCO's common stock. An additional 231,000 shares of TXCO common stock were issued for the make-whole provision related to preferred dividends. The shares of common stock to be issued upon conversion of TXCO's Preferred Stock and payment of related dividends in common stock were registered with the SEC in August 2008.

(iv)   Rights Plan

On June 29, 2000, the Board (as defined below) of TXCO entered into that certain Rights Agreement (the "Rights Agreement"), dated as of June 29, 2000, between TXCO, and Fleet National Bank, as Rights Agent (as disclosed in Exhibit 1.1 to the Form 8-A filed with the SEC on July 7, 2000). Each Right entitles the registered holder to purchase from TXCO one one-thousandth of a share of Series A Junior Participating Preferred Stock, par value $0.01 per share (the "Series A Preferred Stock") of TXCO, at a price of $12.00 per one one-thousandth of a Series A Preferred Stock, subject to adjustment (the "Right").

The Rights are not triggered until the earlier to occur of (i) 10 days following a public announcement that a person or group of affiliated or associated persons (an "Acquiring Person") has acquired beneficial ownership of 15% or more of the outstanding Common Stock, or (ii) 10 business days (or such later date as may be determined by action of the Board prior to such time as any Person becomes an Acquiring Person) following the commencement of, or announcement of an intention to make, a tender offer or exchange offer the consummation of which would result in the beneficial ownership by a person or group of 15% or more of the outstanding Common Stock (the earlier of such dates being called the "Distribution Date").

2752695.1

The Rights are not exercisable until the Distribution Date. The Rights will have expired on June 29, 2010 (the "Final Expiration Date"), unless the Final Expiration Date was extended or unless the Rights were earlier redeemed by the Company. Pursuant to the terms of the Plan, all such Rights will be deemed cancelled.

Section 1.6.     The Debtors' Current Board of Directors

The current Board of Directors ("Board") for TXCO is composed of professionals with significant years of experience in corporate development. The directors for TXCO are as follows:

| *Name* | *Position* | *Relevant Experience* |
|---|---|---|
| James E. Sigmon | Director (Chairman) | *Mr. Sigmon has served as a Director of TXCO since 1984 and in December 2006 he was elected Chairman of the Board. Mr. Sigmon has served as TXCO's Chief Executive Officer since February 1985 and also from July 1984 to October 1984. He served as President of TXCO from July 1984 until June 2008. As an engineer, Mr. Sigmon has been active for more than 35 years in the exploration and development of oil and gas properties. Prior to joining TXCO, he was an engineer with Halliburton Co. and he served in the management of Retamco Properties, a private oil and gas exploration company, based in San Antonio, Texas, that was active in drilling wells in South Texas. He served as a Director of ExproFuels, Inc., a former subsidiary of TXCO, from 1994 to 1998. Mr. Sigmon received his Bachelor of Science degree in electrical engineering from the University of Texas at Arlington.* |
| Alan L. Edgar | Director | *Mr. Edgar has been involved in energy-related investment banking and equity analysis for more than 35 years. Since 1998, Mr. Edgar has served as Chairman of Cochise Capital, a privately held investment bank based in Dallas, Texas, specializing in energy-related mergers and acquisitions and equity and debt financing. Mr. Edgar's previous energy investment banking experience includes serving as Corporate and Research Director of Schneider, Bernet & Hickman, Inc. (Thompson, McKinnon) from 1972 through 1986, Managing Director of the Energy Group of Prudential-Bache Capital Funding from 1987 to 1990, and Managing Director and Co-Head of the Energy Group of Donaldson, Lufkin & Jenrette Securities, Inc. from 1990 to 1997. Mr. Edgar serves as a Director of Marion Energy Limited (AU: MAE). Mr. Edgar earned an economics degree from Monash University in Melbourne, Australia, and an MBA from Southern Methodist University. Mr. Edgar has served as a director of TXCO since 2000.* |

| Name | Position | Relevant Experience |
| --- | --- | --- |
| Dennis B. Fitzpatrick | Director | *Mr. Fitzpatrick is the Chairman, CEO and Director of D.B. Fitzpatrick & Co., Inc., an asset management firm based in Boise, Idaho, and has served in that role since 1984. Prior to organizing D.B. Fitzpatrick & Co., Inc., Mr. Fitzpatrick taught corporate finance courses as a faculty member at the University of Idaho, Boise State University and the University of Colorado. He is a chartered financial analyst and has been a financial consultant to several companies. Mr. Fitzpatrick holds a doctorate in finance and a bachelor's degree in applied mathematics from the University of Colorado and an MBA from the University of Santa Clara. Mr. Fitzpatrick has served as a director of TXCO since 2005.* |
| Jon Michael Muckleroy | Director | *Mr. Muckleroy offers more than 50 years of business experience, including extensive experience in energy-related industries. Mr. Muckleroy held management positions with Florida Gas Company, Saxon Oil Company and Houston Liquid Fuels, and has been an advisor to several exploration and production companies. He served as Chairman and CEO of Enron Liquid Fuels from 1985 to 1993. Mr. Muckleroy was a Director of EXCO Resources, a public company involved in the acquisition, development and exploitation of oil and natural gas properties from 2002 to 2004. In 2006, Mr. Muckleroy took the position of CEO of M&M Energy, which is involved in creating an energy research park. In June 2008, Mr. Muckleroy took the position of Chief Executive Officer of Millenium E&P Resource Fund I, LLC. He remains involved in management of a substantial family portfolio of oil and gas investments through M.P. Phoenix Holding, Ltd. and D.S. Family Partnership. Mr. Muckleroy holds a bachelor's degree in marketing and finance from Southern Methodist University. Mr. Muckleroy has served as a director of TXCO since 2005.* |
| Michael J. Pint | Director | *Mr. Pint is a business investor with more than 40 years of banking experience, including a four-year term as Commissioner of Banks of Minnesota and Chairman of the Minnesota Commerce Commission. From 1966 to 1983, Mr. Pint was with the Federal Reserve Bank of Minneapolis, Minnesota, and at the time of his departure was serving as its Senior Vice President and Chief Financial Officer. Since 1983, Mr. Pint has served in the capacity of Chairman, President or Director of 40 different banks and bank holding companies throughout the United States. Recently, Mr. Pint was the owner of Valley Bank of* |

| Name | Position | Relevant Experience |
|------|----------|---------------------|
| | | *Arizona located in Phoenix, Arizona, until it was sold in 2003. He currently serves as Chairman of the Board of Intrastate, Inc.; Chairman of the Board of Airport, Town & Yellow Taxis; and Director of Penchant Software, all private companies. Mr. Pint has a bachelor's degree in Finance from the University of Northern Iowa and studied at Rutgers University Stonier Graduate School of Banking. Mr. Pint has served as a director of TXCO since 1997.* |
| Jacob Roorda | Director | *Mr. Roorda is President, CEO and a Director of Canoe Financial Corp. of Calgary, Alberta, which manages the EnerVest group of investment funds. He joined Canoe in August 2008. Previously he was Vice President, Corporate of Harvest Energy Trust, publicly traded oil and natural gas royalty trust based in Calgary. Mr. Roorda was a member of the founding group and President of Harvest Energy from July 2002 until February 2006, when it merged with another royalty trust. Prior to joining Harvest Energy, he held the position of Managing Director and was a member of the board of directors of Research Capital Corporation, an investment banking firm, from 1999 to 2002. Mr. Roorda co-founded PrimeWest Energy Trust in January 1996 and served on the board of directors and as Vice President, Corporate until 1999. From 1991 to 1996, Mr. Roorda was Manager, Business Development at Fletcher Challenge Petroleum Inc. From 1987 to 1991, Mr. Roorda was a Vice President in the equity research group and was a ranked oil and natural gas analyst at BZW Canada Ltd. in Toronto (a subsidiary of Barclays Bank). Prior to joining BZW Canada Ltd., Mr. Roorda held a number of senior engineering positions with Dome Petroleum Ltd. He is one of the founding shareholders and currently serves on the board of directors of North Peace Energy Corp., a publicly traded oil exploration and production company. Mr. Roorda also serves on the board of directors of Argosy Energy, Inc., a publicly traded company focused on the acquisition, exploration and development of oil and natural gas in Western Canada. Mr. Roorda is a Professional Engineer and holds a Bachelor of Applied Science (Eng.) degree from Queen's University, Kingston, Ontario, and an MBA from the University of Calgary. Mr. Roorda has served as a director of TXCO since 2008.* |
| Anthony Tripodo | Director | *Mr. Tripodo is Executive Vice President and Chief Financial Officer of Helix Energy Solutions Group, Inc. ("Helix") of Houston, Texas, a public oilfield service* |

2752695.1

| Name | Position | Relevant Experience |
|---|---|---|
| | | company.  Before joining Helix as an officer in June 2008, he was the Executive Vice President and Chief Financial Officer of Tesco Corporation, a public company involved in the design, manufacture and service delivery of innovative drilling technology for the upstream energy industry.  Prior to joining Tesco Corporation in January 2007, Mr. Tripodo founded Arch Creek Advisors LLC, an investment banking firm specializing in capital formation and M&A advisory services for the oil and gas industry, in 2003.  From 1997 to 2003, he served as Executive Vice President of Veritas DGC, a geophysical services provider to the energy industry.  Prior to joining Helix as an officer, Mr. Tripodo served on its board of directors, where he also served as chairman of the audit committee and a member of the governance committee.  He previously served on the board of directors and the audit committee of Petroleum Geo-Services ASA, a publicly traded oilfield services firm, and on the board of directors of Vetco International Ltd., a privately owned oilfield service company based in London, where he also served as chairman of the audit and compliance committees.  Mr. Tripodo earned his Bachelor of Arts degree in Business at St. Thomas University in Miami, Florida.  Mr. Tripodo has served as a director of TXCO since 2008. |

Section 1.7.    The Debtors' Current Management

The Debtors' current management team is composed of professionals with significant years of experience in the oil and gas industry and corporate development. The executive officers of the Debtors are as follows:

| Name | Position | Relevant Experience |
|---|---|---|
| James E. Sigmon | Chief Executive Officer | Mr. Sigmon has served as TXCO's Chief Executive Officer since February 1985 and also from July 1984 to October 1984.  He served as President of TXCO from July 1984 until June 2008.  Mr. Sigmon has served as a Director of TXCO since 1984 and in December 2006 he was elected Chairman of the Board.  As an engineer, Mr. Sigmon has been active for more than 35 years in the exploration and development of oil and gas properties.  Prior to joining TXCO, he was an engineer with Halliburton Co. and he served in the management of Retamco Properties, a private oil and gas exploration company, based in San Antonio, Texas, that was active in drilling wells in South Texas.  He served as a Director of ExproFuels, Inc., a |

2752695.1

| Name | Position | Relevant Experience |
|---|---|---|
| | | *former subsidiary of TXCO, from 1994 to 1998.  Mr. Sigmon received his Bachelor of Science degree in electrical engineering from the University of Texas at Arlington.* |
| Gary S. Grinsfelder | President | *Mr. Grinsfelder was named TXCO's President in June 2008, responsible for land, exploration, legal and investor relations and corporate communications functions.  He joined TXCO as Vice President - Exploration following TXCO's acquisition of Output Exploration LLC in April 2007.  Prior to April 2007, he was Executive Vice President of Exploration and Business Development for Output Exploration, LLC.  A geologist with more than 30 years of oil and gas industry experience, he was Vice President of Exploration for Triad Energy before joining Output Exploration, LLC in 1994.  Previously, he was with Union Oil Company of California, American Petrofina and Spartan Petroleum Corporation.  Mr. Grinsfelder serves as a Director of Royale Energy, Inc. (Nasdaq: ROYL).  He holds a Bachelor of Science in Geology from Southern Methodist University, and pursued graduate studies at the University of Puerto Rico and University of Houston.* |
| M. Frank Russell | Vice President, Secretary and General Counsel | *Mr. Russell has served as TXCO's Vice President and General Counsel since March 2006 and as Secretary since June 2008.  He is responsible for all corporate legal matters of TXCO and its subsidiaries, including acquisitions, regulatory, contracts and litigation.  He has more than 35 years of legal experience with an emphasis on the energy industry and corporate law, including 22 years as lead outside counsel to TXCO.  He joined TXCO from Barton, Schneider, Russell & East L.L.P., a San Antonio-based law firm, where he was Managing Partner. Mr. Russell received Bachelor of Arts and Doctor of Jurisprudence degrees from the University of Texas at Austin.* |
| Richard A. Sartor | Controller and Principal Accounting Officer | *Mr. Sartor has served as TXCO's Controller since April 1997.  He has nearly 30 years of accounting and energy industry experience.  A Certified Public Accountant since 1980, Mr. Sartor operated a private accounting practice from 1989 to 1997 and has been with such companies as Tesoro Petroleum, Gulf Energy & Development and Hondo Oil & Gas.  Mr. Sartor received a Bachelor of Business Administration degree from the University of Texas at Austin and an MBA from the University of Texas at San Antonio.* |

13

| Name | Position | Relevant Experience |
|---|---|---|
| Albert S. Conly | Chief Restructuring Officer | *Mr. Conly is a Senior Managing Director in the Corporate Finance practice of FTI. Mr. Conly has over 30 years of restructuring, corporate finance and asset management experience in a variety of industries, including financial services. Prior to FTI, Mr. Conly was a partner at PricewaterhouseCoopers LLP and a managing director in the corporate and investment bank of Bank of America, where he managed the bank's exposure to financial institutions and financial service companies. Mr. Conly holds a B.B.A. in accounting from the University of Texas at Austin and is a Certified Public Accountant in the State of Texas.* |

Section 1.8.     The Debtors' Employees

As of the Petition Date, the Debtors had approximately 60 employees. Prior to the commencement of the Cases, the Debtors reduced personnel by 27 employees. The Debtors believe they have a highly qualified and experienced work force that is competitive with the industry in the areas the Debtors operate.

(i)     Employment Agreements

The Debtors' Chief Executive Officer and Chairman of the Board, Mr. James Sigmon, entered into an employment agreement with the Debtors in October 1984. Under the terms of this agreement, Mr. Sigmon's employment may be terminated by either the Debtors or Mr. Sigmon upon ninety (90) days written notice, with or without cause.

(ii)     Change of Control Agreements

TXCO entered into change of control agreements with James E. Sigmon, Gary S. Grinsfelder and M. Frank Russell, as well as most other employees of TXCO. If there is a "change of control" of TXCO, then each of the foregoing executives would be entitled to be paid two times their annual salary, except for Mr. Sigmon and Mr. Grinsfelder, who would be entitled to be paid three times their annual salary. In regards to all other employees, the employee would be entitled to two times the employee's highest monthly salary multiplied by the number of years employed with the Debtors. If any payments to an employee, whether pursuant to the change of control agreement, an employee benefit plan of TXCO, or another arrangement with the Debtors, would result in an "excess parachute payment" within the meaning of section 4999 of the Tax Code, the Debtors would be obligated to pay such additional amounts to such employee as is necessary so that such employee is in the same after-tax position that the employee would have been if section 4999 did not apply.

The change of control payments are required to be paid to TXCO's employees in lump sum on or before thirty (30) days following the date of the change of control; provided, TXCO can defer the payments until March 15th of the year that follows the year in which the change of control occurred. In the event an employee is terminated during such period, the lump sum

payments must be paid to the employee on or before ten (10) days following such termination. TXCO's employees are entitled to the change of control benefits regardless of whether their employment is terminated by TXCO. Employment contracts, including, without limitation, all change of control agreements will be rejected and such employees will be treated as Class 8 General Unsecured Claims.

Generally, a "change of control" means one or more of the following events or occurrences:

- any consolidation or merger of TXCO in which TXCO is not the continuing or surviving corporation, or pursuant to which shares of the TXCO's common stock would be converted in whole or in part into cash, securities or other property, other than a merger of TXCO in which the holders of TXCO's common stock immediately prior to the merger have substantially the same proportionate ownership of common stock of the surviving corporation immediately after the merger, or any sale, lease, exchange or transfer (in one transaction or a series of related transactions) of all or substantially all the assets of TXCO,

- TXCO's stockholders approve any plan or proposal for the liquidation or dissolution of TXCO,

- any person other than the Debtors or any employee benefit plan sponsored by the Debtors or a corporation owned, directly or indirectly, by the stockholders of TXCO in substantially the same proportions as their ownership of stock of TXCO, shall become the beneficial owner of securities of TXCO representing twenty percent (20%) or more of the combined voting power of TXCO's then outstanding securities ordinarily (and apart from rights accruing in special circumstances) having the right to vote in the election of directors, as a result of a tender or exchange offer, open market purchases, privately negotiated purchases or otherwise,

- at any time during a period of two (2) consecutive years, individuals who at the beginning of such period constituted the Board of Directors of TXCO shall cease for any reason to constitute at least a majority thereof, unless the election or the nomination for election by TXCO'S stockholders of each new director during such two-year period was approved by a vote of at least two-thirds (2/3) of the directors then still in office who were directors at the beginning of such two-year period, or

- any other event shall occur that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Exchange Act.

Section 1.9.    Debtors' Assets

(i)    Core Properties

The Debtors' assets consist chiefly of oil and natural gas properties covering approximately 708,466 net acres across the following three core areas:  (i) the Maverick Basin Plays; (ii) the East Texas Basin; and (iii) the Marfa Basin.  Below is a summary of the status of those properties generally as of the Petition Date.

Maverick Basin Plays

1.    Eagle Ford Shale:

The Eagle Ford is a promising, gas-prone shale resource play that underlies the Debtors' entire 1 million gross acres Maverick Basin lease block.  The formation underlies a large portion of South Texas, including the Maverick Basin.  In addition to the Debtors' partners, EnCana Oil & Gas (USA), Inc. ("EnCana"), Anadarko Petroleum Corporation ("Anadarko") and St. Mary Land & Exploration Company ("St. Mary"), several additional well-known companies, such as ConocoPhillips, Petrohawk and EOG, among others, have established acreage positions in the region and are now drilling or making preparations to initiate activities in this play.

During 2008, the Debtors entered into a farm-in agreement with Anadarko that called for the drilling of two Eagle Ford wells in Phase I and four in Phase II.  The Debtors completed Phase I in 2008 and Phase II during 2009.  Through year end 2008, delineation activities included various horizontal drilling and completion innovations, progressing from uncemented, open-hole, single-stage fracture stimulations to the Debtors' latest wells, featuring a cemented liner completion with 10-stage fracture stimulation tests.  In tests conducted in early 2009, these wells flowed at rates as high as 6 Mmcfepd, including a high condensate content.  Through February 2009, the Debtors had completed only one of the wells required to earn the additional interests in the Phase II of this farm-in agreement.  St. Mary also participates with the Debtors under this agreement and has been named operator of the wells drilled in Phase II.  Anadarko will become operator under the farmout agreement under Phase III.  Liquidity issues prevented the Debtors from completing their commitment under this agreement prior to entering into bankruptcy protection and receiving Debtor-In-Possession financing.

Overall during 2008 the Debtors participated in four wells targeting the Eagle Ford formation.  At year end 2008, one of these wells was producing natural gas, one well was producing oil, one well was awaiting completion, and one well was drilling.  There was no 2009 activity in this play prior to May 17, 2009. However, one (1) of the wells in completion at year end 2008 began producing oil during first quarter 2009.

2.    Pearsall Shale:

This over-pressured resource natural gas shale play underlies approximately 819,000 gross acres of the Debtors' Maverick Basin deep-rights holdings.  The Debtors participated in the drilling, completion and testing a vertical Pearsall well under the EnCana agreement in the Maverick Basin during 2006, which began producing natural gas during 2007.  This data-gathering well was the first in a series targeting the natural gas resource play in a joint venture

2752695.1

(50% WI) with EnCana as operator. As of December 31, 2008, delineation activities had included vertical and horizontal drilling and various completion innovations, progressing from uncemented, open hole, single stage fracture stimulations featuring a cemented liner completion with a 9-stage fracture stimulation test.

The Debtors completed Phase I of its modified agreement with EnCana, carrying them on three wells by the end of July 2008, thus earning additional interests in the acreage block. Based on the success of the three initial wells, the Debtors elected to move to Phase II of the agreement, committing to drill four additional wells by the end of July 2009 (extended to December 31, 2009 by amendments) to further increase its interest in the play, and drilled the first required well in 2008. Liquidity issues prevented the Debtors from completing their commitments under this agreement.

Overall during 2008, the Debtors participated in a total of six (6) wells targeting the Pearsall formation. At year-end, two (2) wells were producing natural gas, one (1) well was waiting for pipeline connection, two (2) wells were awaiting completion, and one (1) well was completed as a monitor well. There was no 2009 activity in this play prior to May 17, 2009. However, two (2) of the wells in completion at year end 2008 began producing gas during 2009.

3.      Glen Rose Oil:

The Debtors' working interest in much of its non-operated, 95,250-gross acre Comanche Ranch lease is 75.5%. The Debtors have a proprietary 3-D seismic survey that covers the Comanche Ranch lease. Along with its partners, the Debtors acquired and processed the entire 3-D survey several years ago, identifying numerous Glen Rose prospects. While the first well found a water-bearing porosity, the second well became the discovery well for the Comanche Halsell (6500) field and tested at rates over 2,000 barrels of oil per day ("BOPD") in 2002. That well targeted a prospect on the Comanche Ranch lease, which contained evidence of multiple Glen Rose prospects stacked over a previously unidentified structure. Initial drilling found no productive reefs, but discovered a highly fractured porosity interval.

After the first three years of development, production on the Comanche Ranch lease was spread over a twenty (20) square-mile area. Forty-degree gravity, low-sulfur oil is consistent throughout the entire area, which contains no gas. The Debtors' engineering staff completed extensive reviews of the porosity intervals and the oil and water production profiles, and determined that this is a strong water-drive reservoir. Additionally, seismic was integrated with the Comanche Halsell field production profile. The water, which is produced along with the oil, is disposed of at surface locations or trucked to disposal wells.

Nine (9) new wells and four (4) re-entries were drilled on the Comanche Ranch lease during 2008 with the Debtors' operating partner. Additionally, during 2008 the Debtors drilled or re-entered seventeen (17) Glen Rose oil wells on the adjacent Cage Ranch lease, where the Debtors hold a 100% working interest. Of the combined thirty (30) wells drilled or re-entered targeting the porosity zone, twenty three (23) were producing oil at year-end 2008, and seven (7) were shut in pending further evaluation. For comparison, the Debtors drilled or re-entered fourteen (14) Glen Rose oil wells during 2007.

2752695.1

Glen Rose oil sales for 2008 totaled 813,600 barrels of oil ("BO") up from 714,200 BO during 2007. The combined number of wells drilled since the oil play's discovery in February 2002 was one hundred seventeen (117) at year-end 2008. Cumulative Glen Rose gross oil production since its discovery surpassed 6.1 million barrels of oil through January 2009. Net proved reserves at December 31, 2008, for the Glen Rose oil porosity zone are estimated at 1.4 million BO, equivalent to 8.4 Bcfe, compared with 1.6 million (9.9 Bcfe) for the prior year.

During 2007, the Debtors contracted with Schlumberger to conduct a comprehensive reservoir optimization study that focused on multiple aspects of the Glen Rose project, including the establishment of higher reserve levels, higher recovery rates, evaluating secondary recovery opportunities and overall operating efficiencies. Their report was delivered in 2008 and the Debtors' technical staff modified certain of its procedures based on the study. There was no 2009 activity in this play prior to May 17, 2009.

4.   Georgetown:

During 2008, the Debtors spudded six (6) new Georgetown wells and re-entered six (6) wells, as compared to three (3) Georgetown wells drilled or re-entered in 2007. At year end 2008, of the 12 Georgetown wells started in 2008, six (6) wells were producing oil and one (1) well was producing gas, while four (4) wells remain in completion and one (1) well was dry. Georgetown natural gas sales for 2008 totaled 75.3 mmcf, compared to 38.4 mmcf during 2007, while Georgetown oil sales increased to 73,800 BO from 14,300 BO in 2007. Based on this ongoing success, the Debtors participated in four (4) Georgetown wells through May 17, 2009, two of which were re-entries. Three (3) of the four (4) 2009 wells are producing oil and one is producing gas. In order to conserve capital, the Debtors entered into a joint venture with Millenium E&P Resource Fund I, LLC ("Millenium") on December 31, 2008, whereby the Debtors are carried for a 50% interest at no cost to the Debtors.

The Debtors began using seismic coherency processing to more accurately predict the location of formation faults and fractures in this field in late 2003. The Georgetown is a fractured reservoir, which makes it difficult to predict the type and quantity of ultimate reserves for each well, as such reservoirs typically have hyperbolic decline curves with high initial production rates that rapidly fall to lower, sustained rates. Georgetown proved reserve estimates increased to 1.9 Bcfe at year-end 2008 from 0.7 Bcfe at year-end 2007. The Debtors also participated in two new wells and two re-entry wells through May 17, 2009. Three of the four wells are producing oil and one is producing gas.

5.   San Miguel Waterflood:

In 2002, the Debtors acquired the Pena Creek oil field in Dimmit County, Texas, which included ninety four (94) producing oil wells, ninety four (94) injection wells and twenty eight (28) shut-in wells. The Debtors completed a 3-D seismic survey covering the field and surrounding acreage. The Debtors also completed an extensive geological, engineering and 3-D seismic review, including the review of historic well data acquired with the property. These evaluations enabled the Debtors to identify bypassed infill San Miguel oil reserves, establishing more than one hundred twenty (120) potential infill locations to date, with further potential to

establish additional infill locations as warranted by ongoing drilling results. The Debtors expect additional oil recovery from planned revamping of injection well configuration.

During 2008, the Debtors began eleven (11) infill wells targeting bypassed reserves and three (3) wells not in the waterflood zone. All of these 14 wells were producing oil as of December 31, 2008. During 2007, we drilled 11 wells. San Miguel oil sales in 2008 were 77,800 BO, compared to 78,700 BO in 2007. Net proved reserves at year-end 2008 for this field were estimated at 3.4 million barrels, equivalent to 20.6 Bcfe, down slightly from 3.9 million barrels (23.2 Bcfe) at year-end 2007. There was no 2009 activity in this play prior to May 17, 2009. The 10,000-gross acre Pena Creek prospect is contiguous to the Debtors' Comanche Ranch lease.

6.      Glen Rose Gas:

In late 2001, the Debtors announced the start of a horizontal Glen Rose shoal natural gas play on a portion of its Chittim and Paloma leases. The Debtors' geologists analyzed a large carbonate shoal (or carbonate "sand" bar) located within the Glen Rose interval. The Chittim 1-141, the first well completed in this program, went on production in 2001. Pursuant to the Debtors' agreement with AROC-Texas Inc., covering this portion of the Chittim lease, the Debtors drill and complete these horizontal Glen Rose shoal wells and AROC operates them. Since 2001, the Debtors have completed thirty two (32) horizontal Glen Rose natural gas wells, with one (1) well awaiting completion.

The Debtors did not participate in Glen Rose shoal or reef wells during 2008 or 2009. The Debtors participated in six (6) wells in 2007. Glen Rose natural gas sales for 2008 totalled 0.7 Bcf, compared to 0.8 Bcf during 2007. The field has produced more than 16.5 Bcfe since horizontal drilling techniques were first applied in 2001. At December 31, 2008, net proved natural gas reserves for Glen Rose were estimated at 5.0 Bcfe, compared to 7.0 Bcfe for the prior year. In 2009, there has been no activity in Glen Rose shoals or reefs.

7.      Oil Sands:

The San Miguel Oil Sands feature ("Oil Sands") is prospective under approximately 83,500 gross acres of the Debtors' existing Maverick Basin acreage. Independent reservoir engineers and geologists estimated that there are 7 to 10 billion BO in place basin wide. The Debtors began three pilot projects that have provided important information that could prove valuable when favorable crude oil prices allow commercial-scale production at some future date. Also, Conoco and Mobil did pilot projects on the San Miguel Oil Sands in the late 1970's and early 1980's and Conoco achieved recoveries of over 50% in two pilots with the use of steam injection. The Oil Sands are similar to those found in Cold Lake Field in Canada. In 2005 the Debtors entered into a Participation Agreement that has resulted in a shared leasehold working interest with Newmex Energy (USA) Inc., a wholly-owned subsidiary of Pearl Exploration and Production, Ltd. (TSX Venture: "PXX") ("Pearl"). The Participation Agreement includes an Area of Mutual Interest that contains approximately 42,500 gross acres of the Debtors' joint leasehold and calls for the drilling of three (3) pilot wells at no cost to the Debtors. In addition, the Debtors hold a 100% working interest in approximately 41,000 contiguous acres over the deposit.

To date, the Debtors completed an initial, two-well, cyclic-steam pilot phase, having mobilized the oil and established a preliminary, favorable price differential to West Texas Intermediate crude oil from purchasers. Based on continuing reservoir simulation studies, the Debtors decided to convert this pilot to a Steam-Assisted Gravity Drainage ("SAGD") process by the addition of two (2) horizontal wells. The Debtors used its shallow drilling rig to drill two (2) horizontal wells in this conversion in late 2007 and early 2008. The SAGD technique is used extensively in Canada. This marks the first time that a SAGD pilot has been applied to the San Miguel Oil Sands.

The SAGD well pair was drilled between the existing cyclic steam wells, which were converted to temperature-monitoring wells. Existing steam generation capacity was doubled in 2008 by the addition of a second 25 Mmbtu steam generator. The SAGD project started steam injection after pre-heating the wells and initial oil production began during fourth-quarter 2008. The Debtors discontinued the SAGD project in February 2009 due to cash flow constraints, after obtaining valuable information to document the recovery rates and costs associated with harvesting the heavy oil for future use.

The Debtors also further utilized their drilling rig to establish a second and third pilot project during the first half of 2008. The second, contained five (5) new vertical wells utilizing Conoco's proven Fracture-Assisted Steamflood Technology (FAST) technique. The third pilot contained three (3) horizontal wells utilizing a modified version of Conoco's FAST technique. Two new 50 Mmbtu steam generators were installed in second-quarter 2008.

Due to the sharp decline in crude oil prices, the Debtors shut-in the FAST projects in December 2008 until the outlook for oil prices improves, and recorded an impairment charge of approximately $11 million for this project in 2008. An additional $7.8 million of impairment was recorded for all oil sands projects in 2009.

Marfa Basin:

The Marfa Basin is located approximately 200 miles northwest of the Debtors' Maverick Basin leases. It is an underexplored area along the Ouachita Overthrust that is prospective for the Barnett and Woodford Shales. The Debtors acquired an interest in 140,000 gross acres in the Marfa Basin in 2005, and in 2006 brought in Continental Resources Inc. as the Debtors' fifty percent (50%) partner. The Debtors re-entered one vertical well targeting the Woodford shale during 2006, which tested gas. A fracture stimulation procedure was performed on the well during 2007 and certain zones were perforated in the wellbore during 2008. In 2009, there has been no activity in the Marfa Basin. There was no 2009 activity in this basin.

Williston Basin:

As of December 31, 2008, the Debtors retained approximately 4,400 gross and 2,000 net acres in the Williston Basin. During 2008, the Debtors participated in the drilling of one new well (2.77% working interest) in the Red River formation, which is producing oil. In 2007 the Debtors participated in one (1) new and two (2) re-entered oil wells in this formation. The Debtors' 2008 net sales for the Williston Basin totalled 19,900 BO and 18.3 Mmcf, as compared

to 19,600 BO and 26.6 Mmcf in 2007.  There was no 2009 activity in this basin prior to May 17, 2009.

       (ii)     Oil and Natural Gas Reserves

Values under 2008 Annual Report

The following tables set forth the Debtors' estimated net proved oil and natural gas reserves and the PV-10 value of such reserves as of December 31, 2008, as contained in the TXCO's Form 10-K filed.  These calculations were prepared using standard geological and engineering methods generally accepted by the oil and natural gas industry and in accordance with the financial accounting and reporting standards of the SEC.  Proved oil and natural gas reserves are the estimated quantities of crude oil, natural gas liquids and natural gas which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions.

| | Volumes | Mix |
|---|---|---|
| Natural gas (Bcf) | 36.0 | 44% |
| Oil (Mmbbls) | 7.6 | 56% |
| Natural gas equivalent (Bcfe)* | 81.7 | 100% |
| Oil equivalent (Mmbbls)* | 13.6 | 100% |

*Oil and natural gas were combined by converting oil to natural gas Mcfe on the basis of 1 barrel of oil = 6 Mcfe of gas.

The PV-10 Value is based on the estimated future net revenues, as prepared by the Debtors' independent reservoir engineering firms in accordance with the Financial Accounting Standards Board's Codification section 932-235-50-31.  Accordingly, the estimate is net of estimated production, future development costs and future outflows related to asset retirement obligations, and does not give effect to non-property related expenses, such as corporate general and administrative expenses, debt service and future income tax expenses or to depreciation, depletion and amortization. PV-10 Value generally differs from the standardized measure by the present value of estimated income taxes.

Oil prices used in PV-10 Value are based on a December 31, 2008, Flint Hills West Texas Intermediate posted price of $41.25 per barrel, adjusted by lease for quality, transportation fees, regional price differentials and fixed price contracts for the life of each respective contract. Natural gas prices used in PV-10 Value are based on a December 31, 2008, Houston Ship Channel spot market price of $5.245 per Mmbtu, adjusted by lease for energy content, transportation fees, and regional price differentials.  Prices for hedges that were in place for a portion of the Debtors' 2009 through 2011 projected sales were also used to adjust price expectations for those years. Oil and natural gas prices are held constant. While the methodology is the same across each Debtor, the reference price and adjustments will vary between each Debtor based on conditions in their production areas.  The PV-10 Value and the standardized measure of discounted future net cash flows are not intended to represent the current market value of the Debtors' estimated oil and natural gas reserves.

2752695.1

| PV-10 Value of Estimated Future Net Revenues, by year: | *(in thousands)* |
| --- | --- |
| 2009 | $15,565 |
| 2010 | 14,643 |
| 2011 | 18,799 |
| 2012 | 13,743 |
| 2013 | 15,613 |
| Thereafter | 59,098 |
| Total PV-10 value | 137,461 |
| *Less*: Present value of estimated income tax expense | 0 |
| Standardized measure | 137,461 |

Due to the inherent uncertainties and the limited nature of reservoir data, proved reserves are subject to change as additional information becomes available. The above estimates of reserves, future cash flows and present value are based on various assumptions, including those prescribed by the SEC, and are inherently imprecise. Although the Debtors believe these estimates are reasonable, actual future production, cash flows, taxes, development expenditures, operating expenses and quantities of recoverable oil and natural gas reserves may vary substantially from these estimates. Also, the use of a 10% discount factor for reporting purposes may not necessarily represent the most appropriate discount factor, given actual interest rates and risks to which the Debtors' business or the oil and natural gas industry in general are subject.

In accordance with applicable financial accounting and reporting standards of the SEC, the estimates of the Debtors' proved reserves and the present value of proved reserves set forth herein are made using oil and natural gas sales prices estimated to be in effect as of the date of such reserve estimates and are held constant throughout the life of the properties. Estimated quantities of proved reserves and their present value are affected by changes in oil and natural gas prices. A PV-10 value is not intended to represent the current market value of the estimated oil and natural gas reserves owned by the Debtors.

Reserve Values by DeGolyer and MacNaughton as of the Petition Date

On or about June 4, 2009, DeGolyer and MacNaughton prepared an appraisal report for the Debtors regarding the fair market value of the Debtors' proved crude oil, condensate, and natural gas reserves for a significant portion of the Debtors' oil and gas leases. The estimated future revenue and costs attributable to the production and sale of TXCO's net proved reserves of the properties appraised by DeGolyer and MacNaughton, as of the Petition Date, is summarized as follows:

| | Proved | | | |
|---|---|---|---|---|
| | **Developed Producing** | **Developed Nonproducing** | **Undeveloped** | **Total** |
| Future Gross Revenue, M$ | 232,286 | 95,722 | 411,576 | 739,584 |
| Production Taxes, M$ | 13,943 | 5,517 | 24,063 | 43,523 |
| Ad Valorem Taxes, M$ | 4,600 | 2,005 | 9,646 | 16,251 |
| Operating Expenses, M$ | 66,404 | 17,415 | 44,371 | 128,190 |
| Investment, M$ | 7 | 7,150 | 144,377 | 151,534 |
| Abandonment Costs, M$ | 1,263 | 230 | 100 | 1,593 |
| Future Net Revenue, M$ | 146,069 | 63,405 | 189,019 | 398,493 |
| Present Worth at 10 Percent, M$ | 87,990 | 20,824 | 56,093 | 164,907 |

Reserve Values by DeGolyer and MacNaughton as of November 30, 2009

The Debtors have requested that DeGolyer and MacNaughton prepare a Reserve Report as of November 30, 2009, but have no assurances it will be completed prior to the Confirmation Hearing.

(iii)   Oil and Natural Gas Volumes

The table below sets forth certain information regarding the production volumes associated with the Debtors' production of oil and natural gas for the first half of 2009 and for the years ended December 31, 2007 and 2008.

| | **2009**[3] | **2008** | **2007** |
|---|---|---|---|
| **Oil:** | | | |
| Sales volumes in Barrels (Bbl) | 442,000 | 1,132,000 | 974,000 |
| **Natural Gas:** | | | |
| Sales volumes in Mcf | 952,000 | 2,422,000 | 2,125,000 |

(iv)    Exploration, Development and Acquisition Capital Expenditures through the Petition Date

The Debtors participated in three new wells and three re-entries through May 17, 2009, with five of the six total wells in the Maverick Basin. On a gross basis, the Debtors participated in 96 wells, including new drilling of 73 wells and the re-entry of 23 existing wells during 2008, acting as operator on 57 of the 73 new wells (78%). During 2008, Debtors acquired additional interests in their Fort Trinidad acreage in East Texas and sold 15 non-core properties in South Texas. Both of the properties were part of the acquisition of Output during 2007. On April 2, 2007, TXCO closed on the purchase of Output, a privately held, Houston-based exploration and production firm, for $95.6 million. The consideration for the purchase was $91.6 million in cash, subject to certain adjustments, and $4.0 million of TXCO common stock. The transaction, the largest in TXCO's history, effectively doubled its proved reserves and increased current oil and natural gas production by nearly two thirds relative to pre-acquisition levels. The core of the Output assets is in the East Texas Fort Trinidad Field and is prospective for the Glen Rose, Buda,

---

[3] For the period covering January 1, 2009 through June 30, 2009.

2752695.1

Austin Chalk, Eagle Ford/Woobine and Bossier formations. Other Output assets acquired include acreage in the Midcontinent and Gulf Coast regions and shallow Gulf Coast waters. Separately in February 2007, TXCO acquired an interest in primarily shallow horizons under 85,681 gross acres in an agreement with EnCana. In September 2007, TXCO acquired additional shallow horizons from EnCana under its Comanche, Cage Ranch and other existing leases along with the options to earn Pearsall and deeper horizons. Effective December 1, 2007, TXCO acquired additional interests in its Fort Trinidad area holdings from other working interest holders. In 2009, prior to the Petition Date, the Debtors participated in three new wells and three re-entries with five of the six total wells located in the Maverick Basin.

> (v)     Drilling Activity through the Petition Date

The Debtors participated in three new wells and three re-entries through May 17, 2009, with five of the six total wells in the Maverick Basin. Four of the six wells targeted the Georgetown formation, of which three wells are producing oil and one well is producing gas. One well targeted the Olmos formation and awaits completion. One re-entry by an operating partner in the shallow waters of the offshore Louisiana is expected to be plugged and abandoned. After receiving approval of the DIP Loan, the Debtor participated in six new wells and one re-entry on its Maverick Basin acreage. Of these seven wells, three are producing oil, one is producing gas, and three are awaiting completion as of September 30, 2009.

The following table sets forth the Debtors' drilling activity during the periods indicated. In the table, "gross" refers to the total number of wells in which the Debtors have a working interest, and "net" refers to gross wells multiplied by the Debtors' working interest therein.

| | Pre-Petition | | Twelve Months Ended December 31st | | | | | |
| | 2009 | | 2008 | | 2007 | | 2006 | |
| **Completions Summary:** | Gross | Net | Gross | Net | Gross | Net | Gross | Net |
|---|---|---|---|---|---|---|---|---|
| Drilling Well Completions: | | | | | | | | |
| Oil wells *(1)* | 2 | 1.00 | 46 | 38.84 | 31 | 26.59 | 37 | 33.47 |
| Natural gas wells *(1)* | 2 | 0.57 | 8 | 2.91 | 8 | 3.23 | 1 | 1 |
| Service wells | - | - | 6 | 3 | - | - | - | - |
| Dry holes *(2)* | - | - | 1 | 0.17 | 1 | 1 | 2 | 1.62 |
| Total Drilling Wells Completed | 4 | 1.57 | 61 | 44.92 | 40 | 30.82 | 40 | 36.09 |
| | | | | | | | | |
| Re-entries Completed: | | | | | | | | |
| Oil wells | 2 | 1.00 | 10 | 7.31 | 13 | 8.03 | 6 | 5.45 |
| Natural gas wells | 1 | 1.00 | 2 | 0.51 | 1 | 0.02 | - | - |
| Service wells | - | - | 1 | 0.5 | - | - | 1 | 1 |
| Dry holes | - | - | - | - | 1 | 0.5 | 2 | 1.13 |
| Total Re-entries Completed | 3 | 2.00 | 13 | 8.32 | 15 | 8.55 | 9 | 7.58 |
| Wells Completed in Period | 7 | 3.57 | 74 | 53.24 | 55 | 39.37 | 49 | 43.67 |

*(1)* The 2009 column includes one oil well and two gas wells that were spud in 2008 and completed prior to May 17, 2009. The 2008 column includes four oil wells and one natural gas well spud in prior years and completed in 2008, while the 2007 column includes two oil wells and two natural gas wells spud in prior years and completed in 2007, and the 2006 column includes three oil wells spud in prior years and completed in 2006.
*(2)* The dry holes in the 2006 column were wells spud in prior years.

(vi)  Productive Wells

The following table sets forth producing wells. Productive wells are wells that are capable of producing natural gas or oil.

| | Productive Wells | | | | | |
| | Oil | | Gas | | Total | |
| Period Ended | Gross | Net | Gross | Net | Gross | Net |
| 5/17/2009 | 423 | 309.75 | 324 | 138.78 | 747 | 448.53 |
| 12/31/2008 | 418 | 316.44 | 331 | 140.44 | 749 | 456.88 |
| 12/31/2007 | 407 | 282.39 | 370 | 145.09 | 777 | 427.48 |
| 12/31/2006 | 277 | 234.93 | 113 | 66.76 | 390 | 301.69 |

(vii)  Debtors' Acreage

As of May 17, 2009, the Debtors owned, by lease or in fee, the following acreage:

| | Gross Acres | Net Acres |
| --- | --- | --- |
| Texas | 1,069,000 | 689,054 |
| Oklahoma | 33,013 | 4,521 |
| Louisiana | 5,635 | 788 |
| Total | 1,107,648 | 694,363 |

As is customary in the oil and natural gas industry, the Debtors can generally retain their interest in undeveloped acreage by drilling activity that establishes commercial production sufficient to maintain the leases, by paying delay rentals or by drilling continually on the lease during the remaining primary term of leases.  The oil and natural gas leases in which the Debtors have an interest are for varying primary terms, and if production under a lease continues from the Debtors' developed lease acreage beyond the primary term, the Debtors are entitled to hold the developed portion of the lease for as long as oil or natural gas is produced.

Section 1.10.   Pending Pre-petition Litigation

A list and brief description of the pre-petition litigation is attached hereto as Exhibit "M."

Section 1.11.   Insurance Policies and Indemnification

The Debtors maintains insurance coverage with respect to its employees and its assets. The insurance policies include coverage for workers' compensation, general liability, commercial auto, umbrella claims, operator's extra expenses, equipment, and property claims. The Debtors also provide health insurance to their employees.  In addition, the Debtors carry directors' and officers' liability, as well as excess directors' and officers' liability insurance.  A schedule of the Debtors' insurance policies is attached hereto as Exhibit "O."  The Amended and Restated Bylaws of TXCO Resources Inc. provides indemnification to each of the Debtors'

officers and directors, pursuant to which TXCO agreed to indemnify its officers and directors to the fullest extent permitted under Delaware law.

Section 1.12.   The Debtors' Prepetition Secured Indebtedness

TXCO is the borrower under the Senior Lien Debt Credit Agreement and the Term Loan Credit Agreement (each as defined below) and OPEX, Output, Energy and Tar Sands are guarantors of the Senior Lien Debt Credit Agreement (as defined below) and the Term Loan Credit Agreement (as defined below).

In connection with its acquisition of Output Exploration LLC in April 2007, TXCO replaced its credit facility with Guaranty Bank with two new facilities with the Bank of Montreal ("BMO" or "Agent").  Both of these facilities were amended and restated or amended in July 2007, as described below.  As disclosed in the Form 8-K filed with the SEC on February 27, 2009, on the Petition Date TXCO was in violation of the current ratio covenant under these agreements.

(i)   Senior Lien Debt Credit Agreement

At December 31, 2008, the Debtors had a $125 million senior revolving credit facility (the "Senior Lien Debt Credit Agreement," "SCA" or "Revolver Loan") with BMO, as agent for BMO, Amegy Bank, National Organization; Guaranty Bank; Allied Irish Banks, P.L.C.; Natixis; Western National Bank; and Standard Bank Plc (the "Revolver Lenders").  The Senior Lien Debt Credit Agreement was entered into in April 2007, amended in July 2007 and had an expiration date of April 2011.  At December 31, 2008, the borrowing base was $55 million, $50 million was outstanding at a weighted average interest rate of 4.0% and the unused borrowing base was $5 million.  The Senior Lien Debt Credit Agreement is secured by a first-priority security interest in certain of the assets of TXCO, Tar Sands, Energy, Output and OPEX, including certain proved oil and natural gas reserves and in the equity interests of certain subsidiaries.  As of May 17, 2009, the balance outstanding under the Senior Lien Debt Credit Agreement was $50.0 million, with a weighted average non-default interest rate of 4.00%, using the base rate option.  Loans under the Senior Lien Debt Credit Agreement are subject to floating rates of interest based on (1) the total amount outstanding under the Senior Lien Debt Credit Agreement in relation to the borrowing base, and (2) whether the loan is a LIBOR rate loan or a base rate loan.  LIBOR rate loans bear interest at the LIBOR rate (for the applicable 1-, 2-, 3- or 6-month maturity chosen by TXCO) plus the applicable margin and base rate loans bear interest at the base rate plus the applicable margin.  The applicable margin varies with the ratio of total amount outstanding to the borrowing base.  For base rate loans the applicable margin ranges from zero to 100 basis points, and for LIBOR rate loans the applicable margin ranges from 150 to 250 basis points.  The Senior Lien Debt Credit Agreement allows the Senior Credit Lenders to increase the interest rate by 200 basis points at any time an event of default exists under the Senior Lien Debt Credit Agreement (the "Default Interest Rate").  Effective March 27, 2009, the Default Interest Rate was being charged.

(ii)    Term Loan Credit Agreement

At December 31, 2008, the Debtors had a $100 million, five-year term loan facility (as amended, restated, supplemented or otherwise modified from time to time the "Term Loan Credit Agreement" or "Term Loan") with BMO as agent for BMO, Regiment Capital, Carlson Capital, Standard Bank Plc, CIT Group, AIB Debt Management United, and Amegy Bank, National Organization, and assignees and/or affiliates thereof (the "Term Loan Lenders") with a non-default interest rate of 5.9375%. The Term Loan Credit Agreement is secured by a second-priority security interest in certain assets of TXCO, Tar Sands, Energy, Output and OPEX, including certain proved oil and natural gas reserves and in the equity interest of certain subsidiaries. Loans under the Term Loan Credit Agreement are subject to floating rates of interest equal to, at TXCO's option, the LIBOR rate plus 4.50% or the base rate plus 3.50%. The LIBOR rate and the base rate are calculated in the same manner as under the Senior Lien Debt Credit Agreement. The Term Loan Credit Agreement allows the Term Loan Lenders to increase the interest rate by 200 basis points at any time a payment event of default exists under the Term Loan Credit Agreement. Effective April 21, 2009, the Default Interest Rate was being charged Borrowings under the Term Loan Credit Agreement may be prepaid, but not reborrowed. However, no prepayments are permitted if the ratio of the total amount outstanding under the Senior Lien Debt Credit Agreement to the borrowing base thereunder exceeds 75% or if any event of default exists under the Senior Lien Debt Credit Agreement.

(iii)    Hedges

Due to the volatility of oil and natural gas prices and interest rates, the Debtors, from time to time, entered into risk management transactions (e.g., swaps, collars and floors) for a portion of its oil and natural gas production and/or interest payments on its bank debt. This allowed it to achieve a more predictable cash flow, as well as to reduce exposure from price fluctuations. On a quarterly basis, the Debtors' management sets all of TXCO's risk management policies, including quantity, types of instruments and counterparties. None of these instruments were used for trading purposes. The Debtors terminated all of their outstanding derivative instruments during first-quarter 2009 for a net cash benefit.

(iv)    Other Secured Obligations

In addition to the secured obligations listed above, certain creditors of the Debtors are secured creditors by virtue of liens arising under operating agreements, mechanics' and materialmens' liens or other liens created by statute. Included in these potential secured creditors are: operators and other working interest owners under operating agreements, vendors providing service and/or materials for the benefit of the Debtors in their business (the "Mineral Lien Claimants"), sureties providing secured bonds on behalf of the Debtors, regulatory agencies holding cash deposits and taxing authorities.

(v)    Trade Debt

As of the Petition Date, outstanding trade debt was approximately $80 million, which is inclusive of claims held by Mineral Lien Claimants.

Section 1.13.   Events Leading to Chapter 11

During 2008, Debtors engaged in the largest capital expenditure program in their history. The costs incurred in the development and purchase of oil and natural gas properties increased from $117 million in 2007 to $182 million in 2008.   After the drilling program was initiated, costs to drill escalated throughout the summer of 2008 followed by an unprecedented commodity price collapse.   There was a 51.3% decrease in oil and gas revenue for the first three (3) months of 2009 when compared to the same period in 2008.[4]   As a result of the time lag between the incurrence of the increased drilling costs and the resulting increase in revenues from new production, and deteriorating economic conditions, Debtors experienced severe cash flow constraints.  These cash flow constraints led to substantial difficulties in meeting short-term cash needs, particularly in relation to vendor commitments.  Extreme volatility in energy prices and a deteriorating global economy created great difficulties in the capital markets and greatly hindered the Debtors' ability to raise debt and/or equity capital.   The Debtors examined alternatives to improve liquidity and cash resources, including seeking additional short and long-term capital through bank borrowings, the issuance of debt instruments, the sale of common stock and preferred stock, the sale of non-strategic assets, joint-venture financing, and restructuring of existing obligations.   The inability to improve liquidity and cash resources caused material adverse business consequences.   The Debtors went into covenant default under the Senior Lien Debt Credit Agreement and the Term Loan Credit Agreement.  Due to a variety of factors, including the drastic fall in the price of crude oil in the last calendar quarter of 2008, the stress on the Debtors' cash flow increased.  The Debtors, the Senior Lien Debt Lenders and Term Loan Lenders began addressing a forbearance agreement beginning in March 2009 which, unfortunately, could not be consummated.

On April 21, 2009, BMO provided the Debtors with (i) notice of acceleration of the amounts due under the Senior Lien Debt Credit Agreement, which had an outstanding balance (not including any accrued and unpaid interest) of approximately $50 million as of March 31, 2009, and (ii) notice of acceleration of the amounts due under the Term Loan Credit Agreement of approximately $100 million as of March 31, 2009 (together, the "Notices of Acceleration"). The Notices of Acceleration notified the Debtors of the acceleration of and demand for immediate payment of the entire amount of the funds that the Debtors owed to the Term Loan Lenders and the Senior Lien Debt Lenders under the Term Loan Credit Agreement and the Senior Lien Debt Credit Agreement, including all interest accrued and unpaid thereon.   The Notices of Acceleration also notified the Debtors that the commitment of each of the Senior Lien Debt Lenders and Term Loan Lenders to make loans or participate in issuances of letters of credit was terminated.  Prior to the Notices of Acceleration, the Agent also demanded interest at the default rate.   On information and belief, prior to the Petition Date there was no payment default on the Senior Lien Debt Credit Agreement and the only payment default on the Term Loan Credit Agreement was a failure to pay the default interest demanded by the Agent shortly before the Petition Date.

---

[4]  Operational Data

| For the Periods Ending March 31 | Three Months | | |
| --- | --- | --- | --- |
| | 2009 | 2008 | % Change |
| Oil – average daily sales (bopd) | 2,866 | 2,717 | + 5.5 |
| Natural gas – average daily sales (mcfc) | 5,747 | 7,306 | – 21.3 |
| Combined average daily sales (mboed) | 3,824 | 3,935 | – 2.8 |
| Combined average daily sales (mmcfed) | 22,944 | 23,608 | – 2.8 |

Also as a result of the liquidity issues, Debtors began receiving demands for payment and notices of lien filings from its vendors. As of May 15, 2009, in excess of $14 million in liens had been filed and over $37 million in demands for payment had been received.

The Debtors determined that they could no longer operate outside of Chapter 11 and commenced these cases on May 17-18, 2009 (the "Petition Date").

Section 1.14.  Sources of Information

The descriptions contained in this Disclosure Statement of the Debtors' history, capitalization, business assets and operations, and financial condition are primarily based upon the public reports filed by TXCO pursuant to the Exchange Act, in the form of current reports on Forms 8-K and periodic reports on Forms 10-K and 10-Q, including (i) TXCO's audited financial statements for the year ended December 31, 2008, contained in its annual report on Form 10-K filed with the SEC on March 16, 2009, and (ii) the Debtors' quarterly report for the quarter ended September 30, 2009, on Form 10-Q filed with the SEC on November 9, 2009, attached hereto as Exhibits  "K" and "L," respectively.  Reports and any other documents filed by the Debtor with the SEC are available for reading and copying at the SEC's public reference room at 100 F Street N.E., Washington, D.C. 20549 (tel. 1-800-SEC-0330 for further information), as well as available for retrieval on the SEC's website at www.sec.gov.

Some of the ownership information concerning the greater than 5% beneficial owners of the Debtors was obtained from third-party reports on Schedules 13D and 13G and Forms 3 and 4 filed with the SEC by such parties in accordance with section 13 of the Exchange Act.

## ARTICLE II
## THE CHAPTER 11 CASES

Section 2.1.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of title 11 of the United States Code (as amended, the "Bankruptcy Code"). Chapter 11 authorizes a debtor to reorganize its business for the benefit of its creditors, equity interest holders, and other parties in interest. Commencing a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The principal objective of a chapter 11 case is to consummate a plan of reorganization. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court binds a debtor, any issuer of securities thereunder, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity the bankruptcy court may find to be bound by such plan. Chapter 11 requires that a plan treat similarly situated creditors and similarly situated equity interest holders equally, subject to the priority provisions of the Bankruptcy Code.

Subject to certain limited exceptions, a bankruptcy court order confirming a plan of reorganization discharges a debtor from any debt that arose prior to the date of confirmation of the plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

Prior to soliciting acceptances of a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization. This Disclosure Statement is submitted in accordance with section 1125 of the Bankruptcy Code.

Section 2.2.    Administration of the Cases

The Debtors commenced these cases by each filing a voluntary petition on the Petition Date (the "Chapter 11 Cases").  The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors have sought certain relief from the Bankruptcy Court to ensure that their operations continue with the least possible disruption, including, but not limited to, the relief set forth below. The Debtors intend to seek all necessary and appropriate additional relief from the Bankruptcy Court in order to expedite the process and to minimize any adverse impact on their business that may result from the Chapter 11 Cases.

(i)    Entry of "First Day" Orders

On and soon after the Petition Date, the Debtors filed a number of motions seeking entry of so-called "first day" orders intended to facilitate a debtor's transition into chapter 11 by approving certain regular business conduct for which approval of the Bankruptcy Court is required. The initial hearing was held on May 19, 2009.

The first day orders entered by the Bankruptcy Court consist of the following:

- *Order on Motion for an Order Directing Joint Administration of Bankruptcy Cases* (Dkt. No. 44 entered 5/19/09);

- *Order on Motion for Entry of Order (I) Prohibiting Utilities From Altering, Refusing or Discontinuing Services on Account of Prepetition Invoices and (II) Authorizing and Approving of Procedures for Providing Adequate Assurance of Postpetition Payments* (Dkt. No. 46 entered 5/20/09);

- *Order on Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals* (Dkt. No. 47 entered 5/20/09);

- *Order on Motion for Order Granting Additional Time to File Schedules and Statements* (Dkt. No. 51 entered 5/20/09);

- *Order on Motion for Entry of Order Limiting Notice and Establishing Notice Procedures* (Dkt. No. 54 entered 5/20/09);

- *Order on Motion for Approval of Payments on Insurance Premium Financing Agreement* (Dkt. No. 60 entered 5/21/09);

- *Interim Order on Motion for Order Under 11 U.S.C. §§ 105, 362 and 541 Establishing Notification and Hearing Procedures for Trading in Equity Securities* (Dkt. No. 62 entered 5/21/09);

- *Order (I) Authorizing Debtors to Pay (A) Certain Prepetition Employee Obligations and Benefits and (B) Prepetition Withholding Obligations and (II) Directing all Banks to Honor Certain Related Prepetition Transfers* (Dkt. No. 64 entered 5/22/09);

- *Order Establishing Bar Date for Filing Requests for Payment of Administrative Expense Claims Under Sections 105 and 503(b)(9) of the Bankruptcy Code and Approving Form, Manner, and Sufficiency of Notice of the Bar Date Pursuant to Bankruptcy Rule 9007* (Dkt. No. 66 entered 5/22/09);

- *Order on Motion for Authority to Pay or Honor Prepetition and Postpetition Royalty Obligations and Other Obligations under Oil & Gas Leases* (Dkt. No. 67 entered 5/22/09);

- *Order Granting Complex Chapter 11 Bankruptcy Case Treatment* (Dkt. No. 272 entered 6/23/09);

- *Order Authorizing the Debtors to Pay Certain Prepetition Taxes in the Ordinary Course of Business and Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto* (Dkt. No. 290 entered 6/29/09);

- *Order Authorizing Payments Under Severance and Retention Plan* (Dkt. No. 481 entered 8/18/09).

(ii)   Retention of Debtors' Professionals

During the pendency of the Chapter 11 Cases, the Debtors filed retention applications for certain professionals to represent and assist them in the administration of these Chapter 11 Cases. These professionals were intimately involved with negotiating and developing the terms of the Plan, and all of these professionals will continue to provide vital services throughout the Chapter 11 Cases. The following retention orders were approved by the Bankruptcy Court:

- *Interim Order on the Motion for Approval of the Employment of FTI Consulting, Inc. as Chief Restructuring Officer and Financial Advisors for the Debtors* (Dkt. No. 48 entered 5/20/09);

- *Interim Order on the Application for Approval of the Employment of Fulbright & Jaworski L.L.P. as Attorneys for the Debtors* (Dkt. No. 49 entered 5/20/09);

- *Interim Order Authorizing the Employment of DeGolyer and MacNaughton as Engineers and Consultants for the Debtors* (Dkt. No. 50 entered 5/20/09);

- *Interim Order on the Application for Approval of the Employment of Cox Smith Matthews Incorporated as Attorneys for the Debtors* (Dkt. No. 52 entered 5/20/09);

- *Interim Order Authorizing the Employment of Administar Services Group, LLC as Claims, Balloting, Noticing and Administrative Agent for the Debtors* (Dkt. No. 53 entered 5/20/09);

- *Order Authorizing the Employment of KPMG LLP as Tax Consultants Nunc Pro Tunc to the Petition Date* (Dkt. No. 459 entered 8/13/09);

- *Order Authorizing the Employment of Financial Advisors and Investment Bankers, Global Hunter Securities LLC* (Dkt. No. 585 entered 9/23/09);

- *Order Authorizing the Employment of Lonquist & Co. LLC as Engineers and Consultants for the Debtors* (Dkt. No. 584 entered on 9/23/09); and

- *Order on the Application for Authority to Expand the Employment of FTI Consulting, Inc. as Chief Restructuring Officer and Financial Advisors for the Debtors* (Dkt. No.627 entered on 10/14/09).

(iii)   Debtors' Obtain Authority for Postpetition Financing and Use of Cash Collateral

On May 22, 2009, the Bankruptcy Court entered the *Interim Order Under 11 U.S.C. §§ 105(a), 361, 363, and 364 and Fed. R. Bankr. P. 2002, 4001 and 9014, (I) Authorizing Debtors to Incur Post-Petition Secured Indebtedness, (II) Granting Security Interests and Superpriority Claims, (III) Approving Use of Cash Collateral, and (IV) Scheduling a Final Hearing* (Dkt. No. 68) (the "Interim DIP Loan Order"), authorizing the Debtors, on an interim basis, to obtain up to $12,500,000 in principal amount of postpetition financing from certain affiliates of the Term Loan Lenders (the "DIP Lenders") under a multiple draw term loan credit facility, use of the Prepetition Lenders' cash collateral in accordance with a budget submitted to the Bankruptcy Court, and to provide adequate protection to the Term Loan Lenders and the Senior Credit Lenders, as defined in the Interim Cash Collateral Order.  Additionally, the Bankruptcy Court found that the claims held by Mineral Lien Claimants did not have an interest in the Debtors' proceeds from production or payments owed to the Debtors for joint interest billings ("JIBs").

On June 8 and 9, the Bankruptcy Court held hearings regarding approval of the relief requested on a final basis.  At that hearing, the Bankruptcy Court determined that the Mineral Lien Claimants with liens that were junior to the Senior Lien Debt Credit Agreement and Term Loan Credit Agreement were adequately protected by the granting of a replacement lien that was not subject to the Senior Lien Debt Credit Agreement and the Term Loan Credit Agreement. Subsequently, on June 15, 2009, the Bankruptcy Court entered the *Final Order Under 11 U.S.C. §§ 105(a), 361, 363, and 364 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Incur Post-Petition Secured Indebtedness, (II) Granting Security Interests and Superpriority Claims, (III) Approving Use of Cash Collateral, and (IV) Scheduling a Final Hearing* (Dkt. No. 220) (the "Final DIP Loan Order"), authorizing the Debtors, on a final basis, to obtain up to $32,000,000 in principal amount of postpetition financing under a multiple draw term loan credit facility (the "DIP Loan"), use of the Prepetition Lenders' cash collateral in accordance with a budget submitted to the Bankruptcy Court, and providing adequate protection

to the Term Loan Lenders, the Senior Credit Lenders, and the Mineral Lien Claimants with liens that were junior to the Term Loan Lenders and Revolver Lenders. The Final DIP Loan Order provides that the DIP Loan matures on December 15, 2009.

On September 4, 2009, the Debtors filed the *First Stipulation With Regard to Expiration of Final Maturity Date Under Final Order Under 11 U.S.C. §§ 105(a), 361, 363, and 364 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Incur Post-Petition Secured Indebtedness, (II) Granting Security Interests and Superpriority Claims, (III) Approving Use of Cash Collateral* (Dkt. No. 534) (the "First Stipulation"), which extended the Final Maturity Date, as set forth in the DIP Loan, from December 15, 2009 to January 14, 2009. On September 8, 2009, the Debtors filed the *Second Stipulation With Regard to Expiration of Final Maturity Date Under Final Order Under 11 U.S.C. §§ 105(a), 361, 363, and 364 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Incur Post-Petition Secured Indebtedness, (II) Granting Security Interests and Superpriority Claims, (III) Approving Use of Cash Collateral* (Dkt. No. 543) (the "Second Stipulation"), which further extended the Final Maturity Date to February 1, 2010. On October 19, 2009, the Debtors filed the *Third Stipulation With Regard to Expiration of Final Maturity Date Under Final Order Under 11 U.S.C. §§ 105(a), 361, 363, and 364 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Incur Post-Petition Secured Indebtedness, (II) Granting Security Interests and Superpriority Claims, (III) Approving Use of Cash Collateral* (Dkt. No. 650) (the "Third Stipulation") which further extended the Final Maturity Date to February 15, 2010.

(iv) The Committee

On June 1, 2009, the Office of the United States Trustee filed the *Notice of Appointment of the Committee of Unsecured Creditors* (Dkt. No. 114), whereby the United States Trustee created the Official Committee of Unsecured Creditors of TXCO Resources Inc. (the "Committee"). The Committee consists of the following eleven (11) members, as appointed by the United States Trustee: (a) Halliburton Energy Services, Inc.; (b) Baker Hughes Oilfield Operations, Inc.; (c) McGuire Industries, Inc.; (d) Standard Tube Company; (e) Precision Gas Well Testing L.P.; (f) Patterson-UTI Drilling Company, LLC; (g) Smith International, Inc., Thomas Energy and Wireline Control Systems; (h) Strata Directional Tech & Allis Chalmers Tubular Services; (i) Innovative Energy Services, Inc.; (j) MTZ Vacuum Services; and (k) WTG Gas Marketing, Inc. The Committee retained the law firm of Gardere Wynne Sewell LLP, 1601 Elm Street, Suite 3000, Dallas, TX 75201-4761 as its legal counsel and Stephen A. McCartin has acted as lead counsel for the Committee. On June 26, 2009, the Bankruptcy Court entered the *Interim Order on the Application for Approval of Employment of Gardere Wynne Sewell LLP as Counsel to the Official Committee of Unsecured Creditors Effective as of June 2, 2009* (Dkt No. 292 entered on 6/29/09). On October 29, 2009, the Bankruptcy Court entered the *Order Authorizing Employment of Grant Thornton LLP as Financial Advisors for the Official Committee of Unsecured Creditors Nunc Pro Tunc to September 25, 2009* (Dkt. No. 722 entered on 10/29/09).

(v) Other Material Relief Obtained During the Chapter 11 Cases

During the pendency of the Chapter 11 Cases, additional orders were entered by the Bankruptcy Court that aided in the overall administration of the Estates, including

- *Revised Order Granting Motion for Order Authorizing Retention of Professionals Utilized by the Debtors in the Ordinary Course of Business* (Dkt. No. 454 entered 8/12/09);

- *Order Extending the Debtors' Time to File Notices of Removal* (Dkt. No. 460 entered 8/13/09);

- *Order on Motion to Extend Date to Assume or Reject Real Property Leases* (Dkt. No. 496 entered 8/20/09); and

- *Order Granting Motion to Approve Third Amendment to Joint Exploration Agreement with EnCana Oil & Gas (USA) Inc. and Letter Agreement with Redemption Oil & Gas, LLC* (Dkt. No. 554 entered on 9/10/09).

(vi)   Executory Contracts and Leases

As of the Petition Date, the Debtors were parties to approximately four hundred (400) executory contracts and unexpired leases. The Debtors have commenced an analysis and review of their executory contracts and unexpired leases and such review is continuing. The analysis seeks to: (a) identify whether any contracts or leases would aid or further the Debtors' operational restructuring initiatives; (b) ensure that any contracts and leases that are assumed are priced competitively; and (c) determine any costs which would be associated with or incurred as a result of assuming and assigning such contract or lease.  This evaluation process involves a review of the costs and benefits of each contract and lease and a determination of how that contract and lease fits within the Debtors' overall business plan. The Debtors expect to conclude this review prior to the Confirmation Hearing.  The Plan proposes a settlement with certain consenting creditors.

(vii)   Preference Analysis and Other Potential Avoidance Actions

The Debtors intend to investigate pre-petition transfers that may be avoided as preferential, fraudulent or otherwise under sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code or applicable state law such as the Uniform Fraudulent Transfer Act.  The Debtors have not completed their analysis of which claims will be pursued.  The list of potential preference defendants will be set out in Exhibit "Q," which will be filed prior to the hearing on the Disclosure Statement.

(viii)   Exclusivity

Under the Bankruptcy Code, the Debtors have the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of one hundred (120) days from the Petition Date.  If the Debtors file a plan within this exclusive period, then the Debtors have the exclusive right for one hundred eighty days (180) days from the Petition Date to solicit acceptances to its plan. During these exclusive periods, no other party in interest may file a competing plan of reorganization; however, a court may extend or reduce these periods upon request of a party in interest and "for cause."  Without further order of the Bankruptcy Court, the Debtors' exclusive filing period would have expired on September 14, 2009, and the Debtors' exclusive solicitation period would have expired on November 13, 2009.  The Bankruptcy Court granted the Debtors an extension of the exclusive period to file a plan to November 12, 2009.

(ix)   Post-Petition Exploration, Development and Acquisition Capital Expenditures

The Debtors participated in six gross (3.48 net) new wells and two gross (1.03 net) re-entries from May 18, 2009 through September 30, 2009, with seven (4.48 net) of the eight gross (4.51 net) total wells in the Maverick Basin. At September 30, 2009, three of the eight wells were producing -- two (0.5 net) producing gas from the Eagle Ford formation and one (100% working interest) producing oil from the Glen Rose Porosity formation; two wells (25% working interest) targeting the Eagle Ford formation and one well (100% working interest) targeting the Austin Chalk formation were in completion stage; and one well (100% working interest) targeting the Glen Rose Porosity formation and one well (3% working interest) targeting the Red River formation, in South Dakota, continued drilling.

(x)   Description of Sales Tax Audit

TXCO is currently involved in a sales tax audit and refund claim procedures with the Texas Comptroller of Public Accounts in connection with sales and use taxes administered by the State of Texas.  The first type of tax being addressed is TXCO's sales and use tax.  In connection with the sales and use tax, the Texas Comptroller of Public Accounts has filed a First Amended Priority Proof of Claim in the amount of $839,835.61.  This claim amends an estimated claim in the same amount which was awaiting final assessment upon completion of the tax audit.

The other tax at issue is TXCO's "direct pay" tax obligations (which are also sales and use taxes).  The Texas Comptroller of Public Accounts has filed a Second Amended Priority Proof of Claim in the amount of $2,591,659.61 in connection with the purported direct pay sales and use taxes.  This claim amended an initial estimated claim in the amount of $2,591,659.61 and a prior First Amended Claim in the amount of $3,431,405.22.

Additionally, TXCO had filed a refund claim with the Texas Comptroller covering the period 01/01/2003 through 05/31/2006.  The amount of the refund claim is approximately $553,000.

Prior to its bankruptcy filing, TXCO retained KPMG to pursue its potential sales tax refund claims as well as to address the subsequent audit that was instituted by the Comptroller. KPMG has been retained post-petition by Debtors to continue its work in connection with the sales tax refund claim and sales tax audits.

The Comptroller has approved approximately $313,000 of the refund claim.  The main issues in connection the remaining refund claims at this time (of approximately $240,000) cover transactions from several vendors pertaining to whether or not TXCO purchased compression service that is not taxable or whether TXCO leased compressors on a month to month basis that would be subject to tax.  TXCO paid tax on these transactions and is seeking a refund of those taxes as it believes the transactions at issue are in fact purchase of compression services, and, thus, non-taxable transactions.

The issues in the sales tax audit, covering both the sales and use tax and the direct pay tax (which are the subject of the two First Amended Priority Proofs of Claim), involve numerous factual and legal issues including allegedly missing documentation, local taxes being assessed in

error, taxability interpretations of the state sales and use tax rules pertaining to new construction, repairs, maintenance of real property, manufacturing exemptions, and oil and gas service exemptions.

KPMG and TXCO have been working with the auditor to narrow the outstanding issues and have supplied the auditor with documentation supporting TXCO's position and anticipate continuing to obtain and supply necessary documentation and information which TXCO believes should reduce the alleged tax obligations. The audited refund matters were addressed by the auditor and turned in for processing and billing at the end of July 2009. KPMG has met with the audit supervisor and the auditor for a reconciliation conference and addressed refund issues but certain issues were not able to be addressed as the auditor was not finished with necessary fieldwork. Since receipt of the auditor's filed schedules, TXCO and KPMG have divided the examination of the audit into small portions to challenge audit assessments for the entire audit period and are also examining potential additional refunds from 06/01/2006 through 09/30/2008.

Again, TXCO and KPMG continue to work with the Comptroller's Office to reconcile the outstanding documentation and other issues related to the audit and the final assessment. Upon issuance of the final assessment, which TXCO has not yet received but which is likely reflected in the recently filed First Amended Priority Proofs of Claim, TXCO and KPMG would have thirty (30) days from receipt of the assessment to file a motion for redetermination, which TXCO anticipates will occur. From receipt of the motion for redetermination, it is anticipated that the Comptroller will provide TXCO with approximately sixty (60) days to provide information and documentation on any outstanding issues prior to the independent auditor review conference on the Motion for Determination. It is likely that such conference would take place in early to mid 2010. The auditor and KPMG have agreed to continue working from the date of receipt of the final assessment up to the date of the independent auditor review conference to resolve issues that can be resolved and to narrow issues that remain open for determination at the independent auditor review conference.

TXCO intends to vigorously contest the audit and the claim of the Comptroller relating to additional tax obligations. TXCO is currently determining whether the claims of the Comptroller relating to the alleged tax obligations will be addressed through the Texas State administrative claims process or via the claims and claims objection process in the Bankruptcy Court. It is anticipated that such determination will be made once the final assessment is received and reviewed.

(xi)   Sale of Assets and Bid Protection Motion

On or about October 15, 2009, the Debtors received a proposal letter from Newfield Exploration Company ("Newfield") regarding Newfield's expression of interest in purchasing substantially all of the Debtors' assets for $211 million (the "Initial Newfield Offer"). The offer was an all cash offer with no financing contingencies. The proposal contemplated leaving certain assets that would remain with Reorganized TXCO, including the following:

(1)     All offshore properties;
(2)     The property known as the "Dexter Waterflood Unit;"
(3)     The Forrest WM B 1U;

(4)     All non-operated properties in the Williston Basin;
(5)     All non-operated properties in south Texas outside of Maverick and Dimmit Counties; and
(6)     All Oklahoma properties.

On or about October 22, 2009, the Debtors received a second purchase offer (the "Second Offer") to purchase substantially all of the assets and/or equity of the Debtors for $227 million. The Second Offer did not specifically state that any assets would remain with Reorganized TXCO.

On or about October 28, 2009, Newfield submitted a second proposal letter to the Debtors increasing its offer to $223 million (the "Second Newfield Offer"). The Second Newfield Offer indicated that in addition to the items that Newfield was willing to exclude from its previous offer, Newfield was not seeking to purchase the drilling rigs owned by TXCO Drilling and clarified that other assets would be left with Reorganized Debtors. The Debtors entered into negotiations with Newfield to finalize a purchase and sale agreement.

On November 6, 2009, the Debtors and Newfield entered into that certain Purchase and Sale Agreement (the "Newfield PSA"), which is attached as Exhibit "E" to this Disclosure Statement. Pursuant to the Newfield PSA, Newfield has agreed to purchase substantially all of the assets of the Debtors (the "Acquired Properties") for $223 million subject to adjustments all as set out more fully in the Newfield PSA. The Newfield PSA provides that the following assets will remain (the "Excluded Assets") with Reorganized TXCO:

(1)     All offshore properties;
(7)     The property known as the "Dexter Waterflood Unit;"
(8)     The Forrest WM B 1U;
(9)     All non-operated properties in the Williston Basin;
(10)    All non-operated properties in south Texas outside of Maverick, LaSalle, Zavala and Dimmit Counties;
(11)    All Oklahoma properties; and
(12)    The Vinton Dome Property.

In addition to agreeing to sell substantially all of their assets pursuant to the terms of the Newfield PSA, the Debtors also agreed to obtain certain bid protections on behalf of Newfield, in recognition of Newfield's status as stalking horse bidder.

On November 6, 2009, the Debtors filed the *Motion for Order, Pursuant to §§ 363, 105 and 503(b), Approving (I) Newfield Exploration, Inc. as Plan Sponsor and (II) Bid Protections Contained In Purchase and Sale Agreement Between TXCO Resources Inc. and Newfield Exploration, Inc.* (the "Bid Protection Motion"), whereby the Debtors requested that the Court enter an order providing certain bid protections to Newfield in connection with pursuing confirmation of a plan of reorganization based on the Newfield PSA. The bid protections include a No-Shop Covenant that prohibits the Debtors from directly or indirectly soliciting any other Acquisition Proposal upon entry of an order approving the Bid Protection Motion; however, the Debtors can still take any actions necessary to satisfy their fiduciary duties in the event an unsolicited offer is received that the Debtors believe is or could lead to a Superior

Proposal. Furthermore, under the Newfield PSA, until entry of an order on the Bid Protection Motion the Debtors can use the Newfield PSA to solicit additional offers for the Debtors' assets pursuant to the Go-Shop Covenant. The Bid Protection Motion also requests that Newfield be granted a Break-Up Fee equal to 3% of the proposed purchase price and expense reimbursement up to $500,000. On November ___, 2009, the Court entered the Order approving the Bid Protection Motion.

(xii)  General Discussion of Classes of Creditors

There are six general classes of non-subordinated creditors holding claims against the Debtors[5]: (1) Secured Claims arising from the DIP Loan; (2) Claims arising from Mineral Liens that are secured by liens on the Non-Mortgaged Properties; (3) Secured Claims arising the Revolver Loan; (4) Secured Claims arising from the Term Loan; (5) Claims arising from Mineral Liens that are filed against the Mortgaged Properties; and (6) General Unsecured Claims.

Generally speaking, the secured claims are as follows. The DIP Loan is secured by a first lien on all assets of the Debtors SAVE and EXCEPT those properties which are subject to Mineral Liens on Non-Mortgaged Properties. The DIP Loan is also secured by a second lien on such Non-Mortgaged Properties. The DIP Lenders have the right to be paid in full at confirmation. Absent a sale of assets, the Debtors do not have sufficient liquidity to pay that loan in full at confirmation.

Each Mineral Lien holder on a Non-Mortgaged Property shares *pari passu* in the value of the specific piece of property to which the Mineral Liens attach. The Debtors believe the value of Non-Mortgaged Properties will generally exceed the amount of the liens of Mineral Lien Holders on each lease which is a Non-Mortgaged Property. To the extent that the value of any Non-Mortgaged Property is less than the amount of the valid Mineral Liens against that specific piece of Non-Mortgaged Property, each Mineral Lien holder will have an unsecured claim equal to its *pari passu* share of the difference between the value of the property and the amount of the valid Mineral Liens.[6] To the extent that the value of any Non-Mortgaged Property exceeds the amount of valid Mineral Liens against such Non-Mortgaged Property, the excess value secures the DIP Loan.

The Revolver Lenders have liens which are secured by all of the Mortgaged Properties. The Debtors believe that the claims of the Revolver Lenders are fully secured and, in fact, the value of the Mortgaged Properties substantially exceeds the amount of the Revolver Loan. To the extent that the value of the Mortgaged Properties exceeds the amount of the Revolver Loan, that excess is first available to secure the loans of the Term Loan Lenders.

---

[5] This excludes TXCO Drilling, Inc.

[6] Certain Mineral Lien Holders have also asserted a security interest in (a) production proceeds from property to which their liens attach ("Production Proceeds") and (b) payments to the Debtors by third parties on account of Joint Interest Billings ("JIB") attributable to such properties. At least as to Texas, Mineral Lien Holders, the Bankruptcy Court has ruled that their liens do not attach to JIBs or to Production Proceeds. That decision is currently on appeal. Certain Mineral Lien Holders have also asserted a right to payments from Third Parties equal to the amount of JIBs which those third parties owe to the Debtors. Without conceding that such claims are valid, the plan provides certain Mineral Lienholders will receive a *pro rata* share of the payments from Third Parties listed on Exhibit "U."

The Term Loan Lenders have liens which are secured by all of the Mortgaged Properties. The Debtors believe that the claims of the Term Lenders are fully secured. To the extent that the value of the Mortgaged Properties exceeds the amount of the Revolver Loan and the Term Loan, that excess is available to secure the claims of holders of valid Mineral Liens against the Mortgaged Properties.

The evaluation of the positions of the holders of Mineral Liens on the Mortgaged Properties is much more complicated. Mineral Liens attach only to the specific property on which the goods or services were provided. Thus, while the Revolver Lenders and Term Loan Lenders have liens against all Mortgaged Properties, the holders of the Mineral Liens have liens against only a sub-set of those properties. Under the facts of this case, the holders of the Mineral Liens at least on Texas Properties do not have a right to seek to compel the Term Loan Lenders to marshal or otherwise force the Term Loan Lenders to look to assets in a particular order. Thus, unless the value of the Mortgaged Properties exceeds the total of the amounts owing to the Term Loan Lenders, the Revolver Lenders and the Mineral Liens (the "Mortgaged Property Debt") on the Mortgaged Properties, every such Mineral Lien holder is potentially completely unsecured or fully secured. To avoid this potential inequity and to the extent that it is determined that the value of the Mortgaged Properties does not equal or exceed the Mortgaged Property Debt, the Plan proposes that the full amount claims of the Mineral Lien Claimants on the Mortgaged Properties are unsecured claims.

Under this Plan, the unsecured creditors consist of those creditors who (a) have not asserted a secured claim; (b) have asserted a secured claim but the Court determines that the secured claim is not an Allowed Secured Claim; (c) any and all Mineral Lien holder claims on Non-Mortgaged Properties to the extent all such claims exceed the value of the particular property to which the claims attach; and (d) the claims of Mineral Lien Claimants on Mortgaged Properties to the extent the value of the Mortgaged Properties does not equal or exceed the Mortgaged Property Debt. The recovery of unsecured creditors is dependent upon (a) any value in any Non-Mortgaged Properties above the total amount owed to the Mineral Lien Claimants on the Non-Mortgaged Properties and the DIP Loan, (b) any value in the Mortgaged Properties above that owed to the DIP Lenders, Term Lenders, the Revolver Lenders, and (c) any equity in TXCO.

## ARTICLE III
## SUMMARY OF SALE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE SALE PLAN AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE SALE PLAN. IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE SALE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A.

THE SUMMARY OF THE SALE PLAN AND OF OTHER DOCUMENTS REFERRED TO HEREIN DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THOSE DOCUMENTS, AND REFERENCE IS MADE TO THE SALE PLAN AND THE OTHER DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF THEIR TERMS AND PROVISIONS.

THE SALE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR UNDER THE SALE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE SALE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE SALE PLAN OR THE OTHER OPERATIVE DOCUMENT WILL CONTROL.

### Section 3.1.    Sale of Assets

The terms of the Sale Plan contemplate the sale of the Acquired Properties to Newfield or to such other purchaser that has submitted a Superior Proposal as more fully described in the Newfield PSA, which is attached as Exhibit "E" to this Disclosure Statement. Additionally, the Sale Plan provides for future distributions to the holders of certain Allowed Claims based on the reorganization of the Debtors using the Excluded Assets following Closing of the sale to either Newfield or such other purchaser that has submitted a Superior Proposal.

### Section 3.2.    Substantive Consolidation

The Sale Plan provides for the substantive consolidation of the Debtors' estates except for the estate of TXCO Drilling.  Following Confirmation, the Debtors will be substantively consolidated for all purposes.

### 1.    Discussion of Substantive Consolidation Generally

Generally, substantive consolidation of the estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of the multiple debtors for certain purposes under a plan.  The effect of consolidation is the pooling of the assets of, and claims against, the consolidated debtors; satisfying liabilities from a common fund; and combining the creditors of the debtors for purposes of voting on reorganization plans.  *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988).  There is no statutory authority specifically authorizing substantive consolidation.  The authority of a Bankruptcy Court to order substantive consolidation is derived from its general equitable powers under section 105(a) of the Bankruptcy Code, which provides that the court may issue orders necessary to carry out the provisions of the Bankruptcy Code.  *In re DRW Property Co.*, 54 B.R. 489, 494 (Bankr. N.D. Tex. 1985).  Nor are there statutorily prescribed standards for substantive consolidation.  Instead, judicially developed standards control whether substantive consolidation should be granted in any given case.

The propriety of substantive consolidation must be evaluated on a case-by-case basis. *See, FDIC v. Colonial Realty Co.*, 966 F.2d 57 (2d Cir. 1992).  The extensive list of elements and factors frequently cited and relied upon by courts in determining the propriety of substantive consolidation may be viewed as variants on two critical factors, namely, (i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors.  *In re Augie/Restivo Baking Co.*, 860 F.2d at 518.  Some courts have viewed these elements and factors as examples of information that may be useful to courts charged with

deciding whether there is substantial identity between the entities to be consolidated and whether consolidation is necessary to avoid some harm or to realize some benefit.

Among the specific factors or elements looked to by courts are the following:

- the degree of difficulty in segregating and ascertaining the individual assets and liabilities of the entities to be consolidated;

- the presence or absence of consolidated financial statements among the entities to be consolidated;

- the commingling of assets and business functions among the entities to be consolidated;

- the unity of interests and ownership among the various entities;

- the existence of parent and intercorporate guarantees on loans to the various entities;

- the transfer of assets to and from the various entities without formal observance of corporate formalities; and

- the effect on the percentage recovery of a claim if substantive consolidation is allowed compared to administrative consolidation.

Substantive consolidation is an equitable remedy that a bankruptcy court may be asked to apply in chapter 11 cases involving affiliated debtors. Substantive consolidation involves the pooling of the assets and liabilities of the affected debtors. All of the debtors in the substantively consolidated group are treated as if they were a single corporate and economic entity. Consequently, a creditor of one of the substantively consolidated debtors is treated as a creditor of the substantively consolidated group of debtors, and issues of individual corporate ownership of property and individual corporate liability on obligations are ignored. Substantive consolidation of two or more debtors' estates generally results in the deemed consolidation of the assets and liabilities of the debtors, the elimination of multiple and duplicative creditor claims, joint and several liability claims and guarantees and the payment of allowed claims from a common fund. Absent such substantive consolidation, payment of such duplicative claims would be dilutive of the amounts ultimately payable to certain holders of Allowed Claims against the Debtors. The Debtors believe that substantive consolidation is warranted in light of the criteria established by the courts in ruling on the propriety of substantive consolidation in other cases.

2. Application to the Debtors

The facts and circumstances surrounding the historical business operations of TXCO and the Affiliate Debtors support substantive consolidation in these Chapter 11 cases. TXCO and the Affiliate Debtors historically have issued consolidated financial statements. As reflected in the organization chart attached as Exhibit "D" to this Disclosure Statement, TXCO directly or

indirectly owns 100% of the Affiliate Debtors. TXCO and the Affiliate Debtors have common officers and directors and have shared key employees and outside professionals, including, but not limited to, employees of TXCO who performed human resources, legal and risk management services for the benefit of all the Debtors, and accounting firms, law firms, and consultants who rendered services to all of the Debtors.

As mentioned above, the Affiliate Debtors share the same ultimate corporate parent: TXCO. There is significant overlap in the officers and directors of the Affiliate Debtors. The Debtors utilize a centralized cash management system, and pay the liabilities of the Affiliate Debtors as needed. As mentioned above, the Debtors' financial statements are consolidated at TXCO. Accordingly, for the reasons stated above, the Debtors believe that substantive consolidation for purposes of the Sale Plan is warranted in light of the criteria established by the courts in ruling on the propriety of substantive consolidation in other cases.

<div align="center">Section 3.3.    Classification and Treatment of Claims and Interests</div>

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify the claims of a debtor's creditors and the claims of its interest holders. In accordance with section 1123, the Sale Plan divides Claims and Interests into Classes and sets forth the treatment for each Class. The Debtors are required under section 1122 of the Bankruptcy Code to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

A Claim or Interest shall be deemed classified in a particular Class only to the extent that it qualifies within the description of such Class, and shall be deemed classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. Notwithstanding anything to the contrary in the Sale Plan, a Claim or Interest shall be deemed classified in a Class only to the extent that such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe the Sale Plan has classified all Claims and Interests in compliance with the provisions of section 1122; however, a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests, and the Bankruptcy Court may find that a different classification is required for the Sale Plan to be confirmed. In that event the Debtors intend, to the extent permitted by the Bankruptcy Code, the Sale Plan and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Sale Plan to permit confirmation and to use the Sale Plan acceptances received in this solicitation for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Sale Plan, by changing the composition of such Class and the vote required of that Class for approval of the Sale Plan. Furthermore, a reclassification of a Claim or Interest after approval of the Sale Plan could necessitate a redistribution of the Disclosure Statement and re-solicitations of acceptances under the Sale Plan.

2752695.1

(i)     Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests of the Sale Plan. These unclassified Claims are treated as follows:

Administrative Claims

An Administrative Claim is defined in the Sale Plan as a Claim for payment of an administrative expense of a kind specified in sections 503(b)(including an Unsecured Claim entitled to priority under section 503(b)(9) of the Bankruptcy Code) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including, but not limited to, (i) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors, including, without limitation, wages, salaries, or commissions for services rendered after the commencement of these Cases, (ii) Professional Fee Claims, (iii) Substantial Contribution Claims, (iv) all fees and charges assessed against the Estates under section 1930 of title 28 of the United States Code, and (v) Cure payments for contracts and leases that are assumed under section 365 of the Bankruptcy Code, except to the extent waived.

Under the Sale Plan, except as otherwise provided for in Section 11.1 of the Sale Plan, on, or as soon as reasonably practicable thereafter, the latest of (i) the Effective Date, (ii) the date such Administrative Claim becomes an Allowed Administrative Claim or (iii) the date such Administrative Claim becomes payable pursuant to any agreement between the holder of such Administrative Claim and the Debtors or Reorganized TXCO, as applicable, the holder of each Allowed Administrative Claim shall receive in full satisfaction, release, settlement and discharge of such Allowed Administrative Claim:  (A) cash equal to the unpaid portion of such Allowed Administrative Claim; or (B) in accordance with the terms of any written agreement between the Debtors or Reorganized Debtors, as applicable, regarding such Allowed Administrative Claim; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during these Cases will be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto. As of the Confirmation Hearing, the Debtors estimate that the amount of Allowed Administrative Claims will be $_____.

The Sale Plan provides that all final requests for payment of Professional Fee Claims (excluding Substantial Contribution Claims) must be filed and served on Reorganized TXCO, their counsel, and any other necessary parties in interest no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to such requests for payment must be filed and served on Reorganized TXCO, their counsel, and the requesting Professional or other entity no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable request for payment was served.

2752695.1

Priority Tax Claims

The Sale Plan defines Priority Tax Claims as Claims entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code. Such Claims include Claims of governmental units for taxes owed by Debtors that are entitled to a priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code. The taxes entitled to priority are (i) taxes on or measured by income or gross receipts that meet the requirements set forth in section 507(a)(8)(A) of the Bankruptcy Code, (ii) property taxes meeting the requirements of section 507(a)(8)(B) of the Bankruptcy Code, (iii) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in section 507(a)(8)(C) of the Bankruptcy Code, (iv) employment taxes on wages, salaries, or commissions that are entitled to priority pursuant to section 507(a)(4) of the Bankruptcy Code, to the extent that such taxes also meet the requirements of section 507(a)(8)(D), (v) excise taxes of the kind specified in section 507(a)(8)(E) of the Bankruptcy Code, (vi) customs duties arising out of the importation of merchandise that meet the requirements of section 507(a)(8)(F) of the Bankruptcy Code, and (vii) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in section 507(a)(8)(G).

Under the Sale Plan, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, as will have been determined by the Debtors or by Reorganized TXCO, as applicable, either (i) on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, Cash equal to the due and unpaid portion of such Allowed Priority Tax Claim, (ii) treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such different treatment as to which such holder and the Debtors or Reorganized TXCO, as applicable, will have agreed upon in writing. To the extent the Debtors elect under section 1129(a)(9)(C) of the Bankruptcy Code to make regular instalment payments in Cash over a period of five years from the Petition Date, the holder of an Allowed Priority Tax Claim will receive Post-Effective Date interest of 6.5% per annum with the first instalment to be thirty days after the Effective Date. As of the Confirmation Hearing, the Debtors estimate that the amount of Allowed Priority Tax Claims will be $_____.

(ii)    Classification and Treatment of Claims and Interests

Treatment of Class 1 Allowed DIP Loan Secured Claim

On the Closing Date, the Debtors will transfer to the DIP Loan Agent from their Cash, the funds necessary to satisfy in full the DIP Loan, including any accrued interest and charges. In addition, the Debtors will pay fees and reasonable attorney's fees and expenses, as agreed upon by the Debtors and the Committee or if there is a dispute, such amount as ordered by the Bankruptcy Court at the Confirmation Hearing. As of the Confirmation Hearing, the Debtors estimate that the amount of the Allowed DIP Loan Secured Cash will be $32 million.

Treatment of Class 2 Allowed Secured Claims of Mineral Lienholders on Non-Mortgaged Properties

"Senior Mineral Lien Claimants" is limited to creditors in their capacities as holders of liens upon the Debtors' property upon which the Revolver and Term Loan Lenders do not hold perfected liens as of the Petition Date. In connection with the treatment of the Claims under Class 2, the Debtors prepared Exhibit "S," which is a preliminary list of the Senior Mineral Lien Claimants (by non-mortgaged lease/class) that the Debtors have tentatively identified as having complied with all statutory requirements necessary to perfect a Senior Mineral Lien (the "Preliminary Non-Binding Senior Mineral Lien Determination").

Estimated Amount Owing as of the Effective Date – $25 million. The Senior Mineral Lien Claimants will be placed into separate classes by lease based on the Non-Mortgaged Property to which their Senior Mineral Lien has attached.

Treatment

(a) Step One (Application of JIBs) – All Senior Mineral Lien Claimants which hold allowed claims on leases where a Debtor was the Operator are "Mineral Subcontractors" (as the term is defined in Tex. Prop. Code § 56.001(4)) and by well will receive their *pro rata* share of any unpaid prepetition Joint Interest Billings (an "Unpaid JIB") within 45 calendar days of receipt of such funds by the Debtors or Reorganized Debtors (the "JIB Payment"). Upon payment of an Unpaid JIB to the Debtors or Reorganized Debtors, the JIB Obligor will be deemed released of any and all claims by any mineral subcontractor including, without limitation, any claims under Tex. Prop. Code § 56.043 or any other section of the Texas Property Code. Exhibit "U" contains a list of the amounts which the Debtors believe constitute Unpaid JIBs and the leases on which the Unpaid JIBs are owed.

(b) Step Two (Consenting Senior Mineral Lien Claimants) – If a Senior Mineral Lien Claimant votes in favor of the Sale Plan and does not object to confirmation of the Sale Plan (a "Consenting Senior Mineral Lien Claimant"), the Debtors will not object to the extent, validity, or enforceability of the Senior Mineral Lien held by such Consenting Senior Mineral Lien Claimant as set forth in the Preliminary Non-Binding Senior Mineral Lien Determination and the Claims set forth therein will be deemed Allowed Senior Mineral Lien Claims. The Preliminary Non-Binding Senior Mineral Lien Determination will NOT include any attorney's fees or interest.

Allowed Consenting Senior Mineral Lien Claimants will be treated as follows:

- The Preference Credit –The claims of any Allowed Consenting Senior Mineral Lien Claimant will be reduced by an amount equal to fifty percent (50%) (or a lower percentage if agreed to by the Debtors or Reorganized Debtors) of the full amount of the payments received in the 90 days prior to the Petition Date against the applicable Allowed Senior Mineral Lien Claim (or a lower percentage, if

agreed to by the Debtors or Reorganized Debtors). Exhibit "Q" discloses the amounts which the Debtors paid to Senior Mineral Lien Claimants during the 90 days prior to the Petition Date. If the Allowed Consenting Senior Mineral Lien Claimant has liens on multiple leases, the payment will be allocated *pro rata* to all Senior Mineral Liens held by such Allowed Consenting Senior Mineral Lien Claimant (a "Preference Credit"). The Preference Credit will be in full and complete satisfaction of any and all claims under 11 U.S.C. § 547 against any Allowed Consenting Senior Mineral Lien Claimant.

- <u>Allowed Consenting Senior Mineral Lien Claimants</u> – Within thirty (30) days of the Effective Date, each Allowed Consenting Senior Mineral Lien Claimants will be paid an amount equal to its Preliminary Non-Binding Senior Mineral Lien Determination less any Preference Credit and/or JIB Payment, as applicable (the "Net Allowed Senior Mineral Lien Claim").

  Allowed Consenting Senior Mineral Lien Claimants shall have no further claims against the Debtors or against any party to an agreement or contract with any one or more of the Debtors other than a claim to receive any applicable JIB Payment if, when and as received by Reorganized TXCO.

(c) <u>Step Two (Non-Consenting Senior Mineral Lien Claimants)</u> – To the extent a Senior Mineral Lien Claimant objects to confirmation of the Sale Plan, votes against the Sale Plan, or does not vote in connection with the Sale Plan (a "Non-Consenting Senior Mineral Lien Claimant"), Reorganized TXCO reserves their right to further examine and/or to object to the extent, validity and/or enforceability of any lien and/or claim asserted by such Non-Consenting Senior Mineral Lien Claimant. Non-Consenting Senior Mineral Lien Claimants will be treated as follows:

- <u>Preferences</u> – Reorganized TXCO reserves the right to file avoidance actions against any and all Non-Consenting Senior Mineral Lien Claimants.

- <u>Claims Resolution Process</u> – Within 120 days after the Effective Date, Reorganized TXCO will begin to obtain a determination as to the value of any property securing the claims of Non-Consenting Senior Mineral Lien Claimants by filing a motion pursuant to Rule 9014 of the Bankruptcy Rules seeking a final ruling whether the liens of Non-Consenting Senior Mineral Lien Claimants attach to any interest acquired by a Debtor after the Petition Date (whether such interest is an increase in acreage, an increase in a working interest or attributable to a lease signed after the Petition Date) (the "Lien Motion"). Reorganized TXCO will also seek a determination as to whether they are entitled to recover from any property allegedly securing the claims of a Non-Consenting Senior Mineral Lien Claimant, the reasonable and necessary costs and expenses of preserving such property pursuant to 11 U.S.C. § 506(c). If no Lien Motion is filed, or if filed, once those issues are fully and finally resolved, the Debtors will file motions seeking determinations of the value of the property ultimately determined to

2752695.1

secure each Non-Consenting Senior Mineral Lien Claim (the "Valuation Motion").

Within 30 days after the filing of each Valuation Motion, Reorganized TXCO shall schedule mediation and identify a mediator. Any Non-Consenting Senior Mineral Lien Claimant subject to a Valuation Motion may object in writing to the mediator selected by Reorganized TXCO not later than 30 days after being notified of the identity of the proposed mediator. In the absence of any agreement, the Bankruptcy Court will select a mediator if an objection has been filed within such 30 day period. Mediations will occur at a mutually agreeable location between Reorganized TXCO and the Non-Consenting Senior Mineral Lien Claimants asserting a lien in the property. If no mutually agreeable location can be determined, the mediation will occur in San Antonio, Texas. If the mediation is successful, the Non-Consenting Senior Mineral Lien Claimant shall be entitled to the treatment of its Allowed Non-Consenting Senior Mineral Lien Claim as set forth below. In the event mediation is unsuccessful, the Debtors will set a hearing before the Bankruptcy Court to consider the Valuation Motion.

Within 60 calendar days after entry of a final order determining the value of the property to which the liens attach and the total amount of all Allowed Non-Consenting Senior Mineral Lien Claims against such property, the amount of the Allowed Non-Consenting Senior Mineral Lien Claims will be paid in full, including interest as allowed by law. Any deficiency claim will be treated as a Class 8 General Unsecured Claim.

(d)     <u>Step Two (Non-Consenting Section 1111(b) Senior Mineral Lien Claimants)</u> – To the extent a class of Senior Mineral Lien Claimants on property which is not sold, transferred or conveyed under the Sale Plan elects to be treated in the Sale Plan under section 1111(b) of the Bankruptcy Code (the "Non-Consenting Section 1111(b) Senior Mineral Lien Claimants"), Reorganized TXCO reserves their right to further examine and/or to object to the extent, validity and/or enforceability of any lien and/or claim asserted by such Non-Consenting Section 1111(b) Senior Mineral Lien Claimants. Each member of the class of Non-Consenting Section 1111(b) Senior Mineral Lien Claimants will be treated as follows:

- <u>Preferences</u> – Reorganized TXCO reserves the right to file avoidance actions against any and all Non-Consenting Section 1111(b) Senior Mineral Lien Claimants, including, without limitation, to assert that an 1111(b) election is an admission that the class is undersecured and/or that such class is estopped from denying that it is undersecured.

- <u>Claims Resolution Process</u> – Within 120 days after the Effective Date, Reorganized TXCO will begin to obtain a determination as to the value of any property securing the claims of Non-Consenting Section 1111(b) Senior Mineral Lien Claimants by filing a motion pursuant to Rule 9014 of the Bankruptcy Rules seeking a final ruling whether the liens of Non-Consenting Section 1111(b) Senior Mineral Lien Claimants attach to any interest acquired by a Debtor after

the Petition Date (whether such interest is an increase in acreage, an increase in a working interest or attributable to a lease signed after the Petition Date) (the "Lien Motion"). Reorganized TXCO will also seek a determination as to whether they are entitled to recover from any property allegedly securing the claims of a Non-Consenting Section 1111(b) Senior Mineral Lien Claimants, the reasonable and necessary costs and expenses of preserving such property pursuant to 11 U.S.C. § 506(c). Once those issues are fully and finally resolved, the Debtors will file motions (the "Section 1111(b) Valuation Motion") seeking determinations of the value of the property to ultimately determine the value securing each Non-Consenting Section 1111(b) Senior Mineral Lien Claimants Claims, if any.

Within 30 days after filing of each Section 1111(b) Valuation Motion, Reorganized TXCO shall schedule mediation and identify a mediator. Any of the Non-Consenting Section 1111(b) Senior Mineral Lien Claimants subject to a Section 1111(b) Valuation Motion may object in writing to the mediator selected by Reorganized TXCO not later than 30 days after being notified of the identity of the proposed mediator. In the absence of any agreement, the Bankruptcy Court will select a mediator if an objection has been filed within such 30 day period. Mediations will occur at a mutually agreeable location between Reorganized TXCO and the Non-Consenting Section 1111(b) Senior Mineral Lien Claimants asserting a lien in the property. If no mutually agreeable location can be determined, the mediation will occur in San Antonio, Texas. If the mediation is successful, the Non-Consenting Section 1111(b) Senior Mineral Lien Claimants shall be entitled to the treatment of its Allowed Non-Consenting Section 1111(b) Senior Mineral Lien Claim as set forth below. In the event mediation is unsuccessful, the Debtors will set a hearing before the Bankruptcy Court to consider the Section 1111(b) Valuation Motion.

Once a determination is reached on the value of the property to which the liens attach and the total amount of all Allowed Non-Consenting Section 1111(b) Senior Mineral Lien Claims against such property:

Within 30 days after filing of each Section 1111(b) Valuation Motion, Reorganized TXCO shall schedule mediation and identify a mediator. Any of the Non-Consenting Section 1111(b) Senior Mineral Lien Claimants subject to a Section 1111(b) Valuation Motion may object in writing to the mediator selected by Reorganized TXCO not later than 30 days after being notified of the identity of the proposed mediator. In the absence of any agreement, the Bankruptcy Court will select a mediator if an objection has been filed within such 30 day period. Mediations will occur at a mutually agreeable location between Reorganized TXCO and the Non-Consenting Section 1111(b) Senior Mineral Lien Claimants asserting a lien in the property. If no mutually agreeable location can be determined, the mediation will occur in San Antonio, Texas. If the mediation is successful, the Non-Consenting Section 1111(b) Senior Mineral Lien Claimants shall be entitled to the treatment of its Allowed Non-Consenting Section 1111(b) Senior Mineral Lien Claim as set forth below. In the event mediation is

unsuccessful, Reorganized TXCO will set a hearing before the Bankruptcy Court to consider the Section 1111(b) Valuation Motion.

Classes for Secured Claims of Mineral Lienholders on Non-Mortgaged Properties:

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|-------|-----------|--------------|----------------|-------------------|
| Class 2A | Alkek Leases | TX-003-001.00<br>TX-003-002.00<br>TX-003-004.00 | MTZ Vacuum Service<br>EMS Pipeline Services, LP | $ 389.29 |
| Class 2B | Barrett Lease | TX-027-017.00 | Nabors Wells Services Co. | $ 11,513.01[7] |
| Class 2C | Briscoe Catarina Lease | TX-101J-001.00 | Baker Hughes Oilfield Inc.<br>Tim's Welding LLC<br>Wood Group Logging Services | $ 95,053.48 |
| Class 2D | Briscoe Catarina West Lease | TX-101M-001.00 | Alice Southern Equipment<br>Allis-Chalmers Tubular<br>Baker Hughes Oilfield Inc.<br>BJ Services Company<br>Blue Star Pipe<br>Capital Well Service, LLC<br>Doug Frazier<br>Eastern Oil Well Service Co.<br>Fernando Alvarez<br>Fesco Ltd.<br>Gyrodata, Inc.<br>Julu Services Inc.<br>Lide Industries, Inc.<br>Lin's Completion Fluids, Inc.<br>Mangum's Oilfield Services, Inc.<br>McGuire Industries, Inc.<br>Mitco Brick Inc. | $ 3,918,808.58[8] |

---

[7] The allocated value for the Barrett Lease is $0 under the Newfield PSA and there are no potential JIB payments owed on the Barrett Lease.

[8] The allocated value for the Briscoe Catarina West Lease is $1,800,000 under the Newfield PSA and there are potential JIB payments owed in the amount of $2,592,044.20.

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|---|---|---|---|---|
| | | | MTZ Vacuum Service Perforating Services Intl. Smith International Specialty Rental Tools Texas Southern Crane The South Texas Supply Company Thomas Energy Services, Inc. Thomas Petroleum, Ltd. Tim Ligocky Top Notch Energy Services Inc. Treat-Em-Rite Corporation Wood Group Production Testing Tasco Tool Service, Ltd. | |
| Class 2E | Briscoe Chupadera Lease | TX-101R-001.01/.02 | DHW Well Service Inc. Doug Frazier Eastern Oil Well Service Co. Fesco Ltd. Lide Industries, Inc. Mangum's Oilfield Services Inc. McGuire Industries, Inc. MTZ Vacuum Service Specialty Rental Tools Tasco Tool Service, Ltd. The South Texas Supply Company Thomas Energy Services, Inc. Tim's Welding LLC Weatherford U.S., L.P. Wood Group Logging Services Wood Group Production Testing | $ 4,651,876.58[9] |

[9] The allocated value on the Briscoe Chupadera Lease is $725,999.00 under the Newfield PSA and there are no potential JIB payments owed on the Briscoe Chupadera Lease.

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|---|---|---|---|---|
| | | | Odessa Pumps & Equipment | |
| Class 2F | Burr "A" Lease | TX-006-001 | J F Ralston Co. Capital Well Service, LLC EMS Pipeline Services, LP Tasco Tool Service, Ltd. The South Texas Supply Company Thomas Petroleum, Ltd. Tim Ligocky Tim's Welding LLC Treat-Em-Rite Corporation MTZ Vacuum Service | $ 383,355.24[10] |
| Class 2G | Cherry Lease | TX-029-001.01-.05 | Capital Well Service, LLC | $ 3,156.98 |
| Class 2H | Chittim "B" Lease | TX-009-001.01/.02 | Fesco Ltd. Tim Logocky Doug Frazier EMS Pipeline Services, LP Mangum's Oilfield Services Inc. McGuire Industries, Inc. Tasco Tool Service, Ltd. Total Production Services, Inc. Weatherford U.S., L.P. Wood Group Logging Services HBK Resources Ltd. J F Ralston Co Inc. Lide Industries, Inc. Mesa Safety Services The South Texas Supply | $ 4,192,537.51[11] |

---

[10] The allocated value for the Burr "A" Lease is $330,000.00 under the Newfield PSA and there are potential JIB payments owed in the amount of $42,000.00.

[11] The allocated value for the Chittim "B" Lease is $175,000.00 under the Newfield PSA and there aer potential JIB payments owed in the amount of $493,615.08.

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|---|---|---|---|---|
| | | | Company<br>Treat-Em-Rite Corporation<br>Halliburton Energy Services<br>Tim's Welding LLC<br>Capital Well Service, LLC<br>ITS Engineered Systems, Inc.<br>Techmation Electric & MTZ Vacuum Service<br>Odessa Pumps & Equipment<br>Petrospec Engineering Ltd. | |
| Class 2I | Chittim "G" Lease | TX-004-004.00 | MTZ Vacuum Service | $ 230.00 |
| Class 2J | Farmers Lease | TX-016A | Midway Oilfield Constructors | $ 2,380.13 |
| Class 2K | Felps Lease | TX-030-003.00 | MTZ Vacuum Service | $ 1,376.00 |
| Class 2L | Glass "A" Lease | TX-002-001.01/.02 | Doug Frazier<br>Eastern Oil Well Service Co.<br>Mangum's Oilfield Services Inc.<br>MTZ Vacuum Service<br>Stinger Wellhead Protection<br>Wood Group Logging Services<br>Allis-Chalmers Tubular<br>Capital Well Service, LLC<br>J F Ralston Co Inc<br>McGuire Industries, Inc.<br>Mesa Safety Services<br>Tasco Tool Service, Ltd.<br>The South Texas Supply Company<br>Thomas Energy | $ 1,122,714.43 |

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|-------|-----------|--------------|----------------|-------------------|
| | | | Services, Inc.<br>EMS Pipeline Services, LP<br>J&J Excavating & Materials | |
| Class 2M | Glass "B" Lease | TX-020-002.01/.02 | Total Production Services, Inc | $ 1,568.50 |
| Class 2N | Gorman Lease | TX-012-001.01/.02/ .03/.04 | Odessa Pumps & Equipment | $ 3,279.98 |
| Class 2O | Harris Lease | TX-030-006.01 | Capital Well Service, LLC | $ 428.67 |
| Class 2P | Keller Lease | TX-015-051.00 | Capital Well Service, LLC<br>Eastern Oil Well Service Co.<br>MTZ Vacuum Service<br>The South Texas Supply Company | $ 25,837.70 |
| Class 2Q | Kincaid Lease | TX-002-001.00 | The South Texas Supply Company<br>Capital Well Service, LLC | $ 1,055.50 |
| Class 2R | Latham McKnight Lease | TX-022-032.00 | Doug Frazier<br>MTZ Vacuum Service | $ 79,546.21 |
| Class 2S | Maddux Lease | TX-026-002.01 | Capital Well Service, LLC<br>Doug Frazier<br>McGuire Industries, Inc.<br>MTZ Vacuum Service<br>Weatherford U.S., L.P. | $ 56,645.26[12] |
| Class 2T | Marolyn Powell Bean Lease | TX-022-012.01 | The South Texas Supply Company | $ 354.79 |

---

[12] The allocated value for the Maddux Lease is $25,000.00 under the Newfield PSA and there are potential JIB payments of $40,349.00.

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|---|---|---|---|---|
| Class 2U | Marolyn Powell Bean Lease | TX-022-012.01/.02 & TX-023-001.01/.02 | J F Ralston Co Inc<br>Capital Well Service, LLC<br>Eastern Oil Well Service Co.<br>Doug Frazier<br>MTZ Vacuum Service | $ 156,641.60 |
| Class 2V | Marolyn Powell Bean Lease | TX-022-012.01/TX-023-001.01 | Allis-Chalmers Tubular<br>Baker Hughes Oilfield Inc.<br>C&J Spec-Rent Services, Inc.<br>Doug Frazier<br>Julu Services Inc.<br>Mangum's Oilfield Services Inc<br>McGuire Industries, Inc.<br>Patterson-UTI Drilling Co LP<br>Smith International<br>Standard Tube Company<br>Stinger Wellhead Protection<br>Tasco Tool Service, Ltd.<br>Thomas Energy Services, Inc.<br>Weatherford U.S., L.P.<br>Wood Group Logging Services<br>Fernando Alvarez<br>Matthew Mchazlett-DBA<br>Texas Energy Services, L.P. | $ 1,736,354.75 |
| Class 2W | Myers Lease | TX-014-001.00 | J F Ralston Co Inc<br>Tim's Welding LLC<br>Capital Well Service, LLC<br>DHW Well Service Inc.<br>Doug Frazier<br>Mangum's Oilfield Services Inc | $ 219,652.93 |

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|-------|-----------|--------------|----------------|-------------------|
| | | | MTZ Vacuum Service The South Texas Supply Company Treat-Em-Rite Corporation | |
| Class 2X | Myra Gould Lease | Unknown (Non-TXCO Lease) | Midway Oilfield Constructors Weatherford U.S., L.P. Wood Group Logging Services | $ 27,393.06 |
| Class 2Y | O'Meara Lease J.A. Webb Lease | TX-014-006.00 TX-014-002.00 | Allis-Chalmers Tubular Backer Hughes Oilfield Inc. Bourland & Leverich Supply Co Doug Frazier Fernando Alvarez J&J Excavating & Materials Julu Services Inc. Leam Drilling Systems, Inc. Lin's Completion Fluids, Inc. Mangum's Oilfield Services, Inc. McGuire Industries, Inc. Mesa Safety Services Mitco Brick Inc. MTZ Vacuum Service Patterson-UTI Drilling Co LP Smith International Specialty Rental Tools Thomas Energy Services, Inc. Thomas Petroleum, Ltd. Treat-Em-Rite Corporation Turbeco Inc. TXCO Drilling Corp Weatherford U.S., L.P. Wood Group Logging | $ 3,458,623.35 |

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|-------|-----------|--------------|----------------|-------------------|
| | | | Services<br>EMS Pipeline Services, LP<br>J F Ralston Co Inc<br>Tim's Welding LLC | |
| Class 2Z | Peters Lease | ND-06-196A | Baker Hughes | $ 5,067.21 |
| Class 2AA | San Pedro Ranch Lease | TX-101A-001-01/02/03 | Alice Southern Equipment<br>Allis-Chalmers Tubular<br>Baker Hughes Oilfield Inc.<br>BJ Services Company<br>C&J Spec-Rent Services, Inc.<br>Capital Well Service, LLC<br>DHW Well Service Inc.<br>Dorsal Services, Inc.<br>Doug Frazier<br>EMA Pipeline Services, LP<br>Fernando Alvarez<br>Fesco Ltd.<br>J&J Excavating & Materials<br>Julu Services Inc.<br>J-W Wireline Company<br>Lin's Completion Fluids, Inc.<br>Matthew Mchazlett-DBA<br>McGuire Industries, Inc.<br>Mitco Brick Inc.<br>MTZ Vacuum Service<br>Nabors Well Services Co.<br>Odessa Pumps & Equipment<br>Patterson-UTI Drilling Co LP | $ 12,495,556.98[13] |

[13] The allocated value for the San Pedro Ranch Lease is $4,200,000 under the Newfield PSA and there are potential JIB payments of $6,162,245.44.

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|---|---|---|---|---|
| | | | Perforating Services Intl. | |
| | | | Professional Wireline Rentals | |
| | | | Schlumberger Technology | |
| | | | Smith International | |
| | | | Specialty Rental Tools | |
| | | | Standard Tube Company | |
| | | | Stinger Wellhead Protection | |
| | | | Tasco Tool Service, Ltd. | |
| | | | Texas Energy Services, L.P. | |
| | | | Texas Southern Crane | |
| | | | The South Texas Supply Company | |
| | | | Thomas Energy Services, Inc. | |
| | | | Thomas Petroleum, Ltd. | |
| | | | Thru Tubing Solutions, Inc. | |
| | | | Tim Ligocky | |
| | | | Tim's Welding LLC | |
| | | | Top Notch Energy Services Inc | |
| | | | Torqued-Up Oilfield | |
| | | | Treat-Em-Rite Corporation | |
| | | | Turbeco Inc. | |
| | | | Weatherford U.S., L.P. | |
| | | | Wood Group Logging Services | |
| | | | Halliburton Energy Services | |
| | | | J F Ralston Co Inc | |
| | | | Lide Industries, Inc. | |
| | | | Mangum's Oilfield Services Inc | |

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|---|---|---|---|---|
| Class 2BB | Saner Lease | TX-026-004.00 | MTZ Vacuum Service Cameron International Corp. McGuire Industries, Inc. Doug Frazier Mangum's Oilfield Services Inc. Weatherford U.S., L.P. Versa Tech Automation Services Petrospec Engineering Ltd. Tim Ligocky Tim's Welding LLC | $ 2,069,598.82[14] |
| Class 2CC | WIPFF Lease | TX-005-001.01 | Capital Well Service, LLC MTZ Vacuum Service | $ 931.01 |

Treatment of Class 3 Allowed Secured Claims of the Revolver Lenders

On the Closing Date, the Debtors will transfer to the Revolver Loan Agent from their Cash, the funds necessary to satisfy in full the Revolver Loan, including any accrued interest and charges. In addition, the Debtors will pay fees and reasonable attorneys' fees and expenses, as agreed upon by the Debtors and the Committee or if there is a dispute, such amount as ordered by the Bankruptcy Court at the Confirmation Hearing. As of the Confirmation Hearing, the Debtors estimate that the amount of the Allowed Secured Claims of the Revolver Lenders will be $_____.

Treatment of Class 4 Allowed Secured Claims of the Term Loan Lenders

On the Closing Date, the Debtors will transfer to the Term Loan Agent from their Cash, the funds necessary to satisfy in full the Term Loan, including any accrued interest and charges. In addition, the Debtors will pay all fees and reasonable attorneys' fees and expenses, as agreed upon by the Debtors and the Committee or, if there is a dispute, such amount as ordered by the Bankruptcy Court at the Confirmation Hearing. As of the Confirmation Hearing, the Debtors estimate that the amount of the Allowed Secured Claims of the Term Loan Lenders will be $_____.

---

[14] The allocated value for the Saner Lease is $150,000.00 under the Newfield PSA and there are potential JIB payments owed in the amount of $1,810,881.51.

Treatment of Class 5 Allowed Secured Claims of the Mineral Lien Holders on Mortgaged Properties

"Junior Mineral Lien Claimants" means creditors in their capacities as holders of liens upon property upon which the Revolver and Term Loan Lenders do hold perfected liens as of the Petition Date. In connection with the treatment of the Claims under Class 5, the Debtors prepared Exhibit "T," which is a preliminary list of the Junior Mineral Lien Claimants (by lease/class) that the Debtors have tentatively identified as having complied with all statutory requirements necessary to perfect a lien (the "Preliminary Non-Binding Junior Mineral Lien Determination").

Total Estimated Amount Owing as of the Effective Date – $15 million.

Treatment

(a)   Step One (Application of JIBs) – All Junior Mineral Lien Claimants which are "Mineral Subcontractors" (as the term is defined in Tex. Prop. Code § 56.001(4)) receive their *pro rata* share of any Unpaid JIB within 45 calendar days of the Debtors' or Reorganized Debtors' receipt of a JIB Payment. Upon payment of an Unpaid JIB to the Debtors or Reorganized Debtors, the JIB Obligor will be deemed released of any and all claims by any mineral subcontractor including, without limitation, any claims under Tex. Prop. Code § 56.043 or any other section of the Texas Property Code. Exhibit "U" contains a list of the amounts which the Debtors believe constitute Unpaid JIBs and the leases on which the Unpaid JIBs are owed.

(b)   Step Two (Consenting Junior Mineral Lien Claimants) – If a Junior Mineral Lien Claimant votes in favor of the Sale Plan and does not object to confirmation of the Sale Plan (a "Consenting Junior Mineral Lien Claimant"), the Debtors will not object to the extent, validity, or enforceability of the Junior Mineral Lien held by such Consenting Junior Mineral Lien Claimant as set forth in the Preliminary Non-Binding Junior Mineral Lien Determination and the Claims set forth therein will be deemed Allowed Junior Mineral Lien Claims. The Preliminary Non-Binding Junior Mineral Lien Determination will NOT include any attorney's fees or interest.

Allowed Consenting Junior Mineral Lien Claimants will be treated as follows:

• The Preference Credit – The allowed claims of the Consenting Junior Mineral Lien Claimant will be reduced by an amount equal to fifty percent (50%) of the full amount of the payments received in the 90 days prior to the Petition Date against their Allowed Junior Mineral Lien Claim (or a lower percentage, if agreed to by the Debtors or Reorganized Debtors). Exhibit "Q" discloses the amounts which the Debtors paid to Junior Mineral Lien Claimants during the 90 days prior to the Petition Date. If the Junior Mineral Lien Claimant asserts a lien on multiple leases, the payment will be allocated *pro rata* to all Junior Mineral Liens held by such Consenting Junior Mineral Lien Claimant (a "JMLC Preference Credit").

The JMLC Preference Credit will be in full and complete satisfaction of any and all claims under 11 U.S.C. § 547 against any Allowed Consenting Junior Mineral Lien Claimant.

- Allowed Consenting Junior Mineral Lien Claimants – Consenting Junior Mineral Lien Claimants will be paid to the extent that the value of the Mortgaged Properties equal or exceed the Mortgaged Property Debt, the Allowed Junior Mineral Lien Claim, after reducing such Allowed Junior Mineral Lien Claim by any JMLC Preference Credit and/or JIB Payment, as applicable (the "Net Allowed Junior Mineral Lien Claim") within thirty (30) calendar days after the Effective Date. In the event the value of the Mortgaged Properties does not equal or exceed the Mortgaged Property Debt, the net Allowed Junior Mineral Lien Claim will be treated under Class 8 General Unsecured Claim.

(c)    Step Two (Non-Consenting Junior Mineral Lien Claimants):  To the extent a Junior Mineral Lien Claimant objects to confirmation of the Sale Plan, votes against the Sale Plan or does not vote in connection with the Sale Plan (a "Non-Consenting Junior Mineral Lien Claimant"), Reorganized TXCO reserves their right to further examine and/or to object to the extent, validity and/or enforceability of any lien and/or claim asserted by such Non-Consenting Junior Mineral Lien Claimant.

Non-Consenting Junior Mineral Lien Claimants will be treated as follows:

- Preferences – Reorganized TXCO reserves the right to file avoidance actions against any and all Non-Consenting Junior Mineral Lien Claimants.

- Claims Resolution Process – Within 120 days after the Effective Date, Reorganized TXCO will begin to obtain a determination as to the value of any property securing the claims of Non-Consenting Junior Mineral Lien Claimants by filing a motion pursuant to Rule 9014 of the Bankruptcy Rules seeking a final ruling whether the liens of Mineral Lien Claimants attach to any interest acquired by a Debtor after the Petition Date (whether such interest is an increase in acreage, an increase in a working interest or attributable to a lease signed after the Petition Date) (the "Lien Motion").  Reorganized TXCO will also seek a determination as to whether they are entitled to recover from any property allegedly securing the claims of the Non-Consenting Junior Mineral Lien Claimants, the reasonable and necessary costs and expenses of preserving such property pursuant to 11 U.S.C. § 506(c).  If no Lien Motion is filed, or if filed, once those issues are fully and finally resolved, the Debtors will file motions seeking determinations of the value of the property ultimately determined to secure each Non-Consenting Junior Mineral Lien Claim (its "Junior Valuation Motion").  Reorganized TXCO will seek a determination as to the value of the interest to which the liens attach.

Within 30 days after filing the Junior Valuation Motion, Reorganized TXCO shall schedule mediation and identify a mediator.  Any Non-Consenting Junior Mineral

Lien Claimant subject to a Junior Valuation Motion may object in writing to the mediator selected by Reorganized TXCO not later than 30 days after being notified of the identity of the proposed mediator. In the absence of any agreement, the Bankruptcy Court will select a mediator if an objection has been filed within such 30 day period. Mediations will occur at a mutually agreeable location between Reorganized TXCO and the Non-Consenting Junior Mineral Lien Claimants asserting a lien in the property. If no mutually agreeable location can be determined, the mediation will occur in San Antonio, Texas. If the mediation is successful, the Non-Consenting Junior Mineral Lien Claimant will be entitled to the treatment of its Allowed Non-Consenting Junior Mineral Lien Claim as set forth below. In the event mediation is unsuccessful, the Debtors will set a hearing before the Bankruptcy Court to consider the Junior Valuation Motion.

Within sixty (60) days after entry of a Final Order determining the value of the property to which the liens attach and the total amount of the Allowed Non-Consenting Junior Mineral Lien Claims against such property, the amount of the Allowed Non-Consenting Junior Mineral Lien Claims will be paid in full, including interest as allowed by law. Any deficiency claim will be treated as a Class 8 General Unsecured Claim.

(d)     Step Two (Section 1111(b) Junior Mineral Lien Claimants) – To the extent a class of Junior Mineral Lien Claimants on property which is not sold, transferred or conveyed under the Sale Plan, elects to be treated in the Sale Plan under section 1111(b) of the Bankruptcy Code (the "Non-Consenting Section 1111(b) Junior Mineral Lien Claimants"), Reorganized TXCO reserves their right to further examine and/or to object to the extent, validity and/or enforceability of any lien and/or claim asserted by such Non-Consenting Section 1111(b) Junior Mineral Lien Claimants. Each member of the class of Non-Consenting Section 1111(b) Junior Mineral Lien Claimants will be treated as follows:

Non-Consenting Junior Section 1111(b) Mineral Lien Claimants will be treated as follows:

- Preferences – Reorganized TXCO reserves the right to file avoidance actions against any and all Non-Consenting Section 1111(b) Junior Mineral Lien Claimants including, without limitation, to assert that an 1111(b) election is an admission that the class is undersecured and/or that such class is estopped from denying that it is undersecured.

- Claims Resolution Process – Within 120 days after the Effective Date, Reorganized TXCO will begin to obtain a determination as to the value of any property securing the claims of Non-Consenting Section 1111(b) Junior Mineral Lien Claimants by filing a motion pursuant to Rule 9014 of the Bankruptcy Rules seeking a final ruling whether the liens of Non-Consenting Section 1111(b) Junior Mineral Lien Claimants attach to any interest acquired by a Debtor after the Petition Date (whether such interest is an increase in acreage, an increase in a

working interest or attributable to a lease signed after the Petition Date) (the "Lien Motion"). Reorganized TXCO will also seek a determination as to whether they are entitled to recover from any property allegedly securing the claims of the Non-Consenting Section 1111(b) Junior Mineral Lien Claimants, the reasonable and necessary costs and expenses of preserving such property pursuant to 11 U.S.C. § 506(c). Once those issues are fully and finally resolved, the Debtors will file motions (the "Junior Section 1111(b) Valuation Motion") seeking determinations of the value of the property, including whether the remaining value of the property is of inconsequential value such that the class of Junior Mineral Claimants was not entitled to make an election under section 1111(b) of the Bankruptcy Code, to ultimately determine the value securing each Non-Consenting Section 1111(b) Senior Mineral Lien Claimants Claims, if any. In undertaking the Junior Section 1111(b) Valuation Motion, the Debtors, Reorganized TXCO and the Term Loan Lenders reserve the right to oppose any attempt to compel a particular allocation of senior debt to collateral that secures the liens of Junior Mineral Lien Claimants or to "marshal" the claims. For avoidance of doubt, the Term Lenders and the Debtors take the position that any party seeking to compel marshalling will not be able to meet their burden. See *In re Mid-West Motors, Inc.*, 82 B.R. 439, 442 (Bankr. N.D. Tex. 1988), *In re Mesa Intercontinental, Inc.*, 79 B.R. 669, 671 (Bankr. S.D. Tex. 1987).

Within 30 days after filing the Junior Section 1111(b) Valuation Motion, Reorganized TXCO shall schedule mediation and identify a mediator. Any Non-Consenting Section 1111(b) Junior Mineral Lien Claimant subject to a Junior Section 1111(b) Valuation Motion may object in writing to the mediator selected by Reorganized TXCO not later than 30 days after being notified of the identity of the proposed mediator. In the absence of any agreement, the Bankruptcy Court will select a mediator if an objection has been filed within such 30 day period. Mediations will occur at a mutually agreeable location between Reorganized TXCO and the Non-Consenting Section 1111(b) Junior Mineral Lien Claimants asserting a lien in the property. If no mutually agreeable location can be determined, the mediation will occur in San Antonio, Texas. If the mediation is successful, the Non-Consenting Section 1111(b) Junior Mineral Lien Claimant will be entitled to the treatment of its Allowed Non-Consenting Section 1111(b) Junior Mineral Lien Claim as set forth below. In the event mediation is unsuccessful, the Debtors will set a hearing before the Bankruptcy Court to consider the Junior Section 1111(b) Valuation Motion.

Once a determination is reached on the value of the property to which the liens attach and the total amount of all Allowed Non-Consenting Section 1111(b) Junior Mineral Lien Claims against such property:

All Allowed Non-Consenting Section 1111(b) Junior Mineral Lien Claimants will retain a lien against the Excluded Property in which they had previously asserted a Junior Mineral Lien, for the full amount of their Allowed Non-Consenting Section 1111(b) Junior Mineral Lien Claim. Such Allowed Non-Consenting Section 1111(b) Junior Mineral Lien Claims will be paid the earlier of (a) upon

sale of the property up to, but not to exceed,  the full amount of the Allowed Non-Consenting Section 1111(b) Junior Mineral Lien Claim or (b) in full over a period of five years.

Classes for Allowed Secured Claims of the Mineral Lien Holders on Mortgaged Properties:

| Class | Lease Name | Lease Number | Lien Claimants | Lien Amount |
|---|---|---|---|---|
| Class 5A | Barclay Lease | TX-001-002.00 | J F Ralston Co Inc<br>Tasco Tool Service, Ltd.<br>Tim's Welding LLC<br>Wood Group Logging Services<br>EMS Pipeline Services, LP | $ 7,278.45 |
| Class 5B | Briscoe Ranch, Inc. et al "A" | TX-019-002.00<br>TX-019-005.00<br>(for all Cage-West A 134H Unit) | Tim's Welding LLC<br>Eastern Oil Well Service Co.<br>Thomas Energy Services, Inc.<br>Doug Frazier<br>Lide Industries, Inc.<br>Mangum's Oilfield Services Inc<br>McGuire Industries, Inc.<br>Total Production Services, Inc<br>Weatherford U.S., L.P.<br>MTZ Vacuum Service | $ 313,668.55 |
| Class 5C | Briscoe Ranch, Inc. et al "B" | TX-019-003.00<br>TX-019-006.00<br>(for all Case Ranch #1-36D and Cage-Briscoe "B" #1-44H ST4) | The South Texas Supply Company<br>Eastern Oil Well Service Co.<br>Weatherford U.S., L.P.<br>Wood Group Production Testing<br>Mesa Safety Services<br>Doug Frazier<br>Allis-Chalmers Tubular<br>Baker Hughes Oilfield Inc.<br>Fernando Alvarez<br>Julu Services Inc.<br>Mangum's Oilfield Services Inc | $ 2,655,882.18 |

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Lien Amount |
|-------|------------|--------------|----------------|-------------|
| | | | McGuire Industries, Inc.<br>Patterson-UTI Drilling Co LP<br>Professional Wireline Rentals<br>Tasco Tool Service, Ltd.<br>Thomas Energy Services, Inc.<br>Thomas Petroleum, Ltd.<br>Mitco Brick Inc.<br>Smith International<br>MTZ Vacuum Service | |
| Class 5D | Briscoe Ranch, Inc. et al "C" | TX-019-008.00 | MTZ Vacuum Service | $ 107,400.00 |
| Class 5E | Briscoe-Saner Lease | TX-007-001.00 | MTZ Vacuum Service<br>The South Texas Supply Company<br>Odessa Pumps & Equipment<br>Thomas Petroleum, Ltd.<br>EMS Pipeline Services, LP<br>Allis-Chalmers Tubular<br>Doug Frazier<br>J F Ralston Co Inc<br>Mangum's Oilfield Services Inc<br>McGuire Industries, Inc.<br>Tasco Tool Service, Ltd.<br>Thomas Energy Services, Inc.<br>Total Production Services, Inc<br>Wood Group Logging Services<br>The South Texas Supply Company<br>Treat-Em-Rite Corporation<br>Capital Well Service, LLC | $ 687,455.80 |

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Lien Amount |
|---|---|---|---|---|
| Class 5F | Bruton Lease (OPEX) | TX-016-038-000 | Express Energy Services<br>Midway Oilfield Constructors<br>Patterson Services Inc<br>Patterson-UTI Drilling Co LP<br>Specialty Rental Tools<br>Weatherford U.S., L.P.<br>Wood Group Logging Services | $ 550,436.85 |
| Class 5G | Burr "C" Lease | TX-006-003.00 | MTZ Vacuum Service<br>Treat-Em-Rite Corporation<br>Doug Frazier<br>Allis-Chalmers Tubular<br>Baker Hughes Oilfield Inc.<br>Fernando Alvarez<br>Flatrock Compression, Ltd.<br>J F Ralston Co Inc<br>Julu Services Inc.<br>Mangum's Oilfield Services Inc<br>McGuire Industries, Inc.<br>Professional Wireline Rentals<br>Texas Energy Services, L.P.<br>Thomas Energy Services, Inc.<br>Thomas Petroleum, Ltd.<br>TXCO Drilling Corp<br>Yazoo Enterprises Inc.<br>Mitco Brick Inc.<br>Mesa Safety Services<br>Smith International<br>Unison Drilling, Inc. et al<br>Weatherford International<br>Weatherford U.S., L.P.<br>Wood Group Logging Services | $ 2,055,608.62 |

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Lien Amount |
|---|---|---|---|---|
| | | | Odessa Pumps & Equipment<br>The South Texas Supply Company<br>Wood Group Production Testing | |
| Class 5H | Cage Minerals Ltd. et al | TX-019-001.01-03<br>TX-019-002.00 (for all Cage-Kirk A & Bris A 1-5H UT)<br>TX-019-030.00 (for all Cage-Kirk A & Bris A 1-5H UT) | Eastern Oil Well Service Co<br>Mesa Safety Services<br>The South Texas Supply Company<br>Treat-Em-Rite Corporation<br>Warren and Sons, Inc.<br>Doug Frazier<br>Wood Group Logging Services<br>Capital Well Service, LLC<br>EMS Pipeline Services, LP<br>MTZ Vacuum Service<br>Odessa Pumps & Equipment<br>J F Ralston Co Inc<br>Lide Industries, Inc.<br>Total Production Services, Inc<br>Mangum's Oilfield Services Inc<br>McGuire Industries, Inc.<br>Patterson-UTI Drilling Co LP<br>Weatherford U.S., L.P.<br>Thomas Energy Services, Inc. | $ 2,991,681.73 |
| Class 5I | Chittim "A" Lease | TX-004-001 | Capital Well Service, LLC<br>EMS Pipeline Services, LP<br>Total Production Services, Inc.<br>Techmation Electric & | $ 40,287.94 |

| Class | Lease Name | Lease Number | Lien Claimants | Lien Amount |
|---|---|---|---|---|
| Class 5J | Comanche Ranch Lease | TX-008.001 | Weatherford U.S., L.P. | $ 91,943.00 |
| Class 5K | East Pena Creek WF Unit | TX-014-019 | Eastern Oil Well Service Co.<br>Wood Group Logging Services<br>Capital Well Service, LLC<br>DHW Well Service, Inc.<br>The South Texas Supply Company | $ 119,032.56 |
| Class 5L | Forrest-Wakefield Lease (OPEX) | TX-016-031-001/002 | Midway Oilfield Constructors<br>Specialty Rental Tools<br>Weatherford U.S., L.P. | $ 93,953.78 |
| Class 5M | Ft. Trinidad "UGRU" Unit (39 leases) | TX-016-xxx | Midway Oilfield Constructors | $ 32,730.87 |
| Class 5N | Gregg Wood Prospect (approximately 70 leases) | TX-024-xxx | Flatrock Compression, Ltd | $ 80,205.84 |
| Class 5O | L.L. Cox et al Lease (35 leases) (OPEX) | TX-012-014-xxx | K-3 Resources LP | $3,475.13 |
| Class 5P | Maples Lease (OPEX) | TX-016-032-001 | Allis-Chalmers Tubular<br>Express Energy Services<br>McGuire Industries, Inc.<br>Midway Oilfield Constructors<br>Pinnergy, Ltd.<br>Smith International<br>Thomas Energy Services, Inc.<br>Thomas Petroleum, Ltd.<br>Wood Group Logging Services<br>Wood Group Wireline Services | $ 701,984.61 |

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Lien Amount |
|---|---|---|---|---|
| Class 5Q | Marshall Brothers et al (21 leases) (OPEX) | TX-012-003-xxx | K-3 Resources LP | $ 6,669.27 |
| Class 5R | Paloma Lease | TX-001-001.00 | The South Texas Supply Company<br>Treat-Em-Rite Corporation<br>Allis-Chalmers Tubular<br>C&J Spec-Rent Services, Inc.<br>DHW Well Service Inc.<br>Doug Frazier<br>Mangum's Oilfield Services Inc.<br>McGuire Industries, Inc.<br>MTZ Vacuum Service<br>Odessa Pumps & Equipment<br>Smith International<br>Stinger Wellhead Protection<br>Tasco Tool Service, Ltd.<br>Tim Ligocky<br>Tim's Welding LLC<br>Wood Group Logging Services<br>Dorsal Services, Inc.<br>Fernando Alvarez<br>J F Ralston Co Inc<br>Thomas Energy Services, Inc.<br>Julu Services Inc.<br>Thomas Petroleum, Ltd.<br>Mesa Safety Services<br>Total Production Services, Inc<br>Matthew Mchazlett-DBA<br>Capital Well Service, LLC<br>EMS Pipeline Services, LP | $ 1,701,576.90 |

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Lien Amount |
|---|---|---|---|---|
| Class 5S | Pena Creek WF Unit | TX-014-017 | Eastern Oil Well Service Co.<br>J F Ralston Co Inc<br>Tasco Tool Service, Ltd.<br>The South Texas Supply Company<br>Thomas Petroleum, Ltd.<br>Tim's Welding LLC<br>Treat-Em-Rite Corporation<br>Wood Group Logging Services<br>Allis-Chalmers Tubular<br>Baker Hughes Oilfield Inc.<br>Doug Frazier<br>McGuire Industries, Inc.<br>Standard Tube Company<br>Weatherford U.S., L.P.<br>Halliburton Energy Services<br>Mangum's Oilfield Services Inc<br>EMS Pipeline Services, LP | $ 638,138.82 |
| Class 5T | South Pena Creek | TX-014-018 | Eastern Oil Well Service Co.<br>Wood Group Logging Services<br>Treat-Em-Rite Corporation<br>The South Texas Supply Company<br>Capital Well Service, LLC<br>J F Ralston Co Inc<br>Tasco Tool Service, Ltd.<br>Tim's Welding LLC<br>Total Production Services, Inc.<br>Allis-Chalmers Tubular<br>Baker Hughes Oilfield Inc. | $ 957,249.51 |

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Lien Amount |
|---|---|---|---|---|
| | | | Doug Frazier<br>Halliburton Energy Services<br>Standard Tube Company<br>Thomas Petroleum, Ltd.<br>Weatherford U.S., L.P.<br>Yazoo Enterprises Inc. | |
| Class 5U | Sue C. Ortman et al Lease | TX-028-001-000 | Texas Energy Services, L.P. | $ 16,478.25 |
| Class 5V | Undetermined to Date | Undetermined to Date | Warren and Sons, Inc. | $ 12,096.12 |
| Class 5W | Wakefield Lease (21 leases) | TX-015-A-03-02-xxx | Midway Oilfield Constructors | $ 5,026.39 |
| Class 5X | Wesley West Minerals et al "B" | TX-019-006.00 | Allis-Chalmers Tubular<br>Doug Frazier<br>Eastern Oil Well Service Co.<br>Fernando Alvarez<br>Julu Services Inc.<br>Lin's Completion Fluids, Inc.<br>Mitco Brick Inc.<br>MTZ Vacuum Service<br>Professional Wireline Rentals<br>Smith International<br>Specialty Rental Tools<br>Standard Tube Company<br>The South Texas Supply Company<br>Thomas Energy Services, Inc.<br>Wood Group Production Testing<br>Baker Hughes Oilfield Inc.<br>Fesco Ltd.<br>Mangum's Oilfield Services Inc. | $ 1,100,919.37 |

| Class | Lease Name | Lease Number | Lien Claimants | Lien Amount |
|---|---|---|---|---|
| | | | McGuire Industries, Inc. | |
| Class 5Y | W.M. Forrest Lease (OPEX) | TX-016-037-000 | Smith International Thomas Petroleum, Ltd. Weatherford U.S., L.P. Midway Oilfield Constructors | $ 228,975.29 |

Treatment of Class 6 Allowed Secured Tax Claims

Under the Sale Plan, each holder of an Allowed Secured Tax Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Secured Tax Claim, as will have been determined by the Debtors or by  Reorganized TXCO, as applicable, either (i) on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, Cash equal to the due and unpaid portion of such Allowed Secured Tax Claim, (ii) treatment in a manner consistent with section 1129(a)(9)(D) of the Bankruptcy Code, or (iii) such different treatment as to which such holder and the Debtors or Reorganized TXCO, as applicable, will have agreed upon in writing.  To the extent the Debtors elect under Section 1129(a)(9)(D) of the Bankruptcy Code to make regular installment payments in Cash, the holder of an Allowed Secured Tax Claim will receive quarterly payments on the last day of each quarter, of principal and interest, at an interest rate of six and one-half per cent (6½ %) per annum with the final payment due on or before May 17, 2014.  The first installment will be made at the end of the first full quarter after the Effective Date.  Each holder of an Allowed Secured Tax Claim shall retain the liens securing such Claim.  Each holder of an Allowed Secured Tax Claim shall retain the liens securing such Claim.  As of the Confirmation Hearing, the Debtors estimate that the amount of Class 6 Allowed Secured Tax Claims will be $_____.  Class 6 is not impaired under the Plan.

Treatment of Class 7 Allowed Priority Claims

Certain Claims are entitled to priority under Bankruptcy Code section 507(a)(3) (Claims for wages, salaries, or commissions), section 507(a)(4) (Claims for contributions to employee pension plans) and section 507(a)(6) (Claims by individuals for refunds of deposits).

Under the Sale Plan, each holder of an Allowed Priority Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Claim, as will have been determined by the Debtors or by Reorganized TXCO, as applicable, either (i) on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, Cash equal to the due and unpaid portion of such Allowed Priority Claim or (ii) such different treatment as to which such holder and the Debtors or Reorganized TXCO, as applicable, will have agreed upon in writing.  As of the Confirmation Hearing, the Debtors estimate that the amount of unpaid Class 7 Allowed Priority Claims will be $_____.  Class 7 is not impaired under the Sale Plan.

2752695.1

Treatment of Class 8 Allowed General Unsecured Claims

The holders of Claims in this class will have two options: (a) the Unsecured Creditors Discount Payment Option or (b) issuance of a Trust Certificate reflecting a *pro rata* interest in the Creditor Trust. The Creditor Trust will be issued the Secured Trust Promissory Note and one share of Reorganized TXCO Common Stock. The initial principal amount of the Secured Trust Promissory Note will be equal to all General Unsecured Claims less the total of General Unsecured Claims satisfied by the Unsecured Creditors Discount Payment Option and the Claims satisfied under Class 9 as an Allowed Administrative Convenience Claim. The principal amount of the Secured Trust Promissory Note shall also be reduced by the amount of any Disallowed General Unsecured Claims. The Secured Trust Promissory Note shall have a maturity date of five (5) years. Principal and interest payments shall be made by Reorganized TXCO on a quarterly basis at the end of each quarter with the first payment due at the end of the first full quarter following the Effective Date. Interest will be a fixed rate equal to the Applicable Federal Rate on the date the Bankruptcy Court enters the Confirmation Order. The Secured Trust Promissory Note shall be secured by the granting of a first priority security interest in and upon all Excluded Assets, except those Excluded Assets that are subject to the lien of a Non-Consenting Section 1111(b) Senior Mineral Lien Claimant, wherein the lien on behalf of the Secured Trust Promissory Note will be junior. As of the Confirmation Hearing, the Debtors estimate that the amount of the Class 8 Allowed General Unsecured Claims will be $_____. Class 8 is impaired under the Sale Plan.

Treatment of Class 9 Allowed Administrative Convenience Claims

The Sale Plan creates a separate class of Unsecured Creditors designed to avoid the inefficiencies associated with distributions to numerous creditors holding relatively small claims. Class 9 Allowed Administrative Convenience Claims promotes efficiency by providing immediate Cash payments to holders of relatively small Claims. Under the Sale Plan, an Administrative Convenience Claim is any Unsecured Claim in an amount equal to or less than $6,000. Each holder of an Allowed Administrative Convenience Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for such Allowed Administrative Convenience Claim, a single Cash payment equal to 100% of such Allowed Administrative Convenience Claim. Additionally, any party with an Unsecured Claim exceeding $6,000 may elect treatment under Class 9 Allowed Administrative Convenience Claims by agreeing to reduce their Unsecured Claim to an amount that is less than or equal to $6,000. As of the Confirmation Hearing, the Debtors estimate that the amount of the Administrative Convenience Claims will be $1,000,000. Class 9 is impaired under the Sale Plan.

Treatment of Class 10 Intercompany Claims

The Sale Plan defines Intercompany Claims as any Claims arising prior to the Petition Date against any of the Debtors by another Debtor. The term does not include Claims against any of the Debtors by a non-Debtor subsidiary or affiliate of a Debtor, which Claims will be treated as General Unsecured Claims. Except as to Drilling, those claims will be deemed discharged.

Treatment of Class 11 Preferred Stock

Class 11 is comprised of all holders of Preferred Stock in the Debtors under the Sale Plan, including any party that indicated an intent to redeem their shares of Preferred Stock prior to the Petition Date. Holders of Preferred Stock are impaired under the Sale Plan. The Holders of Class 11 Preferred Stock shall receive no Distribution under the Sale Plan. On the Effective Date, all existing Preferred Stock shall, without any further action, be cancelled, annulled and extinguished and any certificates representing such Preferred Stock shall become null, void and of no force or effect. Holders of Preferred Stock shall retain no rights and receive no consideration on account thereof. Class 11 is impaired under the Sale Plan and is deemed to have rejected the Sale Plan.

If Reorganized TXCO determines that there are sufficient funds available for a Distribution to holders of Preferred Stock and no bar date has already been established by the Bankruptcy Court, the Reorganized TXCO shall file a motion asking the Bankruptcy Court to establish the Preferred Stock Bar Date.

Treatment of Class 12 Common Stock

Class 12 is comprised of all holders of Common Stock in the Debtors under the Sale Plan. Holders of Common Stock are impaired under the Sale Plan. The holders of Class 12 Common Stock shall receive no Distribution under the Sale Plan. On the Effective Date, all existing Common Stock shall, without any further action, be cancelled, annulled and extinguished and any certificates representing such Common Stock shall become null, void and of no force or effect. Holders of Common Stock shall retain no rights and receive no consideration on account thereof. Class 12 is impaired under the Sale Plan and is deemed to have rejected the Sale Plan.

(iii)    Voting; Presumptions

Acceptance by Impaired Classes

Each Impaired Class of Claims that will (or may) receive or retain property or any interest in property under the Sale Plan, shall be entitled to vote to accept or reject the Sale Plan. An Impaired Class of Claims shall have accepted the Sale Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Sale Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Sale Plan. An Impaired Class of Interests shall have accepted the Sale Plan if the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Interests actually voting in such Class have voted to accept the Sale Plan.

Voting Presumptions

Claims and Interests in Unimpaired Classes are conclusively deemed to have accepted the Sale Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to

vote to accept or reject the Sale Plan. Claims and Interests in Impaired Classes that do not entitle the Holders thereof to receive or retain any property under the Sale Plan are conclusively deemed to have rejected the Sale Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Sale Plan.

(iv) Unimpaired Classes

Classes 1, 2(a) – 2(cc), 3, 4, 6 and 7 are unimpaired and are deemed to have voted to accept the Sale Plan.

(v) Impaired Classes of Claims Entitled to Vote on the Sale Plan

Classes 5(a) – 5(aa), 8 and 9, including all subclasses therein, are impaired and are entitled to vote.

(vi) Impaired Classes of Claims Receiving No Distribution under the Sale Plan

Classes 10 – 13 are receiving no distribution under the Sale Plan and are deemed to have voted not to accept the Sale Plan.

(vii) Special Provision Regarding Unimpaired Claims

Except as otherwise provided in the Sale Plan, nothing shall affect the Debtors' or Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to Setoff Claims or recoupments against Unimpaired Claims.

(viii) Cram Down

If any Class of Claims or Interests entitled to vote on the Sale Plan shall not vote to accept the Sale Plan, the Debtors shall (a) seek confirmation of the Sale Plan under section 1129(b) of the Bankruptcy Code or (b) amend or modify the Sale Plan in accordance with Article IX of the Sale Plan. With respect to any Class of Claims or Interests that is deemed to reject the Sale Plan, the Debtors shall request that the Bankruptcy Court confirm or "cram down" the Sale Plan pursuant to section 1129(b) of the Bankruptcy Code.

Section 3.4.    Means for Implementation of the Sale Plan

(i) Sale of Assets

The Sale Plan contemplates the sale of substantially all of the assets of the Debtors, except for the Excluded Assets, to Newfield pursuant to the Newfield PSA, unless there is a Superior Proposal. The Confirmation Order shall contain specific authority for the Debtors to comply with the terms of the Newfield PSA or such other Superior Proposal, if applicable.

On the Closing Date, or as soon thereafter as practical, but no later than the Effective Date, the Debtors anticipate making the following transfers to:

A segregated account to establish the Administrative Claims Reserve for the benefit of the Holders of Allowed Administrative Claims, whereby the Debtors shall deposit the amount necessary to pay such Allowed Claims in full upon entry of a Final Order;

The DIP Loan Agent, the funds necessary to satisfy in full the DIP Loan, including any accrued interest, charges, fees and reasonable attorneys' fees and expenses, as agreed upon by the Debtors or ordered by the Bankruptcy Court at the Confirmation Hearing;

The Revolver Loan Agent, the funds necessary to satisfy in full the Revolver Loan, including any accrued interest, charges, fees and reasonable attorneys' fees and expenses, as agreed upon by the Debtors or ordered by the Bankruptcy Court at the Confirmation Hearing;

To each of the Term Lenders, their proportionate share of the funds necessary to satisfy in full the Term Loan, including any accrued interest, charges, fees and reasonable attorneys' fees and expenses, as agreed upon by the Debtors or ordered by the Bankruptcy Court at the Confirmation Hearing;

A segregated account for the Holders of Allowed Senior Mineral Lien Claimants, who have asserted liens against the Acquired Properties, whereby the Debtors shall deposit the amount necessary to pay such Allowed Claims in full upon entry of a Final Order;

A segregated account for the Secured Tax Claims Reserve for the benefit of Holders of Allowed Secured Tax Claims, whereby the Debtors shall deposit the amount necessary to pay such Allowed Claims in full upon entry of a Final Order; and

A segregated account for the Priority Claims Reserve for the benefit of Holders of Allowed Priority Claims, whereby the Debtors shall deposit the amount necessary to pay such Allowed Claims in full upon entry of a Final Order.

(ii)   Restructuring Transactions

Description of Securities to be issued under the Sale Plan

1.     Notes

On the Effective Date, Reorganized TXCO shall issue the Secured Trust Promissory Note to the Creditor Trust. The Secured Trust Promissory Note shall be equal to 100% of the total amount owed as the Net Unsecured Creditors Amount. The Secured Trust Promissory Note shall have a maturity date of five (5) years. Principal and interest payments shall be made by Reorganized TXCO on a quarterly basis at the end of each quarter with the first payment due at the end of the first full quarter following the Effective Date. Interest will be a fixed rate equal to the Federal Funds Rate on the date the Bankruptcy Court enters the Confirmation Order. Principal payments to be tied to the net income of the Reorganized Debtors. The Secured Trust

Promissory Note shall be secured by the granting of a first priority security interest in and upon all Excluded Assets, except those Excluded Assets that are subject to the lien of a Non-Consenting Section 1111(b) Senior Mineral Lien Claimant, wherein the lien on behalf of the Secured Trust Promissory Note will be junior.

<p style="text-align:center">2.     Reorganized TXCO Common Stock</p>

On the Effective Date, Reorganized TXCO shall issue a total of two (2) shares of Reorganized Common Stock. One share of Reorganized TXCO Common Stock will be issued to the President and Secretary of Reorganized TXCO to be held for the purposes of facilitating the liquidation of Reorganized TXCO. This share shall be entitled to vote for only one member of the Board of Directors of Reorganized TXCO. The other share of Reorganized TXCO Common Stock will be issued to the Creditor Trust to be held until termination of the Creditor Trust. Upon termination of the Creditor Trust, the share of Reorganized TXCO common stock held by the Creditor Trust will be cancelled. The share of Reorganized TXCO common stock held by the Creditor Trust will be entitled to vote for only one member of the Board of Directors of Reorganized TXCO. The shares of Reorganized TXCO common stock will also be governed by the Reorganized TXCO Shareholder Agreement, which will dictate the terms for appointing the third member of the Reorganized TXCO Board of Directors.

Creditor Trust Agreement

On the Effective date a Creditor Trust will be created as set forth in Section 3.4(i), which will hold the Secured Trust Promissory Note and one share of Reorganized TXCO common stock.

(iii)   Merger of Affiliated Debtors; Substantive Consolidation

Following the Effective Date, the Debtors shall be merged into a single entity, in accordance with applicable non-bankruptcy law and pursuant to the amended Governance Documents. Upon payment in full to the Holders of Allowed Claims against Drilling, Drilling will be dissolved and the assets of Drilling will become the property of Reorganized TXCO. After the Effective Date, the Reorganized TXCO will be free to act in accordance with applicable government laws, including, without limitation, sale of assets, mergers, dissolution, and name changes.

The Debtors and their respective Estates, except for Drilling, shall be substantively consolidated for all purposes under the Sale Plan. As a result of the substantive consolidation, (a) all Intercompany Claims by and among the Debtors (including such Claims arising from rejection of an executory contract), except for the Intercompany Claims held by Drilling, will be eliminated; (b) any obligation of any of the Debtors and all guarantees thereof executed by any of the Debtors will be deemed to be an obligation of each of the Debtors; (c) any Claim filed or asserted against any of the Debtors will be deemed a Claim against each of the Debtors; (d) any Equity Interest in any of the Debtors will be deemed an Equity Interest in each of the Debtors; and (e) for purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors will be treated as one entity so that (subject to the other provisions of section 553 of the Bankruptcy Code) debts due to any of the Debtors may be offset against the

debts owed by any of the Debtors. The substantive consolidation contemplated by this section shall not, however, cause any Debtor to be liable for any Claim or Equity interest for which it would not otherwise be liable absent the substantive consolidation under the Sale Plan.

On the Effective Date, except as otherwise provided in the Sale Plan, all Claims based on guarantees of collection, payment, or performance made by any Debtor concerning the obligations of another Debtor shall be discharged, released, and without any further force or effect. Additionally, holders of Allowed Claims or Allowed Equity Interests who assert identical Claims against or Equity Interests in multiple Debtors shall be entitled to a single satisfaction of such Claims or Equity Interests.

(iv)    Governance Actions

Amended Governance Documents

On the Effective Date, or as soon as reasonably practicable thereafter, Reorganized TXCO shall file amended Governance Documents with the Secretary of State of the State of Texas.

Other General Corporate Matters

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized TXCO may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary or appropriate to effectuate the Sale Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Sale Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Sale Plan; (3) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that Reorganized TXCO determines is necessary or appropriate.

Each of the matters provided for by the Sale Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of Reorganized TXCO shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Sale Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors of the Debtors or Reorganized TXCO, as the case may be, or any other Entity.

(v)    Directors and Officers

The initial board of directors of Reorganized TXCO shall consist of three (3) directors, the identity of whom shall be disclosed in the Sale Plan Supplement. One member shall be selected by the Debtors, one by the Committee and a third member shall be selected by the other two members of the Board of Directors as set forth in the Reorganized TXCO Shareholder Agreement. To the extent any such Person is an Insider (as defined in section 101(31) of the

Bankruptcy Code), the nature of any compensation for such Person will also be disclosed prior to the Confirmation Hearing. Each of the Persons on the initial Board of Directors of the Reorganized TXCO shall serve in accordance with the Amended Governance Documents of the Reorganized TXCO, as the same may be amended from time to time.

Reorganized TXCO will initially have one officer who will serve as both president and secretary. The initial officer of the Reorganized TXCO shall be disclosed in the Sale Plan Supplement. To the extent any such Person is an Insider (as defined in section 101(31) of the Bankruptcy Code), the nature of any compensation for such Person will also be disclosed at such time. The initial officers shall serve in accordance with the Amended Governance Documents of the Reorganized TXCO, as the same may be amended from time to time.

(vi) Revesting of Assets

Except as otherwise set forth in the Sale Plan, in the Sale Plan Supplement or in the Confirmation Order, as of the Effective Date, all Excluded Assets shall revest in Reorganized TXCO free and clear of all Claims, Liens, encumbrances and other Interests except to the extent provided in the Sale Plan. From and after the Effective Date, Reorganized TXCO may operate (or liquidate and wind up) its business and use, acquire and dispose of property and settle and compromise claims or interests without supervision by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Sale Plan and the Confirmation Order. Without limiting the generality of the foregoing, Reorganized TXCO may, without application to or approval by the Bankruptcy Court, pay fees that they incur after the Effective Date for professional fees and expenses.

(vii) Cancellation of Interest; Issuance of New Common Stock

All Interests of the Debtors shall be cancelled and annulled on the Effective Date. Reorganized TXCO shall issue a total of two (2) shares of New Common Stock. One share of Reorganized TXCO common stock will be issued to the President and Secretary of Reorganized TXCO to be held for the purposes of facilitating the liquidation of Reorganized TXCO. This share shall be entitled to vote for only one member of the Board of Directors of Reorganized TXCO. The other share of Reorganized TXCO Common Stock will be issued to the Creditor Trust to be held until termination of the Creditor Trust. Upon termination of the Creditor Trust, the share of Reorganized TXCO common stock held by the Creditor Trust will be cancelled. The share of Reorganized TXCO common stock held by the Creditor Trust will be entitled to vote for only one member of the Board of Directors of Reorganized TXCO. The shares of Reorganized TXCO common stock will also be governed by the Reorganized TXCO Shareholders' Agreement, which will dictate the terms for appointing the third member of the Reorganized TXCO Board of Directors.

(viii) Authority

Until the Effective Date, the Bankruptcy Court shall retain jurisdiction of the Debtors, their assets and operations.

(ix)  The Creditor Trust

Generally

The Sale Plan proposes that on the Effective Date a Creditor Trust will be created which will hold the Secured Trust Promissory Note and one share of Reorganized TXCO common stock.  The following description shall generally apply to the Creditor Trust created under the Sale Plan.

Establishment of the Creditor Trust

On the Effective Date, the Creditor Trustee shall execute the Credit Trust Agreement on behalf of the Creditor Trust.  The Debtors will transfer to the Creditor Trust the Secured Trust Promissory Note and the one share of Reorganized TXCO common stock.  The Debtors will also execute any and all documents granting to the Creditor Trust a security interest in the Excluded Assets.

Purpose of the Creditor Trust

The Creditor Trust shall exist after the Effective Date, with all the powers of a trust under applicable Texas law.  The Creditor Trust shall execute and consummate such assignments, purchase agreements, bills of sale, operating agreements, conveyance documents and all other transaction documents, contracts, agreements, and instruments as are necessary to implement and consummate the transactions required under or in connection with the Sale Plan, on or after the Effective Date.

After the Effective Date, the Creditor Trust will own the Secured Trust Promissory Note and the one share of Reorganized TXCO Common Stock and shall have the flexibility to conduct any operations necessary to liquidate the Trust Property and to enhance or preserve the value of the Trust Property.

Appointment and Powers of the Creditor Trustee

Prior to the Effective Date, an individual shall be nominated to act as the initial Creditor Trustee under the Creditor Trust.  The Creditor Trustee will serve from and after the Effective Date until a successor is duly elected or appointed.  The Creditor Trustee shall receive title to all Trust Property that the Debtors transfer to the Creditor Trust, including but not limited to, and except as provided in the Sale Plan, any interests held by the Creditor Trust in real and personal property, as well as any other consideration to be received by the Creditors pursuant to the terms of the Sale Plan.

Pursuant to the Creditor Trust Agreement, the Creditor Trustee shall have the power and authority to perform the following acts, among others:

(A)  Perfect and secure his/her right, title and interest to any and all Trust Property;

(B)    Reduce all of the Trust Property to his possession and conserve, protect collect and liquidate or otherwise convert all Trust Property into Cash;

(C)    Distribute the net proceeds of Trust Property as specified herein;

(D)    Release, convey, subordinate or assign any right, title or interest in or to the Trust Property;

(E)    Pay and discharge any costs, expenses, fees or obligations deemed necessary to preserve the Trust Property, and to protect the Creditor Trust and the Creditor Trustee from liability;

(F)    Deposit Creditor Trust funds and draw checks and make disbursements thereof;

(G)    Employ such attorneys, accountants, engineers, agents, tax specialists, other professionals, and clerical assistance as the Creditor Trustee may deem necessary. The Creditor Trustee shall be entitled to rely upon the advice of retained professionals and shall not be liable for any action taken in reliance of such advice. The fees and expenses of all such professionals shall be charges as expenses of the Creditor Trust and shall be paid upon approval of the Creditor Trustee;

(H)    Employ brokers, investment brokers, sales representatives or agents, or other Persons necessary to manage the Trust Property;

(I)    Exercise any and all powers granted to the Creditor Trustee by any agreements or by Texas common law or any statute that serves to increase the extent of the powers granted to the Creditor Trustee hereunder;

(J)    Take any action required or permitted by the Sale Plan or the Creditor Trust Agreement;

(K)    Execute obligations, whether negotiable or non-negotiable;

(L)    Sue and be sued;

(M)    Settle, compromise or adjust by arbitration, or otherwise, any disputes or controversies in favor or against the Creditor Trust;

(N)    Waive or release rights of any kind;

(O)    Appoint, remove and act through agents, managers and employees and confer upon them such power an authority as may be necessary or advisable;

2752695.1

(P) Negotiate, renegotiate or enter into any contract or agreements binding the Creditor Trust, and to execute, acknowledge and deliver any and all investments that are necessary, required or deemed by the Creditor Trustee to be advisable in connection with the performance of his/her duties; and

(Q) In general, without in any manner limiting any of the foregoing, deal with the Trust Property or any part or parts thereof in all other ways as would be lawful for any person owing the same to duty therewith, whether similar to or different from the ways above specified, at any time or times hereafter.

Payment of the Expenses Incurred by the Creditor Trust

The Creditor Trustee will be compensated for services provided at a rate of no more than $_____ per _____ for his/her services. Professionals retained by the Creditor Trust shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred. The payment of the fees and expense of the Creditor Trust retained professionals shall be made in the ordinary course of business from assets of the Creditor Trust.

Exculpation; Indemnification

The Creditor Trustee shall not be liable for actions taken or omitted in his capacity as the Creditor Trustee, except those acts arising out of fraud, willful misconduct, or gross negligence. The Creditor Trustee shall be entitled to indemnification and reimbursement for all losses, fees, and expenses in defending any and all of his actions or inactions in his capacity as the Creditor Trustee, except for any actions or inactions involving his own fraud, willful misconduct, or gross negligence. Any indemnification claim of the Creditor Trustee shall be satisfied from the assets of the Creditor Trust.

The Creditor Trust shall, to the fullest extent permitted by Texas law, indemnify and hold harmless the officers, directors, agents, representatives, attorneys, professionals and employees of the Creditor Trust (each an "Indemnified Party"), from and against any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to, attorneys' fees and costs, arising out of or due to their actions or omissions with respect to the Creditor Trust or the implementation or administration of the Creditor Trust Agreement, if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Creditor Trust, and, with respect to any criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful.

Retention of Funds Prior to Distribution

The Creditor Trustee shall collect all funds constituting Trust Property and, pending distribution, shall deposit funds with a federally insured financial institution that has banking services. The Creditor Trustee will deposit funds so that they are adequately insured. Notwithstanding the foregoing, the Creditor Trustee may invest all Cash funds received into the Creditor Trust (including any earnings thereon or proceeds therefrom) in the same manner as chapter 7 trustees are required to invest funds pursuant to the guidelines of the Unites States

Trustee's Office, provided that the Creditor Trustee shall invest funds held in only demand and time deposits, such as short-term certificates of deposit, in banks or savings institutions, or other temporary, liquid and low-risk investments, such as Treasury bills. The Creditor Trustee shall hold all such funds until they are distributed pursuant to the Sale Plan to Creditors with Allowed Claims.

The Creditor Trustee will not be required to post bond or be audited or monitored except as otherwise expressly provide in the Creditor Trust Agreement. Forty-five (45) days after the end of each calendar year of the Creditor Trust and forty-five (45) days after termination of the Creditor Trust, the Creditor Trustee will file with the Bankruptcy Court an un-audited written report and account showing (i) the assets and liabilities of the Creditor Trust at the end of such year or upon termination; (ii) any changes in the Trust Property that have not been previously reported, and (iii) any material action taken by the Creditor Trustee in the performance of his duties under the Creditor Trust Agreement that has not been previously reported.

Distributions to Creditor Trust Beneficiaries

Within a reasonable period after receipt of a Cash distribution from Reorganized TXCO in connection with the Creditor Trust, the Creditor Trustee shall distribute such Cash, after deducting any costs and expenses associated with operation of the Creditor Trust, *pro rata* to each of the beneficiaries of such Creditor Trust.

Registry of Beneficial Interests

The Creditor Trustee shall establish and retain a registry of all beneficiaries of the Creditor Trust. The Creditor Trustee shall be responsible to maintain and update such registry; however, the Creditor Trustee shall not be obligated to update any beneficiaries name or address until receiving written correspondence from the party seeking to change the address for receipt of notices and distributions. The Creditor Trustee retains the right to request additional information to confirm the name and address of such party before making any modification to the registry.

Termination of the Creditor Trust

The Creditor Trust shall remain and continue in full force and effect until the later of (a) all Trust Property has been wholly converted to Cash or abandoned and all costs, expenses, and obligations incurred in administering the Creditor Trust have been fully paid, and all remaining income and proceeds of the Trust Property have been distributed in payment of the claims of all Beneficiaries pursuant to the provisions of the Sale Plan, but no later than after the Reorganized TXCO has made the final principal and interest payment due under the Secured Trust Promissory Note; provided, that upon complete liquidation of the Trust Property and satisfaction as far as possible of all remaining obligations, liabilities and expenses of the Creditor Trust pursuant to the Sale Plan prior to such date, the Creditor Trustee may, with approval of the Bankruptcy Court, sooner terminate the Creditor Trust. On the termination date of the Creditor Trust, the Creditor Trustee will execute and deliver any and all documents and instruments reasonably requested to evidence such termination. Upon termination and complete satisfaction of its duties under the Creditor Trust Agreement, the Creditor Trustee will be forever discharged and released from all power, duties, responsibilities and liabilities pursuant to the Creditor Trust

2752695.1

other than those attributable to fraud, gross negligence or willful misconduct of the Creditor Trustee.

Resignation of the Creditor Trustee

The Creditor Trustee may resign at any time by giving written notice to the Bankruptcy Court and such resignation shall be effective upon the date provided in such notice. In the case of the resignation of the Creditor Trustee, a successor Creditor Trustee shall thereafter be appointed by the beneficiaries of the Creditor Trust, whereupon such resigning Creditor Trustee shall convey, transfer and set over to such successor Creditor Trustee by appropriate instrument or instruments all of the Trust Property then unconveyed or otherwise undisposed of and all other assets then in his possession the Creditor Trust Agreement. Without further act, deed or conveyance, a successor Creditor Trustee shall be vested with all the rights, privileges, powers and duties of the Creditor Trustee, except that the successor Creditor Trustee shall not be liable for the acts or omissions of his predecessor(s). Each succeeding Creditor Trustee may in like manner resign and another may in like manner be appointed in his place.

(x)    Preservation of Rights of Action; Settlement

Except to the extent such rights, claims, causes of action, defenses, and counterclaims are otherwise dealt with in the Sale Plan or are expressly and specifically released in connection with the Sale Plan, the Confirmation Order or in any settlement agreement approved during the Chapter 11 Cases, or otherwise provided in the Confirmation Order or in any contract, instrument, release, indenture or other agreement entered into in connection with the Sale Plan, in accordance with section 1123(b) of the Bankruptcy Code: (1) any and all rights, claims, causes of action (including the Avoidance Actions), defenses, and counterclaims of or accruing to the Debtors or their Estates shall remain assets of and vest in Reorganized TXCO, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such rights, claims, causes of action, defenses and counterclaims have been listed or referred to in the Sale Plan, the Schedules, or any other document filed with the Bankruptcy Court, and (2) neither the Debtors nor Reorganized TXCO waive, relinquish, or abandon (nor shall they be estopped or otherwise precluded from asserting) any right, claim, cause of action, defense, or counterclaim that constitutes property of the Estates: (a) whether or not such right, claim, cause of action, defense, or counterclaim has been listed or referred to in the Sale Plan or the Schedules, or any other document filed with the Bankruptcy Court, (b) whether or not such right, claim, cause of action, defense, or counterclaim is currently known to the Debtors, and (c) whether or not a defendant in any litigation relating to such right, claim, cause of action, defense or counterclaim filed a proof of Claim in the Chapter 11 Cases, filed a notice of appearance or any other pleading or notice in the Chapter 11 Cases, voted for or against the Sale Plan, or received or retained any consideration under the Sale Plan. Without in any manner limiting the generality of the foregoing, notwithstanding any otherwise applicable principal of law or equity, without limitation, any principals of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a right, claim, cause of action, defense, or counterclaim, or potential right, claim, cause of action, defense, or counterclaim, in the Sale Plan, the Schedules, or any other document filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release, or alter Reorganized TXCO's right to commence, prosecute, defend against, settle, and realize upon any rights, claims, causes of

action, defenses, or counterclaims that the Debtors or Reorganized TXCO have, or may have, as of the Effective Date. Reorganized TXCO may commence, prosecute, defend against, settle, and realize upon any rights, claims, causes of action, defenses, and counterclaims in their sole discretion, in accordance with what is in the best interests, and for the benefit, of Reorganized TXCO.

(xi)   Employee Benefits

On and after the Effective Date, Reorganized TXCO intends to retain at least two employees in connection with its ongoing operations.  As such, Reorganized TXCO will retain an interest in its health insurance plan, including any COBRA coverage that will be available to employees that are not retained by Reorganized TXCO.  Reorganized TXCO may also: (1) honor, in the ordinary course of business, any unrejected contracts, agreements, policies, programs, and plans, in each case to the extent disclosed in the Disclosure Statement or order entered by the Bankruptcy Court approving a pleading seeking payment of, for, among other things, compensation (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, accidental death and dismemberment insurance for the directors, officers and employees of any of the Debtors who served in such capacity at any time, and any other Benefit Plan; and (2) honor, in the ordinary course of business, claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that the Debtors' or Reorganized TXCO's performance of any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan. Nothing in the Sale Plan shall limit, diminish, or otherwise alter the Reorganized TXCO's defenses, claims, any causes of action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.

(xii)  Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers or mortgages from or by the Debtors to Reorganized TXCO or any other Person or entity pursuant to the Sale Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

(xiii) Cancellation of Instruments and Agreements

Upon the occurrence of the Effective Date, except as otherwise provided herein or in the Confirmation Order, instruments, the notes, warrants, options, share certificates, or other documents (other than any insurance policy of the Debtors) evidencing, giving rise to, or governing any Claim or Interest shall be deemed cancelled and annulled without further act or

action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors under such agreements, instruments, notes, warrants, options, share certificates, or other documents shall be discharged.

Section 3.5.    Provisions Governing Distributions

(i)    Distributions for Claims and Interests Allowed as of Effective Date

Except as otherwise provided in the Sale Plan or as ordered by the Bankruptcy Court, distributions to be made on account of Allowed Claims and Allowed Interests as of the Effective Date shall be made on the Distribution Date, or as soon thereafter as practicable. New Common Stock issued under the Sale Plan shall be deemed issued as of the Effective Date.

(ii)    Interest on Claims

Unless otherwise specifically provided by the Sale Plan, the Confirmation Order, or any other order of the Bankruptcy Court, or applicable bankruptcy law, post-petition interest shall not accrue and shall not be paid on Allowed Claims. To the extent postpetition interest is payable on an Allowed Claim, the amount of such interest shall be determined as provided in (i) any contract between the Holder of such Allowed Claim and any applicable Reorganizing Debtor, (ii) any applicable non-bankruptcy law or (iii) in the absence of (i) or (ii), the Prime Rate, as such rates in (i) through (iii) may be limited by applicable bankruptcy law.

(iii)    Reorganized Debtors

Reorganized TXCO shall make all distributions required under the Sale Plan except distributions to the Claims in Classes 1 and 3, which distributions shall be made to the DIP Loan Agent and the Revolver Loan Agent, respectively, who shall promptly deliver such distributions to the holders of such Claims in accordance with the provisions of this Sale Plan and the applicable credit documents.  Distributions made by Reorganized TXCO, as applicable, to the DIP Loan Agent and the Revolver Loan Agent, shall constitute distributions to holders of Allowed DIP Loan Secured Claims and Allowed Secured Claims of the Revolver Lenders, as the case may be, regardless of whether the DIP Loan Agent and/or the Revolver Loan makes subsequent distributions to such holders.

(iv)    Record Date for Distributions

As of the close of business on the Distribution Record Date, the registers for Claims and Interests should be closed, and there shall be no further changes in the Holder of record of any Claim or Interest. Reorganized TXCO and the Creditors' Trustee, as applicable, shall have no obligation to recognize any transfer of Claim or Interest occurring after the Distribution Record Date, and shall instead be authorized and entitled to recognize and deal for all purposes under the Sale Plan with only those Holders of record stated on the registers of Claims and/or Interests as of the close of business on the Distribution Record Date for distributions under the Sale Plan.

(v)  Means of Cash Payment

Cash payments made pursuant to this Sale Plan shall be by check, wire or ACH transfer in U.S. funds or by other means agreed to by the payor and payee or, absent agreement, such commercially reasonable manner as the payor determines in its sole discretion.

(vi)  Delivery of Distributions

Except as otherwise provided in the Sale Plan, distributions to holders of Allowed Claims and Allowed Interests shall be made by Reorganized TXCO, DIP Loan Agent, the Revolver Loan Agent or the Creditors' Trustee, as the case may be, (a) at the addresses set forth on the proofs of Claim or Interest filed by such holders (or at the last known addresses of such holders if no proof of Claim or Interest is filed or if the Debtors or Reorganized TXCO have been notified in writing of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Reorganized TXCO, as applicable, after the date of any related proof of Claim or Interest, (c) at the addresses reflected in the Schedules if no proof of Claim or Interest has been filed and Reorganized TXCO, as applicable, has not received a written notice of a change of address, (d) in the case of the Holder of a Claim that is governed by an indenture or other agreement and is administered by an indenture trustee, agent, or servicer, at the addresses contained in the official records of such indenture trustee, agent, or servicer, or (e) at the addresses set forth in a properly completed letter of transmittal accompanying securities, if any, properly remitted to Reorganized TXCO. If any Holder's distribution is returned as undeliverable, no further distributions to such Holder shall be made unless and until Reorganized TXCO, as applicable, or the agent, or servicer is notified of such Holder's then current address, at which time all missed distributions shall be made to such Holder without interest. Amounts in respect of undeliverable distributions made through Reorganized TXCO or the indenture trustee, agent, or servicer, shall be returned to Reorganized TXCO until such distributions are claimed. All claims for undeliverable distributions must be made on or before the first (1st) anniversary of the Effective Date, after which date all unclaimed property shall revert to Reorganized TXCO free of any restrictions thereon, except as provided in the Sale Plan, and the claim of any holder or successor to such holder with respect to such property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

(vii)  Claims Paid or Payable by Third Parties

Claims Paid by Third Parties

The Debtors or Reorganized TXCO, as applicable, shall reduce a Claim, and such Claim shall be disallowed without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full or in part on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two (2) weeks of receipt thereof, repay or return the distribution to the applicable Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Sale Plan exceeds the amount of such Claim as of the date of any such distribution under the Sale

Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

Claims Payable by Third Parties

No distributions under the Sale Plan shall be made on account of an Allowed Claim that is payable pursuant to any applicable insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the applicable insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

Applicability of Insurance Policies

Except as otherwise provided in the Sale Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Sale Plan shall constitute or be deemed a waiver of any cause of action that the Debtors or Reorganized Debtors or any entity may hold against any other entity, including insurers under any policies of insurance, nor shall anything contained in the Sale Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses

Withholding and Reporting Requirements

In connection with this Sale Plan and all distributions hereunder, Reorganized TXCO shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. Reorganized TXCO shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

(viii) Expunging of Certain Claims

All Claims marked or otherwise designated as "contingent, unliquidated or disputed" on the Debtors' Schedules and for which no proof of claim has been timely filed, shall be deemed disallowed and such claim may be expunged without the necessity of filing a claim objection and without any further notice to, or action, order or approval of the Bankruptcy Court.

Section 3.6.    Treatment of Executory Contracts, Unexpired Leases and Other Agreements

(i)    Assumption/Rejection

On the Effective Date, and to the extent permitted by applicable law, all of the Debtors' executory contracts and unexpired leases, including, but not limited to, those contracts and leases listed as being rejected on Exhibit "R," will be rejected by Reorganized TXCO unless such

executory contract or unexpired lease: (a) is being assumed pursuant to the Sale Plan or is identified on Exhibit "R" as an executory contract or unexpired lease being assumed pursuant to the Sale Plan, (b) is the subject of a motion to assume filed on or before the Confirmation, or (c) has been previously rejected or assumed.

(ii)    Cure of Defaults of Assumed Executory Contracts and Unexpired Leases

Any monetary amounts by which an executory contract and/or unexpired lease to be assumed pursuant to the Sale Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code by Cure. The Debtors shall file and serve the proposed cure amounts, which shall be included in Exhibit "R." Any party to an executory contract or unexpired lease that disagrees with the Debtors' proposed cure amount must file an objection to the cure amount no later than 10 days after the schedule disclosing such amount is filed. If there is a dispute regarding (a) the nature or amount of Cure, (b) the ability of any Reorganized Debtor or any assignee to provide "adequate assurance of performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, the matter shall be set for hearing before the Bankruptcy Court on the next available hearing date, or such other date as may be agreed upon, and Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving assumption or assumption and assignment, as applicable; provided, however, that if there is a dispute as to the amount of Cure that cannot be resolved consensually among the parties, the Debtors shall have the right to reject the contract or lease for a period of five (5) days after entry of a Final Order establishing a Cure amount in excess of 25% of that provided by the Debtors. If the Cure amount is not disputed, Reorganized TXCO shall pay the claim, if any, to the claimant within twenty (20) days of the Effective Date. Disputed cure amounts that are resolved by agreement or Final Order shall be paid by the Debtors within twenty (20) days of such agreement or Final Order.

(iii)    Pass-Through

Except as otherwise provided in the Sale Plan, any rights or arrangements necessary or useful to the operation of Reorganized TXCO's businesses, but not otherwise addressed as a Claim or Interest, including non-exclusive or exclusive patent, trademark, copyright, maskwork or other intellectual property licenses and other executory and/or non-executory contracts not assumable under section 365(c) of the Bankruptcy Code, shall, in the absence of any other treatment under the Sale Plan or Confirmation Order, be passed through the Chapter 11 Cases for the benefit of Reorganized TXCO and the counterparty unaltered and unaffected by the bankruptcy filings or Chapter 11 Cases.

(iv)    Mineral Leases/Oil and Gas Leases

To the extent any of the Debtors' Mineral Leases or Oil and Gas Leases constitutes an executory contract or unexpired lease of real property under section 365 of the Bankruptcy Code, such Mineral Leases or Oil and Gas Leases will be assumed by Reorganized TXCO and, if an Asset under the PSA, assigned to the Purchaser. To the extent any of the Debtors' Mineral Leases or Oil and Gas Leases constitute contracts or other property rights not assumable under section 365 of the Bankruptcy Code, except as provided in the Sale Plan or Confirmation Order,

2752695.1

such Mineral Leases or Oil and Gas Leases shall pass through the Chapter 11 Cases for the benefit of the applicable Reorganized Debtor and the counterparties to such Mineral Leases or Oil and Gas Leases and, if an Asset under the PSA, assigned to the Purchaser.

Except for the defaults of a kind specified in sections 365(b)(2) and 541(c)(1) of the Bankruptcy Code (which defaults the applicable Debtors or Reorganized Debtors will not be required to cure), or as otherwise provided herein, the legal, equitable and contractual rights of the counterparties to such Mineral Leases or Oil and Gas Leases shall be unaltered by the Sale Plan; provided, however, that to the extent a failure by the Debtors to pay or perform an obligation under such Mineral Lease or Oil and Gas Lease (whether or not such Mineral Lease or Oil and Gas Lease is subject to the provisions of section 365 of the Bankruptcy Code) is a default under any applicable Mineral Lease or Oil and Gas Lease, such default shall be cured for all purposes by the payments provided for herein or Reorganized TXCO's subsequent performance of such obligation with such applicable Mineral Lease or Oil and Gas Lease otherwise remaining in full force and effect for the benefit of Reorganized TXCO. To the extent such payment is due and owing on the Effective Date, such payment shall be made, in Cash, on the Distribution Date, or upon such other terms as may be agreed to by the Debtors' or Reorganized TXCO, as the case may be. To the extent such payment is not due and owing on the Effective Date, such payment (a) will be made, in Cash, in accordance with the terms of any agreement between the parties, or as such payment becomes due and owing under (i) applicable non-bankruptcy law, or (ii) in the ordinary course of business of Reorganized TXCO, or (b) will be made upon other terms as may be agreed upon by the Debtors or Reorganized TXCO, as the case may be, and the Person to whom such payment is due. To the extent it is impossible for Reorganized TXCO to cure a default arising from any failure to perform a non-monetary obligation, such default shall be cured by performance by the applicable Debtor at or after the time of assumption in accordance with the terms of the applicable Mineral Lease or Oil and Gas Lease with the applicable Mineral Lease or Oil and Gas Lease remaining in effect for the benefit of the applicable Reorganized Debtor. If there is a dispute as to any cure obligation (including cure payments) between the applicable Reorganized Debtor and the Lessor of a Mineral Lease or Oil and Gas Lease, the applicable Reorganized Debtor shall only have to pay or perform as provided in the Sale Plan.

(v)     Assumed Executory Contracts and Unexpired Leases

Each executory contract and unexpired lease that is assumed will include (a) all amendments, modifications, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease, and (b) all executory contracts or unexpired leases and other rights appurtenant to the property, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other equity interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements have been rejected pursuant to an order of the Bankruptcy Court or is the subject of a motion to reject filed on or before the Confirmation Date.

Amendments, modifications, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during their Chapter 11

Cases shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any claims that may arise in connection therewith.

(vi)    Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases

Rejection or repudiation of any executory contract or unexpired lease pursuant to the Sale Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, Reorganized TXCO expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected or repudiated executory contracts or unexpired leases.

(vii)   Intercompany Contracts, Assumed Contracts and Leases, and Contracts and Leases Entered Into After Petition Date

Intercompany contracts, contracts and leases with third parties entered into after the Petition Date by any Debtor, and any executory contracts and unexpired leases assumed by any Debtor, may be performed by the applicable Debtor in the ordinary course of business.

(viii)  Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Sale Plan Supplement, nor anything contained in the Sale Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an executory contract or unexpired lease or that any of the Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized TXCO, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

(ix)    Additional Cure Provisions

Except as otherwise provided under the Sale Plan, any monetary amounts that must be cured as a requirement for assumption and/or assignment by any of the Debtors, such cure shall be effected or otherwise satisfied by prompt payment of such monetary amount as contemplated by section 365(b)(1)(A) of the Bankruptcy Code or as otherwise agreed to by the parties. If there is a dispute regarding (a) the timing of any payment required in order to meet the promptness requirement of 365(b)(1), (b) the nature, extent or amount of any cure requirement, (c) the Debtors', Reorganized Debtors', or the Debtors' assignees ability to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (d) any other matter pertaining to assumption, cure will occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

(x)    Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Debtors' executory contracts and unexpired leases pursuant to the Sale Plan or otherwise must be filed with the Claims Agent no later than thirty (30) days after the later of the Effective Date or the effective date of rejection.  Any Proofs of Claim arising from the rejection of the Debtors' executory contracts or unexpired leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any of the Debtors without the need for any objection by Reorganized TXCO or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  All Allowed Claims arising from the rejection of the Debtors' executory contracts and unexpired leases shall be classified as General Unsecured Claims for the particular Debtor in question and shall be treated in accordance with the particular provisions of the Sale Plan for such Debtor; provided, however, if the Holder of an Allowed Claim for rejection damages has an unavoidable security interest in any Collateral to secure the obligations under such rejected executory contract or lease, the Allowed Claim for rejection damages shall be treated as an Other Secured Claim to the extent of the value of such Holder's interest in the Collateral, with the deficiency, if any, treated as a General Unsecured Claim.

(xi)   Survival of Indemnification and Corporation Contribution

Except as otherwise specifically provided herein or in the Sale Plan, any obligations or rights of the Debtors to indemnify, defend or advance expenses to its present and former directors, officers, employees, agents or representatives under its certificate of incorporation, bylaws, policies, any agreement or under state law, or any agreement with respect to any claim, demand, suit, cause of action, or proceeding, shall survive confirmation of the Sale Plan. The employees of the Debtors who become employed by Reorganized TXCO shall receive indemnification by Reorganized TXCO in the ordinary course of its business. Claims against the Debtors for indemnification shall be classified under the Sale Plan as General Unsecured Claims and are payable as Class 8 Claims.

(xii)  Compensation, Benefit, and Pension Programs

Any employee compensation, benefit and pension plans, and employment agreements or settlements reached thereunder of the Debtors, including benefit plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under the Sale Plan, and the Debtors' respective obligations under each such Retained Benefit Plan shall survive Confirmation of this Sale Plan.

Section 3.7.   Procedures for Resolving Disputed, Contingent and Unliquidated Claims

(i)    Objections to Claims

The Debtors or Reorganized TXCO (or their authorized representatives), as applicable, shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment

any objections to Claims. From and after the Effective Date, Reorganized TXCO (or their authorized representatives) may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. Reorganized TXCO (or their authorized representatives) also shall have the right to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law. Reorganized TXCO shall use commercially reasonable efforts to settle or otherwise reduce the amount of General Unsecured Claims.

As soon as practicable, but no later than the Claims Objection Deadline, Reorganized TXCO (or their authorized representatives) may file objections with the Bankruptcy Court and serve such objections on the creditors holding the Claims to which objections are made. Nothing contained herein, however, shall limit the right of Reorganized TXCO (or their authorized representatives) to object to Claims, if any, filed or amended after the Claims Objection Deadline. The Claims Objection Deadline may be extended by the Bankruptcy Court upon motion by the applicable Reorganized Debtor (or their authorized representatives) without notice or hearing.

(ii)    Estimation of Claims

Any Debtor, Reorganized Debtor (or their authorized representative), as applicable, may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether such Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any claim, including during the pendency of any appeal related to any such objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism.

(iii)    No Distributions Pending Allowance

Notwithstanding any other provision of the Sale Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

(iv)    Distributions after Allowance

Reorganized TXCO shall make payments and distributions to each holder of a Disputed Claim that has become an Allowed Claim in accordance with the provisions of the Sale Plan governing the class of Claims to which such Holder belongs and Section 3.5.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing all or part of any Disputed Claim becomes a Final Order, Reorganized TXCO shall distribute to

the Holder of such Claim, as provided for in Section 3.5, the distribution (if any) that would have been made to such Holder on the Distribution Date had such Allowed Claim been allowed on the Distribution Date. After a Disputed Claim is Allowed or otherwise resolved, the excess Cash or other property that was reserved on account of such Disputed Claim, if any, shall become property of Reorganized TXCO.

(v)    General Unsecured Claims

Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtors prior to the Effective Date including pursuant to orders of the Bankruptcy Court. To the extent such payments are not reflected in the Schedules, such Schedules will be deemed amended and reduced to reflect that such payments were made.  Nothing in the Sale Plan shall preclude Reorganized TXCO from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

(vi)    Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, Reorganized TXCO shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Sale Plan to the contrary, the Debtors (or their authorized representative) and Reorganized TXCO shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Sale Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. Reorganized TXCO reserves the right to allocate all distributions made under the Sale Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens and encumbrances.

Section 3.8.  Conditions Precedent to Confirmation and Consummation of the Sale Plan

(i)    Conditions Precedent to Confirmation

The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtors and Purchasers and shall include a finding of fact that the Debtors, Released Parties, and their respective present and former members, officers, directors, managers, employees, advisors, attorneys and agents, acted in good faith within the meaning of and with respect to all of the actions described in section 1125(e) of the Bankruptcy Code and are therefore not liable for the violation of any applicable law, rule, or regulation governing such actions.

(ii)    Conditions Precedent to Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with Section 3.8(d) below:

- The Confirmation Order shall have been entered in form and substance reasonably acceptable to the Purchasers.

- All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of this Sale Plan shall have been obtained.

- There shall not be in effect on the Effective Date any (a) order entered by a court, (b) any order, opinion, ruling or other decision entered by any other court or governmental entity, or (c) any applicable law staying, restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by the Sale Plan.

- No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall remain pending.

- All conditions to the consummation of the transactions contemplated by the Sale Plan shall have been satisfied or waived.

(iii) Substantial Consummation

On the Effective Date, the Sale Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

(iv) Waiver of Conditions

Each of the conditions set forth in Section 3.8(b) of the Sale Plan may be waived in whole or in part by written consent of the applicable Debtor. As to the conditions regarding the Exit Facility, the Exit Facility Agent, without any notice to other parties in interest or the Bankruptcy Court and without a hearing may waive any of the conditions set forth in Section 3.8(b). The failure to satisfy or waive any condition to the Effective Date may be asserted by the Debtors or Reorganized TXCO regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors or Reorganized Debtors). The failure of the Debtors or Reorganized TXCO to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

(v) Revocation, Withdrawal, Non-Consummation

The Debtors reserve the right to revoke or withdraw the Sale Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Sale Plan, or if Confirmation or consummation of the Sale Plan does not occur, then (a) the Sale Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Sale Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), and any document or agreement executed pursuant to the Sale Plan shall be deemed null and void, and (c) nothing contained in the Sale Plan, and no acts taken in preparation for consummation of the Sale Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other

Person, (ii) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or (iii) constitute an admission of any sort by the Debtors or any other Person.

Section 3.9.    Retention of Jurisdiction

Under sections 105 and 1142 of the Bankruptcy Code, and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Cases and the Sale Plan, to the fullest extent permitted by law, including jurisdiction to:

- enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Sale Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Sale Plan, this Disclosure Statement or the Confirmation Order;

- hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Sale Plan and all contracts, instruments, and other agreements executed in connection with the Sale Plan;

- hear and determine any request to modify the Sale Plan or to cure any defect or omission or reconcile any inconsistency in the Sale Plan or any order of the Bankruptcy Court;

- issue and enforce injunctions or other orders, or take any other action that may be necessary or appropriate to restrain any interference with the implementation, consummation, or enforcement of the Sale Plan or the Confirmation Order,

- enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

- hear and determine any matters arising in connection with or relating to the Sale Plan, this Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Sale Plan, this Disclosure Statement or the Confirmation Order;

- enforce all orders, judgments, injunctions, releases, exculpations and rulings entered in connection with the Chapter 11 Case;

- hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

- hear and determine matters relating to the allowance, disallowance, determination, classification, estimation and/or liquidation of Claims against the Debtors and to

enter or enforce any order requiring the filing of any such Claim before a particular date;

- hear and determine motions, application, adversary proceedings, contested matters and other litigation matters filed or commenced after the Effective Date, including proceedings with respect to the rights and claims of the Debtors to recover property under the applicable provisions of Chapter 5 of the Bankruptcy Code or to bring any litigation claims, or otherwise to collect or recover on account of any litigation claim;

- determine all applications, Claims, adversary proceedings and contested matters pending on the Effective Date; and

- enter a final decree closing the Chapter 11 Case.

Section 3.10.    Release, Exculpation and Related Provisions

(a)    Compromise and Settlement

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Sale Plan, the provisions of the Sale Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Sale Plan, including, without limitation, all Claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Sale Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their Estates, Creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.

It is not the intent of the Debtors that confirmation of the Sale Plan shall in any manner alter or amend any settlement and compromise between the Debtors and any Person that has been previously approved by the Bankruptcy Court (each, a "Prior Settlement"). To the extent of any conflict between the terms of the Sale Plan and the terms of any Prior Settlement, the terms of the Prior Settlement shall control and such Prior Settlement shall be enforceable according to its terms.

Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), the Debtors may compromise and settle various claims against them and claims that they have against other Persons. The Debtors expressly reserve the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims against them and claims that they may have against other Persons up to and including the Effective Date. After the Effective Date, Reorganized TXCO may compromise and settle any Claims against them and claims they may have against other Persons without approval from the

Bankruptcy Court where the amount in dispute is less than $500,000 or the Claim to be settled is less than $1,000,000.

(b)     Satisfaction of Claims

The rights afforded in the Sale Plan and the treatment of all Claims and Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever against the Debtors or any of their Estates, assets, properties, or interests in property. Except as otherwise provided herein, on the Effective Date, all Claims against and Interests in the Debtors shall be satisfied, discharged, and released in full. Neither Reorganized TXCO, nor their Affiliates, shall be responsible for any pre-Effective Date obligations of the Debtors, except those expressly assumed by the Debtors or their Affiliates, as applicable. Except as otherwise provided herein, all Persons and Entities shall be precluded and forever barred from asserting against Debtors and their Affiliates, their respective successors or assigns, or their Estates, assets, properties, or interests in property any event, occurrence, condition, thing, or other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

(c)     Exculpation and Limitation of Liability

Notwithstanding any other provision of the Sale Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any right of action whether in law or equity, whether for breach of contract, statute, or tort claim, against the Debtors, the Estates, Reorganized TXCO, the Committee, the DIP Lenders, the DIP Loan Agent, Newfield or any of their respective affiliates, representatives, present or former members, officers, directors, employees, advisors, attorneys, or agents, for any act or omission in connection with, relating to, or arising out of, these Cases, the pursuit of Confirmation of the Sale Plan, consummation of the Sale Plan, or the administration of the Sale Plan or the property to be distributed under the Sale Plan, except for their willful misconduct or gross negligence.

(d)     Good Faith

As of the Confirmation Date, the Debtors shall be deemed to have solicited acceptances of the Sale Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  The Debtors have participated in good faith and in compliance with Section 1125(e) of the Bankruptcy Code in the offer and issuance of the New Common Stock under the Sale Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Sale Plan or the offer and issuance of the New Common Stock under the Sale Plan.

(e)     Discharge of Liabilities

Except as otherwise provided in the Sale Plan, upon the occurrence of the Effective Date, Reorganized TXCO shall be discharged from all Claims and Causes of Action to the fullest

extent permitted by Section 1141 of the Bankruptcy Code, and all holders of Claims and Interests shall be precluded from asserting against Reorganized TXCO, its respective assets, or any property dealt with under the Sale Plan, any further or other Cause of Action based upon any act or omission, transaction, event, thing, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date.

EXCEPT AS OTHERWISE PROVIDED IN THE SALE PLAN, REORGANIZED TXCO SHALL NOT HAVE, AND SHALL NOT BE CONSTRUED TO HAVE, OR MAINTAIN ANY LIABILITY, CLAIM, OR OBLIGATION, THAT IS BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OTHER OCCURRENCE OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE SALE PLAN, INCLUDING, WITHOUT LIMITATION, ANY LIABILITY OR CLAIMS ARISING UNDER APPLICABLE NON-BANKRUPTCY LAW AS A SUCCESSOR TO THE DEBTORS AND NO SUCH LIABILITIES, CLAIMS, OR OBLIGATIONS FOR ANY ACTS SHALL ATTACH TO REORGANIZED TXCO.

(f)     Discharge of the Debtors

Except as otherwise provided in the Sale Plan or the Confirmation Order, on the Effective Date, without further notice or order, all Claims of any nature whatsoever shall be automatically discharged forever. Except as otherwise provided in the Sale Plan or the Confirmation Order, on the Effective Date, the Debtors, their Estates, and all successors thereto shall be deemed fully discharged and released from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or (c) the holder of a Claim based upon such debt has accepted the Sale Plan. The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors, their Estates, and all successors thereto.  As provided in Section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtors, their Estates, or any successor thereto at any time obtained to the extent it relates to a Claim discharged, and operates as an injunction against the prosecution of any action against Reorganized TXCO or its property to the extent it relates to a discharged Claim.

(g)     Permanent Injunction

**Except as otherwise provided in the Sale Plan, from and after the Confirmation Date, all Persons who have held, hold, or may hold Claims against or Interests in the Debtors prior to the Effective Date are permanently enjoined from taking any of the following actions against the Debtors, Reorganized TXCO, Newfield, the Committee, the DIP Lenders, the DIP Loan Agent, the Term Loan Lenders, the Term Loan Agent, and the Estates on account of any such Claims or Interests: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors; and (e)**

**commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Sale Plan; provided, however, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Sale Plan.**

        (h)      Releases by the Debtors, Reorganized TXCO and their Estates

        Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Sale Plan or the Confirmation Order, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors, Reorganized TXCO and the implementation of the restructuring contemplated by the Sale Plan, on and after the Effective Date, the Debtors, Reorganized TXCO and their Estates, for themselves and on behalf of their respective successors and assigns, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each (i) Released Party and (ii) the Debtors', Reorganized TXCO's and their Estates' past and present directors, managers, officers, employees, attorneys and other representatives from any and all claims, interests, obligations, rights, suits, damages, losses, costs and expenses, actions, causes of action, remedies, and liabilities of any kind or character whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, Reorganized TXCO, and their Estates, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, suspected or unsuspected, matured or unmatured, fixed or contingent, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, Reorganized TXCO or their respective Affiliates or Estates ever had, now has or hereafter can, shall or may have, or otherwise would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, against any (i) Released Party and (ii) the Debtors', Reorganized TXCO's and their Estates' current and former directors, managers, officers, employees, attorneys and other representatives arising from or relating to, directly or indirectly from, in whole or in part, the Debtors, the Debtors' restructuring, the Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Sale Plan, the business or contractual arrangements among any two or more of any of Debtors, Reorganized TXCO or any Released Party (and the acts or omissions of any other Released Party in connection therewith), the restructuring of Claims and Interests prior to or in the Cases, the negotiation, formulation, or preparation of the Sale Plan and Disclosure Statement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence, including the management and operation of the Debtors, taking place on or before the Effective Date. Notwithstanding the foregoing, nothing in this Section 3.8(h) shall release any Released Party or other individual included within this release from liability for (i) any act or omission by such Released Party or other individual that is found by a court of law in a final, non-appealable judgment to constitute Fraud or willful misconduct, or (ii) any obligation for borrowed money owed by a Released Party to the Debtors, Reorganized TXCO or their respective Affiliates or Estates.

        (i)      Releases by Holders of Claims and Interests

        **Except as otherwise specifically provided in the Sale Plan or the Confirmation Order, on and after the Effective Date, in consideration of the Distributions under the Sale**

Plan, holders of Claims and Interests, for themselves and on behalf of their respective successors and assigns, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party from any and all claims, interests, obligations, rights, suits, damages, losses, costs and expenses, actions, causes of action, remedies, and liabilities of any kind or character whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, Reorganized TXCO or their Estates, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, suspected or unsuspected, matured or unmatured, fixed or contingent, existing or hereafter arising, in law, equity or otherwise, that such Entity ever had, now has or hereafter can, shall or may have, or otherwise would have been legally entitled to assert (whether individually or collectively or directly or derivatively), against any Released Party arising from or relating to, directly or indirectly, in whole or in part, the Debtors, the Debtors' restructuring, the Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Sale Plan, the business or contractual arrangements among any two or more of any Debtor, Reorganized TXCO or any Released Party (and the acts or omissions of any other Released Party in connection therewith), the restructuring of Claims and Interests prior to or in the Cases, the negotiation, formulation, or preparation of the Sale Plan and Disclosure Statement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence, including the management and operation of the Debtors, taking place on or before the Effective Date. Notwithstanding the foregoing, nothing in this Section shall release any Released Party from liability for any act or omission by such Released Party that is found by a court of law in a formal, non-appealable judgment to constitute Fraud or willful misconduct.**

(j)     Setoffs

Except as otherwise expressly provided for in the Sale Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, Reorganized TXCO may setoff against any Allowed Claim and the distributions to be made pursuant to the Sale Plan on account of such Allowed Claim (before such distribution is made), any claims, rights, and causes of action of any nature that such Debtor or Reorganized TXCO, as applicable, may hold against the holder of such Allowed Claim, to the extent such claims, rights, or causes of action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Sale Plan or otherwise); provided, however, the neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Sale Plan shall constitute a waiver or release by Reorganized TXCO of any such claims, rights, and causes of action that Reorganized TXCO may possess against such holder. In no event shall any holder of Claims or Interests be entitled to setoff any Claim or Interest against any claim, right, or cause of action of the Debtors or Reorganized TXCO, as applicable, unless such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

2752695.1

(k)     Recoupment

In no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or Reorganized TXCO, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

(l)     Release of Liens

Except as otherwise provided in the Sale Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Sale Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Sale Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of the Reorganized TXCO's Estate shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, liens, pledges, or other security interests shall revert to Reorganized TXCO and its successors and assigns.

In addition to, and in no way a limitation of, the foregoing, to the extent the Debtors' property or assets are encumbered by mortgages, security interests or Liens of any nature for which any holder of such mortgages, security interests or Liens does not have an Allowed Claim against such Debtor, such mortgages, security interests or Liens shall be deemed fully released and discharged for all purposes and such holder shall execute such documents as reasonably requested by Reorganized TXCO in form and substance as may be necessary or appropriate to evidence the release of any such mortgages, security interests or Liens of any nature. If such holder fails to execute such documents, Reorganized TXCO is authorized to execute such documents on behalf of such holder and to cause the filing of such documents with any or all governmental or other entities as may be necessary or appropriate to effect such releases.

(m)     Satisfaction of Subordination Rights

All Claims against the Debtors and all rights and claims between or among Claim holders relating in any manner whatsoever to Claims against the Debtors, based upon any claimed subordination rights (if any), shall be deemed satisfied by the distributions under the Sale Plan to Claim holders having such subordination rights, and such subordination rights shall be deemed waived, released, discharged and terminated as of the Effective Date. Distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment or like legal process by any Claim holder by reason of any claimed subordination rights or otherwise, so that each Claim holder shall have and receive the benefit of the distributions in the manner set forth in the Sale Plan.

Section 3.11.     Miscellaneous Provisions

(i)     Amendments and Modification

The Debtors may alter, amend, or modify the Plan or any exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date; however, the treatment of the Class 1 Allowed DIP Loan Secured Claim and Class 4 Allowed Secured Claims of the Term Loan Lenders may not be modified without their express consent. After the Confirmation Date and prior to "substantial consummation" as provided in the Plan, the Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, so long as such proceedings do not materially adversely affect the treatment of holders of Claims or Interests under the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

(ii)     Bar Dates for Certain Claims

Administrative Claims; Substantial Contribution Claims

The Confirmation Order will establish an Administrative Claims Bar Date for filing of all Administrative Claims, including Substantial Contribution Claims (but not including Professional Fee Claims or claims for the expenses of the members of the Committee or Administrative Claims in Section 3.11(b)(iv), below), which date will be forty-five (45) days after the Effective Date. Holders of asserted Administrative Claims, other than Professional Fee Claims, claims for U.S. Trustee fees under 28 U.S.C. § 1930, administrative tax claims and administrative ordinary course liabilities, must submit proofs of Administrative Claim on or before such Administrative Claims Bar Date or forever be barred from doing so. A notice prepared by the applicable Reorganized Debtors will set forth such date and constitute notice of this Administrative Claims Bar Date. The Debtors or applicable Reorganized Debtors, as the case may be, shall have forty-five (45) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Claims Bar Date to review and object to such Administrative Claims before a hearing for determination of allowance of such Administrative Claims.

Administrative Ordinary Course Liabilities

Holders of Administrative Claims that are based on liabilities incurred in the ordinary course of the applicable Debtors' businesses (other than Claims of governmental units for taxes and for interest and/or penalties related to such taxes) shall not be required to file any request for payment of such Claims. Such Administrative Claims, unless objected to by the applicable Debtors or Reorganized Debtors, shall be assumed and paid by the applicable Reorganized Debtors, in Cash, pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claim.  Holders of Administrative Claims pursuant to section 503(b)(9) of the Bankruptcy Code were required to file proof of such a claim on or before August 21, 2009. The Debtors received claims of asserting relief under section 503(b)(9) of the Bankruptcy Code

2752695.1

totalling $338,275.98, which the Debtors are currently reviewing to determine if each claim qualifies for treatment as an Administrative Claim.

Administrative Tax Claims

All requests for payment of Administrative Claims by a governmental unit for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date, and for which no bar date has otherwise been previously established, must be filed and served on Reorganized TXCO and any other party specifically requesting a copy in writing on or before the later of (a) thirty (30) days following the Effective Date; and (b) one hundred and twenty (120) days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit. Any Holder of any such Claim that is required to file a request for payment of such taxes and does not file and properly serve such a Claim by the applicable bar date shall be forever barred from asserting any such Claim against Reorganized TXCO or their property, regardless of whether any such Claim is deemed to arise prior to, on, or subsequent to the Effective Date. Any interested party desiring to object to an Administrative Claim for taxes must file and serve its objection on counsel to Reorganized TXCO and the relevant taxing authority no later than ninety (90) days after the taxing authority files and serves its application.

Professional Fee Claims

All final requests for compensation or reimbursement of Professional Fees pursuant to sections 327, 328, 330, 331, 363, 503(b) or 1103 of the Bankruptcy Code for services rendered to or on behalf of the applicable Debtors or the Committee prior to the Effective Date (other than Substantial Contribution Claims under section 503(b)(4) of the Bankruptcy Code) must be filed and served on the applicable Reorganized Debtors and their counsel no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such Professionals or other entities for compensation or reimbursement of expenses must be filed and served on the applicable Reorganized Debtors and their counsel and the requesting Professional or other entity no later than 45 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served.

(iii) Payment of Statutory Fees

On or before the Effective Date, the Debtors shall have paid in full, in Cash (including by check or wire transfer), in U.S. dollars, all fees payable pursuant to section 1930 of title 28 of the United States Code, in the amount determined by the Bankruptcy Court at the Confirmation Hearing.

(iv) Binding Effect

The Sale Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims against and Interests in the Debtors, their respective successors and assigns, including, but not limited to, Reorganized TXCO, and all other parties-in-interest in these Cases.

(v)    Term of Injunctions or Stay

Unless otherwise provided in the Sale Plan or Confirmation Order, all injunctions or stays provided for in the Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Sale Plan or Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Sale Plan or Confirmation Order shall remain in full force and effect in accordance with their terms.

(vi)    Setoffs

Except as otherwise expressly provided for in the Sale Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, each Reorganized Debtor may setoff against any Allowed Claim and the distributions to be made pursuant to the Sale Plan on account of such Allowed Claim (before such distribution is made), any claims, rights, and causes of action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or causes of action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Sale Plan or otherwise); provided, however, the neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Sale Plan shall constitute a waiver or release by such Reorganized Debtor of any such claims, rights, and causes of action that such Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any claim, right, or cause of action of the Debtors or Reorganized Debtors, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

(vii)   Recoupment

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or Reorganized TXCO, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

(viii)  Dissolution of Committee

On the Effective Date, the Committee, if any, shall dissolve and the members of the Committee shall be released and discharged from all authority, duties, responsibilities and obligations related to and arising from and in connection with the Cases.

(ix)   Release of Liens

Except as otherwise provided in the Sale Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Sale Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Sale Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of Reorganized TXCO's Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, liens, pledges, or other security interests shall revert to Reorganized TXCO and their successors and assigns.

In addition to, and in no way a limitation of, the foregoing, to the extent the Debtors' property or assets are encumbered by mortgages, security interests or Liens of any nature for which any Holder of such mortgages, security interests or Liens does not have an Allowed Claim against such Debtor, such mortgages, security interests or Liens shall be deemed fully released and discharged for all purposes and such Holder shall execute such documents as reasonably requested by the applicable Reorganized Debtors in form and substance as may be necessary or appropriate to evidence the release of any such mortgages, security interests or Liens of any nature. If such Holder fails to execute such documents, the applicable Reorganized Debtor is authorized to execute such documents on behalf of such Holder and to cause the filing of such documents with any or all governmental or other entities as may be necessary or appropriate to effect such releases.

(x)   No Admissions

Notwithstanding anything in the Sale Plan to the contrary, nothing in the Sale Plan shall be deemed as an admission by the Debtors with respect to any matter set forth in the Sale Plan, including liability on any Claim.

(xi)   Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Texas, without giving effect to the principles of conflicts of law thereof, shall govern the construction and implementation of the Sale Plan and any agreements, documents, and instruments executed in connection with the Sale Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control) as well as corporate governance matters with respect to Reorganized TXCO; provided, however, that corporate governance matters relating to the Debtors or Reorganized Debtors, as applicable, not organized under Texas law shall be governed by the laws of the state of organization of such Debtor or Reorganized Debtor.

(xii)   Third Party Agreements; Subordination

The Sale Plan Distributions to the various classes of Claims and Equity Interests hereunder shall not affect the right of any Person to levy, garnish, attach, or employ any other legal process with respect to such Sale Plan Distributions by reason of any claimed subordination rights or otherwise. All of such rights and any agreements relating thereto shall remain in full force and effect, except as compromised and settled pursuant to the Sale Plan.   Sale Plan

Distributions to Holders of Claims in classes that are subject to contractual subordination provisions are subject to distribution in accordance with such contractual subordination provisions as provided in the Sale Plan. Sale Plan Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Sale Plan. The right of the Debtors to seek subordination of any Claim or Equity Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Equity Interest that becomes a Subordinated Claim or subordinated Equity Interest at any time shall be modified to reflect such subordination. Unless the Confirmation Order provides otherwise, no Sale Plan Distributions shall be made on account of a Subordinated Claim or subordinated Equity Interest.

(xiii) Sale Plan Supplement

Any and all exhibits, lists, or schedules not filed with the Sale Plan shall be contained in the Sale Plan Supplement and filed with the Clerk of the Bankruptcy Court not later than ten (10) days prior to the Sale Plan Voting Deadline or such other filing deadline as may be approved by the Bankruptcy Court. Holders of Claims or Interests may also obtain a copy of the Sale Plan Supplement upon written request to the Debtors. Notwithstanding the foregoing, the Debtors may amend the Sale Plan Supplement and any attachments thereto, through and including the Confirmation Date.

(xiv) Notices

Any notices, requests, and demands required or permitted to be provided under the Sale Plan, in order to be effective, shall be in writing (including, without express or implied limitation, by facsimile transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors:

TXCO RESOURCES INC.
777 E. Sonterra Boulevard, Suite 350
San Antonio, Texas 78258

with a copy to:

Deborah D. Williamson
Cox Smith Matthews Incorporated
112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205
Facsimile: (210) 226-8395

(xv) Severability of Sale Plan Provision.

If, before the Confirmation Order, the Bankruptcy Court holds that any provision of the Sale Plan is invalid, void or unenforceable, the Debtors, at their option and if acceptable to the Exit Facility Lender, may amend or modify the Sale Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Sale Plan. The Confirmation

Order shall constitute a judicial determination and shall provide that each term and provision of the Sale Plan, as it may have been amended or modified in accordance with the foregoing, is valid and enforceable.

# ARTICLE IV
# SUMMARY OF OPERATIONAL PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE OPERATIONAL PLAN AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE OPERATIONAL PLAN. IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE OPERATIONAL PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A.

THE SUMMARY OF THE OPERATIONAL PLAN AND OF OTHER DOCUMENTS REFERRED TO HEREIN DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THOSE DOCUMENTS, AND REFERENCE IS MADE TO THE OPERATIONAL PLAN AND THE OTHER DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF THEIR TERMS AND PROVISIONS.

THE OPERATIONAL PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE OPERATIONAL PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE OPERATIONAL PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE OPERATIONAL PLAN OR THE OTHER OPERATIVE DOCUMENT WILL CONTROL.

Section 4.1.    Substantive Consolidation

The Operational Plan provides for the substantive consolidation of the Debtors' estates for all purposes.

1.    Discussion of Substantive Consolidation Generally

Generally, substantive consolidation of the estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of the multiple debtors for certain purposes under a plan. The effect of consolidation is the pooling of the assets of, and claims against, the consolidated debtors; satisfying liabilities from a common fund; and combining the creditors of the debtors for purposes of voting on reorganization plans. *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988). There is no statutory authority specifically authorizing substantive consolidation. The authority of a Bankruptcy Court to order substantive consolidation is derived from its general equitable powers under section 105(a) of the Bankruptcy Code, which provides that the court may issue orders necessary to carry out the provisions of the Bankruptcy Code. *In re DRW Property Co.*, 54 B.R. 489, 494 (Bankr. N.D. Tex. 1985). Nor are there statutorily prescribed standards for substantive consolidation. Instead, judicially developed standards control whether substantive consolidation should be granted in any given case.

The propriety of substantive consolidation must be evaluated on a case-by-case basis. *See, FDIC v. Colonial Realty Co*., 966 F.2d 57 (2d Cir. 1992). The extensive list of elements and factors frequently cited and relied upon by courts in determining the propriety of substantive consolidation may be viewed as variants on two critical factors, namely, (i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors. *In re Augie/Restivo Baking Co.*, 860 F.2d at 518. Some courts have viewed these elements and factors as examples of information that may be useful to courts charged with deciding whether there is substantial identity between the entities to be consolidated and whether consolidation is necessary to avoid some harm or to realize some benefit.

Among the specific factors or elements looked to by courts are the following:

- the degree of difficulty in segregating and ascertaining the individual assets and liabilities of the entities to be consolidated;

- the presence or absence of consolidated financial statements among the entities to be consolidated;

- the commingling of assets and business functions among the entities to be consolidated;

- the unity of interests and ownership among the various entities;

- the existence of parent and intercorporate guarantees on loans to the various entities;

- the transfer of assets to and from the various entities without formal observance of corporate formalities; and

- the effect on the percentage recovery of a claim if substantive consolidation is allowed compared to administrative consolidation.

Substantive consolidation is an equitable remedy that a bankruptcy court may be asked to apply in chapter 11 cases involving affiliated debtors. Substantive consolidation involves the pooling of the assets and liabilities of the affected debtors. All of the debtors in the substantively consolidated group are treated as if they were a single corporate and economic entity. Consequently, a creditor of one of the substantively consolidated debtors is treated as a creditor of the substantively consolidated group of debtors, and issues of individual corporate ownership of property and individual corporate liability on obligations are ignored. Substantive consolidation of two or more debtors' estates generally results in the deemed consolidation of the assets and liabilities of the debtors, the elimination of multiple and duplicative creditor claims, joint and several liability claims and guarantees and the payment of allowed claims from a common fund. Absent such substantive consolidation, payment of such duplicative claims would be dilutive of the amounts ultimately payable to certain holders of Allowed Claims against the Debtors. The Debtors believe that substantive consolidation is warranted in light of the

criteria established by the courts in ruling on the propriety of substantive consolidation in other cases.

2.      Application to the Debtors

The facts and circumstances surrounding the historical business operations of TXCO and the Affiliate Debtors support substantive consolidation in these Chapter 11 cases. TXCO and the Affiliate Debtors historically have issued consolidated financial statements. As reflected in the organization chart attached as Exhibit "D" to this Disclosure Statement, TXCO directly or indirectly owns 100% of the Affiliate Debtors. TXCO and the Affiliate Debtors have common officers and directors and have shared key employees and outside professionals, including, but not limited to, employees of TXCO who performed human resources, legal and risk management services for the benefit of all the Debtors, and accounting firms, law firms, and consultants who rendered services to all of the Debtors.

As mentioned above, the Affiliate Debtors share the same ultimate corporate parent: TXCO. There is significant overlap in the officers and directors of the Affiliate Debtors. The Debtors utilize a centralized cash management system, and pay the liabilities of the Affiliate Debtors as needed. As mentioned above, the Debtors' financial statements are consolidated at TXCO. Accordingly, for the reasons stated above, the Debtors believe that substantive consolidation for purposes of the Operational Plan is warranted in light of the criteria established by the courts in ruling on the propriety of substantive consolidation in other cases.

Section 4.2.    Classification and Treatment of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify the claims of a debtor's creditors and the claims of its interest holders. In accordance with section 1123, the Operational Plan divides Claims and Interests into Classes and sets forth the treatment for each Class. The Debtors are required under section 1122 of the Bankruptcy Code to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

A Claim or Interest shall be deemed classified in a particular Class only to the extent that it qualifies within the description of such Class, and shall be deemed classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. Notwithstanding anything to the contrary in the Operational Plan, a Claim or Interest shall be deemed classified in a Class only to the extent that such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe the Operational Plan has classified all Claims and Interests in compliance with the provisions of section 1122; however, a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests, and the Bankruptcy Court may find that a different classification is required for the Operational Plan to be confirmed. In that event the Debtors intend, to the extent permitted by the Bankruptcy Code, the Operational Plan and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Operational Plan to permit confirmation and to use the Operational Plan acceptances received in this solicitation for purposes of obtaining the approval of the reconstituted Class or Classes of

which each accepting holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Operational Plan, by changing the composition of such Class and the vote required of that Class for approval of the Operational Plan. Furthermore, a reclassification of a Claim or Interest after approval of the Operational Plan could necessitate a redistribution of the Disclosure Statement and re-solicitations of acceptances under the Operational Plan.

(i)     Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests of the Operational Plan. These unclassified Claims are treated as follows:

Administrative Claims

An Administrative Claim is defined in the Operational Plan as a Claim for payment of an administrative expense of a kind specified in sections 503(b)(including an Unsecured Claim entitled to priority under section 503(b)(9) of the Bankruptcy Code) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including, but not limited to, (i) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors, including, without limitation, wages, salaries, or commissions for services rendered after the commencement of these Cases, (ii) Professional Fee Claims, (iii) Substantial Contribution Claims, (iv) all fees and charges assessed against the Estates under section 1930 of title 28 of the United States Code, and (v) Cure payments for contracts and leases that are assumed under section 365 of the Bankruptcy Code, except to the extent waived.

Under the Operational Plan, except as otherwise provided for in Section 11.1 of the Operational Plan, on, or as soon as reasonably practicable thereafter, the latest of (i) the Effective Date, (ii) the date such Administrative Claim becomes an Allowed Administrative Claim or (iii) the date such Administrative Claim becomes payable pursuant to any agreement between the holder of such Administrative Claim and the Debtors or Reorganized TXCO, as applicable, the holder of each Allowed Administrative Claim shall receive in full satisfaction, release, settlement and discharge of such Allowed Administrative Claim: (A) cash equal to the unpaid portion of such Allowed Administrative Claim; or (B) in accordance with the terms of any written agreement between the Debtors or Reorganized Debtors, as applicable, regarding such Allowed Administrative Claim; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during these Cases will be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto. As of the Confirmation Hearing, the Debtors estimate that the amount of Allowed Administrative Claims will be $_____.

The Operational Plan provides that all final requests for payment of Professional Fee Claims (excluding Substantial Contribution Claims) must be filed and served on Reorganized TXCO, their counsel, and any other necessary parties in interest no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to such requests for payment must be filed and served on Reorganized TXCO, their counsel, and the

requesting Professional or other entity no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable request for payment was served.

Priority Tax Claims

The Operational Plan defines Priority Tax Claims as Claims entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code. Such Claims include Claims of governmental units for taxes owed by Debtors that are entitled to a priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code. The taxes entitled to priority are (i) taxes on or measured by income or gross receipts that meet the requirements set forth in section 507(a)(8)(A) of the Bankruptcy Code, (ii) property taxes meeting the requirements of section 507(a)(8)(B) of the Bankruptcy Code, (iii) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in section 507(a)(8)(C) of the Bankruptcy Code, (iv) employment taxes on wages, salaries, or commissions that are entitled to priority pursuant to section 507(a)(4) of the Bankruptcy Code, to the extent that such taxes also meet the requirements of section 507(a)(8)(D), (v) excise taxes of the kind specified in section 507(a)(8)(E) of the Bankruptcy Code, (vi) customs duties arising out of the importation of merchandise that meet the requirements of section 507(a)(8)(F) of the Bankruptcy Code, and (vii) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in section 507(a)(8)(G).

Under the Operational Plan, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, as will have been determined by the Debtors or by Reorganized TXCO, as applicable, either (i) on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, Cash equal to the due and unpaid portion of such Allowed Priority Tax Claim, (ii) treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such different treatment as to which such holder and the Debtors or Reorganized TXCO, as applicable, will have agreed upon in writing. To the extent the Debtors elect under section 1129(a)(9)(C) of the Bankruptcy Code to make regular instalment payments in Cash over a period of five years from the Petition Date, the holder of an Allowed Priority Tax Claim will receive Post-Effective Date interest of 6.5% per annum with the first instalment to be thirty days after the Effective Date. As of the Confirmation Hearing, the Debtors estimate that the amount of Allowed Priority Tax Claims will be $_____.

DIP Loan Claims

Notwithstanding any other term or provision of the Plan to the contrary, the DIP Loan Claims shall be deemed Allowed Secured Administrative Claims in the unpaid principal balance of $_____, together with accrued and unpaid interest, fees and charges, and on the Effective Date in full settlement, satisfaction, release and discharge thereof (i) the DIP Lenders shall receive their *pro rata* share of (A) Senior Secured Convertible Notes to be issued in the face principal amount of 50% of the unpaid principal balance, and accrued and unpaid interest, of the DIP Loan outstanding on the Effective Date, and (B) Convertible Preferred A Shares having a liquidation preference in the aggregate principal amount of 50% of the unpaid principal balance, and accrued and unpaid interest, of the DIP Loan outstanding on the Effective Date, and (ii) the

DIP Loan Agent shall receive payment in Cash of all its charges, fees, and reasonable attorneys' fees and expenses of its counsel accrued and unpaid through the Effective Date. As of the Confirmation Hearing, the Debtors estimate that the amount of the Allowed DIP Loan Secured Cash will be $32 million.

(b)     Classification and Treatment of Claims and Interests

(i)     Treatment of Class 1 Allowed Secured Claim of Western National Bank

The secured claim of Western National Bank, which claim is secured by the pre-petition first priority lien of Western National Bank on TXCO Drilling's Rigs and related equipment, is classified as Class 1 under this Plan. The Allowed Secured Claim of Western National Bank shall be treated, at the election of Reorganized TXCO, either by (1) reinstatement of the existing Western National Bank debt to its pre-default state pursuant to Section 1124(2) of the Bankruptcy Code, (2) issuance of a note by Reorganized TXCO to Western National Bank in an amount equal to the amount of its Allowed Secured Claim with a five year maturity with payments of interest only to be due monthly on the last business day of the month (commencing on the last day of the first month after the Effective date) at the Prime Rate set out in the Wall Street Journal's money rate tables as of the Effective Date, or as otherwise set by the Bankruptcy Court at the Confirmation Hearing, with all outstanding principal and interest due on the fifth anniversary of the Effective Date, or (3) such other treatment of Western National Bank's Allowed Secured Claim as agreed to in writing between TXCO Drilling and/or Reorganized TXCO and Western National Bank with the terms of such agreed treatment to be set out in a Plan Supplement to be filed by the Debtors at least ten (10) days prior to the Confirmation Hearing. TXCO Drilling and Western National Bank agreed during the pendency of TXCO Drilling's Bankruptcy Case that TXCO Drilling would, as adequate protection, pay the outstanding interest accrued on the Western National Bank obligation at the non-default rate of interest and Western National Bank agreed to waive any right to assert default interest in connection with its Claim.

(ii)     Treatment of Class 2 Allowed Secured Claims of Senior Mineral Lien Claimants

"Senior Mineral Lien Claimants" is limited to creditors in their capacities as holders of liens upon the Debtors' property upon which the Revolver and Term Loan Lenders do not hold perfected liens as of the Petition Date. In connection with the treatment of the Claims under Class 2, the Debtors prepared Exhibit "S," which is a preliminary list of the Senior Mineral Lien Claimants (by non-mortgaged lease/class) that the Debtors have tentatively identified as having complied with all statutory requirements necessary to perfect a Senior Mineral Lien (the "Preliminary Non-Binding Senior Mineral Lien Determination").

Estimated Amount Owing as of the Effective Date – $_____ million. The Senior Mineral Lien Claimants will be placed into separate classes by lease based on the Non-Mortgaged Property to which their Senior Mineral Lien has attached.

Treatment

1.     Application of JIBs – All Senior Mineral Lien Claimants who are Mineral Subcontractors for a particular well will receive a JIB Payment. Upon

payment of an Unpaid JIB to the Debtors or Reorganized TXCO, the JIB Obligor will be deemed released of any and all claims and/or liens held or asserted by any Mineral Subcontractor including, without limitation, any claims under Texas Property Code § 56.043 or any other section of the Texas Property Code.

2(a).  Consenting Senior Mineral Lien Claimants – Reorganized TXCO, on behalf of the Debtors, will not object to the extent, validity, or enforceability of the Senior Mineral Lien held by a Consenting Senior Mineral Lien Claimant as set forth in the Preliminary Non-Binding Senior Mineral Lien Determination and the Claims set forth therein will be Allowed Consenting Senior Mineral Lien Claims. Consenting Senior Mineral Lien Claimants will be treated as follows:

   i.  The Preference Credit –The Allowed Consenting Senior Mineral Lien Claim of any Consenting Senior Mineral Lien Claimant will be reduced by an amount equal to fifty percent (50%) (or a lower percentage if agreed to by Reorganized TXCO, on behalf of the Debtors,) of the full amount of the payments received in the 90 days prior to the Petition Date against the applicable Allowed Consenting Senior Mineral Lien Claim. Exhibit Q to the Disclosure Statement discloses the amounts that the Debtors paid to Senior Mineral Lien Claimants during the 90 days prior to the Petition Date. If the Consenting Senior Mineral Lien Claimant has liens on multiple leases, the payment will be allocated *pro rata* to all Senior Mineral Liens held by such Consenting Senior Mineral Lien Claimant (a **"Preference Credit"**). The Preference Credit will be in full and complete satisfaction of any and all claims that the Debtors may have under 11 U.S.C. § 547 against any Consenting Senior Mineral Lien Claimant.

   ii.  Within thirty (30) days of the Effective Date, each Allowed Consenting Senior Mineral Lien Claimant shall (i) receive, at the election of such Claimant, either (A) its *pro rata* interest in a Creditor Trust holding the Consenting Senior Mineral Lien Claimants Note in an amount equal to its Preliminary Non-Binding Senior Mineral Lien Determination less any Preference Credit and/or JIB Payment, as applicable (the "Net Allowed Senior Mineral Lien Claim"), or (B) payment in Cash of an amount equal to twenty percent (20%) of its Net Allowed Senior Mineral Lien Claim, and (ii) have Preferred Bidder Status. The Consenting Senior Mineral Lien Claimants Note shall be payable to the Trustee of the Consenting Senior Mineral Lien Claimants Creditor Trust.

   Consenting Senior Mineral Lien Claimants shall have no further claims against the Debtors or against any party to an agreement or

contract with any of the Debtors other than its Distribution and any applicable JIB Payment if, when and as received by the Debtors or Reorganized TXCO.

2(b).   Non-Consenting Senior Mineral Lien Claimants – Reorganized TXCO, on behalf of the Debtors, reserves its right to further examine and/or to object to the extent, validity and/or enforceability of any lien and/or Claim asserted by such Non-Consenting Senior Mineral Lien Claimant. Non-Consenting Senior Mineral Lien Claimants will be treated as follows:

   i.   Preferences – Reorganized TXCO, on behalf of the Debtors, reserves the right to file Avoidance Actions against any and all Non-Consenting Senior Mineral Lien Claimants.

   ii.   Claims Resolution Process – Within 120 days after the Effective Date, Reorganized TXCO, on behalf of the Debtors, will begin to obtain a determination as to the value of any property securing the claims of Non-Consenting Senior Mineral Lien Claimants by filing a motion pursuant to Rule 9014 of the Bankruptcy Rules seeking a final ruling whether the liens of Non-Consenting Senior Mineral Lien Claimants attach to any interest acquired by a Debtor after the Petition Date (whether such interest is an increase in acreage, an increase in a working interest or attributable to a lease signed after the Petition Date) (the "Lien Motion"). Reorganized TXCO, on behalf of the Debtors, will also seek a determination as to whether the Debtors are entitled to recover from any property allegedly securing the claims of a Non-Consenting Senior Mineral Lien Claimant, the reasonable and necessary costs and expenses of preserving such property pursuant to 11 U.S.C. § 506(c). If no Lien Motion is filed, or if filed, once those issues are resolved by Final Order, the Debtors will file motions seeking determinations of the value of the property ultimately determined to secure each Non-Consenting Senior Mineral Lien Claim (the "Valuation Motion").

   Within 30 days after the filing of each Valuation Motion, Reorganized TXCO, on behalf of the Debtors, shall schedule mediation and identify a mediator. Any Non-Consenting Senior Mineral Lien Claimant subject to a Valuation Motion may object in writing to the mediator selected by Reorganized TXCO, on behalf of the Debtors, not later than 30 days after being notified of the identity of the proposed mediator. In the absence of any agreement, the Bankruptcy Court will select a mediator if an objection has been filed within such 30 day period. Mediations will occur at a mutually agreeable location between Reorganized TXCO, on behalf of the Debtors, and the Non-Consenting Senior Mineral Lien Claimant asserting a lien in the property. If no

mutually agreeable location can be determined, the mediation will occur in San Antonio, Texas. If the mediation is successful, the Non-Consenting Senior Mineral Lien Claimant shall be entitled to the treatment of its Allowed Non-Consenting Senior Mineral Lien Claim as set forth below. In the event mediation is unsuccessful, Reorganized TXCO, on behalf of the Debtors, will set a hearing before the Bankruptcy Court to consider the Valuation Motion.

Within 60 calendar days after entry of a final order determining the value of the property to which the liens attach and the total amount of all Allowed Non-Consenting Senior Mineral Lien Claims against such property, each such Claimant shall receive its *pro rata* interest in a Creditor Trust holding the Non-Consenting Senior Mineral Lien Claimants Note with respect to such property. The Non-Consenting Senior Mineral Lien Claimants Note shall be payable to the Trustee of the Non-Consenting Senior Mineral Lien Claimants Creditor Trust who shall make distributions to the Non-Consenting Senior Mineral Lien Claimants in accordance with their percentage interests. Any deficiency claim shall be treated as a Class 8 General Unsecured Claim.

2(c).  Non-Consenting Section 1111(b) Senior Mineral Lien Claimants – Reorganized TXCO, on behalf of the Debtors, reserves its right to further examine and/or to object to the extent, validity and/or enforceability of any lien and/or claim asserted by such Non-Consenting Section 1111(b) Senior Mineral Lien Claimant. Each member of the class of Non-Consenting Section 1111(b) Senior Mineral Lien Claimants will be treated as follows:

i.  Preferences – Reorganized TXCO, on behalf of the Debtors, reserves the right to file Avoidance Actions against any and all Non-Consenting Section 1111(b) Senior Mineral Lien Claimants, including, without limitation, to assert that an 1111(b) election is an admission that the class is undersecured and/or that such class is estopped from denying that it is undersecured.

ii.  Claims Resolution Process – Within 120 days after the Effective Date, Reorganized TXCO, on behalf of the Debtors, will begin to obtain a determination as to the value of any property securing the Claims of Non-Consenting Section 1111(b) Senior Mineral Lien Claimants by filing a Lien Motion. Reorganized TXCO, on behalf of the Debtors, will also seek a determination as to whether the Debtors are entitled to recover from any property allegedly securing the Claims of a Non-Consenting Section 1111(b) Senior Mineral Lien Claimant, the reasonable and necessary costs and expenses of preserving such property pursuant to 11 U.S.C. § 506(c). Once those issues are fully and finally resolved, the

Debtors will file motions (the "Section 1111(b) Valuation Motion") seeking determinations of the value of the property to ultimately determine the value securing each Non-Consenting Section 1111(b) Senior Mineral Lien Claimants Claim, if any.

Within 30 days after filing of each Section 1111(b) Valuation Motion, Reorganized TXCO, on behalf of the Debtors, shall schedule mediation and identify a mediator. Any of the Non-Consenting Section 1111(b) Senior Mineral Lien Claimants subject to a Section 1111(b) Valuation Motion may object in writing to the mediator selected by Reorganized TXCO, on behalf of the Debtors, not later than 30 days after being notified of the identity of the proposed mediator. In the absence of any agreement, the Bankruptcy Court will select a mediator if an objection has been filed within such 30 day period. Mediations will occur at a mutually agreeable location between Reorganized TXCO, on behalf of the Debtors, and the Non-Consenting Section 1111(b) Senior Mineral Lien Claimants asserting a lien in the property. If no mutually agreeable location can be determined, the mediation will occur in San Antonio, Texas. If the mediation is successful, the Non-Consenting Section 1111(b) Senior Mineral Lien Claimants shall be entitled to the treatment of its Allowed Non-Consenting Section 1111(b) Senior Mineral Lien Claim as set forth below. In the event mediation is unsuccessful, Reorganized TXCO, on behalf of the Debtors, will set a hearing before the Bankruptcy Court to consider the Section 1111(b) Valuation Motion.

Once a determination is reached on the value of the property to which the liens attach and the total amount of all Allowed Non-Consenting Section 1111(b) Senior Mineral Lien Claims against such property, Reorganized TXCO, on behalf of the Debtors, will execute a Non-Consenting Section 1111(b) Senior Mineral Lien Claimants Note. Holders of Non-Consenting Section 1111(b) Senior Mineral Lien Claims with respect to a particular piece of property will receive a pro rata interest in a Creditor Trust holding the Non-Consenting Section 1111(b) Senior Mineral Lien Claimants Note (See Exhibit F). The Non-Consenting Section 1111(b) Senior Mineral Lien Claimants Note shall be payable to the Trustee of the Non-Consenting Section 1111(b) Senior Mineral Lien Claimants Creditor Trust who shall make distributions to the Non-Consenting Section 1111(b) Senior Mineral Lien Claimants in accordance with their percentage interests.

2752695.1

Classes for Secured Claims of Mineral Lienholders on Non-Mortgaged Properties:

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|---|---|---|---|---|
| Class 2A | Alkek Leases | TX-003-001.00<br>TX-003-002.00<br>TX-003-004.00 | MTZ Vacuum Service<br>EMS Pipeline Services, LP | $ 389.29 |
| Class 2B | Barrett Lease | TX-027-017.00 | Nabors Wells Services Co. | $ 11,513.01[15] |
| Class 2C | Briscoe Catarina Lease | TX-101J-001.00 | Baker Hughes Oilfield Inc.<br>Tim's Welding LLC<br>Wood Group Logging Services | $ 95,053.48 |
| Class 2D | Briscoe Catarina West Lease | TX-101M-001.00 | Alice Southern Equipment<br>Allis-Chalmers Tubular<br>Baker Hughes Oilfield Inc.<br>BJ Services Company<br>Blue Star Pipe<br>Capital Well Service, LLC<br>Doug Frazier<br>Eastern Oil Well Service Co.<br>Fernando Alvarez<br>Fesco Ltd.<br>Gyrodata, Inc.<br>Julu Services Inc.<br>Lide Industries, Inc.<br>Lin's Completion Fluids, Inc.<br>Mangum's Oilfield Services, Inc.<br>McGuire Industries, Inc.<br>Mitco Brick Inc.<br>MTZ Vacuum Service<br>Perforating Services Intl. | $ 3,918,808.58[16] |

---

[15] The allocated value for the Barrett Lease is $0 under the Newfield PSA and there are no potential JIB payments owed on the Barrett Lease.

[16] The allocated value for the Briscoe Catarina West Lease is $1,800,000 under the Newfield PSA and there are potential JIB payments owed in the amount of $2,592,044.20.

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|---|---|---|---|---|
| | | | Smith International Specialty Rental Tools Texas Southern Crane The South Texas Supply Company Thomas Energy Services, Inc. Thomas Petroleum, Ltd. Tim Ligocky Top Notch Energy Services Inc. Treat-Em-Rite Corporation Wood Group Production Testing Tasco Tool Service, Ltd. | |
| Class 2E | Briscoe Chupadera Lease | TX-101R-001.01/.02 | DHW Well Service Inc. Doug Frazier Eastern Oil Well Service Co. Fesco Ltd. Lide Industries, Inc. Mangum's Oilfield Services Inc. McGuire Industries, Inc. MTZ Vacuum Service Specialty Rental Tools Tasco Tool Service, Ltd. The South Texas Supply Company Thomas Energy Services, Inc. Tim's Welding LLC Weatherford U.S., L.P. Wood Group Logging Services Wood Group Production Testing Odessa Pumps & Equipment | $ 4,651,876.58[17] |

---

[17] The allocated value on the Briscoe Chupadera Lease is $725,999.00 under the Newfield PSA and there are no potential JIB payments owed on the Briscoe Chupadera Lease.

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|---|---|---|---|---|
| Class 2F | Burr "A" Lease | TX-006-001 | J F Ralston Co. Capital Well Service, LLC EMS Pipeline Services, LP Tasco Tool Service, Ltd. The South Texas Supply Company Thomas Petroleum, Ltd. Tim Ligocky Tim's Welding LLC Treat-Em-Rite Corporation MTZ Vacuum Service | $ 383,355.24[18] |
| Class 2G | Cherry Lease | TX-029-001.01-.05 | Capital Well Service, LLC | $ 3,156.98 |
| Class 2H | Chittim "B" Lease | TX-009-001.01/.02 | Fesco Ltd. Tim Logocky Doug Frazier EMS Pipeline Services, LP Mangum's Oilfield Services Inc. McGuire Industries, Inc. Tasco Tool Service, Ltd. Total Production Services, Inc. Weatherford U.S., L.P. Wood Group Logging Services HBK Resources Ltd. J F Ralston Co Inc. Lide Industries, Inc. Mesa Safety Services The South Texas Supply Company Treat-Em-Rite Corporation Halliburton Energy | $ 4,192,537.51[19] |

[18] The allocated value for the Burr "A" Lease is $330,000.00 under the Newfield PSA and there are potential JIB payments owed in the amount of $42,000.00.

[19] The allocated value for the Chittim "B" Lease is $175,000.00 under the Newfield PSA and there aer potential JIB payments owed in the amount of $493,615.08.

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|---|---|---|---|---|
| | | | Services<br>Tim's Welding LLC<br>Capital Well Service, LLC<br>ITS Engineered Systems, Inc.<br>Techmation Electric & MTZ Vacuum Service<br>Odessa Pumps & Equipment<br>Petrospec Engineering Ltd. | |
| Class 2I | Chittim "G" Lease | TX-004-004.00 | MTZ Vacuum Service | $ 230.00 |
| Class 2J | Farmers Lease | TX-016A | Midway Oilfield Constructors | $ 2,380.13 |
| Class 2K | Felps Lease | TX-030-003.00 | MTZ Vacuum Service | $ 1,376.00 |
| Class 2L | Glass "A" Lease | TX-002-001.01/.02 | Doug Frazier<br>Eastern Oil Well Service Co.<br>Mangum's Oilfield Services Inc.<br>MTZ Vacuum Service<br>Stinger Wellhead Protection<br>Wood Group Logging Services<br>Allis-Chalmers Tubular<br>Capital Well Service, LLC<br>J F Ralston Co Inc<br>McGuire Industries, Inc.<br>Mesa Safety Services<br>Tasco Tool Service, Ltd.<br>The South Texas Supply Company<br>Thomas Energy Services, Inc.<br>EMS Pipeline Services, LP<br>J&J Excavating & | $ 1,122,714.43 |

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|---|---|---|---|---|
| | | | Materials | |
| Class 2M | Glass "B" Lease | TX-020-002.01/.02 | Total Production Services, Inc | $ 1,568.50 |
| Class 2N | Gorman Lease | TX-012-001.01/.02/ .03/.04 | Odessa Pumps & Equipment | $ 3,279.98 |
| Class 2O | Harris Lease | TX-030-006.01 | Capital Well Service, LLC | $ 428.67 |
| Class 2P | Keller Lease | TX-015-051.00 | Capital Well Service, LLC Eastern Oil Well Service Co. MTZ Vacuum Service The South Texas Supply Company | $ 25,837.70 |
| Class 2Q | Kincaid Lease | TX-002-001.00 | The South Texas Supply Company Capital Well Service, LLC | $ 1,055.50 |
| Class 2R | Latham McKnight Lease | TX-022-032.00 | Doug Frazier MTZ Vacuum Service | $ 79,546.21 |
| Class 2S | Maddux Lease | TX-026-002.01 | Capital Well Service, LLC Doug Frazier McGuire Industries, Inc. MTZ Vacuum Service Weatherford U.S., L.P. | $ 56,645.26[20] |
| Class 2T | Marolyn Powell Bean Lease | TX-022-012.01 | The South Texas Supply Company | $ 354.79 |
| Class 2U | Marolyn Powell Bean Lease | TX-022-012.01/.02 & TX-023-001.01/.02 | J F Ralston Co Inc Capital Well Service, LLC | $ 156,641.60 |

[20] The allocated value for the Maddux Lease is $25,000.00 under the Newfield PSA and there are potential JIB payments of $40,349.00.

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|-------|-----------|--------------|----------------|-------------------|
| | | | Eastern Oil Well Service Co.<br>Doug Frazier<br>MTZ Vacuum Service | |
| Class 2V | Marolyn Powell Bean Lease | TX-022-012.01/TX-023-001.01 | Allis-Chalmers Tubular<br>Baker Hughes Oilfield Inc.<br>C&J Spec-Rent Services, Inc.<br>Doug Frazier<br>Julu Services Inc.<br>Mangum's Oilfield Services Inc<br>McGuire Industries, Inc.<br>Patterson-UTI Drilling Co LP<br>Smith International<br>Standard Tube Company<br>Stinger Wellhead Protection<br>Tasco Tool Service, Ltd.<br>Thomas Energy Services, Inc.<br>Weatherford U.S., L.P.<br>Wood Group Logging Services<br>Fernando Alvarez<br>Matthew Mchazlett-DBA<br>Texas Energy Services, L.P. | $ 1,736,354.75 |
| Class 2W | Myers Lease | TX-014-001.00 | J F Ralston Co Inc<br>Tim's Welding LLC<br>Capital Well Service, LLC<br>DHW Well Service Inc.<br>Doug Frazier<br>Mangum's Oilfield Services Inc<br>MTZ Vacuum Service<br>The South Texas Supply Company | $ 219,652.93 |

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|---|---|---|---|---|
| | | | Treat-Em-Rite Corporation | |
| Class 2X | Myra Gould Lease | Unknown (Non-TXCO Lease) | Midway Oilfield Constructors Weatherford U.S., L.P. Wood Group Logging Services | $ 27,393.06 |
| Class 2Y | O'Meara Lease J.A. Webb Lease | TX-014-006.00 TX-014-002.00 | Allis-Chalmers Tubular Backer Hughes Oilfield Inc. Bourland & Leverich Supply Co Doug Frazier Fernando Alvarez J&J Excavating & Materials Julu Services Inc. Leam Drilling Systems, Inc. Lin's Completion Fluids, Inc. Mangum's Oilfield Services, Inc. McGuire Industries, Inc. Mesa Safety Services Mitco Brick Inc. MTZ Vacuum Service Patterson-UTI Drilling Co LP Smith International Specialty Rental Tools Thomas Energy Services, Inc. Thomas Petroleum, Ltd. Treat-Em-Rite Corporation Turbeco Inc. TXCO Drilling Corp Weatherford U.S., L.P. Wood Group Logging Services EMS Pipeline Services, LP | $ 3,458,623.35 |

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|---|---|---|---|---|
| | | | J F Ralston Co Inc<br>Tim's Welding LLC | |
| Class 2Z | Peters Lease | ND-06-196A | Baker Hughes | $ 5,067.21 |
| Class 2AA | San Pedro Ranch Lease | TX-101A-001-01/02/03 | Alice Southern Equipment<br>Allis-Chalmers Tubular<br>Baker Hughes Oilfield Inc.<br>BJ Services Company<br>C&J Spec-Rent Services, Inc.<br>Capital Well Service, LLC<br>DHW Well Service Inc.<br>Dorsal Services, Inc.<br>Doug Frazier<br>EMA Pipeline Services, LP<br>Fernando Alvarez<br>Fesco Ltd.<br>J&J Excavating & Materials<br>Julu Services Inc.<br>J-W Wireline Company<br>Lin's Completion Fluids, Inc.<br>Matthew Mchazlett-DBA<br>McGuire Industries, Inc.<br>Mitco Brick Inc.<br>MTZ Vacuum Service<br>Nabors Well Services Co.<br>Odessa Pumps & Equipment<br>Patterson-UTI Drilling Co LP<br>Perforating Services Intl.<br>Professional Wireline | $ 12,495,556.98[21] |

---

[21] The allocated value for the San Pedro Ranch Lease is $4,200,000 under the Newfield PSA and there are potential JIB payments of $6,162,245.44.

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|-------|-----------|--------------|----------------|-------------------|
| | | | Rentals<br>Schlumberger Technology<br>Smith International<br>Specialty Rental Tools<br>Standard Tube Company<br>Stinger Wellhead Protection<br>Tasco Tool Service, Ltd.<br>Texas Energy Services, L.P.<br>Texas Southern Crane<br>The South Texas Supply Company<br>Thomas Energy Services, Inc.<br>Thomas Petroleum, Ltd.<br>Thru Tubing Solutions, Inc.<br>Tim Ligocky<br>Tim's Welding LLC<br>Top Notch Energy Services Inc<br>Torqued-Up Oilfield<br>Treat-Em-Rite Corporation<br>Turbeco Inc.<br>Weatherford U.S., L.P.<br>Wood Group Logging Services<br>Halliburton Energy Services<br>J F Ralston Co Inc<br>Lide Industries, Inc.<br>Mangum's Oilfield Services Inc | |
| Class 2BB | Saner Lease | TX-026-004.00 | MTZ Vacuum Service<br>Cameron International Corp.<br>McGuire Industries, Inc. | $ 2,069,598.82[22] |

---

[22] The allocated value for the Saner Lease is $150,000.00 under the Newfield PSA and there are potential JIB payments owed in the amount of $1,810,881.51.

| Class | Lease Name | Lease Number | Lien Claimants | Filed Lien Amount |
|-------|-----------|--------------|----------------|-------------------|
| | | | Doug Frazier<br>Mangum's Oilfield Services Inc.<br>Weatherford U.S., L.P.<br>Versa Tech Automation Services<br>Petrospec Engineering Ltd.<br>Tim Ligocky<br>Tim's Welding LLC | |
| Class 2CC | WIPFF Lease | TX-005-001.01 | Capital Well Service, LLC<br>MTZ Vacuum Service | $ 931.01 |

Treatment of Class 3 Allowed Secured Claims of the Revolver Lenders

As of the Effective Date, the Class 3 Claims are deemed Allowed. In full settlement, satisfaction, release and discharge of the Allowed Class 3 Claims, each Revolving Loan Lender shall receive on the Effective Date its *pro rata* interest in (i) First Lien Notes issued in the face principal amount of the unpaid principal balance, and accrued and unpaid interest, of the Revolver Loans outstanding on the Effective Date, or (ii) to the extent that Class 3 makes an election under section 1111(b) of the Bankruptcy Code, First Lien Alternative Notes issued in the face principal amount of the unpaid balance, and accrued and unpaid interest, of the Revolver Loans outstanding on the Effective Date. In addition, the Debtors will pay to the Revolver Agent all of its charges, fees, and reasonable attorneys' fees and expenses of its counsel accrued and unpaid through the Effective Date.

Regardless of any election under section 1111(b) of the Bankruptcy Code, the Revolver Lenders shall receive debt obligations in full satisfaction of the First Lien Obligations as defined in the Intercreditor Agreement in accordance with Section 6.6 of the Intercreditor Agreement. Also in accordance with Section 6.6 of the Intercreditor Agreement, the Intercreditor Agreement will apply with like effect to the liens securing the newly issued debt obligations until the date a court of competent jurisdiction enters a final order invalidating the Intercreditor Agreement and/or the subordination provisions thereunder. As of the Confirmation Hearing, the Debtors estimate that the amount of the Allowed Secured Claims of the Revolver Lenders will be $50 million.

Treatment of Class 4 Allowed Secured Claims of the Term Loan Lenders

As of the Effective Date, the Class 4 Claims are deemed Allowed. In full settlement, satisfaction, release and discharge of the Allowed Class 4 Claims, each Term Loan Lender shall receive on the Effective Date its *pro rata* share of: (a) 97.5% of the New Common Stock issued under the Plan <u>plus</u> an additional percentage of New Common Stock up to 2.5% that shall be equal to the collective percentage of Allowed Class 8 Claims opting for the Unsecured Creditors

126

Payment Option multiplied by 2.5% (the "Additional New Common Stock")(the Additional New Common Stock shall be held by Reorganized TXCO in trust pending resolution of all Disputed General Unsecured Claims a final determination of the total Allowed General Unsecured Claims), (b) Convertible Preferred B Shares having an aggregate liquidation preference in the amount of 64% of the unpaid principal balance of Term Loans held by Term Loan Lenders, and (c) Second Lien Notes in the aggregate unpaid principal balance of 35% of all Term Loans held by the Term Loan Lenders. In addition, on the Effective Date the Debtors shall pay in Cash all reasonable attorneys' fees and expenses of counsel to the Term Loan Lenders accrued and unpaid through the Effective Date. The Term Loan Lenders shall retain the right to contest the effectiveness of the Intercreditor Agreement and subordination of their liens thereunder. As of the Confirmation Hearing, the Debtors estimate that the amount of the Allowed Secured Claims of the Term Loan Lenders will be $106 million.

Treatment of Class 5 Allowed Secured Claims of the Mineral Lien Holders on Mortgaged Properties

"Junior Mineral Lien Claimants" means creditors in their capacities as holders of liens upon property upon which the Revolver and Term Loan Lenders do hold perfected liens as of the Petition Date. In connection with the treatment of the Claims under Class 5, the Debtors prepared Exhibit "T," which is a preliminary list of the Junior Mineral Lien Claimants (by lease/class) that the Debtors have tentatively identified as having complied with all statutory requirements necessary to perfect a lien (the "Preliminary Non-Binding Junior Mineral Lien Determination").

<u>Total Estimated Amount Owing as of the Effective Date</u> – $___ million.

<u>Treatment</u>

1.    <u>Application of JIBs</u> – All Junior Mineral Lien Claimants who are Mineral Subcontractors for a particular well will receive a JIB Payment. Upon payment of an Unpaid JIB to the Debtors or Reorganized TXCO, the JIB Obligor will be deemed released of any and all claims by any Mineral Subcontractor including, without limitation, any claims under Texas Property Code § 56.043 or any other section of the Texas Property Code.

2(a).    <u>Consenting Junior Mineral Lien Claimants</u> – The Debtors will not object to the extent, validity, or enforceability of the Junior Mineral Lien held by such Consenting Junior Mineral Lien Claimant as set forth in the Preliminary Non-Binding Junior Mineral Lien Determination and the Claims set forth therein will be deemed Allowed Junior Mineral Lien Claims. Consenting Junior Mineral Lien Claimants will be treated as follows:

i.    <u>The Preference Credit</u> – The Allowed Consenting Junior Mineral Lien Claim of any Consenting Junior Mineral Lien Claimant will be reduced by an amount equal to fifty percent (50%)(or a lower percentage, if agreed to by the Debtors or Reorganized TXCO) of

the full amount of the payments received in the 90 days prior to the Petition Date against their Allowed Junior Mineral Lien Claim. Exhibit __ to the Disclosure Statement discloses the amounts which the Debtors paid to Junior Mineral Lien Claimants during the 90 days prior to the Petition Date. If the Consenting Junior Mineral Lien Claimant asserts a lien on multiple leases, the payment will be allocated *pro rata* to all Junior Mineral Liens held by such Consenting Junior Mineral Lien Claimant. The Preference Credit will be in full and complete satisfaction of any and all claims that the Debtors or Reorganized TXCO may have under 11 U.S.C. § 547 against any Allowed Consenting Junior Mineral Lien Claimant.

ii. Within thirty (30) calendar days after the Effective Date, Consenting Junior Mineral Lien Claimants shall (i) receive its *pro rata* interest in a Creditor Trust holding the Consenting Junior Mineral Lien Claimants Note in an amount equal to its Allowed Junior Mineral Lien Claim, after reducing such Allowed Junior Mineral Lien Claim by any JMLC Preference Credit and/or JIB Payment, as applicable, and (ii) have Preferred Bidder Status. The Consenting Junior Mineral Lien Claimants Note shall be payable to the Trustee of the Consenting Junior Mineral Lien Claimants Creditor Trust. The Trustee shall make distributions to the Consenting Junior Mineral Lien Claimants in accordance with their percentage interests in the Trust.

2(b). <u>Non-Consenting Junior Mineral Lien Claimants</u> – Reorganized TXCO, on behalf of the Debtors, reserves its right to further examine and/or to object to the extent, validity and/or enforceability of any lien and/or Claim asserted by such Non-Consenting Junior Mineral Lien Claimant. Non-Consenting Junior Mineral Lien Claimants will be treated as follows:

i. <u>Preferences</u> – Reorganized TXCO, on behalf of the Debtors, reserves the right to file Avoidance Actions against any and all Non-Consenting Junior Mineral Lien Claimants.

ii. <u>Claims Resolution Process</u> – Within 120 days after the Effective Date, Reorganized TXCO, on behalf of the Debtors, will begin to obtain a determination as to the value of any property securing the claims of Non-Consenting Junior Mineral Lien Claimants by filing a Lien Motion. Reorganized TXCO, on behalf of the Debtors, will also seek a determination as to whether the Debtors are entitled to recover from any property allegedly securing the claims of the Non-Consenting Junior Mineral Lien Claimants, the reasonable and necessary costs and expenses of preserving such property pursuant to 11 U.S.C. § 506(c). If no Lien Motion is filed, or if filed, once those issues are resolved by a Final Order, the Debtors

will file motions seeking determinations of the value of the property ultimately determined to secure each Non-Consenting Junior Mineral Lien Claim (the "<u>Junior Valuation Motion</u>"). Reorganized TXCO, on behalf of the Debtors, will seek a determination as to the value of the interest to which the liens attach.

Within 30 days after filing the Junior Valuation Motion, Reorganized TXCO, on behalf of the Debtors, shall schedule mediation and identify a mediator. Any Non-Consenting Junior Mineral Lien Claimant subject to a Junior Valuation Motion may object in writing to the mediator selected by Reorganized TXCO, on behalf of the Debtors, not later than 30 days after being notified of the identity of the proposed mediator. In the absence of any agreement, the Bankruptcy Court will select a mediator if an objection has been filed within such 30 day period. Mediations will occur at a mutually agreeable location between Reorganized TXCO, on behalf of the Debtors, and the Non-Consenting Junior Mineral Lien Claimants asserting a lien in the property. If no mutually agreeable location can be determined, the mediation will occur in San Antonio, Texas. If the mediation is successful, the Non-Consenting Junior Mineral Lien Claimant will be entitled to the treatment of its Allowed Non-Consenting Junior Mineral Lien Claim as set forth below. In the event mediation is unsuccessful, Reorganized TXCO, on behalf of the Debtors, will set a hearing before the Bankruptcy Court to consider the Junior Valuation Motion.

Within sixty (60) days after entry of a final order determining the value of the property to which the liens attach and the total amount of the Allowed Non-Consenting Junior Mineral Lien Claims against such property, each such Claimant shall receive its *pro rata* interest in a Creditor Trust holding the Non-Consenting Junior Mineral Lien Claimants Note with respect to such property. The Non-Consenting Junior Mineral Lien Claimants Note shall be payable to the Trustee of the Non-Consenting Junior Mineral Lien Claimants Creditor Trust who shall make distributions to the Non-Consenting Junior Mineral Lien Claimants in accordance with their percentage interests. Any deficiency claim will be treated as a Class 9 General Unsecured Claim.

2(c). <u>Non-Consenting Section 1111(b) Junior Mineral Lien Claimants</u> – Reorganized TXCO, on behalf of the Debtors, reserves its right to further examine and/or to object to the extent, validity and/or enforceability of any lien and/or Claim asserted by such Non-Consenting Section 1111(b) Junior Mineral Lien Claimants. Each member of the class of Non-

Consenting Section 1111(b) Junior Mineral Lien Claimants will be treated as follows:

i. Preferences – the right to file Avoidance Actions against any and all Non-Consenting Section 1111(b) Junior Mineral Lien Claimants including, without limitation, to assert that an 1111(b) election is an admission that the class is undersecured and/or that such class is estopped from denying that it is undersecured.

ii. Claims Resolution Process – Within 120 days after the Effective Date, Reorganized TXCO, on behalf of the Debtors, will begin to obtain a determination as to the value of any property securing the claims of Non-Consenting Section 1111(b) Junior Mineral Lien Claimants by filing a Lien Motion. Reorganized TXCO, on behalf of the Debtors, will also seek a determination as to whether the Debtors are entitled to recover from any property allegedly securing the claims of the Non-Consenting Section 1111(b) Junior Mineral Lien Claimants, the reasonable and necessary costs and expenses of preserving such property pursuant to 11 U.S.C. § 506(c). Once those issues are fully and finally resolved, Reorganized TXCO, on behalf of the Debtors, will file motions (the "Junior Section 1111(b) Valuation Motion") seeking determinations of the value of the property, including whether the remaining value of the property is of inconsequential value such that the class of Junior Mineral Claimants was not entitled to make an election under section 1111(b) of the Bankruptcy Code, to ultimately determine the value securing each Non-Consenting Section 1111(b) Senior Mineral Lien Claimants Claims, if any.

Within 30 days after filing the Junior Section 1111(b) Valuation Motion, Reorganized TXCO, on behalf of the Debtors, shall schedule mediation and identify a mediator. Any Non-Consenting Section 1111(b) Junior Mineral Lien Claimant subject to a Junior Section 1111(b) Valuation Motion may object in writing to the mediator selected by Reorganized TXCO, on behalf of the Debtors, not later than 30 days after being notified of the identity of the proposed mediator. In the absence of any agreement, the Bankruptcy Court will select a mediator if an objection has been filed within such 30 day period. Mediations will occur at a mutually agreeable location between Reorganized TXCO, on behalf of the Debtors, and the Non-Consenting Section 1111(b) Junior Mineral Lien Claimants asserting a lien in the property. If no mutually agreeable location can be determined, the mediation will occur in San Antonio, Texas. If the mediation is successful, the Non-Consenting Section 1111(b) Junior Mineral Lien Claimant will be entitled to the treatment of its Allowed Non-Consenting Section 1111(b) Junior Mineral Lien Claim as set forth below. In

the event mediation is unsuccessful, Reorganized TXCO, on behalf of the Debtors, will set a hearing before the Bankruptcy Court to consider the Junior Section 1111(b) Valuation Motion.

Once a determination is reached on the value of the property to which the liens attach and the total amount of all Allowed Non-Consenting Section 1111(b) Junior Mineral Lien Claims against such property, Reorganized TXCO, on behalf of the Debtors, will execute a "Non-Consenting Section 1111(b) Junior Mineral Lien Claimants Note." Holders of Non-Consenting Section 1111(b) Junior Mineral Lien Claims will receive their *pro rata* interest in a Creditor Trust holding the Non-Consenting Section 1111 (b) Junior Mineral Lien Claimants Note with respect to such property. The Non-Consenting Section 1111(b) Junior Mineral Lien Claimants Note shall be payable to the Trustee of the Non-Consenting Section 1111(b) Junior Mineral Lien Claimants Creditor Trust. The Trustee shall make distributions to the Non-Consenting Section 1111(b) Junior Mineral Lien Claimants in accordance with their percentage interests in the Trust.

Classes for Allowed Secured Claims of the Mineral Lien Holders on Mortgaged Properties:

| Class | Lease Name | Lease Number | Lien Claimants | Lien Amount |
|---|---|---|---|---|
| Class 5A | Barclay Lease | TX-001-002.00 | J F Ralston Co Inc<br>Tasco Tool Service, Ltd.<br>Tim's Welding LLC<br>Wood Group Logging Services<br>EMS Pipeline Services, LP | $ 7,278.45 |
| Class 5B | Briscoe Ranch, Inc. et al "A" | TX-019-002.00<br>TX-019-005.00<br>(for all Cage-West A 134H Unit) | Tim's Welding LLC<br>Eastern Oil Well Service Co.<br>Thomas Energy Services, Inc.<br>Doug Frazier<br>Lide Industries, Inc.<br>Mangum's Oilfield Services Inc<br>McGuire Industries, Inc.<br>Total Production Services, Inc<br>Weatherford U.S., L.P.<br>MTZ Vacuum Service | $ 313,668.55 |

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Lien Amount |
|---|---|---|---|---|
| Class 5C | Briscoe Ranch, Inc. et al "B" | TX-019-003.00 TX-019-006.00 (for all Case Ranch #1-36D and Cage-Briscoe "B" #1-44H ST4) | The South Texas Supply Company Eastern Oil Well Service Co. Weatherford U.S., L.P. Wood Group Production Testing Mesa Safety Services Doug Frazier Allis-Chalmers Tubular Baker Hughes Oilfield Inc. Fernando Alvarez Julu Services Inc. Mangum's Oilfield Services Inc McGuire Industries, Inc. Patterson-UTI Drilling Co LP Professional Wireline Rentals Tasco Tool Service, Ltd. Thomas Energy Services, Inc. Thomas Petroleum, Ltd. Mitco Brick Inc. Smith International MTZ Vacuum Service | $ 2,655,882.18 |
| Class 5D | Briscoe Ranch, Inc. et al "C" | TX-019-008.00 | MTZ Vacuum Service | $ 107,400.00 |
| Class 5E | Briscoe-Saner Lease | TX-007-001.00 | MTZ Vacuum Service The South Texas Supply Company Odessa Pumps & Equipment Thomas Petroleum, Ltd. EMS Pipeline Services, LP Allis-Chalmers Tubular Doug Frazier J F Ralston Co Inc Mangum's Oilfield Services Inc | $ 687,455.80 |

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Lien Amount |
|-------|-----------|--------------|----------------|-------------|
| | | | McGuire Industries, Inc. Tasco Tool Service, Ltd. Thomas Energy Services, Inc. Total Production Services, Inc Wood Group Logging Services The South Texas Supply Company Treat-Em-Rite Corporation Capital Well Service, LLC | |
| Class 5F | Bruton Lease (OPEX) | TX-016-038-000 | Express Energy Services Midway Oilfield Constructors Patterson Services Inc Patterson-UTI Drilling Co LP Specialty Rental Tools Weatherford U.S., L.P. Wood Group Logging Services | $ 550,436.85 |
| Class 5G | Burr "C" Lease | TX-006-003.00 | MTZ Vacuum Service Treat-Em-Rite Corporation Doug Frazier Allis-Chalmers Tubular Baker Hughes Oilfield Inc. Fernando Alvarez Flatrock Compression, Ltd. J F Ralston Co Inc Julu Services Inc. Mangum's Oilfield Services Inc McGuire Industries, Inc. Professional Wireline Rentals Texas Energy Services, L.P. | $ 2,055,608.62 |

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Lien Amount |
|-------|-----------|--------------|----------------|-------------|
| | | | Thomas Energy Services, Inc. Thomas Petroleum, Ltd. TXCO Drilling Corp Yazoo Enterprises Inc. Mitco Brick Inc. Mesa Safety Services Smith International Unison Drilling, Inc. et al Weatherford International Weatherford U.S., L.P. Wood Group Logging Services Odessa Pumps & Equipment The South Texas Supply Company Wood Group Production Testing | |
| Class 5H | Cage Minerals Ltd. et al | TX-019-001.01-03 TX-019-002.00 (for all Cage-Kirk A & Bris A 1-5H UT) TX-019-030.00 (for all Cage-Kirk A & Bris A 1-5H UT) | Eastern Oil Well Service Co Mesa Safety Services The South Texas Supply Company Treat-Em-Rite Corporation Warren and Sons, Inc. Doug Frazier Wood Group Logging Services Capital Well Service, LLC EMS Pipeline Services, LP MTZ Vacuum Service Odessa Pumps & Equipment J F Ralston Co Inc Lide Industries, Inc. Total Production Services, Inc Mangum's Oilfield | $ 2,991,681.73 |

| Class | Lease Name | Lease Number | Lien Claimants | Lien Amount |
|-------|-----------|--------------|----------------|-------------|
| | | | Services Inc<br>McGuire Industries, Inc.<br>Patterson-UTI Drilling Co LP<br>Weatherford U.S., L.P.<br>Thomas Energy Services, Inc. | |
| Class 5I | Chittim "A" Lease | TX-004-001 | Capital Well Service, LLC<br>EMS Pipeline Services, LP<br>Total Production Services, Inc.<br>Techmation Electric & | $ 40,287.94 |
| Class 5J | Comanche Ranch Lease | TX-008.001 | Weatherford U.S., L.P. | $ 91,943.00 |
| Class 5K | East Pena Creek WF Unit | TX-014-019 | Eastern Oil Well Service Co.<br>Wood Group Logging Services<br>Capital Well Service, LLC<br>DHW Well Service, Inc.<br>The South Texas Supply Company | $ 119,032.56 |
| Class 5L | Forrest-Wakefield Lease (OPEX) | TX-016-031-001/ 002 | Midway Oilfield Constructors<br>Specialty Rental Tools<br>Weatherford U.S., L.P. | $ 93,953.78 |
| Class 5M | Ft. Trinidad "UGRU" Unit (39 leases) | TX-016-xxx | Midway Oilfield Constructors | $ 32,730.87 |
| Class 5N | Gregg Wood Prospect (approximately 70 leases) | TX-024-xxx | Flatrock Compression, Ltd | $ 80,205.84 |
| Class 5O | L.L. Cox et al Lease (35 leases) | TX-012-014-xxx | K-3 Resources LP | $3,475.13 |

| Class | Lease Name | Lease Number | Lien Claimants | Lien Amount |
|---|---|---|---|---|
| | (OPEX) | | | |
| Class 5P | Maples Lease (OPEX) | TX-016-032-001 | Allis-Chalmers Tubular Express Energy Services McGuire Industries, Inc. Midway Oilfield Constructors Pinnergy, Ltd. Smith International Thomas Energy Services, Inc. Thomas Petroleum, Ltd. Wood Group Logging Services Wood Group Wireline Services | $ 701,984.61 |
| Class 5Q | Marshall Brothers et al (21 leases) (OPEX) | TX-012-003-xxx | K-3 Resources LP | $ 6,669.27 |
| Class 5R | Paloma Lease | TX-001-001.00 | The South Texas Supply Company Treat-Em-Rite Corporation Allis-Chalmers Tubular C&J Spec-Rent Services, Inc. DHW Well Service Inc. Doug Frazier Mangum's Oilfield Services Inc. McGuire Industries, Inc. MTZ Vacuum Service Odessa Pumps & Equipment Smith International Stinger Wellhead Protection Tasco Tool Service, Ltd. Tim Ligocky Tim's Welding LLC Wood Group Logging Services Dorsal Services, Inc. | $ 1,701,576.90 |

| Class | Lease Name | Lease Number | Lien Claimants | Lien Amount |
|-------|-----------|--------------|----------------|-------------|
|       |           |              | Fernando Alvarez<br>J F Ralston Co Inc<br>Thomas Energy Services, Inc.<br>Julu Services Inc.<br>Thomas Petroleum, Ltd.<br>Mesa Safety Services<br>Total Production Services, Inc<br>Matthew Mchazlett-DBA<br>Capital Well Service, LLC<br>EMS Pipeline Services, LP | |
| Class 5S | Pena Creek WF Unit | TX-014-017 | Eastern Oil Well Service Co.<br>J F Ralston Co Inc<br>Tasco Tool Service, Ltd.<br>The South Texas Supply Company<br>Thomas Petroleum, Ltd.<br>Tim's Welding LLC<br>Treat-Em-Rite Corporation<br>Wood Group Logging Services<br>Allis-Chalmers Tubular<br>Baker Hughes Oilfield Inc.<br>Doug Frazier<br>McGuire Industries, Inc.<br>Standard Tube Company<br>Weatherford U.S., L.P.<br>Halliburton Energy Services<br>Mangum's Oilfield Services Inc<br>EMS Pipeline Services, LP | $ 638,138.82 |
| Class 5T | South Pena Creek | TX-014-018 | Eastern Oil Well Service Co. | $ 957,249.51 |

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Lien Amount |
|---|---|---|---|---|
| | | | Wood Group Logging Services<br>Treat-Em-Rite Corporation<br>The South Texas Supply Company<br>Capital Well Service, LLC<br>J F Ralston Co Inc<br>Tasco Tool Service, Ltd.<br>Tim's Welding LLC<br>Total Production Services, Inc.<br>Allis-Chalmers Tubular<br>Baker Hughes Oilfield Inc.<br>Doug Frazier<br>Halliburton Energy Services<br>Standard Tube Company<br>Thomas Petroleum, Ltd.<br>Weatherford U.S., L.P.<br>Yazoo Enterprises Inc. | |
| Class 5U | Sue C. Ortman et al Lease | TX-028-001-000 | Texas Energy Services, L.P. | $ 16,478.25 |
| Class 5V | Undetermined to Date | Undetermined to Date | Warren and Sons, Inc. | $ 12,096.12 |
| Class 5W | Wakefield Lease (21 leases) | TX-015-A-03-02-xxx | Midway Oilfield Constructors | $ 5,026.39 |
| Class 5X | Wesley West Minerals et al "B" | TX-019-006.00 | Allis-Chalmers Tubular<br>Doug Frazier<br>Eastern Oil Well Service Co.<br>Fernando Alvarez<br>Julu Services Inc.<br>Lin's Completion Fluids, Inc.<br>Mitco Brick Inc.<br>MTZ Vacuum Service<br>Professional Wireline | $ 1,100,919.37 |

2752695.1

| Class | Lease Name | Lease Number | Lien Claimants | Lien Amount |
|---|---|---|---|---|
| | | | Rentals<br>Smith International<br>Specialty Rental Tools<br>Standard Tube Company<br>The South Texas Supply Company<br>Thomas Energy Services, Inc.<br>Wood Group Production Testing<br>Baker Hughes Oilfield Inc.<br>Fesco Ltd.<br>Mangum's Oilfield Services Inc.<br>McGuire Industries, Inc. | |
| Class 5Y | W.M. Forrest Lease (OPEX) | TX-016-037-000 | Smith International<br>Thomas Petroleum, Ltd.<br>Weatherford U.S., L.P.<br>Midway Oilfield Constructors | $ 228,975.29 |

(v)     Treatment of Class 6 Allowed Secured Tax Claims

Each holder of an Allowed Secured Tax Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Secured Tax Claim, as will have been determined by the Debtors or by Reorganized TXCO, as applicable, either (i) on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, Cash equal to the due and unpaid portion of such Allowed Secured Tax Claim, (ii) treatment in a manner consistent with section 1129(a)(9)(D) of the Bankruptcy Code, or (iii) such different treatment as to which such holder and the Debtors or Reorganized TXCO, as applicable, will have agreed upon in writing. To the extent the Debtors elect under Section 1129(a)(9)(D) of the Bankruptcy Code to make regular installment payments in Cash, the holder of an Allowed Secured Tax Claim will receive quarterly payments on the last day of each quarter, of principal and interest, at an interest rate of six and one-half per cent (6½ %) per annum with the final payment due on or before May 17, 2014. The first installment will be made at the end of the first full quarter after the Effective Date. Each holder of an Allowed Secured Tax Claim shall retain the liens securing such Claim. As of the Confirmation Hearing, the Debtors estimate that the amount of Class 6 Allowed Secured Tax Claims will be $_____. Class 6 is not impaired under the Plan.

2752695.1

Treatment of Class 7 Allowed Priority Claims

Certain Claims are entitled to priority under Bankruptcy Code section 507(a)(3) (Claims for wages, salaries, or commissions), section 507(a)(4) (Claims for contributions to employee pension plans) and section 507(a)(6) (Claims by individuals for refunds of deposits).

Each holder of an Allowed Priority Non-Tax Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim, as will have been determined by the Debtors or by Reorganized TXCO, as applicable, either (i) on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, Cash equal to the due and unpaid portion of such Allowed Priority Non-Tax Claim or (ii) such different treatment as to which such holder and the Debtors or Reorganized TXCO, as applicable, will have agreed upon in writing. As of the Confirmation Hearing, the Debtors estimate that the amount of unpaid Class 7 Allowed Priority Claims will be $_____. Class 7 is not impaired under the Operational Plan.

Treatment of Class 8 Allowed General Unsecured Claims

Each holder of Claims in this Class shall have the option to receive within sixty (60) days of the later of the Effective Date or the date such Claim is Allowed, either (a) a discounted payment, equal to 5% of the amount of its Allowed General Unsecured Claim (the "Unsecured Creditors Payment Option"), or (b) a number of shares of New Common Stock equal to what would be the holder's *pro rata* share of 2.5% of the New Common Stock issued under the Plan if all Allowed General Unsecured Claims opted to receive New Common Stock (the New Common Stock shall be held by Reorganized TXCO in trust pending a final determination of the total pool of Allowed General Unsecured Claims). As of the Confirmation Hearing, the Debtors estimate that the amount of the Class 8 Allowed General Unsecured Claims will be $_____. Class 8 is impaired under the Operational Plan.

Treatment of Class 9 Allowed Administrative Convenience Claims

Each holder of an Allowed Administrative Convenience Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for such Allowed Administrative Convenience Claim, a single Cash payment equal to its *pro rata* share of $1,000,000, not to exceed its Allowed Administrative Convenience Claim. Additionally, any party with an Unsecured Claim exceeding $6,000 may elect treatment under Class 9 Allowed Administrative Convenience Claims by agreeing to reduce their Unsecured Claim to an amount that is less than or equal to $6,000. As of the Confirmation Hearing, the Debtors estimate that the amount of the Administrative Convenience Claims will be $600,000. Class 9 is impaired under the Operational Plan.

Treatment of Class 10 Intercompany Claims

The Operational Plan defines Intercompany Claims as any Claims arising prior to the Petition Date against any of the Debtors by another Debtor. All Intercompany Claims will be deemed discharged on the Effective Date.

Treatment of Class 11 Preferred Stock

Class 11 is comprised of all holders of Preferred Stock in the Debtors under the Operational Plan, including any party that indicated an intent to redeem their shares of Preferred Stock prior to the Petition Date. The holders of Class 11 Preferred Stock shall receive no Distribution under the Plan. On the Effective Date, all existing Preferred Stock (including, but not limited to, the Common Stock) shall, without any further action, be cancelled, annulled and extinguished and any certificates representing such Preferred Stock shall become null, void and of no force or effect. The holders of Preferred Stock shall retain no rights and receive no consideration on account thereof. Class 11 is impaired under the Operational Plan and is deemed to have rejected the Operational Plan.

Treatment of Class 12 Common Stock

Class 12 is comprised of all holders of Common Stock in the Debtors under the Operational Plan. Holders of Common Stock are impaired under the Operational Plan. The holders of Class 12 Common Stock shall receive no Distribution under the Plan. On the Effective Date, all existing Common Stock shall, without any further action, be cancelled, annulled and extinguished and any certificates representing such Common Stock shall become null, void and of no force or effect. Holders of Common Stock shall retain no rights and receive no consideration on account thereof. Class 12 is impaired under the Operational Plan and is deemed to have rejected the Operational Plan.

(c) Voting; Presumptions

(a) Acceptance by Impaired Classes

Each Impaired Class of Claims that will (or may) receive or retain property or any interest in property under the Operational Plan, shall be entitled to vote to accept or reject the Operational Plan. An Impaired Class of Claims shall have accepted the Operational Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Operational Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Operational Plan. An Impaired Class of Interests shall have accepted the Operational Plan if the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Interests actually voting in such Class have voted to accept the Operational Plan.

**ARTICLE I** Voting Presumptions

Claims and Interests in Unimpaired Classes are conclusively deemed to have accepted the Operational Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Operational Plan. Claims and Interests in Impaired Classes that do not entitle the Holders thereof to receive or retain any property under the Operational Plan are conclusively deemed to have rejected the Operational Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Operational Plan.

       (ii)     Unimpaired Classes

Classes 1, 6 and 7 are unimpaired and are deemed to have voted to accept the Operational Plan.

       (iii)    Impaired Classes of Claims Entitled to Vote on the Operational Plan

Classes 2(a)-2(cc), 3, 4 ,5(a)-5(aa), 8 and 9, including all subclasses therein, are impaired and are entitled to vote.

       (iv)    Impaired Classes of Claims Receiving No Distribution under the Operational Plan

Classes 10 – 12 are receiving no distribution under the Operational Plan and are deemed to have voted not to accept the Operational Plan.

       (v)    Special Provision Regarding Unimpaired Claims

Except as otherwise provided in the Operational Plan, nothing shall affect the Debtors' or Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to Setoff Claims or recoupments against Unimpaired Claims.

       (vi)    Cram Down

If any Class of Claims or Interests entitled to vote on the Operational Plan shall not vote to accept the Operational Plan, the Debtors shall (a) seek confirmation of the Operational Plan under section 1129(b) of the Bankruptcy Code or (b) amend or modify the Operational Plan in accordance with Article IX of the Operational Plan. With respect to any Class of Claims or Interests that is deemed to reject the Operational Plan, the Debtors shall request that the Bankruptcy Court confirm or "cram down" the Operational Plan pursuant to section 1129(b) of the Bankruptcy Code.

Section 4.3.    Means for Implementation of the Sale Plan

(a)    Certain Accounts and Payments

On or before the Effective Date, the Debtors anticipate making the following transfers to:

i.    The Disbursing Agent to establish a segregated account for the Administrative Claims Reserve for the benefit of the Holders of Allowed Administrative Claims;

ii.    The DIP Loan Agent, the funds necessary to satisfy in full all of its charges, fees and reasonable attorneys' fees and expenses of its counsel;

iii.    The Revolver Loan Agent, the funds necessary to satisfy in full all of its charges, fees and reasonable attorneys' fees;

iv. Counsel to the Term Loan Lenders, the funds necessary to satisfy in full the reasonable attorneys' fees and expenses of such counsel; and

v. The Disbursing Agent to establish a segregated account for the Priority Claims Reserve for the benefit of the Holders of Allowed Priority Claims.

(b) Restructuring Transactions

(i) Description of Securities to be issued under the Plan

1. Issuance of Notes

On the Effective Date, Reorganized TXCO shall issue in accordance with the distribution provisions of the Plan the Senior Secured Convertible Notes, as applicable, the First Lien Notes, the Alternative First Lien Notes, the Second Lien Notes, the Consenting Senior Mineral Lien Claimants Note, the Non-Consenting Senior Mineral Lien Claimants Note, the Non-Consenting Section 1111(b) Senior Mineral Lien Claimants Note, the Consenting Junior Mineral Lien Claimants Note, the Non-Consenting Junior Mineral Lien Claimants Note, and the Non-Consenting Section 1111(b) Junior Mineral Lien Claimants Note

2. New Capital Stock for Reorganized TXCO

Reorganized TXCO shall issue the New Common Stock as a Distribution to the holders of Allowed Class 4 and Class 8 Claims, together with Convertible Preferred A Shares distributable to holders of DIP Loan Claims and Convertible Preferred B Shares distributable to holders of Allowed Class 4 Claims, all in accordance with the distribution provisions of the Plan.

3. Establishing the Creditor Trusts

On the Effective Date, Creditor Trusts will be created as set forth in Article XII of the Operational Plan to hold the applicable promissory notes to be issued by Reorganized TXCO.

(c) Merger of Affiliated Debtors; Substantive Consolidation of the Debtors

The Debtors and their respective Estates shall be substantively consolidated for all purposes under the Plan. As a result of the substantive consolidation, (a) all Intercompany Claims by and among the Debtors (including such Claims arising from rejection of an executory contract) will be eliminated; (b) any obligation of any of the Debtors and all guarantees thereof executed by any of the Debtors will be deemed to be an obligation of each of the Debtors; (c) any Claim filed or asserted against any of the Debtors will be deemed a Claim against each of the Debtors; (d) any Interest in any of the Debtors will be deemed an Interest in each of the Debtors; and (e) for purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors will be treated as one entity so that (subject to the other provisions of section 553 of the Bankruptcy Code) debts due to any of the Debtors may be offset against the debts owed by any of the Debtors. The substantive consolidation contemplated by this section shall not affect or impair any Lien to which the assets of any Debtor are subject in the absence of substantive consolidation under this Plan, provided, however, it shall not cause any such Lien to secure any Claim which such would not otherwise secure absent such substantive consolidation.

2752695.1

On the Effective Date, except as otherwise provided in the Plan, all Claims based on guarantees of collection, payment, or performance made by any Debtor concerning the obligations of another Debtor shall be discharged, released, and without any further force or effect. Additionally, holders of Allowed Claims or Allowed Interests who assert identical Claims against or Interests in multiple Debtors shall be entitled to a single satisfaction of such Claims or Interests.

(d)     Order Granting Substantive Consolidation

The Operational Plan shall serve as a motion seeking entry of an order substantively consolidating the Cases. Unless an objection to such substantive consolidation is made in writing by any creditor affected by the Operational Plan as herein provided on or before five (5) days prior to the Voting Deadline, or such other date as may be fixed by the Court, an order approving the substantive consolidation described herein (which may be in the Confirmation Order) may be entered by the Court. However, an order shall only be entered if the Bankruptcy Court enters the Confirmation Order. In the event any such objections are timely filed, a hearing with respect thereto shall occur at the Confirmation Hearing.

(e)     Continued Corporate Existence

On the Effective Date, all the Debtors shall have merged into TXCO Resources, Inc., with TXCO Resources, Inc. being the surviving entity. On the Effective Date, Reorganized TXCO shall have no subsidiaries and shall cease to be a public company.

(f)     Governance Documents

(i)     Amended Governance Documents

On the Effective Date, or as soon as reasonably practicable thereafter, Reorganized TXCO shall file amended Governance Documents with the Secretary of State of the State of Texas.

(ii)     Other General Corporate Matters

On the Effective Date or as soon as reasonably practicable thereafter, Reorganized TXCO may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary or appropriate to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that Reorganized TXCO determines is necessary or appropriate.

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of Reorganized TXCO shall, as

of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors of the Debtors or Reorganized TXCO, as the case may be, or any other Entity.

(g)     Directors and Officers of Reorganized TXCO

The initial board of directors of Reorganized TXCO shall consist of 5 directors, the identity of whom shall be disclosed in the Plan Supplement, one of whom shall be selected by each of Carlson Capital, L.P. ("Carlson"), CIT Bank ("CIT"), Regiment Capital Special Situations Fund III LP ("Regiment"), and Reorganized TXCO, together with an independent director selected by Carlson, CIT and Regiment. Each of the Persons on the initial Board of Directors of Reorganized TXCO shall serve in accordance with the Amended Governance Documents of Reorganized TXCO, as the same may be amended from time to time.

The initial officer of Reorganized TXCO shall be disclosed in the Plan Supplement. To the extent any such Person is an Insider (as defined in section 101(31) of the Bankruptcy Code), the nature of any compensation for such Person will also be disclosed at such time. The initial officers shall serve in accordance with the Amended Governance Documents of Reorganized TXCO, as the same may be amended from time to time.

(h)     Corporate Action

On the Effective Date, the adoption of the Certificates of Incorporation or similar constituent documents, the adoption of the Bylaws, the selection of directors and officers (or persons serving in similar capacities) for Reorganized TXCO, and all other actions contemplated by the Plan shall be authorized and approved  in all respects (subject to the provisions of the Plan). All matters provided for in the Plan involving the organizational structure of the Debtors or Reorganized TXCO, and any corporate action required by the Debtors or Reorganized TXCO in connection with the Plan, shall, as of the Effective Date, be deemed to have occurred and shall be effective as provided herein, and shall be authorized and approved in all respects without any requirement of further action by the security holders or directors of the Debtors and Reorganized TXCO; provided, however, that certain corporate actions shall be subject to the terms of the Shareholders' Agreement.

(i)     Revesting of Assets; Releases of Liens

Except as otherwise set forth in the Plan, in the Plan Supplement or in the Confirmation Order, as of the Effective Date, all property of the Debtors shall revest in Reorganized TXCO free and clear of all Claims, Liens, encumbrances and other Interests except to the extent provided in the Plan. From and after the Effective Date, Reorganized TXCO may operate its businesses and use, acquire and dispose of property and settle and compromise claims or interests without supervision by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. Without limiting the generality of the foregoing, Reorganized

TXCO may, without application to or approval by the Bankruptcy Court, pay fees that they incur after the Effective Date for professional fees and expenses.

(j)     Cancellation of Interest; Issuance of New Common Stock

All Interests of the Debtors shall be cancelled and annulled on the Effective Date. Reorganized TXCO shall issue a total of _____ shares of New Common Stock for distribution in accordance with the Plan.

(k)     Authority

Until the Effective Date, the Bankruptcy Court shall retain jurisdiction of the Debtors, their assets and operations.

(l)     Employee Benefits

On and after the Effective Date, Reorganized TXCO intends to retain employees in connection with its ongoing operations.  As such, Reorganized TXCO will retain an interest in its health insurance plan, including any COBRA coverage that will be available to employees that are not retained by Reorganized TXCO.   Reorganized TXCO may also: (1) honor, in the ordinary course of business, any unrejected contracts, agreements, policies, programs, and plans, in each case to the extent disclosed in the Disclosure Statement or order entered by the Bankruptcy Court approving a pleading seeking payment of, for, among other things, compensation (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, accidental death and dismemberment insurance for the directors, officers and employees of any of the Debtors who served in such capacity at any time, and any other Benefit Plan; and (2) honor, in the ordinary course of business, claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that the Debtors' or Reorganized TXCO's performance of any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan. Nothing in the Plan shall limit, diminish, or otherwise alter Reorganized TXCO's defenses, claims, any causes of action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.

(m)     Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers or mortgages from or by the Debtors to Reorganized TXCO or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

(n) Preservation of Rights of Action; Settlement

(i) Retention of Causes of Action

Except to the extent such rights, claims, causes of action, defenses, and counterclaims are otherwise dealt with in the Plan or are expressly and specifically released in connection with the Plan, the Confirmation Order or in any settlement agreement approved during the Chapter 11 Cases, or otherwise provided in the Confirmation Order or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code: (1) any and all rights, claims, causes of action (including the Avoidance Actions), defenses, and counterclaims of or accruing to the Debtors or their Estates shall remain assets of and vest in Reorganized TXCO, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such rights, claims, causes of action, defenses and counterclaims have been listed or referred to in the Plan, the Schedules, or any other document filed with the Bankruptcy Court, and (2) neither the Debtors nor Reorganized TXCO waive, relinquish, or abandon (nor shall they be estopped or otherwise precluded from asserting) any right, claim, cause of action, defense, or counterclaim that constitutes property of the Estates: (a) whether or not such right, claim, cause of action, defense, or counterclaim has been listed or referred to in the Plan or the Schedules, or any other document filed with the Bankruptcy Court, (b) whether or not such right, claim, cause of action, defense, or counterclaim is currently known to the Debtors, and (c) whether or not a defendant in any litigation relating to such right, claim, cause of action, defense or counterclaim filed a proof of Claim in the Chapter 11 Cases, filed a notice of appearance or any other pleading or notice in the Chapter 11 Cases, voted for or against the Plan, or received or retained any consideration under the Plan. Without in any manner limiting the generality of the foregoing, notwithstanding any otherwise applicable principal of law or equity, without limitation, any principals of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a right, claim, cause of action, defense, or counterclaim, or potential right, claim, cause of action, defense, or counterclaim, in the Plan, the Schedules, or any other document filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release, or alter Reorganized TXCO's right to commence, prosecute, defend against, settle, and realize upon any rights, claims, causes of action, defenses, or counterclaims that the Debtors or Reorganized TXCO have, or may have, as of the Effective Date. Reorganized TXCO may commence, prosecute, defend against, settle, and realize upon any rights, claims, causes of action, defenses, and counterclaims in their sole discretion, in accordance with what is in the best interests, and for the benefit, of Reorganized TXCO.

(ii) Retention of Subsequent Causes of Action

Except as is otherwise expressly provided herein or in the Confirmation Order, nothing in this Plan or the Confirmation Order shall preclude or estop Reorganized TXCO or its privies, as successors in interest to the Debtors and their privies, from bringing a subsequent action in any court or adjudicative body of competent jurisdiction, to enforce any or all of its or their rights in connection with the Causes of Action, irrespective of the identity of any interest, cause of action, or nexus of fact, issues or events which is now or which could have been asserted in these Cases, the present litigation, and those which may be asserted in any subsequent litigation brought by

147

Reorganized TXCO or its privies. Moreover, the failure to commence any Retained Action prior to the Confirmation Date shall not constitute res judicata, judicial or collateral estoppel.

The Plan proposes that on the Effective date a Creditor Trust will be created which will hold the Unsecured Claims Trust Promissory Note. Separate Creditor Trusts will be created to hold the Consenting Senior Mineral Lien Claimants Note, the Non-Consenting Senior Mineral Lien Claimants Note, the Non-Consenting Section 1111(b) Senior Mineral Lien Claimants Note, the Consenting Junior Mineral Lien Claimants Note, the Non-Consenting Junior Mineral Lien Claimants Note and the Non-Consenting Section 1111(b) Junior Mineral Lien Claimants Note. The following description shall generally apply to each Creditor Trust created under the Plan.

Section 4.4.    Establishment of the Creditor Trust

(a)    Generally

The Plan proposes that on the Effective date a Creditor Trust will be created which will hold the Unsecured Claims Trust Promissory Note. Separate Creditor Trusts will be created to hold the Consenting Senior Mineral Lien Claimants Note, the Non-Consenting Senior Mineral Lien Claimants Note, the Non-Consenting Section 1111(b) Senior Mineral Lien Claimants Note, the Consenting Junior Mineral Lien Claimants Note, the Non-Consenting Junior Mineral Lien Claimants Note and the Non-Consenting Section 1111(b) Junior Mineral Lien Claimants Note. The following description shall generally apply to each Creditor Trust created under the Plan.

(b)    Establishment of the Creditor Trust

On the Effective Date, the Creditor Trustee shall execute the Credit Trust Agreement on behalf of the Creditor Trust. The Debtors will transfer to the Creditor Trust the applicable promissory note. The Debtors will also execute any and all documents granting to the Creditor Trust a security interest in the Debtors' properties, as set forth in the Exhibits to the Plan.

(c)    Purpose of the Creditor Trust

The Creditor Trust shall exist after the Effective Date, with all the powers of a trust under applicable Texas law. The Creditor Trust shall execute and consummate such assignments, purchase agreements, bills of sale, operating agreements, conveyance documents and all other transaction documents, contracts, agreements, and instruments as are necessary to implement and consummate the transactions required under or in connection with the Plan, on or after the Effective Date.

After the Effective Date, the Creditor Trust will own the promissory notes assigned to it and shall have the flexibility to conduct any operations necessary to liquidate the Trust Property and to enhance or preserve the value of the Trust Property.

(d)    Appointment and Powers of the Creditor Trustee

Prior to the Effective Date, an individual shall be nominated to act as the initial Creditor Trustee under the Creditor Trust. The Creditor Trustee will serve from and after the Effective Date until a successor is duly elected or appointed. The Creditor Trustee shall receive title to all

Creditor Trust Assets that the Debtors transfer to the Creditor Trust, including but not limited to, and except as provided in the Plan, any interests held by the Creditor Trust in real and personal property, as well as any other consideration to be received by the Creditors pursuant to the terms of the Plan.

Pursuant to the Creditor Trust Agreement, the Creditor Trustee shall have the power and authority to perform the following acts, among others:

(1)     Perfect and secure his/her right, title and interest to any and all Creditor Trust Assets;

(2)     Reduce all of the Creditor Trust Assets to his possession and conserve, protect collect and liquidate or otherwise convert all Creditor Trust Assets into Cash;

(3)     Distribute the net proceeds of Creditor Trust Assets as specified herein;

(4)     Release, convey or assign any right, title or interest in or to the Creditor Trust Assets;

(5)     Pay and discharge any costs, expenses, fees or obligations deemed necessary to preserve the Creditor Trust Assets, and to protect the Creditor Trust and the Creditor Trustee from liability;

(6)     Deposit Creditor Trust funds and draw checks and make disbursements thereof;

(7)     Employ such attorneys, accountants, engineers, agents, tax specialists, other professionals, and clerical assistance as the Creditor Trustee may deem necessary. The Creditor Trustee shall be entitled to rely upon the advice of retained professionals and shall not be liable for any action taken in reliance of such advice. The fees and expenses of all such professionals shall be charges as expenses of the Creditor Trust and shall be paid upon approval of the Creditor Trustee;

(8)     Employ brokers, investment brokers, sales representatives or agents, or other Persons necessary to manage the Creditor Trust Assets;

(9)     Exercise any and all powers granted the Creditor Trustee by any agreements or by Texas common law or any statute that serves to increase the extent of the powers granted to the Creditor Trustee hereunder;

(10)    Take any action required or permitted by the Plan or the applicable Creditor Trust Agreement;

(11)    Execute obligations, whether negotiable or non-negotiable;

(12)    Sue and be sued;

2752695.1

(13)     Settle, compromise or adjust by arbitration, or otherwise, any disputes or controversies in favor or against the Creditor Trust;

(14)     Waive or release rights of any kind;

(15)     Appoint, remove and act through agents, managers and employees and confer upon them such power an authority as may be necessary or advisable;

(16)     Negotiate, renegotiate or enter into any contract or agreements binding the Creditor Trust, and to execute, acknowledge and deliver any and all investments that are necessary, required or deemed by the Creditor Trustee to be advisable in connection with the performance of his/her duties; and

(17)     In general, without in any manner limiting any of the foregoing, deal with the Creditor Trust Assets or any part or parts thereof in all other ways as would be lawful for any person owing the same to deal therewith, whether similar to or different from the ways above specified, at any time or times hereafter.

(e)     Payment of the Expenses Incurred by the Creditor Trust

The Creditor Trustee will be compensated for services provided at a rate of no more than $_____ per _____ for his/her services.  Professionals retained by the Creditor Trust shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred.  The payment of the fees and expense of the Creditor Trust retained professionals shall be made in the ordinary course of business from assets of the Creditor Trust.

(f)     Exculpation; Indemnification

The Creditor Trustee shall not be liable for actions taken or omitted in his capacity as the Creditor Trustee, except those acts arising out of fraud, willful misconduct, or gross negligence. The Creditor Trustee shall be entitled to indemnification and reimbursement for all losses, fees, and expenses in defending any and all of his actions or inactions in his capacity as the Creditor Trustee, except for any actions or inactions involving his own fraud, willful misconduct, or gross negligence.  Any indemnification claim of the Creditor Trustee shall be satisfied from the assets of the Creditor Trust.

The Creditor Trust shall, to the fullest extent permitted by Texas law, indemnify and hold harmless the officers, directors, agents, representatives, attorneys, professionals and employees of the Creditor Trust (each an "Indemnified Party"), from and against any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to, attorneys' fees and costs, arising out of or due to their actions or omissions with respect to the Creditor Trust or the implementation or administration of the Creditor Trust Agreement, if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Creditor Trust, and, with respect to any criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful.

(g)    Retention of Funds Prior to Distribution

The Creditor Trustee shall collect all funds constituting Creditor Trust Assets and, pending distribution, shall deposit funds with a federally insured financial institution that has banking services.  The Creditor Trustee will deposit funds so that they are adequately insured. Notwithstanding the foregoing, the Creditor Trustee may invest all Cash funds received into the Creditor Trust (including any earnings thereon or proceeds therefrom) in the same manner as chapter 7 trustees are required to invest funds pursuant to the guidelines of the Unites States Trustee's Office, provided that the Creditor Trustee shall invest funds held in only demand and time deposits, such as short-term certificates of deposit, in banks or savings institutions, or other temporary, liquid and low-risk investments, such as Treasury bills. The Creditor Trustee shall hold all such funds until they are distributed pursuant to the Plan to Creditors with Allowed Claims.

The Creditor Trustee will not be required to post bond or be audited or monitored except as otherwise expressly provide in the Creditor Trust Agreement.  Forty-five (45) days after the end of each calendar year of the Creditor Trust and forty-five (45) days after termination of the Creditor Trust, the Creditor Trustee will file with the Bankruptcy Court an un-audited written report and account showing (i) the assets and liabilities of the Creditor Trust at the end of such year or upon termination; (ii) any changes in the Creditor Trust Assets that have not been previously reported, and (iii) any material action taken by the Creditor Trustee in the performance of his duties under the Creditor Trust Agreement that has not been previously reported.

(h)    Distributions to Creditor Trust Beneficiaries

Within a reasonable period after receipt of a Cash distribution from Reorganized TXCO in connection with the Creditor Trust, the Creditor Trustee shall distribute such Cash, after deducting any costs and expenses associated with operation of the Creditor Trust, *pro rata* to each of the beneficiaries of such Creditor Trust.

(i)    Registry of Beneficial Interests

The Creditor Trustee shall establish and retain a registry of all beneficiaries of the Creditor Trust.  The Creditor Trustee shall be responsible to maintain and update such registry; however, the Creditor Trustee shall not be obligated to update any beneficiaries name or address until receiving written correspondence from the party seeking to change the address for receipt of notices and distributions.  The Creditor Trustee retains the right to request additional information to confirm the name and address of such party before making any modification to the registry.

(j)    Termination of the Creditor Trusts

Each Creditor Trust shall remain and continue in full force and effect until the later of (a) Trust Property has been wholly converted to Cash or abandoned and all costs, expenses, and obligations incurred in administering the Creditor Trust have been fully paid, and all remaining income and proceeds of the Trust Property have been distributed in payment of the claims of all Beneficiaries pursuant to the provisions of the Plan, but no later than after Reorganized TXCO have made the final principal and interest payment due under the applicable promissory notes

assigned to the Creditor Trust; provided, that upon complete liquidation of the Trust Property and satisfaction as far as possible of all remaining obligations, liabilities and expenses of the Creditor Trust pursuant to the Plan prior to such date, the Creditor Trustee may, with approval of the Bankruptcy Court, sooner terminate the Creditor Trust. On the termination date of the Creditor Trust, the Creditor Trustee will execute and deliver any and all documents and instruments reasonably requested to evidence such termination. Upon termination and complete satisfaction of its duties under the Creditor Trust Agreement, the Creditor Trustee will be forever discharged and released from all power, duties, responsibilities and liabilities pursuant to the Creditor Trust other than those attributable to fraud, gross negligence or willful misconduct of the Creditor Trustee.

(k)     Resignation of the Creditor Trustee

The Creditor Trustee may resign at any time by giving written notice to the Bankruptcy Court and such resignation shall be effective upon the date provided in such notice. In the case of the resignation of the Creditor Trustee, a successor Creditor Trustee shall thereafter be appointed by the beneficiaries of the Creditor Trust, whereupon such resigning Creditor Trustee shall convey, transfer and set over to such successor Creditor Trustee by appropriate instrument or instruments all of the Trust Property then unconveyed or otherwise undisposed of and all other assets then in his possession the Creditor Trust Agreement. Without further act, deed or conveyance, a successor Creditor Trustee shall be vested with all the rights, privileges, powers and duties of the Creditor Trustee, except that the successor Creditor Trustee shall not be liable for the acts or omissions of his predecessor(s). Each succeeding Creditor Trustee may in like manner resign and another may in like manner be appointed in his place.

(l)     Status as Liquidation Trust

For federal income tax purposes, it is intended that each Creditor Trust be classified as a liquidation trust under section 301.7701-4 of the Procedure and Administration Regulations and that such trust be owned by its beneficiaries. Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they received a Distribution of an undivided interest in the trust assets, to the extent of their interest therein, and then contributed such interests to the Creditor Trust. The Creditor Trust Agreement shall (i) state that the primary purpose of the Creditor Trust is to liquidate the trust assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating purpose and (ii) contain a fixed or determinable termination date that is generally not more than five (5) years from the date of creation of the Creditor Trust, which termination date may be extended for one or more finite terms subject to the approval of the Bankruptcy Court upon a finding that the extension is necessary to its liquidating purpose. Each such extension must be approved by the Bankruptcy Court within six months of the beginning of the extended term.

The Creditor Trustee shall be responsible for filing all federal, state and local tax returns for the Liquidation Trust. The Trustee shall file all federal tax returns for the Creditor Trust as a grantor trust pursuant to section 1.671-4(a) of the Procedure and Administration Regulations.

The form of Creditor Trust Agreement attached as an exhibit hereto and all of its provisions (i) are hereby incorporated as if explicitly set forth in this Plan, and (ii) shall be deemed approved by the Bankruptcy Court upon entry of the Confirmation Order.

Section 4.5.    Treatment of Executory Contracts and Unexpired Leases

(a)    Assumption/Rejection

On the Effective Date, and to the extent permitted by applicable law, all of the Debtors' executory contracts and unexpired leases, including, but not limited to, those contracts and leases listed as being rejected on Exhibit "__" will be rejected by Reorganized TXCO unless such executory contract or unexpired lease: (a) is being assumed pursuant to the Plan or is identified on Exhibit __ as an executory contract or unexpired lease being assumed pursuant to the Plan; (b) is the subject of a motion to assume filed on or before the Confirmation Hearing; or (c) has been previously rejected or assumed.

(b)    Pass-Through

Except as otherwise provided in the Plan, any rights or arrangements necessary or useful to the operation of Reorganized TXCO's business, but not otherwise addressed as a Claim or Interest, including non-exclusive or exclusive patent, trademark, copyright, maskwork or other intellectual property licenses and other executory and/or non-executory contracts not assumable under section 365(c) of the Bankruptcy Code, shall, in the absence of any other treatment under the Plan or Confirmation Order, be passed through the Chapter 11 Cases for the benefit of Reorganized TXCO and the counterparty unaltered and unaffected by the bankruptcy filings or Chapter 11 Cases.

(c)    Mineral Leases/Oil and Gas Leases

To the extent any of the Debtors' Mineral Leases or Oil and Gas Leases constitutes an executory contract or unexpired lease of real property under section 365 of the Bankruptcy Code, such Mineral Leases or Oil and Gas Leases will be assumed by Reorganized TXCO. To the extent any of the Debtors' Mineral Leases or Oil and Gas Leases constitute contracts or other property rights not assumable under section 365 of the Bankruptcy Code, except as provided in the Plan or Confirmation Order, such Mineral Leases or Oil and Gas Leases shall pass through the Chapter 11 Cases for the benefit of Reorganized TXCO and the counterparties to such Mineral Leases or Oil and Gas Leases.

Except for the defaults of a kind specified in sections 365(b)(2) and 541(c)(1) of the Bankruptcy Code (which defaults the applicable Debtors or Reorganized TXCO will not be required to cure), or as otherwise provided herein, the legal, equitable and contractual rights of the counterparties to such Mineral Leases or Oil and Gas Leases shall be unaltered by the Plan; provided, however, that to the extent a failure by the Debtors to pay or perform an obligation under such Mineral Lease or Oil and Gas Lease (whether or not such Mineral Lease or Oil and Gas Lease is subject to the provisions of section 365 of the Bankruptcy Code) is a default under any applicable Mineral Lease or Oil and Gas Lease, such default shall be cured for all purposes by the payments provided for herein or Reorganized TXCO's subsequent performance of such obligation with such applicable Mineral Lease or Oil and Gas Lease otherwise remaining in full

2752695.1

force and effect for the benefit of Reorganized TXCO. To the extent such payment is due and owing on the Effective Date, such payment shall be made, in Cash, on the Distribution Date, or upon such other terms as may be agreed to by Reorganized TXCO, as the case may be. To the extent such payment is not due and owing on the Effective Date, such payment (a) will be made, in Cash, in accordance with the terms of any agreement between the parties, or as such payment becomes due and owing under (i) applicable non-bankruptcy law, or (ii) in the ordinary course of business of Reorganized TXCO, or (b) will be made upon other terms as may be agreed upon by Reorganized TXCO, as the case may be, and the Person to whom such payment is due. To the extent it is impossible for Reorganized TXCO to cure a default arising from any failure to perform a non-monetary obligation, such default shall be cured by performance by the applicable Debtor at or after the time of assumption in accordance with the terms of the applicable Mineral Lease or Oil and Gas Lease with the applicable Mineral Lease or Oil and Gas Lease remaining in effect for the benefit of Reorganized TXCO. If there is a dispute as to any cure obligation (including cure payments) between Reorganized TXCO and the Lessor of a Mineral Lease or Oil and Gas Lease, Reorganized TXCO shall only have to pay or perform as provided in the Plan.

(d)     Assumed Executory Contracts and Unexpired Leases

Each executory contract and unexpired lease that is assumed will include (a) all amendments, modifications, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease, and (b) all executory contracts or unexpired leases and other rights appurtenant to the property, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other equity interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements have been rejected pursuant to an order of the Bankruptcy Court or is the subject of a motion to reject filed on or before the Confirmation Date.

Amendments, modifications, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during their Chapter 11 Cases shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any claims that may arise in connection therewith.

(e)     Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection or repudiation of any executory contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, Reorganized TXCO expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized TXCO, as applicable, from counterparties to rejected or repudiated executory contracts or unexpired leases.

(f)      Assumed Contracts and Leases, and Contracts and Leases Entered Into After Petition Date

Contracts and leases with third parties entered into after the Petition Date by any Debtor, and any executory contracts and unexpired leases assumed by any Debtor, may be performed by Reorganized TXCO in the ordinary course of business.

(g)      Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an executory contract or unexpired lease or that any of the Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized TXCO, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

(h)      Additional Cure Provisions

Except as otherwise provided under the Plan, any monetary amounts that must be cured as a requirement for assumption and/or assignment by any of the Debtors, such cure shall be effected or otherwise satisfied by prompt payment of such monetary amount as contemplated by Section 365(b)(1)(A) of the Bankruptcy Code or as otherwise agreed to by the parties.  If there is a dispute regarding (a) the timing of any payment required in order to meet the promptness requirement of 365(b)(1), (b) the nature, extent or amount of any cure requirement, (c) the Debtors', Reorganized TXCO, or the Debtors' assignees ability to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (d) any other matter pertaining to assumption, cure will occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

(i)      Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Debtors' executory contracts and unexpired leases pursuant to the Plan or otherwise must be filed with the Claims Agent no later than thirty (30) days after the later of the Effective Date or the effective date of rejection.  Any Proofs of Claim arising from the rejection of the Debtors' executory contracts or unexpired leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any of the Debtors without the need for any objection by Reorganized TXCO or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  All Allowed Claims arising from the rejection of the Debtors' executory contracts and unexpired leases shall be classified as General Unsecured Claims for the particular Debtor in question and shall be treated in accordance with the particular provisions of the Plan for such Debtor; provided, however, if the holder of an Allowed Claim for rejection damages has an

unavoidable security interest in any Collateral to secure the obligations under such rejected executory contract or lease, the Allowed Claim for rejection damages shall be treated as an Other Secured Claim to the extent of the value of such holder's interest in the Collateral, with the deficiency, if any, treated as a General Unsecured Claim.

(j)     Survival of Indemnification and Corporation Contribution

Except as otherwise specifically provided herein or in the Plan, any obligations or rights of the Debtors to indemnify, defend or advance expenses to its present and former directors, officers, employees, agents or representatives under its certificate of incorporation, bylaws, policies, any agreement or under state law, or any agreement with respect to any claim, demand, suit, cause of action, or proceeding, shall survive confirmation of the Plan. The employees of the Debtors who become employed by Reorganized TXCO shall receive indemnification by Reorganized TXCO in the ordinary course of its business. Claims against the Debtors for indemnification shall be classified under the Plan as General Unsecured Claims and are payable as Class 8 Allowed General Unsecured Claims.

Section 4.6.     Provisions for Distributions

(a)     Distributions for Claims and Interests Allowed as of Effective Date

Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, distributions to be made on account of Allowed Claims and Allowed Interests as of the Effective Date shall be made on the Distribution Date, or as soon thereafter as practicable. New Stock issued under the Plan shall be deemed issued as of the Effective Date.

(b)     Interest on Claims

Unless otherwise specifically provided by the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, or applicable bankruptcy law, post-petition interest shall not accrue and shall not be paid on Allowed Claims. To the extent postpetition interest is payable on an Allowed Claim, the amount of such interest shall be determined as provided in (i) any contract between the holder of such Allowed Claim and any applicable Reorganizing Debtor, (ii) any applicable non-bankruptcy law or (iii) in the absence of (i) or (ii), the Prime Rate, as such rates in (i) through (iii) may be limited by applicable bankruptcy law.

(c)     Disbursements to Classes of Claims

Reorganized TXCO shall make all Distributions required under the Plan except Distributions to the Claims in Classes 1, 3 and 8, which distributions shall be made to the DIP Lender Agent and the Revolver Loan Agent, respectively, who shall promptly deliver such distributions to the holders of such Claims in accordance with the provisions of this Plan and the applicable credit documents. Distributions made by Reorganized TXCO, as applicable, to the DIP Loan Agent and the Revolver Loan Agent, shall constitute Distributions to holders of Allowed DIP Loan Secured Claims and Allowed Secured Claims of the Revolver Lenders, as the case may be, regardless of whether the DIP Loan Agent and/or the Revolver Loan Agent make subsequent distributions to such holders.

2752695.1

Additionally, Reorganized TXCO shall make distributions for Claims in Class 8, which distributions shall be made to the Creditor Trustee, who shall promptly deliver such distributions to the holders of such Claims in accordance with the provisions of this Plan and the applicable credit documents. Distributions made by Reorganized TXCO to the Creditors Trust, shall constitute distributions to holders of Allowed General Unsecured Claims, regardless of whether the Creditor Trust makes subsequent distributions to such holders.

(d)     Record Date for Distributions

As of the close of business on the Distribution Record Date, the registers for Claims and Interests should be closed, and there shall be no further changes in the holder of record of any Claim or Interest. Reorganized TXCO and the Creditor Trustee, as applicable, shall have no obligation to recognize any transfer of Claim or Interest occurring after the Distribution Record Date, and shall instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those holders of record stated on the registers of Claims and/or Interests as of the close of business on the Distribution Record Date for distributions under the Plan.

(e)     Means of Cash Payment

Cash payments made pursuant to this Plan shall be by check, wire or ACH transfer in U.S. funds or by other means agreed to by the payor and payee or, absent agreement, such commercially reasonable manner as the payor determines in its sole discretion.

(f)     Delivery of Distributions

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims and Allowed Interests shall be made by Reorganized TXCO, the DIP Lender Agent, the Revolver Loan Agent, or the Creditor Trustee, as the case may be, (a) at the addresses set forth on the proofs of Claim or Interest filed by such holders (or at the last known addresses of such holders if no proof of Claim or Interest is filed or if Reorganized TXCO or the Creditor Trustee have been notified in writing of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to Reorganized TXCO, as applicable, after the date of any related proof of Claim or Interest, (c) at the addresses reflected in the Schedules if no proof of Claim or Interest has been filed and Reorganized TXCO, as applicable, has not received a written notice of a change of address, (d) in the case of the holder of a Claim that is governed by an indenture or other agreement and is administered by an indenture trustee, agent, or servicer, at the addresses contained in the official records of such indenture trustee, agent, or servicer, or (e) at the addresses set forth in a properly completed letter of transmittal accompanying securities, if any, properly remitted to Reorganized TXCO. If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until Reorganized TXCO, as applicable, or the appropriate indenture trustee, agent, or servicer is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest. Amounts in respect of undeliverable distributions made through Reorganized TXCO or the indenture trustee, agent, or servicer, shall be returned to Reorganized TXCO until such distributions are claimed. All claims for undeliverable distributions must be made on or before the first (1st) anniversary of the Effective Date, after which date all unclaimed property shall revert to Reorganized TXCO free of any restrictions thereon, except as provided in the

Plan, and the claim of any holder or successor to such holder with respect to such property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

(g)    Claims Paid or Payable by Third Parties

(i)    Claims Paid by Third Parties

The Debtors or Reorganized TXCO, as applicable, shall reduce a Claim, and such Claim shall be disallowed without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full or in part on account of such Claim from a party that is not a Debtor or Reorganized TXCO.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or Reorganized TXCO on account of such Claim, such holder shall, within two (2) weeks of receipt thereof, repay or return the distribution to Reorganized TXCO, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing Reorganized TXCO annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

(ii)    Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to any applicable insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the applicable insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(iii)    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any cause of action that the Debtors or Reorganized TXCO or any entity may hold against any other entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses

(h)    Withholding and Reporting Requirements

In connection with this Plan and all distributions hereunder, Reorganized TXCO shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. Reorganized shall be authorized to

take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

(i)     Expunging of Certain Claims

All Claims marked or otherwise designated as "contingent, unliquidated or disputed" on the Debtors' Schedules and for which no proof of claim has been timely filed, shall be deemed disallowed and such claim may be expunged without the necessity of filing a claim objection and without any further notice to, or action, order or approval of the Bankruptcy Court.

Section 4.7.     Procedures for Resolving Disputed, Contingent and Unliquidated Claims

(a)     Objections to Claims

The Debtors or Reorganized TXCO (or their authorized representatives), as applicable, shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims. From and after the Effective Date, Reorganized TXCO (or their authorized representatives) may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. Reorganized TXCO (or their authorized representatives) also shall have the right to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law. Reorganized TXCO shall use commercially reasonable efforts to settle or otherwise reduce the amount of General Unsecured Claims.

As soon as practicable, but no later than the Claims Objection Deadline, Reorganized TXCO (or their authorized representatives) may file objections with the Bankruptcy Court and serve such objections on the creditors holding the Claims to which objections are made. Nothing contained herein, however, shall limit the right of Reorganized TXCO (or their authorized representatives) to object to Claims, if any, filed or amended after the Claims Objection Deadline. The Claims Objection Deadline may be extended by the Bankruptcy Court upon motion by Reorganized TXCO (or their authorized representatives) without notice or hearing.

(b)     Estimation of Claims

Any Debtor, Reorganized TXCO (or their authorized representative), as applicable, may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether such Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any claim, including during the pendency of any appeal related to any such objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or Reorganized TXCO, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism.

2752695.1

(c)  No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

(d)  Distributions After Allowance

Reorganized TXCO shall make payments and distributions to each holder of a Disputed Claim that has become an Allowed Claim in accordance with the provisions of the Plan governing the class of Claims to which such holder belongs and Section 3.3(c). As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing all or part of any Disputed Claim becomes a Final Order, Reorganized TXCO shall distribute to the holder of such Claim, as provided for in Section 3.3(c), the distribution (if any) that would have been made to such holder on the Distribution Date had such Allowed Claim been allowed on the Distribution Date. After a Disputed Claim is Allowed or otherwise resolved, the excess Cash or other property that was reserved on account of such Disputed Claim, if any, shall become property of Reorganized TXCO.

(e)  General Unsecured Claims

Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtors prior to the Effective Date including pursuant to orders of the Bankruptcy Court. To the extent such payments are not reflected in the Schedules, such Schedules will be deemed amended and reduced to reflect that such payments were made. Nothing in the Plan shall preclude Reorganized TXCO from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

(f)  Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, Reorganized TXCO shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, Reorganized TXCO (or their authorized representative) shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. Reorganized TXCO reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens and encumbrances.

Section 4.8.    Allowance and Payment of Administrative Claims

(a)    Professional Fee Claims

(i)    On the Effective Date, the Debtors shall pay all amounts owing to Professionals for all outstanding amounts relating to prior periods through the Effective Date approved by the Bankruptcy Court in accordance with the Professional Fee Order; provided, however, that Professionals shall continue to prepare fee applications in accordance with the Professional Fee Order for services rendered and expenses incurred up to the Effective Date.  No later than fifteen (15) days prior to the Confirmation Hearing, each Professional shall estimate fees and expenses due for periods that have not been billed as of the anticipated Effective Date.  Any party in interest shall have until the Confirmation Hearing to object to such estimate.  If no party objects to a Professional's estimate, then within ten (10) days of the Effective Date such Professional shall submit a bill and, provided that such bill is no more than the estimate, the fees and expenses shall be paid; provided, however, that Reorganized TXCO shall be authorized to pay a Professional's success fee only upon approval of such fee by the Bankruptcy Court.  On the Effective Date, Reorganized TXCO shall fund an escrow account in an amount equal to the aggregate amount of outstanding fee applications not ruled upon by the Bankruptcy Court as of the Effective Date plus the aggregate amount of all estimated fees and expenses due for periods that have not been billed as of the Effective Date.  Such escrow account shall be used by Reorganized TXCO to pay the remaining Professional Fee Claims owing to the Professionals as and when Allowed by the Bankruptcy Court.  When all Professional Fee Claims have been paid in full, amounts remaining in such escrow account, if any, shall be returned to Reorganized TXCO.

(ii)    All final requests for compensation or reimbursement of Professional Fees pursuant to sections 327, 328, 330, 331, 363, 503(b) or 1103 of the Bankruptcy Code for services rendered to or on behalf of the applicable Debtors or the Committee prior to the Effective Date (other than Substantial Contribution Claims under section 503(b)(4) of the Bankruptcy Code) must be filed and served on Reorganized TXCO and their counsel no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such Professionals or other entities for compensation or reimbursement of expenses must be filed and served on Reorganized TXCO and their counsel and the requesting Professional or other entity no later than 45 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served.

(b)     Administrative Claims

The Confirmation Order will establish an Administrative Claims Bar Date for filing of all Administrative Claims, including Substantial Contribution Claims (but not including DIP Loan Claims, Professional Fee Claims or claims for the expenses of the members of the Committee or Administrative Claims), which date will be forty-five (45) days after the Effective Date. Holders of asserted Administrative Claims, other than Professional Fee Claims, claims for U.S. Trustee fees under 28 U.S.C. §1930, administrative tax claims and administrative ordinary course liabilities, must submit proofs of Administrative Claim on or before such Administrative Claims Bar Date or forever be barred from doing so. A notice prepared by Reorganized TXCO will set forth such date and constitute notice of this Administrative Claims Bar Date. The Debtors or Reorganized TXCO, as the case may be, shall have forty-five (45) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Claims Bar Date to review and object to such Administrative Claims before a hearing for determination of allowance of such Administrative Claims.  Holders of Administrative Claims pursuant to section 503(b)(9) of the Bankruptcy Code were required to file proof of such a claim on or before August 21, 2009.

(c)     Administrative Ordinary Course Liabilities

Holders of Administrative Claims that are based on liabilities incurred in the ordinary course of the applicable Debtors' businesses (other than Claims of governmental units for taxes and for interest and/or penalties related to such taxes) shall not be required to file any request for payment of such Claims. Such Administrative Claims, unless objected to by the applicable Debtors or Reorganized TXCO, shall be assumed and paid by Reorganized TXCO, in Cash, pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claim.

(d)     Administrative Tax Claims

All requests for payment of Administrative Claims by a governmental unit for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date, and for which no bar date has otherwise been previously established, must be filed and served on Reorganized TXCO and any other party specifically requesting a copy in writing on or before the later of (a) thirty (30) days following the Effective Date; and (b) one hundred and twenty (120) days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit. Any holder of any such Claim that is required to file a request for payment of such taxes and does not file and properly serve such a Claim by the applicable bar date shall be forever barred from asserting any such Claim against Reorganized TXCO or its property, regardless of whether any such Claim is deemed to arise prior to, on, or subsequent to the Effective Date. Any interested party desiring to object to an Administrative Claim for taxes must file and serve its objection on counsel to Reorganized TXCO and the relevant taxing authority no later than ninety (90) days after the taxing authority files and serves its application.

Section 4.9.    Conditions Precedent to Confirmation and Consummation of Plan

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with Section 13.4 below:

(a)    The Confirmation Order shall have been entered in form and substance reasonably acceptable to the DIP Lenders and the Exit Facility Agent as to the Exit Facility.

(b)    The Exit Facility Loan Documents in form and substance acceptable to the Exit Facility Agent shall have been executed and delivered by all parties thereto, and all conditions precedent to consummation thereof shall have been waived or satisfied in the manner permitted thereunder.

(c)    All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of this Plan shall have been obtained.

(d)    There shall not be in effect on the Effective Date any (i) order entered by a court, (ii) any order, opinion, ruling or other decision entered by any other court or governmental entity, or (iii) any applicable law staying, restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by the Plan.

(e)    No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall remain pending.

(f)    The Bankruptcy Court shall have dismissed the Debtors' Adversary Proceeding with prejudice.

(g)    Any provider of debt or equity financing to Reorganized TXCO in connection with the Plan, including, without limitation, the terms and conditions of such financing, shall be acceptable to each of Black Diamond Offshore, Ltd, Double Black Diamond Offshore, Ltd., CIT Middle Market Loan Trust III, and Regiment Capital Special Situations Fund III LP in its sole and absolute discretion.

(h)    All conditions to the consummation of the transactions contemplated by the Plan shall have been satisfied or waived.

This section sets forth a summary of certain material terms of the Exit Facility. On the Effective Date, Reorganized TXCO will enter into definitive documentation with respect to the Exit Facility in substantial compliance with the terms and conditions contained in the Exit Facility Term Sheet attached hereto as Exhibit O. The descriptions contained in this Article IV are summaries only.

2752695.1

(a)     Exit Facility

The Debtors received several expressions of interest to extend the Exit Facility to the Debtors.  The Debtors accepted the Exit Facility proposal submitted by _____, the terms and conditions of which are attached as part of the Plan Supplement.

(b)     Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

(c)     Waiver of Conditions

Each of the conditions set forth in Sections 13.1 and 13.2 of the Plan may be waived in whole or in part by written consent of the applicable Debtor.  As to the conditions regarding the DIP Lenders, without any notice to other parties in interest or the Bankruptcy Court and without a hearing the DIP Lenders may waive any of the conditions set forth in Sections 13.1 and 13.2. The failure to satisfy or waive any condition to the Effective Date may be asserted by the Debtors or Reorganized TXCO regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors or Reorganized TXCO). The failure of the Debtors or Reorganized TXCO to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

(d)     Revocation, Withdrawal, Non-Consummation

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or consummation of the Plan does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person, (ii) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or (iii) constitute an admission of any sort by the Debtors or any other Person.

Section 4.10.   Retention of Jurisdiction

Under Sections 105 and 1142 of the Bankruptcy Code, and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Cases and the Plan, to the fullest extent permitted by law, including jurisdiction to:

(a)     enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases,

and other agreements or documents created in connection with the Plan, this Disclosure Statement or the Confirmation Order;

(b)     hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan and all contracts, instruments, and other agreements executed in connection with the Plan;

(c)     hear and determine any request to modify the Plan or to cure any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court;

(d)     issue and enforce injunctions or other orders, or take any other action that may be necessary or appropriate to restrain any interference with the implementation, consummation, or enforcement of the Plan or the Confirmation Order,

(e)     enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(f)     hear and determine any matters arising in connection with or relating to the Plan, this Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, this Disclosure Statement or the Confirmation Order;

(g)     enforce all orders, judgments, injunctions, releases, exculpations and rulings entered in connection with the Chapter 11 Cases;

(h)     hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

(i)     hear and determine matters relating to the allowance, disallowance, determination, classification, estimation and/or liquidation of Claims against the Debtors and to enter or enforce any order requiring the filing of any such Claim before a particular date;

(j)     hear and determine motions, application, adversary proceedings, contested matters and other litigation matters filed or commenced after the Effective Date, including proceedings with respect to the rights and claims of the Debtors to recover property under the applicable provisions of Chapter 5 of the Bankruptcy Code or to bring any Litigation Claims, or otherwise to collect or recover on account of any Litigation Claim;

(k)     determine all applications, Claims, adversary proceedings and contested matters pending on the Effective Date; and

(l)     enter a final decree closing the Chapter 11 Case.

Section 4.11.   Release, Exculpation and Related Provisions

(a)        Compromise and Settlement

Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their Estates, Creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.

Without limiting the generality of the foregoing, the treatment of Claims in Classes 2, 3, 4, 5 and 8 under this Plan is a good faith compromise and settlement of all the rights of the Debtors, the Creditors and the Estates asserted in the Debtors' Adversary Proceeding.   In consideration of such settlement and compromise, on the Effective Date the Debtor shall be deemed to have withdrawn the Debtors' Adversary Proceeding with prejudice, and each of the Debtors, on their own behalf and as representative of the Debtors' Estates and the Creditors shall be deemed to have waived, released and discharged, and shall be permanently enjoined from initiating or continuing, any claim, action, employment of process, or any act to collect, offset, or recover, any and all claims, obligations, rights, Causes of Action, Avoidance Actions and liabilities, whether based in tort, fraud, contract or otherwise, known or unknown, that they possessed, possess or may possess prior to the Effective Date against any of the Revolver Lenders or Term Lenders ("Lenders"), any such parties acting in an agency capacity ("Agents"), or any of their respective past or present officers, directors, managers, members, employees, representatives, counsel, advisors, consultants or other agents, successors or assigns and that arise from or are related to the Amended and Restated Credit Agreement, dated April 2, 2007, as amended, or the Term Loan Agreement, dated April 2, 2007, as amended, or any predecessor credit or loan agreements thereto, the other documents, instruments and agreements related thereto, and whether or not the same are set forth in the Debtors' Adversary Proceeding, provided that the foregoing release shall not apply to any action or omission that constitutes actual fraud or criminal conduct under any applicable statute.  In the event that the Plan is not confirmed or does not become effective, (x) neither the Agents and Lenders or the Debtors shall be deemed to have waived any right or remedy with respect to the Debtors' Adversary Proceeding, (y) nothing herein or in the Disclosure Statement shall be deemed an admission against interest by any of them, and (z) pursuant to Federal Rule of Evidence 408, the fact or terms of this compromise and settlement shall not be admissible in the Debtors' Adversary Proceeding or any other proceeding commenced with respect to the rights of the Agents and Lenders under the Credit Agreements and related documents, instruments and agreements.  The Plan shall serve as a motion to approve such compromise and settlement of the Debtors' Adversary Proceeding, and entry of the Confirmation Order shall constitute such approval.

It is not the intent of the Debtors that confirmation of the Plan shall in any manner alter or amend any settlement and compromise between the Debtors and any Person that has been previously approved by the Bankruptcy Court (each, a "Prior Settlement"). To the extent of any conflict between the terms of the Plan and the terms of any Prior Settlement, the terms of the Prior Settlement shall control and such Prior Settlement shall be enforceable according to its terms.

Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), the Debtors may compromise and settle various claims against them and claims that they have against other Persons. The Debtors expressly reserve the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims against them and claims that they may have against other Persons up to and including the Effective Date. After the Effective Date, Reorganized TXCO may compromise and settle any Claims against them and claims they may have against other Persons without approval from the Bankruptcy Court where the amount in dispute is less than $500,000 or the Claim to be settled is less than $1,000,000.

(b)     Satisfaction of Claims

The rights afforded in the Plan and the treatment of all Claims and Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever against the Debtors or any of their Estates, assets, properties, or interests in property. Except as otherwise provided herein, on the Effective Date, all Claims against and Interests in the Debtors shall be satisfied, discharged, and released in full. Neither Reorganized TXCO, nor their Affiliates, shall be responsible for any pre-Effective Date obligations of the Debtors, except those expressly assumed by the Debtors or their Affiliates, as applicable. Except as otherwise provided herein, all Persons and Entities shall be precluded and forever barred from asserting against Debtors and their Affiliates, their respective successors or assigns, or their Estates, assets, properties, or interests in property any event, occurrence, condition, thing, or other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

(c)     Exculpation and Limitation of Liability

Notwithstanding any other provision of the Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any right of action whether in law or equity, whether for breach of contract, statute, or tort claim, against the Debtors, the Estates, Reorganized TXCO, the Committee, the DIP Lenders, the DIP Loan Agent, or any of their respective affiliates, representatives, present or former members, officers, directors, employees, advisors, attorneys, or agents, for any act or omission in connection with, relating to, or arising out of, these Cases, the pursuit of Confirmation of the Plan, consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence.

2752695.1

(d)     Good Faith

As of the Confirmation Date, the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  The Debtors and the Exit Facility Lenders have participated in good faith and in compliance with Section 1125(e) of the Bankruptcy Code in the offer and issuance of the New Common Stock under the Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of the New Stock under the Plan.

(e)     Discharge of Liabilities

Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, Reorganized TXCO shall be discharged from all Claims and Causes of Action to the fullest extent permitted by Section 1141 of the Bankruptcy Code, and all holders of Claims and Interests shall be precluded from asserting against Reorganized TXCO, its respective assets, or any property dealt with under the Plan, any further or other Cause of Action based upon any act or omission, transaction, event, thing, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date.

<u>EXCEPT</u> AS OTHERWISE PROVIDED IN THE PLAN, REORGANIZED TXCO SHALL NOT HAVE, AND SHALL NOT BE CONSTRUED TO HAVE, OR MAINTAIN ANY LIABILITY, CLAIM, OR OBLIGATION, THAT IS BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OTHER OCCURRENCE OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE PLAN, <u>INCLUDING</u>, WITHOUT LIMITATION, ANY LIABILITY OR CLAIMS ARISING UNDER APPLICABLE NON-BANKRUPTCY LAW AS A SUCCESSOR TO THE DEBTORS AND NO SUCH LIABILITIES, CLAIMS, OR OBLIGATIONS FOR ANY ACTS SHALL ATTACH TO REORGANIZED TXCO.

(f)     Discharge of the Debtors

<u>Except</u> as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, without further notice or order, all Claims of any nature whatsoever shall be automatically discharged forever. <u>Except</u> as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the Debtors, their Estates, and all successors thereto shall be deemed fully discharged and released from any and all Claims, <u>including,</u> but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or (c) the holder of a Claim based upon such debt has accepted the Plan. The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors, their Estates, and all successors thereto.  As provided in Section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtors, their Estates, or any successor thereto at any time obtained to the extent it relates to a Claim discharged, and operates as an injunction against the prosecution of

any action against Reorganized TXCO or its property to the extent it relates to a discharged Claim.

     (g)     Permanent Injunction

**Except as otherwise provided in the Plan, from and after the Confirmation Date, all Persons who have held, hold, or may hold Claims against or Interests in the Debtors prior to the Effective Date are permanently enjoined from taking any of the following actions against the Debtors, Reorganized TXCO, the Committee, the DIP Lenders, the DIP Loan Agent, the Term Loan Lenders, the Term Loan Agent, and the Estates on account of any such Claims or Interests: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Plan.**

     (h)     Releases by the Debtors, Reorganized TXCO and their Estates

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Confirmation Order, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors, Reorganized TXCO and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Debtors, Reorganized TXCO and their Estates, for themselves and on behalf of their respective successors and assigns, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each (i) Released Party and (ii) the Debtors', Reorganized TXCO's and their Estates' past and present directors, managers, officers, employees, attorneys and other representatives from any and all claims, interests, obligations, rights, suits, damages, losses, costs and expenses, actions, causes of action, remedies, and liabilities of any kind or character whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, Reorganized TXCO, and their Estates, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, suspected or unsuspected, matured or unmatured, fixed or contingent, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, Reorganized TXCO or their respective Affiliates or Estates ever had, now has or hereafter can, shall or may have, or otherwise would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, against any (i) Released Party and (ii) the Debtors', Reorganized TXCO's and their Estates' current and former directors, managers, officers, employees, attorneys and other representatives arising from or relating to, directly or indirectly from, in whole or in part, the Debtors, the Debtors' restructuring, the Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements among any two or more of any of Debtors, Reorganized TXCO or any Released Party (and the acts or omissions of any other Released Party

169

in connection therewith), the restructuring of Claims and Interests prior to or in the Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence, including the management and operation of the Debtors, taking place on or before the Effective Date. Notwithstanding the foregoing, nothing in this Section 3.8(h) shall release any Released Party or other individual included within this release from liability for (i) any act or omission by such Released Party or other individual that is found by a court of law in a final, non-appealable judgment to constitute Fraud or willful misconduct or (ii) any obligation for borrowed money owed by a Released Party to the Debtors, Reorganized TXCO or their respective Affiliates or Estates.

(i)      Releases by Holders of Claims and Interests

**Except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, in consideration of the Distributions under the Plan, holders of Claims and Interests, for themselves and on behalf of their respective successors and assigns, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party from any and all claims, interests, obligations, rights, suits, damages, losses, costs and expenses, actions, causes of action, remedies, and liabilities of any kind or character whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, Reorganized TXCO or their Estates, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, suspected or unsuspected, matured or unmatured, fixed or contingent, existing or hereafter arising, in law, equity or otherwise, that such Entity ever had, now has or hereafter can, shall or may have, or otherwise would have been legally entitled to assert (whether individually or collectively or directly or derivatively), against any Released Party arising from or relating to, directly or indirectly, in whole or in part, the Debtors, the Debtors' restructuring, the Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements among any two or more of any Debtor, Reorganized TXCO or any Released Party (and the acts or omissions of any other Released Party in connection therewith), the restructuring of Claims and Interests prior to or in the Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence, including the management and operation of the Debtors, taking place on or before the Effective Date. Notwithstanding the foregoing, nothing in this Section shall release any Released Party from liability for any act or omission by such Released Party that is found by a court of law in a formal, non-appealable judgment to constitute Fraud or willful misconduct.**

(j)      Setoffs

Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, Reorganized TXCO may setoff against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before such distribution is made), any claims, rights, and causes of action of any nature that such Debtor

170

or Reorganized TXCO, as applicable, may hold against the holder of such Allowed Claim, to the extent such claims, rights, or causes of action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, the neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by Reorganized TXCO of any such claims, rights, and causes of action that Reorganized TXCO may possess against such holder. In no event shall any holder of Claims or Interests be entitled to setoff any Claim or Interest against any claim, right, or cause of action of the Debtors or Reorganized TXCO, as applicable, unless such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

(k)    Recoupment

In no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or Reorganized TXCO, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

(l)    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of the Reorganized TXCO's Estate shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, liens, pledges, or other security interests shall revert to Reorganized TXCO and its successors and assigns.

In addition to, and in no way a limitation of, the foregoing, to the extent the Debtors' property or assets are encumbered by mortgages, security interests or Liens of any nature for which any holder of such mortgages, security interests or Liens does not have an Allowed Claim against such Debtor, such mortgages, security interests or Liens shall be deemed fully released and discharged for all purposes and such holder shall execute such documents as reasonably requested by Reorganized TXCO in form and substance as may be necessary or appropriate to evidence the release of any such mortgages, security interests or Liens of any nature. If such holder fails to execute such documents, Reorganized TXCO is authorized to execute such documents on behalf of such holder and to cause the filing of such documents with any or all governmental or other entities as may be necessary or appropriate to effect such releases.

171

(m)     Satisfaction of Subordination Rights

Except as otherwise expressly provided in the Plan, all Claims against the Debtors and all rights and claims between or among Claim holders relating in any manner whatsoever to Claims against the Debtors, based upon any claimed subordination rights (if any), shall be deemed satisfied by the distributions under the Plan to Claim holders having such subordination rights, and such subordination rights shall be deemed waived, released, discharged and terminated as of the Effective Date.  Distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment or like legal process by any Claim holder by reason of any claimed subordination rights or otherwise, so that each Claim holder shall have and receive the benefit of the distributions in the manner set forth in the Plan.

**ARTICLE V**
**THE SOLICITATION; VOTING PROCEDURES**

Section 5.1.    Solicitation Package

Accompanying this Disclosure Statement for the purpose of soliciting votes on the Plans are copies of (i) the Plan, (ii) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time, and place of the hearing to consider Confirmation of the Plan and related matters, and the time for filing objections to Confirmation of the Plan, and, as applicable, (iii) a Ballot or Ballots (and return envelope(s)) that you may use in voting to accept or to reject the Plan, or a notice of nonvoting status (the "Solicitation Package").  The Ballots that will be distributed are color coded in connection with either the Operational Plan, which will have a BLUE Ballot, or the Operational Plan, which will have a GOLD Ballot.  Only holders eligible to vote in favor of or against the Plan will receive Ballot(s) as part of their Solicitation Package.  If you did not receive Ballots and believe that you should have, please contact the Solicitation Agent at the address or telephone number set forth in the next subsection.

Section 5.2.    Voting Instructions

After carefully reviewing the Plans and this Disclosure Statement, and the exhibits thereto, and the detailed instructions accompanying your Ballots, please indicate your acceptance or rejection of the Plans by voting in favor of or against the Plans on the appropriate color-coded Ballot.  Please complete and sign each of your Ballots and return it in the envelope provided so that it is RECEIVED by the Plan Voting Deadline set forth on the Ballots.

Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballots sent to you with this Disclosure Statement.

If you have any questions about the procedure for voting your eligible Claim or with respect to the Solicitation Package that you have received, please contact the Solicitation Agent at (904) 807-3023 or:

**If by US Mail:**

TXCO Resources, et al.
c/o  Administar Services Group LLC
PO Box 56636
Jacksonville, FL 32241

**If by Courier/Hand Delivery:**

TXCO Resources, et al.
c/o Administar Services Group LLC
8475 Western Way, STE 110
Jacksonville, FL 32256

THE SOLICITATION AGENT MUST RECEIVE ORIGINAL BALLOTS ON OR BEFORE 5:00 P.M., EASTERN STANDARD TIME, ON _____ (THE "PLAN VOTING DEADLINE") AT THE ABOVE ADDRESS. EXCEPT TO THE EXTENT ALLOWED BY THE BANKRUPTCY COURT, BALLOTS RECEIVED AFTER THE PLAN VOTING DEADLINE WILL NOT BE ACCEPTED OR USED IN CONNECTION WITH THE DEBTORS' REQUEST FOR CONFIRMATION OF THE PLAN OR ANY MODIFICATION THEREOF.

Section 5.3.      Voting Tabulation

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only holders who actually vote will be counted.  The failure of a holder to deliver duly executed Ballots will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plans.

Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plans has not been indicated, will not be counted. The Debtors, in their sole discretion, may request that the Solicitation Agent attempt to contact such voters to cure any such defects in the Ballots.

Except as provided below, unless the applicable Ballots are timely submitted to the Solicitation Agent before the Plan Voting Deadline, together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid and decline to utilize it in connection with seeking Confirmation of the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

If Ballots are signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such Person should indicate such capacity when signing and, unless otherwise determined by the Debtors, must submit proper evidence satisfactory to the Debtors of authority to so act.

The period during which Ballots with respect to the Plan will be accepted by the Debtors will terminate on the Plan Voting Deadline. Except to the extent permitted by the Bankruptcy Court, Ballots that are received after the Plan Voting Deadline will not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof). IN NO CASE SHOULD BALLOTs BE DELIVERED TO ANY ENTITY OTHER THAN THE SOLICITATION AGENT.

Section 5.4.    Agreements upon Furnishing Ballots

The delivery of accepting Ballots to the Solicitation Agent by a holder pursuant to one of the procedures set forth above will constitute the agreement of such holder to accept (i) all of the terms of, and conditions to, the Solicitation and (ii) the terms of the Plan; provided, however, all parties in interest retain their right to object to Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

Section 5.5.    Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Solicitation Agent and the Debtors in their sole discretion, which determination will be final and binding.  As indicated in the following subsection, effective withdrawals of Ballots must be delivered to the Solicitation Agent prior to the Plan Voting Deadline.  The Debtors reserve the absolute right to contest the validity of any such withdrawal. The Debtors also reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful.  The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballots.  The interpretation (including of the Ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

Section 5.6.    Withdrawal of Ballots; Revocation

Any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Solicitation Agent at any time prior to the Plan Voting Deadline. A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (iv) be received by the Solicitation Agent in a timely manner at the address set forth in the

Solicitation Section contained in Section 5.2 of this Disclosure Statement. As stated above, the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of Ballots. A purported notice of withdrawal of Ballots which is not received in a timely manner by the Solicitation Agent will not be effective to withdraw a previously cast Ballot.

Any party who has previously submitted to the Solicitation Agent prior to the Plan Voting Deadline a properly completed Ballot may revoke such Ballot and change his or its vote by submitting to the Solicitation Agent prior to the Plan Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received, only the Ballot which bears the latest date will be counted for purposes of determining whether the Requisite Acceptances have been received.

Section 5.7.    Delivery of Existing Securities

Any Person in possession of existing Equity Interests in any of the Debtors will be required to deliver such Equity Interests to TXCO Resources Inc., Attn: _____, 777 E. Sonterra Boulevard, Suite 350, San Antonio, Texas 78258.

## ARTICLE VI
## VALUATION ANALYSIS AND FINANCIAL PROJECTIONS

Section 6.1.    Introduction

As a condition to confirmation, section 1129(a)(11) of the Bankruptcy Code requires that the Debtors prove that the Plans are not likely to be followed by the liquidation or need for further financial reorganization of the Debtors.

To satisfy this so-called "feasibility" requirement, the Debtors have prepared the Financial Projections contained in Exhibit "J" to this Disclosure Statement. In addition, section 1129(a)(7)(A)(ii) of the Bankruptcy Code requires that Holders of Claims and Interests receive a recovery under a plan no less than the recovery they would under a liquidation of the Debtors' Estates. The Debtors developed a set of financial projections, summarized in Exhibit "J" hereto to satisfy this so-called "best interests of creditors" test. The Debtors' management has, through the development of the projections, analyzed Reorganized TXCO's ability to meet their obligations under the Plan to maintain sufficient liquidity and capital resources to conduct their businesses.

Section 6.2.    Financial Projections and Liquidation Analysis

The Debtors prepared the projections and liquidation analysis, set forth in Exhibits "J" and "F" hereto, to satisfy section 1129(a)(11) and 1129(a)(7)(A)(ii) of the Bankruptcy Code. These analyses help establish the feasibility of the Debtors' Plan, that the Plan is in the best interests of all Holders of Claims and that the new debt obligations to be incurred upon emergence from these Cases is necessary for Reorganized TXCO to continue as a viable going concern. The Debtors prepared the analyses based on, among other things, the anticipated future financial condition and results of operations of Reorganized TXCO.

The Debtors prepared the analyses in good faith, based upon estimates and assumptions made by the Debtors' management. The estimates and assumptions in the analyses, while considered reasonable by management, may not be realized, and are inherently subject to significant uncertainties and contingencies beyond the Debtors' control. They also are based on outside factors such as industry performance, general business, economic, competitive, regulatory, market and financial conditions, all of which are difficult to predict. Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ and the actual results may be materially greater or less than those contained in the analyses. No representations can be made as to the accuracy of the analyses or Reorganized TXCO's ability to achieve the projected results. Some assumptions inevitably will not materialize. Actual operating results and values may vary significantly from these analyses. Furthermore, events and circumstances occurring subsequent to the date of which these analyses were prepared may differ from any assumed facts and circumstances. Moreover, unanticipated events and circumstances may come to pass, and may affect financial results in a materially adverse or materially beneficial manner. Therefore, the analyses may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the analyses herein should not be regarded as an indication that the Debtors considered or consider the analyses to reliably predict future performance. The analyses are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments. The Debtors do not intend to update or otherwise revise the analyses to reflect the occurrence of future events, even in the event that assumptions underlying the analyses are not borne out. The analyses should be read in conjunction with Article VIII "Certain Risk Factors Affecting the Debtors" and the assumptions and qualifications set forth herein.

THE ANALYSES WERE PREPARED FROM, AMONG OTHER THINGS, INFORMATION CONTAINED IN THE DEBTORS' BOOKS AND RECORDS AND WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (THE "AICPA"), THE FINANCIAL ACCOUNTING STANDARDS BOARD (THE "FASB"), OR THE RULES AND REGULATIONS OF THE SEC REGARDING PROJECTIONS. FURTHERMORE, THE DEBTORS' INDEPENDENT AUDITOR HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, NEITHER THE DEBTORS NOR REORGANIZED TXCO INTEND TO, AND EACH DISCLAIMS ANY OBLIGATION TO: (A) FURNISH UPDATED ANALYSES TO HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO ANY OTHER PARTY AFTER THE EFFECTIVE DATE; (B) INCLUDE ANY SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC; OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

# ARTICLE VII
## CONFIRMATION PROCEDURES

Section 7.1.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing on the Operational Plan for _____, at _____ [A.M./P.M.] prevailing Central Time, before the Honorable Ronald B. King, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Western District of Texas, located at 615 E. Houston Street, Courtroom 3, Fifth Floor, San Antonio, Texas 78205. The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to confirmation of the Operational Plan must be filed and served on the Debtors and the other parties set forth in the Disclosure Statement Order, and certain other parties, by no later than _____, at 5:00 p.m. prevailing Central Time, in accordance with the Disclosure Statement Order. THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS TO CONFIRMATION OF THE PLAN IF ANY SUCH OBJECTIONS HAVE NOT BEEN TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.

The Confirmation Hearing Notice will contain, among other things, the Plan Objection Deadline, the Plan Voting Deadline, and Confirmation Hearing Date.

At this time, the Debtors are not requesting that the Court set a hearing date for consideration of the Operational Plan. In the event the Operational Plan is no confirmed or the parties do not close on the Operational of the Debtors' assets, the Debtors will request that the Court set a Confirmation Hearing to consider the Operational Plan, as well as request that the Court set a deadline to file objections to the Operational Plan. The Debtors will send out notice of that hearing and of the new objection deadline if and when the Debtors must proceed with seeking to confirm the Operational Plan.

Section 7.2.    Statutory Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied. The Debtors believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as Plan Proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Plan is reasonable; or (b) subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after the Confirmation of the Plan.

- Either each Holder of an Impaired Claim or Equity Interest has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- The Debtors have disclosed the identity and affiliations of any individual prepared to serve, after confirmation of the Plan, as a director, officer or voting trustee of Reorganized TXCO or a successor to the Debtors under the Plan and the appointment to, or continuance in, such office of such individual is consistent with the interests of the creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by such Debtor, and the nature of the compensation for such insider.

- Reorganized TXCO are not proposing any rate change requiring approval by any governmental regulatory commission.

- Each class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not impaired under the Plan, or the Plan can be confirmed without the approval of each voting class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims, Priority Tax Claims and, Other Priority Claims will be paid in full, in cash, on the Effective Date, or as soon thereafter as practicable.

- At least one class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of Reorganized TXCO or any successors thereto under the Plan unless such a liquidation or reorganization is proposed in the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

- The Plan provides for the continuation after consummation of the Plan of payment of all retirement benefits, if any, at the level established under section 1114(e)(1)(B) or (g) of the Bankruptcy Code at any time prior to confirmation of

the Plan, for the duration of the period Reorganized TXCO has obligated itself to provide such benefits.

The Debtors believe that: (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) it complies or will have complied with all of the requirements of chapter 11; and (c) the Plan has been proposed in good faith.

    (i)    Best Interests of Creditors Test/Liquidation Analysis

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of a claim or interest in such Class either: (a) has accepted the Plan; or (b) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such person would receive or retain if the Debtors liquidated under chapter 7 of the Bankruptcy Code. In chapter 7 liquidation cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior Class receiving any payments until all amounts due to senior Classes have been paid fully or any such payment is provided for:

- Secured creditors (to the extent of the value of their collateral);

- Administrative and other priority creditors;

- Unsecured creditors;

- Debt expressly subordinated by its terms or by order of the Bankruptcy Court; and

- Equity interest holders.

As described in more detail in the Liquidation Analysis set forth in Exhibit "F" hereto, the Debtors believe that the value of any distributions in a chapter 7 case would be less than the value of distributions under the Plan because, among other reasons, distributions in a chapter 7 case may not occur for a longer period of time, thereby reducing the present value of such distributions. In this regard, the distribution of the proceeds from liquidation would be delayed until a chapter 7 trustee and its professionals become knowledgeable about the Cases and the Claims against the Debtors. In addition, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of all Operationals. The Debtors would also have to pay the fees and expenses of a chapter 7 trustee in addition to the Professionals' pre-conversion fees and expenses (thereby further reducing cash available for distribution).

    (ii)    Feasibility

The Bankruptcy Code requires a bankruptcy court to find, as a condition to confirmation, that confirmation is not likely to be followed by a debtor's liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. For purposes of showing that the Plan meets this feasibility standard, the Debtors analyzed their ability to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses. As described in more detail in the Financial Projections set forth in Exhibit "J" hereto, Reorganized TXCO should have sufficient cash flow to pay and

2752695.1

service their debt obligations and to fund their operations. Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

### (iii) Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation that, except as described in the following section, each class of claims or equity interests that is impaired under the Plan accept the Plan. A class that is not "impaired" under a plan of reorganization is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of that claim or equity interest; or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest after the occurrence of a default—(1) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (2) reinstates the maturity of such claim or interest as such maturity existed before such default; (3) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (4) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (5) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

### (iv) Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan, even if impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired Class. Holders of Claims or Equity Interests in Classes 10, 11 and 12 are deemed to reject the Plan and, therefore, the Debtors intend to confirm the plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code states that, notwithstanding an impaired class' failure to accept a plan of reorganization, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or equity interest any property.

2752695.1

The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Exhibit or Schedule; including amending or modifying it to satisfy section 1129(b) of the Bankruptcy Code, if necessary.

Section 7.3.     Identity of Persons to Contact for More Information

Any interested party desiring further information about the Plan should contact Debtors' Counsel, Cox Smith Matthews Incorporated at the phone number and/or address as listed on the cover of the Disclosure Statement.

# ARTICLE VIII
## CERTAIN RISK FACTORS AFFECTING CERTAIN OF THE DEBTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL IMPAIRED HOLDERS OF CLAIMS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

Section 8.1.     General

The following provides a non-exhaustive summary of various important considerations and risk factors associated with the Plan. In considering whether to vote for or against the Plan, Holders of Claims or Interests should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced in this Disclosure Statement.

Section 8.2.     Certain Bankruptcy Law Considerations

(i)     Parties-in-Interest May Object To the Plan and Confirmation

Section 1129 of the Bankruptcy Code provides certain requirements for a chapter 11 plan to be confirmed, Parties-in-Interest may object to confirmation of a plan based on an alleged failure to fulfill these requirements or other reasons. The Debtors believe that the Plan complies with the requirements of the Bankruptcy Code.

(ii)     Parties-in-Interest May Object To the Debtors' Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.

The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each class of Claims and Interests encompass Claims or Interests that are substantially similar to the other Claims or Interests in each such class.

(iii)  Closing May Not Occur

The Plan assumes that a Closing will occur pursuant to a Superior Proposal.  There are conditions to Closing, which may not occur.

(iv)  The Ultimate Recovery to Unsecured Creditors is based upon the Projections, which are inherently uncertain

The Projections set forth in this Disclosure Statement and underlying the Plan are based on numerous assumptions, including the timing, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of Reorganized TXCO, general business and economic conditions, and other matters, many of which are beyond the control of Reorganized TXCO and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of Reorganized TXCO's operations. Because the actual results achieved throughout the periods covered by the Projections can be expected to vary from the projected results, the Projections should not be relied upon as a guaranty, representation, or other assurance that the actual results will occur.

(v)  Undue Delay in Confirmation May Disrupt the Debtors' Operations and Have Potential Adverse Effects

The Debtors cannot accurately predict or quantify the impact on their business operations of prolonging the Cases. A lengthy time in bankruptcy could adversely affect the Debtors' relationships with their customers, oil and gas lessors, vendors and employees, which, in turn, could adversely affect the Debtors' competitive position, financial condition, results of operations and cash flows.

Furthermore, prolonging the Cases could adversely affect the Debtors' ability to maintain its existing business. So long as the Cases continue, the Debtors' senior management will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on its current business and future operations, for the Debtors.

Additionally, the DIP Loan matures on March 1, 2010.  A delay in confirming the Plan may cause a default in connection with the DIP Loan, which may result in the DIP Lenders exercising their rights under the DIP Loan.

(vi)  The Debtors May Not Be Able To Obtain Confirmation of the Plan

The Debtors cannot ensure they will receive the requisite acceptances to confirm the Plan. But, even if the Debtors do receive the requisite acceptances, there can be no assurance that the Bankruptcy Court will confirm the Plan. The Bankruptcy Court could still decline to confirm the Plan if it were to determine that any of the statutory requirements for confirmation had not been met, including a determination that the terms of the Plan are not fair and equitable to Classes not accepting the Plan. Therefore, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.

(vii)  Expiration or Termination of Material Restructuring Agreements

The Debtors' ability to consummate the transactions contemplated by the Plan is conditioned upon, among other things, satisfaction of the terms contained in the Newfield PSA. Each of these agreements contains certain closing conditions and termination rights. If these Cases are extended beyond the anticipated timeline, these termination rights may be triggered.

(viii) Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur within a reasonable time following the Confirmation Date, there can be no assurance as to such timing.

(ix)  Risk of Post-Confirmation Default

At the Confirmation Hearing, the Court will be required to make a judicial determination that the Plan is feasible, but that determination does not serve as any guarantee that there will not be any post-confirmation defaults.  The Debtors believe that the cash flow generated from operations and post-Effective Date borrowing will be sufficient to meet Reorganized TXCO's operating requirements and other post-confirmation obligations under the Plan.

Section 8.3.  Risk Factors Associated with Certain of the Debtors' Business

(i)  Reorganized TXCO may have capital requirements in connection with Excluded Assets that, if not met, may hinder operations and cause it to go out of business.

The implementation of the Debtors' plans may require Reorganized TXCO to make significant capital expenditures.  Operational revenue will initially represent the only other source of funding for ongoing operations and payment of the Secured Trust Promissory Note.

(ii)  Reorganized TXCO's leverage and debt service obligations may adversely affect the Reorganized TXCO's cash flow.

Under the Operational Plan, Reorganized TXCO will have approximately $50 million of secured debt when they emerge from Chapter 11.  Reorganized TXCO's level of indebtedness could have consequences, including the following:

- it may make it difficult for Reorganized TXCO to satisfy all of their obligations under the indebtedness and contractual and commercial commitments;

- Reorganized TXCO's flexibility in reacting to changes in the industry may be limited and Reorganized TXCO could be more vulnerable to adverse changes in their business or economic conditions in general; and

- Reorganized TXCO may be at a competitive disadvantage as to competitors who operate on a less leveraged basis.

183

(iii)     Continuation of recent adverse economic conditions in the credit markets may adversely affect the Reorganized TXCO's financial condition.

The disruption experienced in U. S. and global credit markets since the latter half of 2008 has resulted in actual and projected decreases in demand for oil and natural gas. Commodity prices for oil and gas have dropped dramatically during this period and, though the price of oil has trended upward somewhat in recent months, the volatility of prices has affected the availability and cost of capital. In addition, capital and credit markets have experienced unprecedented volatility and disruption and continue to be unpredictable. Given the current levels of market volatility and disruption, the availability of funds from those markets has diminished substantially.  Any inability to obtain adequate financing under the Reorganized TXCO's commercial arrangements, if any, or to fund them on acceptable terms could deter or prevent Reorganized TXCO from meeting any future capital needs, adversely affect the satisfaction or replacement of their debt obligations and result in a deterioration of their financial condition.

(iv)   Access to Financing and Trade Terms

Reorganized TXCO's operations may be adversely affected by any shortage or increased cost of financing and trade vendor support.  If Reorganized TXCO requires working capital and trade financing greater than that provided by operating cash flow, they may be required either to: (a) obtain other sources of financing; (b) Operational of assets; or (c) curtail their operations.

No assurance can be given, however, that any additional financing will be available, if at all, on terms that are favourable or acceptable to Reorganized TXCO.  This is particularly true if the turmoil currently affecting the credit and capital markets continues into the foreseeable future.  The Debtors believe that it is important to Reorganized TXCO's business plan that the performance of Reorganized TXCO meets projected results in order to ensure continued support from vendors and customers.

(v)    Access to Vendors

The Debtors inability to satisfy their vendor obligations on a timely basis prior to and as a result of filing for bankruptcy protection may have resulted in irreparable harm to their relationships with them and their willingness to continue to do business with Reorganized TXCO in the future, under terms that would be acceptable to Reorganized TXCO.  Reorganized TXCO may be required to make advance payments for services, and some critical and/or uniquely qualified vendors may refuse to continue to do business with them, which would create additional liquidity challenges in the future and potentially prevent Reorganized TXCO from meeting their drilling and other operating obligations, and would result in material adverse consequences to Reorganized TXCO.

(vi)   Depletion of Reserves

Producing hydrocarbons from coal bed, shale and tight sands formations generally are characterized by declining production rates that vary depending upon the formations' characteristics and other factors.  Reorganized TXCO's future hydrocarbon reserves and

production, and, therefore, cash flow and income, will be highly dependent upon Reorganized TXCO's success in efficiently developing their current reserves.

(vii)  Uncertainties in Estimating Reserves and Future Net Cash Flows

The process of estimating quantities of proved reserves is complex and inherently imprecise. The process relies on interpretations of available geological, geophysical, engineering and production data.  The extent, quality and reliability of this data can vary. The process also requires a number of economic assumptions, such as natural gas and oil prices, drilling and operating costs and expenses, capital expenditures, taxes and the availability of funds.  Actual results will vary from these estimates and the differences may be material. Any significant variance could reduce the estimated quantities and present value of future net revenues.  The reserve data set forth in this Disclosure Statement are only estimates. There also can be no assurance that Reorganized TXCO's reserves will ultimately be produced within the periods anticipated.  In addition, the estimates of future net cash flows from proved reserves of Reorganized TXCO and the present value thereof are based upon certain assumptions about future production levels, prices and costs that may not be correct when compared to actual results.  The present value of estimated future net cash flows should not be construed as representative of the fair market value of the proved reserves owned by Reorganized TXCO since estimated future net cash flows are based upon projected cash flows, which do not provide for changes in oil and natural gas prices from those in effect on the date indicated or for changes in expenses and capital costs subsequent to such date.  The meaningfulness of such estimates is highly dependent upon the accuracy of the assumptions upon which they were based.

(viii)  Natural Gas and Oil Prices are Highly Volatile and Lower Prices will Negatively Affect Financial Results

Reorganized TXCO's revenue, profitability, cash flow and ability to borrow funds or obtain additional capital, as well as the carrying value of gas and oil properties, are substantially dependent on prevailing prices of natural gas and oil.  Historically, the markets for natural gas and oil have been volatile and those markets are likely to continue to be volatile in the future.  It is impossible to predict future natural gas and oil price movements with certainty. Prices for natural gas and oil are subject to wide fluctuation in response to relatively minor changes in the supply of and demand for natural gas and oil, market uncertainty and a variety of additional factors beyond Reorganized TXCO's control.  These factors include:

- the level of consumer demand for oil and natural gas;

- the domestic and foreign supply of oil and natural gas;

- the ability of the members of the Organization of Petroleum Exporting Countries to agree to and maintain oil price and production controls;

- the price of foreign oil and natural gas;

- domestic governmental regulations and taxes;

- the price and availability of alternative fuel sources;

- weather conditions, including hurricanes and tropical storms in and around the Gulf of Mexico;

- market uncertainty;

- political conditions in oil and natural gas producing regions, including the Middle East; and

- worldwide economic conditions.

Declines in natural gas and oil prices may materially adversely affect Reorganized TXCO's financial condition, results of operations, liquidity and ability to finance planned capital expenditures. Reorganized TXCO's future financial condition, results of operations and the carrying value of their oil and natural gas properties depend primarily upon the prices they receive for their oil and natural gas production. Current economic fundamentals portray a negative outlook for the oil and natural gas exploration and development business for at least a significant portion of 2010 due to low and volatile oil and natural gas prices coupled with a global recession. Oil prices are likely to affect Reorganized TXCO more than natural gas prices because approximately 56% of their proved reserves are oil.

The factors listed above and the volatility of the energy markets generally makes it extremely difficult to predict future oil and natural gas price movements with any certainty. Also, oil and natural gas prices do not necessarily move in tandem. Declines in oil and natural gas prices would not only reduce revenue, but could reduce the amount of oil and natural gas that Reorganized TXCO can produce economically and, as a result, could have a material adverse effect upon their financial condition, cash flows, results of operations, oil and natural gas reserves, the carrying values of their oil and natural gas properties and the amounts they can borrow under their bank credit facilities. If the oil and natural gas industry continues to experience significantly lower prices, Reorganized TXCO may, among other things, be unable to meet their financial obligations or make planned expenditures.

The prices Reorganized TXCO receives for their production and operations may actually vary from prices posted for national markets and exchanges for commodities. Reorganized TXCO intends to sell their natural gas based on the Houston Ship Channel index. Reorganized TXCO will sell their oil on the Flint Hills Resources postings. These prices may vary significantly from national markets for these commodities such as NYMEX. While the disparity between these markets is not significant today, these prices have diverged in the past and could diverge in the future.

(ix)   Reorganized TXCO's ability to market oil and natural gas may be limited.

Reorganized TXCO's ability to market oil and natural gas from their wells depends upon numerous factors beyond their control. These factors include, but are not limited to, the following:

- the level of domestic production and imports of oil and gas;

- the volatility of both oil and natural gas pricing;

- the proximity of natural gas production to natural gas pipelines;

- the availability of pipeline capacity;

- the demand for oil and natural gas by utilities and other end users;

- the availability of alternate fuel sites;

- the effect of inclement weather;

- state and federal regulation of oil and natural gas marketing; and

- federal regulation of natural gas sold or transported in interstate commerce.

If these factors were to change dramatically, Reorganized TXCO's ability to market oil and natural gas or obtain favorable prices for their oil and natural gas could be adversely affected.

     (x)    Reorganized TXCO cannot control activities on properties that they do not operate and will be unable to ensure their proper operation and profitability.

Reorganized TXCO will not operate most, if not all, of the properties in which they will retain an interest. As a result, Reorganized TXCO has limited ability to exercise influence over and control the risks associated with the operations of these properties. The failure of an operator of its wells to adequately perform operations, an operator's breach of the applicable agreements or an operator's failure to act in ways that are in Reorganized TXCO's best interests could reduce production and revenues. The success and timing of Reorganized TXCO's drilling and development activities on non-operated properties therefore depend upon a number of factors outside of their control, including the operator's:

- timing and amount of capital expenditures;

- expertise and financial resources;

- inclusion of other participants in drilling wells; and

- use of technology.

In the event that an operator of Reorganized TXCO's properties experiences financial difficulties, this may negatively impact Reorganized TXCO's ability to receive payments for their share of production that they would be entitled to under their contractual arrangements with such operator. While Reorganized TXCO seeks to minimize such risk by structuring their contractual arrangements to provide for proceeds of production to be paid directly to them by first purchasers of the hydrocarbons, there can be no assurance that Reorganized TXCO can do so in all situations covering their non-operated properties.

2752695.1

(xi)     Reorganized TXCO may not be able to keep pace with technological developments in their industry.

The natural gas and oil industry is characterized by rapid and significant technological advancements and introduction of new products and services which utilize new technologies.  As others use or develop new technologies, Reorganized TXCO may be placed at a competitive disadvantage or competitive pressures may force them to implement those new technologies at substantial costs.  In addition, other natural gas and oil companies may have greater financial, technical, and personnel resources that allow them to enjoy technological advantages and may in the future allow them to implement new technologies before Reorganized TXCO is able to implement such technologies.  Reorganized TXCO may not be able to respond to these competitive pressures and implement new technologies on a timely basis or at an acceptable cost. If one or more of the technologies Reorganized TXCO uses now or in the future were to become obsolete or if Reorganized TXCO was unable to use the most advanced commercially available technology, Reorganized TXCO's business, financial condition and results of operations could be materially adversely affected.

(xii)  Operating Hazards and Uninsured Risks

(1)     Economically Recoverable Oil and Natural Gas Reserves.

The rate of production from oil and natural gas properties declines as reserves are depleted.  As a result, Reorganized TXCO must locate and develop or acquire new oil and natural gas reserves to replace those being depleted by production.  Reorganized TXCO must do this even during periods of low oil and natural gas prices when it is difficult to raise the capital necessary to finance activities.  Without successful exploration or acquisition activities, their reserves and revenues will decline.  Reorganized TXCO may not be able to find and develop or acquire additional reserves at an acceptable cost or have necessary financing for these activities.

(2)     Distribution/Transportation Risk.

The marketability of Reorganized TXCO' production depends in part upon the availability, proximity, and capacity of oil and natural gas pipelines, crude oil trucking, natural gas gathering systems and processing facilities. Any significant change in market factors affecting these infrastructure facilities could harm their business. Reorganized TXCO transport their crude oil through pipelines and trucks that Reorganized TXCO do not own, and Reorganized TXCO deliver their natural gas through gathering systems and pipelines that Reorganized TXCO do not own.  These facilities may not be available to Reorganized TXCO in the future or may become inadequate for the oil and natural gas volumes produced.

(3)     Operating Hazards

Reorganized TXCO' operations are subject to risks inherent in the oil and natural gas industry, including, but not limited to, the following:

- blowouts;

- cratering;

- explosions;

- uncontrollable flows of oil, natural gas or other fluids;

- fires;

- pollution; and

- other environmental risks.

These risks could result in substantial losses to Reorganized TXCO from injury and loss of life, damage to and destruction of property and equipment, pollution and other environmental damage and suspension of operations. Governmental regulations may impose liability for pollution damage or result in the interruption or termination of operations.

(4)     Uninsured Risks

Although Reorganized TXCO maintains several types of insurance to cover their operations, Reorganized TXCO may not be able to maintain adequate insurance in the future at rates Reorganized TXCO considers reasonable, or losses may exceed the maximum limits under their insurance policies.  If a significant event that is not fully insured or indemnified occurs, it could materially and adversely affect their financial condition and results of operations.

(xiii) Reserve Estimates

While estimates of Reorganized TXCO's oil and natural gas reserves, and future net cash flows attributable to those reserves, were prepared by independent petroleum engineers, there are numerous uncertainties inherent in estimating quantities of proved reserves and cash flows from such reserves, including factors beyond their control and the control of engineers. Reserve engineering is a subjective process of estimating underground accumulations of oil and natural gas that cannot be measured in an exact manner. The accuracy of an estimate of quantities of reserves, or of cash flows attributable to these reserves, is a function of many factors, including, but not limited to, the following:

- the available data;

- assumptions regarding future oil and natural gas prices;

- estimates of future production rates;

- expenditures for future development and exploitation activities; and

- engineering and geological interpretation and judgment.

Reserves and future cash flows may also be subject to material downward or upward revisions based upon production history, development and exploitation activities and oil and natural gas prices.   Actual future production, revenue, taxes, development expenditures, operating expenses, quantities of recoverable reserves and the value of cash flows from those

reserves may vary significantly from the estimates. In addition, reserve engineers may make different estimates of reserves and cash flows based on the same available data. For the reserve calculations, oil was converted to natural gas equivalent at six mcf of natural gas for one Bbl of oil. This ratio approximates the energy equivalency of natural gas to oil on a Btu basis. However, it may not represent the relative prices received from the Operational of Reorganized TXCO's oil and natural gas production.

The estimated quantities of proved reserves and the discounted present value of future net cash flows attributable to those reserves included in this document were prepared by independent petroleum engineers in accordance with the rules of the SFAS No. 69 and the SEC. These estimates are not intended to represent the fair market value of its reserves. The future net cash flows are based upon the prices received on December 31 of each year.

During 2008, the SEC approved new rules related to the estimation of reserves. These new rules are effective for fiscal years ending on or after December 31, 2009. These rules change, among other things, the prices to be used for estimation of reserves, from a year-end price to an average price for the prior 12 months, and remove the prohibition against counting as reserves future production of oil or natural gas related to unconventional reservoirs such as coal-bed methane, oil sands and shales.

### (xiv) Government Laws and Regulations

Reorganized TXCO's operations will be affected from time to time in varying degrees by political developments and federal and state laws and regulations. In particular, hydrocarbon production, operations and economics are or have been in the past affected by price controls, taxes and other laws relating to the hydrocarbon industry, by changes in such laws and by changes in administrative regulations. Reorganized TXCO cannot predict how existing laws and regulations may be interpreted by enforcement agencies or court filings, whether additional laws and regulations will be adopted or the effect such changes may have on Reorganized TXCO's business or financial condition.

Reorganized TXCO's operations will be subject to complex and constantly changing environmental laws and regulations adopted by federal, state and local governmental authorities. The discharge of oil, natural gas, oil and natural gas exploration and production wastes or other pollutants into the air, soil or water may give rise to liabilities on the part of Reorganized TXCO to the government or third parties and may require Reorganized TXCO to incur costs of remediation. No assurance can be given that existing environmental laws or regulations, as currently interpreted or reinterpreted in the future, or future laws or regulations, will not materially and adversely affect Reorganized TXCO's operations and financial condition or that material indemnity claims will not arise against Reorganized TXCO with respect to properties acquired or sold by the Debtors.

### (xv) Risks of Hedging Arrangements

The Debtors have historically entered into hedging arrangements and Reorganized TXCO may do so in the future. Such arrangements may limit potential gains by Reorganized TXCO if prices of the underlying contracts were to rise substantially over the price established by the

hedges and may expose Reorganized TXCO to the risk of financial loss in certain circumstances, including possible instances where Reorganized TXCO's production is less than expected or there is an unexpected event materially affecting prices. Hedging arrangements generally will provide for Reorganized TXCO to receive or make counterparty payments on the differential between a fixed price and a variable indexed price for the underlying commodity under the arrangement. If the Reorganized TXCO elect to enter into one or more hedging arrangements, there will be potential exposure to the credit risk of nonperformance by any hedging counterparties, which generally can be quantified as the amount of unrealized gains under the contracts.

(xvi)   Reorganized TXCO Faces Strong Competition from Other Energy Companies

Reorganized TXCO will encounter competition from other natural gas and oil companies in all areas of their operations, including the acquisition of exploratory prospects and proven properties. Competitors include major integrated natural gas and oil companies and numerous independent natural gas and oil companies and drilling and income programs. Many competitors are large, well-established companies that have been engaged in the natural gas and oil business much longer than the Debtors have and possess substantially larger operating staffs and greater capital resources. These companies may be able to pay more for exploratory projects and productive natural gas and oil properties and may be able to define, evaluate, bid for and purchase a greater number of properties and prospects than Reorganized TXCO's financial or human resources permit. In addition, these companies may be able to expend greater resources on the existing and changing technologies that will be increasingly important to attaining success in the industry. Such competitors may also be in a better position to secure oilfield services and equipment on a timely basis or on favorable terms. Reorganized TXCO may not be able to conduct operations, evaluate and select suitable properties and consummate transactions successfully in this highly competitive environment.

Section 8.4.   Financial Information; Disclaimer

(i)    Information Presented Is Based On the Debtors' Books and Records, and No Audit Was Performed

While the Debtors' management has reviewed the financial information provided in this Disclosure Statement and the Debtors have endeavored to present information fairly in this Disclosure Statement, because of the complexity of Debtors' financial matters, the Debtors' books and records upon which this Disclosure Statement is based might be incomplete or inaccurate. The financial information contained herein, or incorporated by reference into, this Disclosure Statement, unless otherwise expressly indicated, is unaudited.

Section 8.5.   Factors Affecting the Value of the Securities to be issued under the Plan

(i)    The New Equity Issued Pursuant to the Plan May Be Illiquid

The New Common Stock to be issued pursuant to the Plan are securities for which there is currently no market, and there can be no assurance as to the development or liquidity of any market of the New Common Stock. It is not intended that Reorganized TXCO will apply to list the New Common Stock on any securities exchange. If a trading market does not develop or is

not maintained, holders of the New Common Stock may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors, including, without limitation, prevailing interest rates, markets for similar securities, industry conditions and the performance of, and investor expectations for, Reorganized TXCO.

Furthermore, Persons to whom the New Common Stock is issued pursuant to the Plan may prefer to liquidate their investments rather than hold such securities on a long-term basis. Accordingly, any market that does develop for such securities may be volatile. Other factors, such as the current intention of Reorganized TXCO not to pay dividends for the foreseeable future, may further depress any market for the New Common Stock.

(ii) Exemption from Registration

Holders of certain Allowed Claims will receive shares of New Common Stock pursuant to the Plan. Section 1145(a)(1) of the Bankruptcy Code exempts the offer or Operational of securities under a plan of reorganization from registration under section 5 of the Securities Act and state laws if three principal requirements are satisfied: (1) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (2) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor or such affiliate; and (3) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or such affiliate, or "principally" in such exchange and "partly" for cash or property. In reliance upon this exemption, the Debtors believe that the offer and Operational of the New Common Stock under the Plan will be exempt from registration under the Securities Act and state securities laws.

In addition, the Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption. Accordingly, such securities generally may be resold without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by section 4(1) of the Securities Act, unless the holder is an "underwriter" (see discussion below) with respect to such securities, as that term is defined under the Bankruptcy Code. In addition, such securities generally may be resold without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirement or conditions to such availability.

(iii) Subsequent Transfers of New Securities.

Section 1145(b) of the Bankruptcy Code defines the term "underwriter" for purposes of the Securities Act as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (2) offers to sell securities offered or

sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under the plan from the holders of such securities, if the offer to buy is: (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or Operational of securities under the plan; or (4) is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

The term "issuer" is defined in section 2(a)(4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor (or its successor) under a plan of reorganization may be deemed to be a "control person," particularly if such management position is coupled with the ownership of a significant percentage of the debtor's (or successor's) voting securities. Ownership of a significant amount of voting securities of a reorganized debtor could also result in a person being considered to be a "control person."

To the extent that persons deemed to be "underwriters" receive New Common Stock or New Notes pursuant to the Plan, Operationals by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such persons would not be permitted to resell such New Common Stock or New Notes, as the case may be, unless such securities were registered under the Securities Act or an exemption from such registration requirements were available. Entities deemed to be statutory underwriters for purposes of section 1145 of the Bankruptcy Code may, however, be able, at a future time and under certain conditions, to sell securities without registration pursuant to the reOperational provisions of Rule 144 under the Securities Act or another available exemption under the Securities Act.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Common Stock or New Notes to be issued pursuant to the Plan, or an "affiliate" of Reorganized Debtors, would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any such person would be such an "underwriter" or "affiliate." PERSONS WHO RECEIVE NEW COMMON STOCK OR NEW NOTES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE SECURITIES LAW AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE NEW COMMON STOCK OR NEW NOTES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS

DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, THE DEBTORS ENCOURAGE EACH NOTEHOLDER AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE NEW COMMON STOCK OR NEW NOTES.

    (iv)    Reorganized TXCO Does Not Expect to Make Distributions on the Reorganized TXCO Common Stock for the Foreseeable Future

The Debtors do not expect Reorganized TXCO to declare dividends in the foreseeable future with respect to the Reorganized TXCO Common Stock, which may adversely affect the market for and value of such equity.

Section 8.6.    Factors Affecting the Debtors

    (i)    The Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Court.

    (ii)    No Representations outside the Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the Debtors' counsel, Committee counsel, or the Office of the United States Trustee.

    (iii)    All Information Was Provided by the Debtors and Was Relied Upon By Professionals

Counsel for and other professionals retained by the Debtors have relied upon information provided by the Debtors in connection with preparation of this Disclosure Statement. Counsel for and other professionals retained by the Debtors have not independently verified the information contained herein.

(iv)   This Disclosure Statement Was Not Approved By the SEC

Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

(v)   No Legal or Tax Advice Is Provided To You by This Disclosure Statement

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR HOLDER OF EQUITY INTEREST SHOULD CONSULT HIS, HER OR ITS OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS, HER, OR ITS CLAIM OR EQUITY INTEREST. THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN OR OBJECT TO CONFIRMATION OF THE PLAN.

(vi)   No Admissions Made

Nothing contained herein shall constitute an admission of any fact or liability by any party (including, without limitation, the Debtors) or to be deemed evidence of the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Equity Interests.

(vii)   Environmental Liability Factors

The Debtors are subject to the requirements of federal, state and local environmental and occupational health and safety laws and regulations.  Reorganized TXCO's operations may involve hazardous substances. Further, some facilities had prior owners who may have had operations that involved hazardous substances. Reorganized Debtors may be held liable for any contamination at any current or former properties or at a location where the Debtors have disposed of waste.

(viii) Pending Litigation or Demands Asserting Prepetition Liability

The Debtors are currently involved in various legal proceedings arising in the ordinary course of business operations. These actions are subject to the automatic stay as set forth in section 362 of the Bankruptcy Code unless relief from this automatic stay has been granted to pursue any particular action. To the extent claims arise, and are ultimately allowed, the Debtors believe they will be General Unsecured Claims. The Debtors' more significant pending prepetition litigation includes the matters described on Exhibit "M" to this Disclosure Statement.

THESE DISCLOSURE STATEMENT FACTORS CONTAIN FORWARD- LOOKING STATEMENTS. AS A GENERAL MATTER, FORWARD-LOOKING STATEMENTS ARE THOSE FOCUSED UPON FUTURE OR ANTICIPATED EVENTS OR TRENDS AND EXPECTATIONS AND BELIEFS RELATING TO MATTERS THAT ARE NOT HISTORICAL IN NATURE. THE WORDS "BELIEVE," "EXPECT," "PLAN," "INTEND," "ESTIMATE" OR "ANTICIPATE" AND SIMILAR EXPRESSIONS, AS WELL AS FUTURE OR CONDITIONAL VERBS SUCH AS "WILL," "SHOULD," "WOULD" AND "COULD,"

OFTEN IDENTIFY FORWARD- LOOKING STATEMENTS. THERE IS A REASONABLE BASIS FOR THE EXPECTATIONS AND BELIEFS, BUT THEY ARE INHERENTLY UNCERTAIN, AND THE EXPECTATIONS MAY NOT BE REALIZED AND THE BELIEFS MAY NOT PROVE CORRECT. WE UNDERTAKE NO OBLIGATION TO PUBLICLY UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENT, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE. THE ACTUAL RESULTS AND FUTURE FINANCIAL CONDITION MAY DIFFER MATERIALLY FROM THOSE DESCRIBED OR IMPLIED BY ANY SUCH FORWARD LOOKING STATEMENTS AS A RESULT OF MANY FACTORS THAT MAY BE OUTSIDE THE DEBTORS' CONTROL. SUCH FACTORS INCLUDE, WITHOUT LIMITATION: GENERAL ECONOMIC CONDITIONS; CHANGES IN THE OIL AND GAS BUSINESS ENVIRONMENT; FEDERAL REGULATION OF THE OIL AND GAS INDUSTRY; COMPETITION FROM EXISTING AND POTENTIAL COMPETITORS; ABILITY TO COMPLETE THE REORGANIZATION IN A TIMELY MANNER; INCREASES IN THE COSTS OF BORROWINGS AND UNAVAILABILITY OF ADDITIONAL DEBT OR EQUITY CAPITAL; IMPACT OF OUR SUBSTANTIAL INDEBTEDNESS ON OUR OPERATING INCOME AND OUR ABILITY TO GROW; THE COST OF LABOR; LABOR DISPUTES; INCREASED INSURANCE COSTS; UNCERTAINTY OF MARKET PRICES FOR HYDROCARBONS PRODUCED BY THE DEBTORS OR REORGANIZED DEBTORS AND OTHER COSTS AND EXPENSES. THIS LIST OF FACTORS AND THE OTHER FACTORS DISCUSSED HEREIN ARE NOT INTENDED TO BE EXHAUSTIVE.

## ARTICLE IX
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Operational Plan is not confirmed and consummated, the alternatives to the Plan include:  (a) the Operational Plan, and (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

Section 9.1.    Alternative Plan of Reorganization

If the Operational Plan is not confirmed, the Debtors would propose confirmation of the Operational Plan.  With respect to the Operational Plan, the Debtors have explored various alternatives in connection with the formulation and development of the Operational Plan.  The Debtors believe that the Operational Plan, as described herein, enables creditors to realize the most value under the circumstances and would urge parties to vote in favor of the Operational Plan.

Section 9.2.    Liquidation under Chapter 7

If no plan can be confirmed, the Debtors' Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed (or elected) to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Equity Interests and the Debtors' liquidation analysis is set forth in Exhibit ___.  The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of: {a) the

likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time; (b) additional administrative expenses involved in the appointment of a trustee; and (c) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

## ARTICLE X
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plans to the Debtors and Reorganized TXCO, and certain Holders of Claims and Interests, and should not be relied upon for purposes of determining the specific tax consequences of the Plans with respect to any particular Holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Legislative, judicial or administrative changes or new interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan. Any such changes or new interpretations may have retroactive effect and could significantly affect the federal income tax consequences of the Plan.

The U.S. federal income tax consequences of the Plans are complex and are subject to significant uncertainties. The Debtors have not requested and will not request a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plans to (i) special classes of taxpayers (such as Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, investors in pass-through entities and Holders of Claims who are themselves in bankruptcy) or (ii) Holders not entitled to vote on the Plan, including Holders whose Claims or Interests are entitled to reinstatement or payment in full in cash under the Plans or Holders whose Claims or Interests are to be extinguished without any distribution.

This discussion assumes that the various debt and other arrangements to which the Debtors are a party will be respected for federal income tax purposes in accordance with their form. Furthermore, this discussion assumes that Holders of Claims or Interests hold only Claims or Interests in a single Class. Holders of multiple Classes of Claims or Interests should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS

NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE TO THEM UNDER THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE UNITED STATES INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) (1) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE, AND (2) IS WRITTEN TO SUPPORT THE PROMOTION, MARKETING OR PROMOTION OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

Section 10.1.    Tax Status of the Debtors

For federal income tax purposes, TXCO Resources Inc. is the parent of an affiliated group of corporations that includes certain Debtors and certain of their corporate subsidiaries that join in the filing of a consolidated federal income tax return (collectively, the "TXCO Tax Group").  The consolidated net operating loss ("NOL") carryforwards of the TXCO Tax Group for U.S. federal income tax purposes are expected to be at least $238,961,979 as of June 30, 2009.  Of this amount, $65,529,170 is subject to an annual limitation of $21,502,948 as a result of a prior change of control pursuant to section 382 of the Tax Code.

As discussed below, in connection with the implementation of the Plan, the amount of the Debtors' NOL carryforwards may be reduced or eliminated and the tax basis of the Debtors' assets may be reduced.  In addition, Reorganized TXCO's utilization of any losses, any remaining NOL carryforwards, and certain other tax attributes may be restricted following the Effective Date.

1.    COD Income

Generally, a taxpayer must recognize cancellation of indebtedness ("COD") income to the extent that the taxpayer's indebtedness is discharged for less than the amount of the indebtedness. For this purpose, COD income is the amount by which the discharged indebtedness exceeds any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income (as in the case where the payment of the cancelled debt would have given rise to a tax deduction).  The amount of consideration paid to a creditor generally would equal the amount of cash, the fair market value of property (including stock), and/or the issue price of any new debt instrument paid to such creditor.  If a new debt instrument is issued to the creditor, then the issue price of such debt instrument is determined under either section 1273 or 1274 of the Tax Code.  Generally, these provisions treat the fair market value of a publicly-traded debt instrument as its issue price and

the stated principal of any other debt instrument as its issue price if its terms provide for adequate stated interest.

The Tax Code provides that a debtor in bankruptcy is entitled to exclude its COD income from its gross income, but is required to reduce its tax attributes — such as NOL carryforwards, current year NOLs, tax credits, and tax basis in assets — by the amount of the excluded COD income. Recently issued Treasury Regulations address the application of the rules for the reduction of tax attributes in situations where a member of a U.S. consolidated group recognizes excluded COD income. Under the ordering rules of the Treasury Regulations, the tax attributes of the separate debtor member are reduced first (including its tax basis in its assets and the stock of its subsidiaries). In this regard, the Treasury Regulations adopt a "tier-down" approach such that, if the debtor reduces its tax basis in its stock in a member of the consolidated group, corresponding reductions must be made to that member's tax attributes, including such member's tax basis in its assets. To the extent that the amount of excluded COD income exceeds the tax attributes of the separate debtor member, the Treasury Regulations generally require the reduction of certain consolidated tax attributes of all members (e.g., NOLs, capital loss carryovers and credits), but do not require the reduction of the tax basis in their assets. To the extent that the amount of excluded COD income exceeds the tax attributes available for reduction, the remaining COD income continues to be excluded from gross income. Generally, a debtor is required to reduce its tax attributes with respect to excluded COD income after the calculation of its tax for the year in which its debt is discharged. However, recently issued Treasury Regulations provide that in the case of certain tax-free reorganizations resulting in the close of the debtor's taxable year, the required reduction of the debtor's tax attributes occurs immediately prior to such transaction.

Under section 108(b)(5) of the Tax Code, a debtor that realizes excluded COD income can elect to reduce its tax basis in depreciable assets prior to the reduction of its other tax attributes, with any remaining COD income applied next to reduce NOLs and other tax attributes in the prescribed statutory order. In addition, under section 1017(b)(3)(D) of the Tax Code, a debtor can elect to treat the stock of a subsidiary in its consolidated group as a depreciable asset to the extent that the subsidiary consents to a corresponding reduction in the tax basis of its depreciable assets.

As a result of the discharge of a portion of the Allowed Claims in exchange for consideration that does not constitute full satisfaction of such Allowed Claims, the Debtors will realize COD income. The extent of such COD income will depend, in significant part, on the value of the New Common Stock and other property that is distributed pursuant to the Plan. It is anticipated that the Debtors will recognize a significant amount of COD income. The actual amount of such COD income cannot be determined prior to the Effective Date.

Because the Debtors will realize COD income with respect to the discharge of the Allowed Claims as a result of the Plan, they will not be required to include such COD income in gross income, but will be required to reduce certain of their tax attributes by the amount of the excluded COD income. As a result of the implementation of the Plan, the required reduction of the tax attributes of the Debtors is expected to occur at the end of the tax year of the TXCO Tax Group that includes the Effective Date.

Under the rules for the reduction of tax attributes, the amount of excluded COD income that is realized by TXCO will be applied first to reduce TXCO's NOL carryforwards and certain other tax attributes, including its tax basis in its assets. To the extent that the amount of excluded COD income exceeds such tax attributes, it would be applied then to reduce the consolidated tax attributes of other members of the TXCO Tax Group to the extent that such attributes could offset income of TXCO. TXCO may elect to reduce its tax basis in depreciable assets prior to the reduction of its NOLs and other tax attributes. In addition, TXCO may elect under section 1017(b)(3)(D) of the Tax Code to treat the stock of its direct U.S. subsidiaries as depreciable assets. In such event, each subsidiary the stock of which is treated as a depreciable asset must reduce the tax basis of its depreciable assets in an amount equal to any reduction in the tax basis of the subsidiary stock. TXCO has not determined whether it will make these elections.

Similar rules will apply with respect to COD income that is realized by other Debtors. The above-described elections are made separately for each Debtor that is a taxpayer. The Debtors have not determined whether they will make elections first to reduce their basis in depreciable assets or to treat the stock of direct U.S. subsidiaries as depreciable assets.

The extent to which NOLs and other tax attributes remain following the required reduction of tax attributes, and the extent of the reduction in the tax basis of the Debtors' assets, will depend upon a number of factors, including (i) the amount of gain recognized as a result of the proposed transactions that are part of the Plan; (ii) the amount of the COD income; and (iii) whether these above-described elections are made by TXCO and/or the other Debtors. However, based on the estimated reorganization value, it is anticipated that the Debtors will retain a significant amount of NOL carryforwards and asset basis after the reductions with respect to excluded COD income.

2.      Limitation on Net Operating Loss Carryforwards and Other Tax Attributes

Following the implementation of the Plan, any remaining NOL and tax credit carryforwards and, possibly, certain other tax attributes of the Debtors allocable to periods prior to the Effective Date (collectively, "pre-change losses") may be subject to limitation as a result of a change in ownership of the Debtors.

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change" and does not qualify for (or elects out of) the Bankruptcy Exception (as discussed below), then the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation. Such annual limitation may also apply to certain losses or deductions that are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change and recognized within five years beginning on the date of such ownership change. See discussion under "U.S. Federal Income Tax Consequences to the Debtors - Limitation on Net Operating Loss Carryforwards and Other Tax Attributes - Built-in Gains and Losses."

Pursuant to the Plan, it is expected that all of the existing Equity Interests in TXCO will be cancelled, TXCO will be reorganized as New TXCO, and the holders of certain Allowed Claims will receive New Common Stock. As a result, the Debtors will undergo an ownership change as a result of the Plan and, unless the TXCO Tax Group qualifies for and does not elect

out of the Bankruptcy Exception (as discussed below), the Debtors' pre-change losses will be subject to an annual limitation (as discussed below).

(i)  General Section 382 Limitation

In general, unless the Bankruptcy Exception applies (as discussed below), the amount of the annual limitation on the utilization of pre-change NOLs to which a corporation (or a consolidated group) would be subject is equal to (i) the fair market value of the stock of the corporation (or in the case of a consolidated group, the stock of the common parent and the stock of any other member that is not owned by a member of the group) immediately before the ownership change (with certain adjustments), multiplied by (ii) the highest federal "long-term tax-exempt rate" in effect for any month in the three-calendar-month period ending with the month in which the ownership change occurs (the "Annual Limitation"). For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan of reorganization, the stock value generally is determined immediately after (rather than before) the ownership change, and certain adjustments that ordinarily would apply do not apply.

Unless the Bankruptcy Exception applies, for any taxable year ending after an ownership change, the pre-change NOLs that can be used in that year to offset taxable income of the corporation cannot exceed the amount of the Annual Limitation. Any unused Annual Limitation may be carried forward, thereby increasing the Annual Limitation in the subsequent taxable year. However, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its assets in a new business for two years after the ownership change, the Annual Limitation resulting from the ownership change is zero. Furthermore, if the corporation (or the consolidated group) undergoes a second ownership change, the second ownership change may result in a lesser (but never greater) Annual Limitation with respect to any losses that existed at the time of the first ownership change.

In the case of the Debtors, the utilization of pre-change NOLs will be limited on an annual basis to the fair market value of the New Common Stock immediately after the date on which the ownership change occurs, multiplied by the highest federal "long-term tax-exempt rate" in effect for any month in the three-calendar-month period ending with the month in which the ownership change occurs. The long-term tax-exempt rate in effect for September 2009 is 4.48 percent.

(ii)  Built-in Gains and Losses

Under certain circumstances, section 382 of the Tax Code also limits the deductibility of certain built-in losses that are recognized during the five years following the date of the ownership change. In particular, if a loss corporation (or loss consolidated group or subgroup) has a net unrealized built-in loss at the time of an ownership change (taking into account its assets and items of "built-in" income and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as a pre-change loss and will be subject to the Annual Limitation. Conversely, if the loss corporation (or loss consolidated group or subgroup) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years

(up to the amount of the original net unrealized built-in gain) generally will increase the Annual Limitation in the year recognized, such that the loss (or loss consolidated group or subgroup) would be permitted to use its pre-change losses in addition to its regular Annual Limitation. Under current law, it is unclear whether COD income will be taken into account as an item of built-in income for purposes of determining whether the Debtors have a net unrealized built-in gain or loss.

Although the rules applicable to net unrealized built-in losses generally apply to consolidated groups on a consolidated basis, a corporation that joins the consolidated group within five years prior to the ownership change may not be taken into account in the computation of the group's net unrealized built-in loss. In such event, the limitation on such corporation's built-in losses, if any, would be determined separately from that of the group. Nevertheless, such corporation would be taken into account in determining whether the consolidated group has a net unrealized built-in gain. In general, a loss corporation's (or loss consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of: (i) $10 million, or (ii) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

Unless the Bankruptcy Exception (as discussed below) applies, or COD income is included in the determination of net unrealized built-in gain or loss, TXCO and the other Debtors may have a net unrealized built-in loss in their assets, and the ability of these entities to utilize such losses could be limited.

(iii) Bankruptcy Exception

Under section 382(l)(5) of the Tax Code, an exception to the foregoing Annual Limitation rules generally applies where (i) shareholders of the debtor immediately before an ownership change, and (ii) qualified (so-called "historic") creditors of the debtor, in respect of their claims, receive stock with at least 50 percent of the vote and value of all the stock of the reorganized debtor (or of a controlling corporation if such corporation is also in bankruptcy) pursuant to a confirmed bankruptcy plan of reorganization (the "Bankruptcy Exception"). For this purpose, a "historic creditor" is a creditor that (i) held its indebtedness for at least eighteen months before the date on which the debtor filed its petition with the Bankruptcy Court, or (ii) whose indebtedness arose in the ordinary course of the business of the debtor and is held by the creditor who at all times was the beneficial owner of such claim. In determining whether the Bankruptcy Exception applies, certain holders of creditor claims that would own directly or indirectly less than 5 percent of the total fair market value of the stock of the debtor pursuant to the bankruptcy plan of reorganization are presumed to have held their claims since the origination of such claims. The Bankruptcy Exception applies to a reorganized debtor pursuant to a confirmed bankruptcy plan of reorganization unless the debtor files an election for the Bankruptcy Exception not to apply. Such an election must be filed with its tax return that includes the effective date of such bankruptcy plan of reorganization.

Under the Bankruptcy Exception, a debtor's pre-change losses are not subject to the Annual Limitation, but instead are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the year that includes the effective date of the reorganization, and during the part of the taxable year that includes the

reorganization, in respect of all debt converted into stock in the bankruptcy proceeding. Moreover, if the Bankruptcy Exception applies, an ownership change of the debtor within a two-year period after the consummation of the bankruptcy plan of reorganization will preclude the debtor's future utilization of any pre-change losses existing at the time of such ownership change.

For purposes of the Bankruptcy Exception, the New Common Stock received by the holders of Allowed Claims against the Debtors should be included in the 50 percent calculation if and to the extent that, such holders constitute "historic creditors" of TXCO ("Historic TXCO Creditors"). A Historic TXCO Creditor is a holder of a TXCO Debtor Claim that: (i) was held by such holder since November 17, 2007 (the date that is eighteen months before the day in which the Debtors filed their petition with the Bankruptcy Court), or (ii) arose in the ordinary course of business and is held by the person who at all times was the beneficial owner of such Allowed Claim. In determining whether the Bankruptcy Exception applies, certain holders of Allowed Claims that would own directly or indirectly less than 5 percent of the total fair market value of New Common Stock pursuant to the Plan are presumed to have held their Allowed Claims since the origination of such Allowed Claims.

In order to preserve the potential applicability of the Bankruptcy Exception to TXCO's and the other Debtors' pre-change losses, the Debtors sought and received an order from the Bankruptcy Court requiring advance notification of transfers of certain interests in the Debtors. The order provided that the failure to follow the procedures set forth therein as they applied to transferring equity securities of the Debtors would make such transfer *void ab initio*. On May 31, 2009, Heartland Advisors, Inc., the owner of approximately 9.1% of issued and outstanding shares of TXCO sold all of its shares without complying with the provisions set forth in the order. The Debtors are currently analyzing whether the transfer had any adverse consequences to the Debtors' use of the NOLs. The Debtors have not yet determined if they will assert that the transfer of shares was void.

The Company believes that the Bankruptcy Exception should apply to the ownership change on the Effective Date because the New Common Stock owned by those persons who are shareholders of TXCO immediately before the ownership change, together with the New Common Stock received by holders of Allowed Claims against the TXCO Debtors pursuant to the Plan, will comprise 50 percent or more of the value of all of the New Common Stock. If the Company is eligible for and does not elect out of the Bankruptcy Exception, although the Annual Limitation will not restrict the deductibility of the Debtors' pre-change losses, the Debtors' pre-change losses will be reduced by any interest paid or accrued by the Debtors during the three taxable years preceding the taxable year in which the ownership change occurs, and during the portion of the taxable year of the ownership change, with respect to all Allowed Claims that are converted into New Common Stock. The Debtors can elect not to have the Bankruptcy Exception apply, in which event the Annual Limitation would apply. Such election would have to be made in the Debtors' U.S. federal income tax return for the taxable year that includes the Effective Date.

As discussed above, if the Bankruptcy Exception applies, a subsequent ownership change with respect to Reorganized TXCO that occurs within two years after the Effective Date will result in the loss of the Bankruptcy Exception and the reduction to zero of the Annual Limitation

that would otherwise be applicable to the subsequent ownership change. Thus, a subsequent ownership change within two years after the Effective Date would eliminate the ability of a Debtor to use its pre-change losses after that ownership change. In order to avoid a subsequent ownership change and protect these tax attributes, in certain circumstances the Debtors would restrict for a period of two years after the Effective Date the transfer of New Common Stock to a holder which, after such transfer, would hold 5 percent or more of the total fair market value of New Common Stock ("Transfer Restriction"). See "The Chapter 11 Plan — Description of Certain Securities to be Issued Pursuant to the Plan — New Common Stock". The purpose of the Transfer Restriction is to reduce the risk that a change in ownership of New TXCO may result in the loss or reduction of federal income tax attributes of New TXCO and its subsidiaries for purposes of sections 382 and 383 of the Tax Code.

With respect to New Common Stock attributable to Claims or Equity Interests that are not Allowed Claims or Allowed Equity Interests, excluding shares of New Common Stock issued under any Management Incentive Program, such shares will be issued on the Effective Date and placed in escrow pending resolution of such Contested Claims. To the extent that a Contested Claim is subsequently allowed, payments and distributions of New Common Stock will be made from the Escrowed Distribution Account to the holder of such claim in accordance with the provisions of the Plan governing the class of Claims to which the respective holder belongs. A holder receiving a distribution from the Escrowed Distribution Account should be treated as if it had owned such New Common Stock as of the Effective Date, so that a distribution of shares from the Escrowed Distribution Account should not create a subsequent ownership change for purposes of the Bankruptcy Exception. However, the IRS could take a different view and instead treat such holder as receiving New Common Stock at the time such shares are actually distributed from the Escrowed Distribution Account, in which case, such transfer may be applied towards determining whether there is an ownership change after the Effective Date.

The Debtors believe that the Bankruptcy Exception may be advantageous as compared to the Annual Limitation. Thus, the Debtors currently intend to apply the Bankruptcy Exception and to restrict the transfer of New Common Stock. The determination of whether to apply the Bankruptcy Exception will be reassessed prior to the filing of the consolidated U.S. federal tax return of TXCO and its subsidiaries for the year that includes the Effective Date.

Section 10.2. Generally Applicable U.S. Federal Income Tax Consequences of the Exchanges Pursuant to the Plans to Holders of Allowed Claims Receiving Direct Distributions under the Plans

Pursuant to the Plans, certain holders of Allowed Claims will receive, in exchange for and in full satisfaction and discharge of such Claims, cash in some cases, and in other cases non-cash assets (i.e., New Common of the Reorganized TXCO being issued pursuant to the Plan).

(i)     Tax Consequences of the Exchanges.

For U.S. federal income tax purposes, the holders of Allowed Claims will be treated as exchanging their Claims for cash, New Notes, as applicable to the class in which such holder's Allowed Claim is included. Each holder may recognize gain or loss equal to the difference

between (i) the sum of the amount of cash (if any), the fair market value as of the Effective Date of the Reorganized TXCO Common Stock (if any) received (in each case, to the extent not allocable to accrued interest not previously included in taxable income) (in the case of any Holder, the "Applicable Consideration") and (ii) the Holder's adjusted tax basis in the Claims surrendered. The amount, and the character of any gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss, will be determined by a number of factors, including, the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the Holder had previously claimed a bad debt deduction in respect of the Claim.

(ii)    Accrued but Unpaid Interest.

To the extent that a portion of the Applicable Consideration received by a Holder in the exchange is allocable to accrued but unpaid interest not previously included by the recipient Holder in taxable income, such amount should be taxable to the Holder as interest income. Conversely, a Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Claim or Interest was previously included in the Holder's gross income but was not paid (or treated as paid) in full by the Debtors.

Although the manner in which Applicable Consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Applicable Consideration paid pursuant to the Plans shall be allocated, pursuant to the Plan, first to the principal amount of such Claim as determined for federal income tax purposes and then to accrued interest, if any, with respect to such Claim. Accordingly, in any case where a Holder receives distributions under the Plans having a value less than the principal amount of its Claim, the Debtors will allocate the full amount of consideration transferred to such Holder to the principal amount of such obligation and will not treat any amount of the consideration to be received by such Holder as attributable to accrued interest. There is no assurance that such allocation will be respected by the IRS for federal income tax purposes.

(iii)    Market Discount.

A Holder that purchased its Allowed Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a Holder of an Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the Allowed Claim. In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument (excluding "qualified stated interest") or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the Allowed Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity). In addition, for holders whose Applicable Consideration is Reorganized TXCO Common Stock, under section 108(e)(7) of the Tax Code, any gain recognized on the subsequent

Operational, exchange, redemption or other disposition will be treated as ordinary income to the extent the Holder of the surrendered Claim previously claimed ordinary loss deductions with respect to the surrendered Claim.

     (iv)   Bad Debt and/or Worthless Security Deduction.

A Holder who, under the Plan, receives in respect of a Claim an amount less than the Holder's tax basis in the Claim may be entitled to a bad debt deduction in some amount under section 166(a) of the Tax Code or a worthless security deduction under section 165 of the Tax Code. The rules governing character, timing and amount of bad debt or worthless security deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of a Claim therefore are urged to consult their tax advisors with respect to their ability to take such a deduction.

     Section 10.3.   Certain U.S. Federal Income Tax Consequences to Recipients of Interests in Creditor Trusts

     (a)      Tax Consequences of the Exchanges.

For U.S. federal income tax purposes, the recipients of beneficial interests in the various Creditor Trusts will be treated as exchanging their Claims for either cash, Reorganized TXCO Common Stock and a Trust Certificate reflecting a *pro rata* interest in a Creditor Trust, as applicable to the class in which such recipient's Allowed Claim is included. Each recipient may recognize gain or loss equal to the difference between (i) the sum of the amount of cash (if any), the fair market value as of the Effective Date of the Reorganized TXCO Common Stock (if any) (in each case, to the extent not allocable to accrued interest not previously included in taxable income) (in the case of any recipient, the "Applicable Consideration") and (ii) the recipient's adjusted tax basis in the Claims surrendered. The amount, and the character of any gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss, will be determined by a number of factors, including, the tax status of the recipient, whether the Claim constitutes a capital asset in the hands of the recipient and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the recipient had previously claimed a bad debt deduction in respect of the Claim.

     (b)      Accrued but Unpaid Interest.

To the extent that a portion of the Applicable Consideration received by a recipient in the exchange is allocable to accrued but unpaid interest not previously included by the recipient in taxable income, such amount should be taxable to the recipient as interest income. Conversely, the holder of a Claim may be able to recognize a deductible loss (or, possibly, a write- off against a reserve for worthless debts) to the extent that any accrued interest on the Claim or Interest was previously included in the recipient's gross income but was not paid (or treated as paid) in full by the Debtors.

Although the manner in which Applicable Consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Applicable Consideration paid pursuant to the Plans shall be allocated, pursuant to the Plan, first to the principal amount of such Claim as determined for federal income tax purposes and then to

accrued interest, if any, with respect to such Claim. Accordingly, in any case where a recipient receives distributions under the Plans having a value less than the principal amount of its Claim, the Debtors will allocate the full amount of consideration transferred to such recipient to the principal amount of such obligation and will not treat any amount of the consideration to be received by such recipient as attributable to accrued interest. There is no assurance that such allocation will be respected by the IRS for federal income tax purposes.

(c)      Market Discount

A recipient that purchased its Allowed General Unsecured Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a recipient of an Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the Allowed Claim. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument (excluding "qualified stated interest") or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the Allowed Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity). In addition, for recipients whose Applicable Consideration is Reorganized TXCO Common Stock, under section 108(e)(7) of the Tax Code, any gain recognized on the subsequent Operational, exchange, redemption or other disposition of Reorganized TXCO Common Stock will be treated as ordinary income to the extent the recipient of the surrendered Claim previously claimed ordinary loss deductions with respect to the surrendered Claim.

(d)      Bad Debt and/or Worthless Security Deduction.

A recipient who, under the Plan, receives in respect of a Claim an amount less than the recipient's tax basis in the Claim may be entitled to a bad debt deduction in some amount under section 166(a) of the Tax Code or a worthless security deduction under section 165 of the Tax Code. The rules governing character, timing and amount of bad debt or worthless security deductions place considerable emphasis on the facts and circumstances of the recipient, the obligor and the instrument with respect to which a deduction is claimed. Holders of a Claim therefore are urged to consult their tax advisors with respect to their ability to take such a deduction.

(e)      Tax Characterization of the Creditor Trust.

The Creditor Trust (the "Trust") should be treated as a "grantor" trust with respect to the holders of Allowed Claims pursuant to sections 671 through 678 of the Tax Code. Assuming this treatment is correct, the Trust will not be treated as a separate taxable entity. Rather, the recipients of the beneficial interests in the Trust ("beneficiaries") should be treated as the substantial owners of the Trust's assets for U.S. federal income tax purposes. There can be no assurance that the IRS will not dispute such treatment.

Each beneficiary of the Trust will be required to report on its U.S. federal income tax return its allocable share of any income, loss, deduction or credit recognized or incurred by the Trust including, but not limited to, any interest or dividend income earned with respect to the assets of the Trust. Each beneficiary's obligation to report its share of any such income is not dependent on the Trust distributing any cash or other proceeds. Accordingly, a beneficiary may incur a tax liability as a result of owning a beneficial interest in the Trust regardless of whether the Trust makes a current distribution.

The Trust will file an annual information tax return with the IRS which will include information concerning the allocation of income, gain, loss, deductions or credit to the beneficiaries of the Trust. Each beneficiary of the Trust should receive a copy of such return and will be required to report on its own U.S. federal income tax return its allocable share of such items.

Within a reasonable period after receipt of cash distributions from Reorganized TXCO, the Trust will make cash distributions, after deducting any costs and expenses associated with the operation of the Trust, *pro* rata to beneficiaries of the Trust. In general, each beneficiary will recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of cash, if any, and the fair market value of any property it receives other than cash and (ii) the beneficiary's adjusted tax basis in its Claim amount. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors including the tax status of the beneficiary, whether the Claim constitutes a capital asset in their hands, whether the Claim (or the obligation constituting the Claim) was purchased at a discount and whether and to what extent the beneficiary has previously claimed a bad debt deduction with respect to its Claim.

**THE HOLDERS OF THE BENEFICIAL INTERESTS IN THE TRUST SHOULD CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX TREATMENT OF THE TRUST FOR U.S. FEDERAL INCOME TAX PURPOSES.**

Section 10.4.    Information Reporting and Withholding

U.S. federal backup withholding tax and information reporting requirements generally apply to certain payments to certain noncorporate holders of Reorganized TXCO Common Stock, New Notes or Allowed Claims. Information reporting generally will apply to payments under the Plan and to payments of dividends on, interest on, and proceeds from the Operational or redemption of Reorganized TXCO Common Stock or New Notes made within the United States to a holder of New TXCO Equity, a holder of New Notes or a holder of an Allowed Claim, other than an exempt recipient or a payee that is not a United States person that provides an appropriate certification or certain other persons. A payor will be required to withhold backup withholding tax from any payments made under the Plan, and payments of dividends on, interest on or the proceeds from the Operational or redemption of Reorganized TXCO Common Stock or New Notes within the United States to a holder, other than an exempt recipient, if such holder fails to furnish its correct taxpayer identification number or otherwise fails to comply with, or establish an exemption from, such backup withholding tax requirements.

2752695.1

In the case of such payments made within the United States to a foreign simple trust, a foreign grantor trust or a foreign partnership, other than payments to a foreign simple trust, a foreign grantor trust or a foreign partnership that qualifies as a "withholding foreign trust" or a "withholding foreign partnership" within the meaning of certain Treasury Regulations, and payments to a foreign simple trust, a foreign grantor trust or a foreign partnership that are effectively connected with the conduct of a trade or business in the United States, the beneficiaries of the foreign simple trust, the persons treated as the owners of the foreign grantor trust or the partners of the foreign partnership, as the case may be, will be required to provide the certification discussed above in order to establish an exemption from backup withholding tax and information reporting requirements. Moreover, a payor may rely on a certification provided by a payee that it is not a United States person only if such payor does not have actual knowledge or a reason to know that any information or certification stated in such certificate is incorrect.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION AND CONTAINS NO DISCUSSION AS TO STATE, LOCAL OR FOREIGN TAX ASPECTS. ALL HOLDERS OF CLAIMS OR INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

<div align="center">

**ARTICLE XI**
**SPECIFIC DISCLOSURES FOR TXCO DRILLING**

</div>

TXCO Drilling Corp filed its voluntary petition under Chapter 11 of the Bankruptcy Code on May 17, 2009 in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division. TXCO Drilling Corp case is bankruptcy case number 09-51809. The TXCO Drilling Corp case is one of the jointly administered cases with the style *In re: TXCO Resources Inc., et al.*, Jointly Administered Chapter 11 Bankruptcy Case No. 09-51807.

Section 11.1.   General Description of TXCO Drilling Corp

TXCO Drilling is a Texas Corporation. Prior to its bankruptcy filing, TXCO Drilling performed drilling operations for TXCO Resources and its affiliates as well as providing drilling services to unaffiliated third parties. TXCO Drilling was shut down shortly before the filing of the TXCO Bankruptcy Cases and its drilling crews laid off in April 2009. Currently, TXCO Drilling has no employees and is not conducting any operations.

Section 11.2.     Assets

As reflected in the Schedules and Statement of Financial Affairs filed by TXCO Drilling, TXCO's personal property assets are valued at $12,941,037.00. Of this amount, $5,034,319.00 consists of inter-company accounts receivable from TXCO Resources and its affiliates. TXCO Drilling has filed a secured proof of claim, based upon certain mineral lien affidavit filings,

against TXCO Resources in the total amount of $4,424,132.70 with the amount of $255,874 for work done on the Burr C #2-54H Well with a lien asserted against the Burr C (Theodosia Coppock) Lease and $674,333 for work done on the O'Meara Webb 687 #1 Well with the lien asserted against the Webb O'Meara Lease and the Webb Lease. The value of TXCO Drilling's collateral is undetermined at this point. TXCO Drilling also has office equipment, furnishings and supplies with a value listed in its schedules of $7,494.00. Additionally, TXCO Drilling has machinery, fixtures, equipment and supplies used in business with a value in TXCO Drilling's Schedules of $7,875,026.00. This primarily consists of three drilling rigs and related equipment owned by TXCO Drilling. TXCO Drilling's Schedules also reflect prepaid expenses in the amount of $22,198.00.

Section 11.3. Liabilities

(i) Secured Claims

As part of the Debtor in Possession financing approved by the Bankruptcy Court in the jointly administered TXCO Resources Bankruptcy Case, TXCO Drilling executed the DIP Loan and pledged its assets to secure the Bankruptcy Court approved DIP Loan from the DIP Lenders. The outstanding DIP Loan obligation is approximately $32 million. Additionally, Western National Bank has a secured claim in the amount of approximately $414,315.07 and had a prepetition security interest in TXCO's Drilling's rigs and related equipment. TXCO Drilling's also reflect a purported secured claim by Thomas Energy Services, LLC which filed a mineral lien affidavit asserting a lien on the Briscoe Saner 2-24 H Well in the amount of $58,610.92. However, this claim was listed as contingent, unliquidated and disputed by TXCO Drilling in its Schedules and TXCO Drilling does not believe that this claim is, in fact, a secured claim as TXCO Drilling owns no mineral interest to which a mineral lien claim could attach.

(ii) Unsecured Claims

Sonora's Construction filed an Administrative Priority Claim under 11 U.S.C. §503(b)(9) in the total amount of $4,210.00. From the invoices attached to the purported Administrative Expense Priority Claim, it appears that the obligation is that of TXCO Resources, not TXCO Drilling, and the invoices also reflect that the obligations are for the provision of services rather than goods such that even if this were a valid claim against TXCO Drilling, it would likely not be entitled to §503(b)(9) Administrative Expense Priority.

TXCO Drilling's Schedules reflect total Unsecured Claims in the amount of $682,180.00. Excluding claims of the IRS (which were originally filed in the amount of $35,874.16 and then amended to $0.00 and in the Sonora's Construction Claim) seven proof of claims were filed by the Bar Date totaling $727,062.62. From a review of the filed claims, it appears that certain of those claims are actually claims against TXCO Resources, not TXCO Drilling, and there are also certain other issues with the claims filed against TXCO Drilling. Consequently, TXCO Drilling anticipates filing several claims objections with respect to the filed claims. In particular, TXCO Drilling anticipates filing claims objections to the claims of National Oilwell Venco, Smith International and Thomas Energy Services.

Section 11.4.    Treatment of Claims Under TXCO Drilling's Chapter 11 Plan

Under the Chapter 11 Plan of Reorganization of TXCO Drilling Corp. (the "TXCO Drilling Plan"), the claims of creditors will be addressed as follows:

(i)    DIP Lender Claims (Class 6)

Pending confirmation of the TXCO Resources Plan and the TXCO Drilling Plan, the liens of the DIP Lenders on the assets of TXCO Drilling shall remain in place.  Post confirmation, it is anticipated that the DIP Loan will be paid in full or converted, in whole or in part, to equity or a post-confirmation loan and, to the extent that any of the DIP Loans are converted to post-confirmation loans of Reorganized TXCO, TXCO Drilling shall continue to be an obligor on such debt and those post confirmation obligations shall be secured by the assets of TXCO Drilling.  It is anticipated that such post-confirmation obligations will be addressed in TXCO Resources Plan and will be paid by TXCO Resources pursuant thereto.

(ii)    Administrative Claims

The only anticipated Administrative Claims in TXCO's Drilling's Chapter 11 Bankruptcy Case are administrative claims for professional fees as any ordinary course of business administrative claims should have been paid during the penancy of the Chapter 11 Bankruptcy Case (although any such ordinary course administrative claims should have been nominal as TXCO Drilling is not currently operating).   With respect to administrative claims of professionals, such claims will be paid as soon as reasonably practicable after such administrative claims become allowed administrative claims and pursuant to any Orders of the Bankruptcy Court regarding such claims.  It is anticipated that the professional fee claims will be paid by TXCO Resources through the TXCO Resources Plan and pursuant to orders of the Bankruptcy Court.  Administrative Claims are not classified under the TXCO Drilling Plan in accordance with Section 1123(a)(1) of the Bankruptcy Code.

(iii)    Priority Tax Claims

Under the TXCO Drilling Plan, each holder of an allowed priority Tax Claim will receive, in full satisfaction, settlement, release and discharge of and in exchange for such allowed priority tax claim, as will have been determined by TXCO Drilling or reorganized TXCO Drilling, as applicable, either (i) on, or as soon as reasonably practicably after, the latter of the Effective Date or the date on which such Claim becomes an Allowed Claim, cash equal to the due and unpaid portion of such Allowed Priority Tax Claim, (ii) treatment in a manner consistent with Section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such different treatment as to which such holder and TXCO Drilling or reorganized TXCO Drilling, as applicable will have agreed upon in writing.  To the extent that TXCO Drilling elects under Section 1129(a)(9)(C) of the Bankruptcy Code to make regular installment payments in Cash over a period of five years from the Petition Date, the holder of the Allowed Priority Tax Claim will receive Post-Effective Date interest of six percent (6%) per annum with the first installment to be paid 30 days after the Effective Date.  As of the Confirmation Hearing, TXCO Drilling estimates that there will be no Priority Tax Claims. Priority Tax Claims are not classified under TXCO Drilling's Plan in accordance with Section 1123(a)(1) of the Bankruptcy Code.

2752695.1

(iv)   Treatment of Class 1 Allowed Secured Tax Claims

Under the Plan, each holder of an Allowed Secured Tax Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Secured Tax Claim, as will have been determined by TXCO Drilling or by the Reorganized TXCO Drilling, as applicable, either (i) on, or as soon as reasonably practicable after, the later of the Effective Date, the date on which such Claim becomes an Allowed Claim, or would be payable without penalty, Cash equal to the due and unpaid portion of such Allowed Secured Tax Claim, (ii) treatment in a manner consistent with Section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such different treatment as to which such holder and TXCO Drilling or the Reorganized TXCO Drilling, as applicable, will have agreed upon in writing.   To the extent that TXCO Drilling elects under Section 1129(a)(9)(C) of the Bankruptcy Code to make regular installment payments in Cash over a period of five years from the Petition Date, the holder of an Allowed Secured Tax Claim will receive Post-Effective Date interest of twelve percent (12%) per annum with the first installment to be made thirty days after the Effective Date.   Each holder of an Allowed Secured Tax Claim shall retain the liens securing such Claim.   As of the Confirmation Hearing, the TXCO Drilling estimates that the amount of Class 1 Allowed Secured Tax Claims will be $25,000 although such taxes are Tax Year 2009 taxes not due and payable to January 31, 2010.

(v)   Treatment of Class 2 Allowed Priority Non-Tax Claims

Certain Non-Tax Claims are entitled to priority under Bankruptcy Code Section 507(a)(4) (Claims for wages, salaries, or commissions) and Section 507(a)(5) (Claims for contributions to employee pension plans).

Under the Plan, each holder of an Allowed Priority Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Claim, as will have been determined by the TXCO Drilling or by the Reorganized TXCO Drilling, as applicable, either (i) on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, Cash equal to the due and unpaid portion of such Allowed Priority Claim or (ii) such different treatment as to which such holder and the TXCO Drilling or the Reorganized TXCO Drilling, as applicable, will have agreed upon in writing. As of the Confirmation Hearing, the TXCO Drilling estimates that there will be no Class 2 Allowed Priority Claims.   Class 2 is not impaired under the Plan.

(vi)   Treatment of Class 3 Allowed Secured Claim of Western National Bank

The secured claim of Western National Bank, which claim is secured by the pre-petition lien of Western National Bank on TXCO Drilling's Rigs and related equipment is classified as Class 3 under the TXCO Drilling Plan.   Under the TXCO Drilling Plan, the Allowed Secured Claim of Western National Bank shall be treated, at the election of TXCO Drilling either by (1) reinstatement of the existing Western National Bank debt to its pre-default state pursuant to Section 1124(2) of the Bankruptcy Code, (2) issuance of a note by TXCO Drilling to Western National Bank in an amount equal to the amount of its Allowed Secured Claim with a five year maturity with interest only payments to be due monthly on the last business day of the month (commencing on the last business day of the month following the Effective Date) at the Prime

Rate set out in the Wall Street Journal as of the Effective Date, or such other rate as detyermined by the bankruptcy court at the Confirmation Hearing, or (3) such other treatment of Western National Bank's Allowed Secured Claim as agreed to in writing between TXCO Drilling and Western National Bank with the terms of such agreed treatment to be set out in a Plan Supplement to be filed by TXCO Drilling at least ten (10) days prior to the Confirmation Hearing. TXCO Drilling and Western National Bank agreed during the pendency of TXCO Drilling's Bankruptcy Case that TXCO Drilling would, as adequate protection, pay the outstanding interest accrued on the Western National Bank obligation at the non-default rate of interest and Western National Bank agreed to waive any right to assert default interest in connection with its claim.

(vii)  Treatment of Class 4 Allowed General Unsecured Claims

Under the TXCO Drilling Plan, holders of Allowed General Unsecured Claims in Class 4 shall have their claims paid in full, without interest, over a five year period. Each holder of an Allowed Class 4 General Unsecured Claim shall receive twenty percent (20%) of its claim on the first anniversary date of the Effective Date and twenty percent thereafter on each succeeding anniversary date of the Effective Date until such Claims are paid in full. TXCO Drilling may prepay, in whole or in part, any of such distributions. TXCO Drilling believes that Allowed General Unsecured Claim should ultimately total approximately $500,000.00.

(viii) Treatment of Class 5 Interests

Class 5 is comprised of all equity Interests in TXCO Drilling. All of the equity Interests in TXCO Drilling are held by TXCO Resources. TXCO Resources shall retain its Interests in TXCO Drilling upon confirmation of the TXCO Drilling Plan.

Section 11.5.       Means for Implementation of TXCO Drilling's Plan

TXCO Drilling anticipates that it will be able to implement its Plan and make the Distributions required thereby through either (1) payment by TXCO Resources of the DIP Loan (and any conversion of such DIP Loan to a post-confirmation loan) and payment of professional fees, (2) payment by TXCO Resources to TXCO Drilling under its Confirmed Plan on account of TXCO Drilling's Secured and/or Unsecured Claims against TXCO Resources in amounts sufficient to fund TXCO Drilling's Plan obligations, (3) Operational of certain of TXCO Drilling's assets in an amount sufficient to pay all Allowed Claims, and/or (4) resumption of business operations and payment of Allowed Claims out of cash flow generated by such reinstituted operations. TXCO Drilling believes that TXCO Resources will have the financial wherewithal to satisfy the DIP Loan or Exit Revolver Facility obligations and the professional fee obligations post-confirmation as well as make distributions to TXCO Drilling in an amount sufficient to allow TXCO Drilling to satisfy its Allowed Secured Claims and/or Allowed Unsecured Claims pursuant to the terms of its Plan. Under the proposed TXCO Resources' Plan, TXCO Drilling's Secured Claim against the Burr "C" Lease (which is a Mortgaged Property) should be treated as a Class 8 General Unsecured Claim and will be entitled to a beneficial interest in the Creditor Trust. TXCO Drilling's Secured Claim against the O'Meara Webb and Webb Leases (which are Unmortgaged Properties) should be entitled to be paid 100% of its $672,333 Secured Claim making $672,333 available for TXCO Drilling's creditors. Moreover,

the value of TXCO Drilling's assets should exceed by a wide margin the Allowed Secured Claims and Allowed Unsecured Claims asserted against TXCO Drilling without consideration of distributions from TXCO Resources. The Debtors anticipate that Reorganized TXCO will pay the claims of TXCO Drilling in full on the Effective Date, or as soon as reasonably possible thereafter, and all right, title and interest in TXCO Drilling's Assets will be transferred to Reorganized TXCO.

Section 11.6.  Executory Contracts or Unexpired Leases

TXCO Drilling is not a party to any Executory Contracts or Unexpired Leases of property and, therefore, its Plan does not provide for the assumption or rejection of any such Executory Contracts or Unexpired Leases. However, to the extent any such Executory Contracts or Unexpired Leases are identified and TXCO desires to assume same, a Plan Supplement will be filed prior to the Confirmation Hearing and will list the "cure" obligations related to such agreement. Any party to an executory contract or unexpired lease that disagrees with TXCO Drilling's proposed cure amount must file an objection to the cure amount no later than 10 days after the schedule disclosing such amount is filed. If there is a dispute regarding (a) the nature or amount of Cure, (b) the ability of TXCO Drilling to provide "adequate assurance of performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, the matter shall be set for hearing before the Bankruptcy Court on the next available hearing date, or such other date as may be agreed upon, and Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving assumption, as applicable; provided, however, that if there is a dispute as to the amount of Cure that cannot be resolved consensually among the parties, TXCO Drilling shall have the right to reject the contract or lease for a period of five (5) days after entry of a Final Order establishing a Cure amount in excess of 25% of that provided by TXCO Drilling. If the Cure amount is not disputed, Reorganized TXCO Drilling shall pay the claim, if any, to the claimant within twenty (20) days of the Effective Date. Disputed cure amounts that are resolved by agreement or Final Order shall be paid by Reorganized TXCO Drilling within twenty (20) days of such agreement or Final Order.

Section 11.7.  Preferences and Other Litigation Claims

TXCO Drilling does not anticipate pursuing any Preference Litigation or other Avoidance Actions under the Bankruptcy Code as TXCO Drilling is solvent on a balance sheet basis and its Plan provides for a 100% distribution to holders of Allowed Claims. Pre-petition, TXCO Drilling was a party to certain litigation with Jake's Equipment and Repair, LLC and ADA Energy Equipment, LLC, ADA Energy Services, LLC, and ADA Energy Drilling, LLC. That litigation is currently pending as Cause No. 2008-21477, in the 234th Judicial District Court of Harris County, Texas. The action is presently stayed as a result of TXCO Drilling's Chapter 11 Bankruptcy filing. TXCO Drilling has asserted an indemnification claim against the ADA Energy entities and has counter-claims against Jake's Equipment and Repair, LLC, the plaintiff in that state court litigation. That action is currently stayed and TXCO Drilling is currently evaluating whether it wishes to continue to pursue claims in such state court litigation. Any recovery in such litigation would be used to satisfy the claims of creditors.

**ARTICLE XII**

## CONCLUSION AND RECOMMENDATION

The Debtors believe that the Plans are in the best interests of all holders of Claims, and urge those holders of Claims entitled to vote to accept the Plans and to evidence such acceptance by returning their color-coded Ballots so they will be RECEIVED by the Solicitation Agent no later than _____ at 5:00 p.m. prevailing Eastern Time.  If the Plans are not confirmed, or if holders in those Classes do not vote to accept the Plans, the holders in those Classes may not receive a distribution.

*[Signature Page Immediately Follows]*

2752695.1

Dated: November 12, 2009

Respectfully submitted,

TXCO Resources Inc.
TXCO Energy Corp.
Texas Tar Sands, Inc.
OPEX Energy, LLC
Charro Energy, Inc.
TXCO Drilling Corp.
Eagle Pass Well Service, L.L.C.
PPL Operating, Inc.
Maverick Gas Marketing, Ltd.
Maverick Dimmit Pipeline, Ltd.

By:    _/s/  James E. Sigmon_____
          James E. Sigmon
          Chief Executive Officer
          TXCO Resources Inc.


Deborah D. Williamson
Texas State Bar No. 21617500
Patrick L. Huffstickler
State Bar No. 10199250
Thomas Rice
State Bar No. 24025613
Meghan E. Bishop
State Bar No. 24055176

**COX SMITH MATTHEWS INCORPORATED**
112 E. Pecan Street, Suite 1800
San Antonio, Texas  78205
(210) 554-5500
(210) 226-8395 (Fax)
dwilliamson@coxsmith.com
phuffstickler@coxsmith.com
trice@coxsmith.com
mbishop@coxsmith.com

**ATTORNEYS FOR THE DEBTORS
AND THE DEBTORS-IN-POSSESSION**